1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SANJIV N. SINGH, A PROFESSIONAL LAW CORPORATION
Sanjiv N. Singh, Esq. (SBN 193525)
1700 S. El Camino Real Suite 503
San Mateo, CA 94402
Phone: (650) 389-2255
Email: ssingh@sanjivnsingh.com

INDRAJANA LAW GROUP, A PROFESSIONAL LAW CORPORATION
Michael B. Indrajana, Esq. (SBN 258329)
1700 S. El Camino Real Suite 503
San Mateo, CA 94402
Phone: (650) 597-0928
Email: michael@indrajana.com

Attorneys for Plaintiff MICHAEL BISCH

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BISCH, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF YOLO, CALIFORNIA, a public corporation; CITY OF WEST SACRAMENTO, a public corporation; CITY OF DAVIS, a public corporation; CITY OF WOODLAND, a public corporation; ANGEL BARAJAS, an individual; OSCAR VILLEGAS, an individual; CHAD RINDE, an individual; AARON LAUREL, an individual; KEN HIATT, an individual; MICHAEL WEBB, an individual; DONALD SAYLOR, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.**:** 2:23-cv-00455-MCE-DB<br><br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT YOLO COUNTY ET AL'S MOTION TO STRIKE**<br><br><br>Judge: Hon. Morrison C. England<br>Hearing Date:   TBD<br>Time:             TBD<br>Dept. No.:        7 |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    FACTUAL BACKGROUND........................................................................................ 1

    A.    Plaintiff Bisch, as a Private Citizen, Was the Executive Director of Yolo Food Bank........................ 1

    B.    Defendants' Factual Narrative is in Large Part Irrelevant for the Court's Analysis as It Does Not Concern the Actual Speech or Conduct in Question.................................................................. 2

    C.    Defendants' Statements Regarding Mercy Coalition and Bosley and Supposed Unethical Practices Were Defamatory and Not Made in the Course of Public Discourse............................................. 2

    D.    The Retaliatory and Defamatory Campaign against Defendant Bisch Ultimately Culminated in a March 18, 2022 Letter from Supervisors Barajas and Villegas to the YFB Board ........................................ 5

III.    LAW AND ARGUMENT............................................................................................ 6

    A.    Summary of Relevant Anti SLAPP Case Law.............................................................. 6

        1.    The General Two Step Analysis for Anti SLAPP Motions.......................................... 6

        2.    The First Prong: "Arising From" Analysis of Government Activity ................................ 6

        3.    The Second Prong: Probability of Prevailing........................................................ 7

    B.    Application of Anti SLAPP Case Law for First Prong Analysis: Defendants Do Not Meet Their Burden to Establish That Conduct in Question is Protected Speech .............................................. 8

        1.    Section 425.6(e)(2) Does Not Provide Protection for the Speech or Conduct in Question.................. 8

            a.    As Pleaded ......................................................................................... 8

            b.    As Evidenced ...................................................................................... 9

        2.    Section 425.6(e)(4) Does Not Provide Protection for the Speech or Conduct in Question............... 11

            a.    As Pleaded ......................................................................................... 11

            b.    As Evidenced ...................................................................................... 12

        3.    Private Statements Making Threats Are Not Protected If They Do Not Otherwise Fit into the Statutory Categories of Protected Speech Set Forth in Section 425.6 ........................................ 13

    C.    Application of Anti SLAPP Case Law for Second Prong Analysis: Plaintiff Bisch Can Show That He Has a Probability of Prevailing on His Tortious Interference and Defamation Claims ............................... 14

1.   Plaintiff Bisch Can Demonstrate a Probability of Prevailing on His Tortious Interference Claims Against All Defendants.................................................................................................. 14

    a.   Plaintiff Bisch Has Evidence to Establish All Required Elements of Tortious Interference Against Each Defendant................................................................................ 14

    b.   Plaintiff Bisch's Contract Was Not at Will and Even If It Was, Defendants Engaged in Independent Wrongful Acts Which Violated Plaintiff Bisch's Constitutional Rights ........................ 15

    c.   Defendants Fail to Articulate a Privilege Which Would Attach to the Bad Faith Threats to Withhold ARPA Funding If YFB Did Not Discipline or Terminate Plaintiff Bisch ........................... 16

2.   Plaintiff Bisch Can Demonstrate a Probability of Prevailing on His Defamation Claims ................ 17

    a.   Plaintiff Bisch Has Evidence to Establish All Required Elements of Defamation against Each Defendant, And That the Statements in Question about Extortion Were Indeed Defamatory.............. 17

    b.   The Statements about Improper Threats and Extortion Were Not True Because YFB Had a Partnership with Mercy Coalition and Had a Reasonable Basis to Have Shifted Site Assignments and Had Not Cut Off Mercy Coalitions' Access to Food ......................................................... 18

    c.   The Reference to Possible Threats were Coupled with Statements to Third Parties That Michael Bisch Was Unethical and Engaged in Outrageous Conduct ............................................... 18

    d.   The Use of The Word Extortion Was Not Hyperbole Because It Was Accompanied by Communications Asserting Michael Bisch Engaged in Unethical Conduct or Outrageous Conduct ... 19

    e.   Defendants Fail to Show That Michael Bisch Is a Limited Purpose Public Figure ................... 19

    f.   Even If Bisch Was a Limited Purpose Public Figure, Plaintiff Can Show Actual Malice. ........ 20

IV.   CONCLUSION.................................................................................................................... 20

## **TABLE OF AUTHORITIES**

### **U.S. SUPREME COURT CASES**

*Greenbelt Coop. Pbl'g Ass'n, Inc. v. Bresler,*

  398 U.S. 6 (1970) ...................................................................................................... 19

### **U.S. COURT OF APPEALS CASES**

*Hogan v. Winder,*

  762 F.3d 1096 (10th Cir. 2014) .............................................................................. 19

### **U.S. DISTRICT COURT CASES**

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.,*

  230 F. Supp. 3d 290 (S.D.N.Y. 2017) ..................................................................... 19

### **CALIFORNIA SUPREME COURT CASES**

*Baral v. Schnitt,*

  1 Cal.5th 376 (2016) .................................................................................................. 8

*City of Montebello v. Vasquez*

  1 Cal.5th 409 (2016) .................................................................................................. 8

*Ixchel Pharma, LLC v. Biogen*, Inc.,

  9 Cal. 5th 1130 (2020) ............................................................................................ 15

*Park v. Bd. of Trustees of California State Univ.,*

  2 Cal. 5th 1057 (2017) ......................................................................................... 7, 8

### **CALIFORNIA COURT OF APPEALS CASES**

*Ampex Corp. v. Cargle,*

  128 Cal. App. 4th 1569 (2005) ................................................................................. 7

*Annette F. v. Sharon S.,*

  19 Cal.App. 4th 1146 (2004) ................................................................................ 6, 7

*Averill v. Superior Court*,

    42 Cal. App. 4th 1170 (1996) ................................................................................. 13

*City of Costa Mesa v. D'Alessio Investments*, LLC,

    Cal.App.4th 358 (2013) ......................................................................................... 13

Copp v. Paxton,

    45 Cal.App.4th 829 (1996)..................................................................................... 19

*Innovative Business Partnerships, Inc.*

    194 Cal.App.4th 623 (2011) ................................................................................... 17

*Navellier v. Sletten*,

    29 Cal. 4th 82 (2002) ............................................................................................. 6

*San Ramon Valley Fire Prot. Dist. v. Contra Costa Cnty. Employees' Ret. Assn.*,

    125 Cal. App. 4th 343 (2004) .................................................................................. 7

*Shahbazian v. City of Rancho Palos Verdes*,

    17 Cal. App. 5th 823 (2017) .................................................................................... 7

*Wong v. Jing*,

    189 Cal.App.4th 1354 (2010) ................................................................................. 17

## I.  INTRODUCTION

Anti SLAPP law should protect private citizens like Plaintiff Michael Bisch when they exercise their rights of public participation in litigation. Here, however, his good faith litigation as a private citizen, as a successful nonprofit leader who was wrongfully terminated, has taken an odd and paradoxical U-turn. Government entities, namely Yolo County and its co-defendants (none of the cities actually submitted a declaration of any kind to support the moving papers), have filed a motion to strike which is an obvious attempt to lift the conduct of Yolo County and the other Defendants outside the scope of judicial review by improperly framing the conduct as free speech. But Defendants in this case have taken it a step further, attacking Bisch in the second sentence of the Motion: ***"Plaintiff Bisch, Executive Director of the Yolo Food Bank (YFB), placed in jeopardy the Edible Food Recovery Program that Yolo County…worked collaboratively to develop and fund."*** Motion at 1:3-7. This scandalous slight, blaming a **single private citizen** who championed food recovery for jeopardizing an entire governmental program, was not essential and ironically reveals further Defendants' malice towards him.

Against this backdrop, pursuant to the traditional first prong of anti SLAPP analysis, Plaintiff Bisch will show that the conduct and speech in question are not protected under California Code of Civil Procedure Section 425.6(e). To the extent they are protected, following the traditional second step of anti SLAPP analysis, Plaintiff Bisch has submitted a plethora of admissible evidence to establish a probability of prevailing on his tortious interference and defamation claims against Defendants.

## II.  FACTUAL BACKGROUND

Defendants' summary of facts is erroneous on multiple fronts. The following is a correct narrative as plead and as evidenced:

### A.  Plaintiff Bisch, as a Private Citizen, Was the Executive Director of Yolo Food Bank

As plead and as evidenced, Plaintiff Bisch was the Executive Director of Yolo Food Bank. Dkt. No. 1 (the "Complaint") at ¶ 1. While he was recognized within the food bank industry on issues related to the operation of food banks including SB1383, he was not a public figure of any kind in connection with the specific speech and conduct over which the food bank is now claiming it requires SLAPP protection—specifically, there was no public controversy at all about YFB's relationship with the Mercy Coalition or any planned reduction in Thanksgiving turkey allocation. Declaration of Michael Bisch ("Bisch Decl.") at ¶ 26(f)-(k); Declaration of Zane Hatfield ("Hatfield Decl.") at ¶¶ 20-22. Contrary to the narrative of Plaintiff Bisch being a negative force in the food bank sector, he had unprecedented success leading YFB out of a troubled

period and transforming the nonprofit into one of the premier nonprofits in the region. Bisch Decl. at ¶¶ 7-9; Hatfield Decl. at ¶¶ 24-25.

**B. Defendants' Factual Narrative is in Large Part Irrelevant for the Court's Analysis as It Does Not Concern the Actual Speech or Conduct in Question**

In the Motion to Strike, the Defendants attempt to persuade the court that the speech in question was about SB 1383. Dkt. No. 9-1 (the "Motion") at 3:10-4:7. The entire portion of the Motion cited is irrelevant to the analysis because as set forth below, none of these publicly debated issues included the private dispute between Mercy Coalition and YFB, or the threat to withhold ARPA funding. *See infra* at Section II(C)-(D).

**C. Defendants' Statements Regarding Mercy Coalition and Bosley and Supposed Unethical Practices Were Defamatory and Not Made in the Course of Public Discourse**

The Motion implies that the issues with Don Bosley, Mercy Coalition, and the Thanksgiving food drive were related to public discourse or were part of the public discourse. Motion at 4:8-6:10. ***They were not and instead were pretexts***. The following key facts are omitted from the Motion  and its supporting declarations: (i) YFB's relationship with Mercy Coalition was a private partnership between two nonprofits, and not the subject of any public discourse; Bisch Decl. at ¶¶ 19-23; Bosley Deposition at 73:15-21; Hatfield Decl. at ¶ 15; (ii) No government entity had a right to interfere with the partnership dialogue or debate that was taking place between YFB and Mercy Coalition; Bisch Decl. at ¶ 20; Dkt. No. 9-5 (the "Rinde Decl.") at Exhibit G; Bosley Deposition at 80:13-19, 146:6-10, 154:16-20; and (iii) The correspondence from Don Bosley in March of 2022 was about a partnership dispute between YFB and Mercy Coalition, and was not the subject of any public discourse on SB 1383, the bulk of which took place in 2021. Bisch Decl. at ¶ 20, Bisch Exhibit 12; Rinde Decl. at Exhibit G. At no point in time had there ever been any public discourse anywhere about private partnership relations between YFB and the Mercy Coalition. Bisch Decl. at ¶ 20; Bosley Deposition at 73:15-21; Hatfield Decl. at ¶ 18. Even Mr. Bosley's declaration corroborates the private nature of the partnership negotiations because he attaches an email where he expressly asks, "Please don't send out this letter with reference to us. My Board and I need to get a little more clarity..." Dkt. No. 9-4 ("Bosley Decl.") at Exhibit F.

Though the Defendants should have been aware of this, they chose to immediately leverage the situation to their advantage by propagating a narrative between government representatives of the various Defendants of "unethical practices" by YFB. On March 4, 2022, literally within **ten minutes** of receiving Don Bosley's email, without any investigation, the City of West Sacramento's Traci Goularte sent out an email to Marissa Juhler at Yolo County proclaiming **"The outright unethical business practices of YCFB [YFB lead by Michael Bisch] is shocking."** Dkt. No. 9-3 (the "Juhler Decl.") at Exhibit C. Despite Mr. Bosley expressly

asking his email not be forwarded, she asks, "Should I send this email to CalRecycle?" *Id.* CPRA Responses from City of Woodland now reveal that the narrative was then shockingly propagated extensively between City and County Officials with the apparent purpose of leveraging termination of Bisch and using the threat of withholding funding to do so. Declaration of Sanjiv Singh in support of Plaintiff's Opposition to Motion to Strike (the "Singh Decl.") at ¶ 5, Singh Exhibit 4.

Thereafter, from their immediate conclusion within ten minutes that YFB, led by Michael Bisch, had engaged in unethical practices, Defendants launched a defamatory campaign that was not part of any public discourse and was not in furtherance of any pending legislation. Evidence that there was defamatory and/or retaliatory conduct to which any speech was simply incidental is as follows:

a.    That same afternoon on March 4, 2022, Bosley was contacted by Supervisor Villegas who happens to be a longtime friend of Bosley. Bosley Deposition at 146:11-21; 149:10-12. According to Bosley's recollection as recounted to his own board, on that day, Villegas, even without investigating Bosley's claims, "affirmed that Michael has essentially gone off the rails, completely driven by 'greed' and 'a power grab'" Singh Decl. at Exhibit 2 (the "Bosley Deposition Exhibit 10") at BOSLEY00021. Bosley also testified that on the same day, before any investigation was conducted, Villegas shared with him that "The County Board of Supervisors are all livid with Michael Bisch." Bosley Deposition at 191:9-13; 177:12-178:11. Bosley concluded, based on his conversations with Villegas, that the County viewed Bisch negatively because of their prior "battles around SB 1383." Villegas, in contrast, states in his own declaration that the conversation with Bosley focused on Bosley's general concerns about feeding the community and "not the broader political dialogue of how SB 1383 was implemented" and does not admit or acknowledge any of the animosity or negative statements he made about Bisch to Bosley. Dkt. No. 9-6 (the "Villegas Decl.") at ¶ 4. He does not admit anywhere in the declaration the 25 year friendship with Bosley. *Id.*

b.    When Michael Bisch inquired about the status of ARPA funding (funding which YFB would have received in normal course given its track record), on March 11, 2022, West Sacramento City Manager Aaron Laurel wrote in response, "Yes, I would like an explanation for why YFB has attempted to extort one of our local service providers." Bisch Decl. at ¶ 24(c), Bisch Exhibit 14. Mr. Laurel did not seem to understand the private partnership relationship between Mercy Coalition and YFB. West Sacramento City Manager Aaron Laurel, also a friend of Bosley, reached out to Don Bosley, but never reached out to talk with Bisch or Hatfield for their version of events except with the conclusory accusation about extortion quoted above. Bosley Deposition at 152:20 – 156:24; Bisch Decl. at ¶ 23; Hatfield Decl. at ¶ 19.

c.    Further evidence that Defendants were disseminating a private narrative that Plaintiff Bisch and YFB had acted unethically and improperly includes but is not limited to the following: (i) The recently **acquired CPRA Response of Woodland** reveals that multiple City and County officials were circulating a narrative about Bisch being unethical, and participating in a plan to use the pressure of withheld funding to YFB to pressure action against Bisch. Singh Decl. at ¶ 5, Singh Exhibit 4; (ii) On March 8, 2022, the CEO of Food Bank of Contra Costa and Solano, Joel Sjostrom, called Plaintiff Bisch demanding to know why he was "cutting off" nonprofit partners from food supplies. Bisch told Sjostrom he was not cutting off anyone. Sjostrom equivocated when Plaintiff Bisch questioned him about his information source. Bisch Decl. at ¶ 24(d); (iii) On or about March 14, 2022, City of West Sacramento Manager Laurel attempted to leverage his personal friendship with YFB Director Daniel Ramos, contacting Mr. Ramos and informing Ramos that Plaintiff Bisch had engaged in improper threats. Bisch Decl. at ¶ 26(a). Unfortunately, acting almost immediately on the communication, Mr. Ramos did not bother to investigate the allegations and immediately contacted Plaintiff Bisch and blasted him for the conduct. In this phone call with Ramos, Ramos described to Bisch the meeting which apparently had occurred between City Manager Laurel and other city managers, and confirmed that they had all agreed to contact their respective Supervisors to attempt to put pressure on YFB and Plaintiff Bisch. *Id*. As disclosed in the deposition of Bosley, Laurel and Bosley had a long standing friendship since 2014. Bosley Deposition at 156:9-24; (iv) The agreement to privately call County Supervisors worked, and shortly thereafter Supervisors from Yolo County responded and began to place private targeted pressure on selected members of the YFB Board appearing to focus on YFB Directors who had personal financial interests impacted by Yolo County oversight—specifically, Tom Muller, whose business benefitted from regular agricultural subsidies, real estate developer Daniel Ramos, whose massive development projects required county and city approvals, and James Durst, whose business, like Mullers, depended on agricultural subsidies. These connections are a matter of public record and are well known in the community. Bisch Decl. at ¶ 25(a)-(c); (v) For example, by mid-March of 2022, Mr. Ramos, who had first been contacted by City of West Sacramento Manager Mr. Laurel, was then contacted by Supervisor Oscar Villegas. Bisch Decl. at ¶¶ 26(a), 26(i); Villegas Decl. at ¶ 6. This contact was private and targeted and not part of private discourse, and made specifically to an individual real estate developer (Ramos) known to have significant financial interests implicated by County decisions. Public records reveal that Ramco and Ramos projects were known to Villegas and indeed voted upon by Villegas and other Yolo County Supervisors including Barajas *during the very same time period that the campaign against Bisch was unfolding*. Bisch Decl. at ¶ 25(b)(x) at Bisch Exhibit 20; (vi)

On the afternoon of March 15, 2022, YFB Board Chairperson Tom Muller called Plaintiff Bisch to warn him that YFB would be receiving a "nasty" letter from Yolo County's Board of Supervisors. Muller indicated he was informed about this by Yolo County's Interim Director of Health and Human Services Agency Nolan Sullivan, and was informed that the Supervisors had met in closed session to discuss how to pressure YFB to silence or remove Plaintiff Bisch. Bisch Decl. at ¶ 26(b). After learning of these events from Muller, Plaintiff Bisch was concerned about a potential Brown Act violation, and checked the county website where he saw a closed session labelled, "Conference with Legal Counsel—Anticipated Litigation." *Id.;* and (vii) Then, on March 17, 2022, the day before the County served the March 18, 2022 letter, Mr. Muller, whose extensive agricultural operations depended on subsidies from the County, was contacted by Supervisor Don Saylor and was expressly told to terminate Plaintiff Bisch. *Id.* at ¶24(i).

### D.  The Retaliatory and Defamatory Campaign against Defendant Bisch Ultimately Culminated in a March 18, 2022 Letter from Supervisors Barajas and Villegas to the YFB Board

After multiple targeted phone calls by Supervisors and Defendants city officials to the YFB Board about Michael Bisch and YFB's negotiations with Mercy Coalition, Defendants Yolo County and the Cities named in the Complaint issued the "nasty" letter on March 18, 2022. The letter was not a communication in the course of public dialogue, but was a targeted letter co-authored by a County Supervisor with known extreme hostility to Bisch (as Villegas told his friend Bosley—*see* Bosley Deposition Exhibit 10 at [Bosley000221]), preceded and followed by phone calls to YFB Directors explicitly targeting Michael Bisch (Bisch Decl. at ¶¶ 26(a)-(b), 24(i)-(j), Bisch Exhibit 16), making implicit threats to pressure action against Plaintiff Bisch to terminate him. It was sent privately to the Yolo Board, and the sending of the letter was preceded by and followed by Supervisors calling the members of the YFB Board who had direct financial interests impacted by the County—those members were Tom Muller, James Durst, and Daniel Ramos. Complaint at ¶ 34(f) and ¶34(i); Bisch Decl. at ¶ 24(i), ¶ 26(a), and ¶ 25(a)-(c); Singh Decl. at ¶ 5, Singh Exhibit 4; *see also* Bisch Decl. at ¶ 24(l), Exhibit 16. As a result of the letter and the pressure placed on the YFB Board members by Supervisors, two YFB Board members, Dan Ramos and Tom Muller, who had both been pressured by Supervisors about Bisch, suggested a "pretend leave" for Plaintiff Bisch to appease the irate government officials. Bisch Decl. at ¶ 26(c).

But the campaign against YFB executives using private back channels to the interested party directors Muller, Durst and Ramos continued. In an April 27, 2022 meeting, Chairman Muller expressly acknowledged that the Supervisors were seeking retribution, consistent with the threats made in the March 18, 2022 letter.

Bisch Decl. at ¶ 26(f)-(k); Hatfield Decl. at ¶ 23. (The **expletive-ridden** contents of this meeting is highly probative on the actual retaliatory conduct of the Supervisors but at the last minute on the day counsel were filing this opposition, counsel for YFB claimed that the Zoom video of the meeting could not be submitted even in a motion to seal to this Court, even though the Zoom video was in independent possession of Michael Bisch, and claimed incorrectly that the video was illegally recorded when it was not—it was recorded with consent of the Board.  Plaintiff Bisch will have to address the issue with the presiding state court where YFB counsel has attempted to designate the video as Confidential.) *See* Singh Decl. at ¶4. In the meeting, Chairman Muller concludes they may have to terminate Bisch and Hatfield. Bisch Declaration at ¶¶ 26(g)-(k).

Using the threat of ARPA funding, and with repeated phone calls by Supervisors to the members of the YFB Board with financial interests implicated, on May 31, 2022, Plaintiff Bisch was terminated by the YFB Board by a text message. Bisch Decl. at ¶ 26(r). The April 27, 2022 meeting and a May 20, 2022 attempted termination prompted immediately two letters of no confidence to the YFB Board from the executive team and other employees at YFB who had respected the leadership of Plaintiff Bisch. Bisch Decl. at ¶ 26(m), Bisch Exhibit 22; ¶26(o) Bisch Exhibit 23.

### III. LAW AND ARGUMENT

Applying the relevant anti SLAPP standards in view of the pleadings and facts in this matter, this Court should deny the motions in their entirety.

#### A. Summary of Relevant Anti SLAPP Case Law

##### 1. The General Two Step Analysis for Anti SLAPP Motions

The well recognized framework two prong framework for anti SLAPP analysis is that the Court must first determine whether defendants have established that plaintiff's cause of action is one "arising from protected activity" within the meaning of the statute. *Annette F. v. Sharon S.*, 19 Cal.App.4th 1146, 1159 (2004). Only if Defendants have met that burden, then the Court must look at whether the plaintiff has demonstrated a probability of prevailing on the claim or so called minimal merits. *Id*; see also *Navellier v. Sletten*, 29 Cal. 4th 82, 89, 52 P.3d 703, 708 (2002). Only if the plaintiff does not have a probability of prevailing or show minimal merit should the court strike the offending cause of action. *Id*.

##### 2. The First Prong: "Arising From" Analysis of Government Activity

In this matter, the moving party attempts to characterize the conduct and related speech in question under California Code of Civil Procedure Section 425.16(e)(2) and 425.16(e)(4): speech in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding

authorized by law" or "free speech in connection with a public issue". Motion at 7:17-8:1. They loosely describe the standard with generic citations to the cases intended to govern private citizens suing non-government entities. *Id*. at 7:1-16.

Respectfully, Defendants have not summarized the law completely. The "arising out standard" ***when applied to governments*** is now well delineated and should have been addressed in their motion: (i) "As we explain, a claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity." *Park v. Bd. of Trustees of California State Univ.*, 2 Cal. 5th 1057, 1060, 393 P.3d 905, 907 (2017); (ii) "Acts of governance mandated by law, without more, are not exercises of free speech or petition. [T]he defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]" *San Ramon Valley Fire Prot. Dist. v. Contra Costa Cnty. Employees' Ret. Assn.*, 125 Cal. App. 4th 343, 354, 22 Cal. Rptr. 3d 724, 732 (2004); (iii) "Failing to distinguish between the challenged decisions and the speech that leads to them or thereafter expresses them 'would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power.' [citation omitted]" *Shahbazian v. City of Rancho Palos Verdes,* 17 Cal. App. 5th 823, 833–34, 225 Cal. Rptr. 3d 772, 780 (2017).

### 3. The Second Prong: Probability of Prevailing

Similarly, Defendants do not accurately summarize the case law applicable to the second prong of SLAPP analysis. Indeed, they summarize the standard as follows: "the plaintiff must demonstrate a probability of prevailing on his claim," citing to *Annette F. v. Sharon S.*, 19 Cal.App.4th 1146, 1159 (2004). Later in their analysis of defamation, citing to *Ampex Corp. v. Cargyle*, they suggest that Plaintiff Bisch is a limited purpose public figure and suggest that the second prong analysis blurs with the "clear and convincing" standard. Motion at 19:1-4, citing to *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576, 27 Cal. Rptr. 3d 863, 868–69 (2005).

In actuality, "probability" for anti-SLAPP analysis is defined clearly by *Ampex* and a plethora of other cases. In applying the second prong, the Court must "not weigh credibility or evaluate the weight of the evidence" and must "accept as true the evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it has defeated plaintiff's submission as a matter of law." *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569, 1576, 27 Cal. Rptr. 3d 863, 868–69 (2005). The Supreme Court summarized the standard as follows: "If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." *Park v. Bd. of Trustees of California State Univ.*, 2 Cal. 5th 1057, 1061, 393 P.3d 905, 907

(2017) (citing to *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89, 124 Cal.Rptr.2d 530, 52 P.3d 703; *see generally City of Montebello v. Vasquez,* 1 Cal.5th 409, 420, 205 Cal.Rptr.3d 499, 376 P.3d 624 (2016); *Baral v. Schnitt,* 1 Cal.5th 376, 384 (2016)).

**B. Application of Anti SLAPP Case Law for First Prong Analysis: Defendants Do Not Meet Their Burden to Establish That Conduct in Question is Protected Speech**

Defendants do not meet their initial burden to establish that the speech in question was protected under Section 425.6. In fact, the speech in question for the state law claims of tortious interference and defamation concerned private threats and statements to try to terminate Michael Bisch by withholding ARPA funds, and Defendants' statements in connection with a private partnership between two nonprofits.

**1. Section 425.6(e)(2) Does Not Provide Protection for the Speech or Conduct in Question**

The Motion goes to great lengths to persuade the Court that the Complaint's tortious interference and defamation claims arose from speech in connection with issues under consideration or review by legislative bodies. This is simply not the case as evidence and as pled.

**a. As Pleaded**

The Motion cites to numerous allegations in the Complaint that are either background allegations describing the context in which the alleged conduct took place, or which relate to the separate First Amendment claims brought by Michael Bisch. For example, the Motion refers to the Court to the following: (i) allegations regarding a Yolo County Official Meeting on October 12, 2021; Complaint at ¶32(b); Motion at 8:14-19; (ii) allegations regarding covert lobbying of state legislature and regulators in 2019 through 2021; Complaint at ¶¶ 27-32; Motion at 8:19-22; and (iii) allegations regarding Defendants acting as the Yolo SMW Enterprise in May or June 2021. Complaint at ¶ 32.

Crystallizing the concerns set forth in *Shahbazian*, *Park* and *San Ramon Valley Fire*, the Motion fails to acknowledge that not a single one of these 2021 allegations relates to the core conduct delineated for the defamation or tortious interference causes of action which all focus on conduct in March of 2022. ***They are background allegations for Plaintiff Bisch's First Amendment claims which are not the subject of the SLAPP motions***. SB 1383 was under consideration in 2021, not the private partnership agreement between YFB and Mercy Coalition or ARPA Funds. A careful read of the Complaint shows that all the defamation and tortious interference allegations focus on specific private interactions between YFB and another private nonprofit Mercy Coalition, or relate to the ARPA threat, all occurring in 2022: (i) **Tortious Interference allegations**: all allegations focus on the alleged withholding of ARPA (American Rescue Act Funds) funds (which COVID relief funds have nothing to do with SB1383) and the use of that express threat in a March

2022 letter to the YFB Board where the letter expressly suggests discipline of YFB management (*i.e.*, Bisch) at the same time it threatens withholding of funds. Complaint at ¶¶ 64-66 (which then cross cite for each of the government entity defendants and individuals to extensive allegations of the conduct and statements made in connection with withholding ARPA funds and accusing Plaintiff Bisch of extortion—see Complaint at ¶ 35). None of these allegations took place in the context of any of the 2021 meetings, communications, advocacy, publications, forums or dialogue about the then pending SB 1383 legislation. *Cf.* Complaint at ¶¶ 27, 32 and 32(b). Indeed, the only connection between the events of 2022 and 2021 is that it is believed that Plaintiff Bisch's attempts to challenge the government entities on their public presentation and positioning in the pre mandate debate on SB1383 in 2021 created hostility and animosity against Plaintiff Bisch (see Complaint at ¶ 64:10-13) which ultimately resulted in government Defendants wanting to pressure the YFB Board to terminate Bisch with a threat to withhold federal COVID relief money in 2022. (ii) **Defamation allegations**: all allegations focus on specific allegations made in private correspondence that Plaintiff Bisch engaged in extortion during the course of a private interaction between two nonprofits in 2022.  Complaint at ¶¶ 73-74, which cross cite also to ¶ 35; see specifically ¶ 35(b) which identified the specific interaction in question as alleged extortion of Mercy Coalition. The alleged conduct that is defamatory took place in March 2022 after SB1383 was already a mandate, and after public sessions on SB1383 had closed. *Id.*; see also Complaint at ¶ 22 which specifically states that SB1383 became law of the land as of January 1 2022. Cf. Complaint at ¶¶ 27, 32 and 32(b) which make clear that the bulk of public discourse and hearings all occurred during 2021.

       **b.  As Evidenced**

       As evidenced, the defamatory and tortious conduct in question was not the subject of any pending public discourse or a matter of public speech. For example, the tortious threat to withhold ARPA funding from YFB unless it dealt with Michael Bisch, including the threat in the March 18, 2022 letter to YFB's Board, were not the subject of any public discourse about SB1383. Bisch Decl. at ¶¶ 24(a)-(m), Bisch Exhibit 15 and Bisch Exhibit 16; Bosley Deposition Exhibit 10 at [Bosley000219]. As stated, ARPA funding was COVID relief funding and had nothing to do with SB1383. Bisch Decl. at 21(l). The threat was made in the March 18, 2022 letter from Barajas and Villegas to the YFB Board, and also made by telephone calls to YFB Board Members. Bisch Decl. at ¶¶ 24(a)-(m); ¶¶ 26(a)-(b), (g)-(k); *see also* Singh Decl. at ¶ 5, Exhibit 4.

       Similarly, the defamatory allegations of extortion and unethical practices focused on a dispute in March of 2022 between two nonprofits, specifically whether Mercy Coalition would continue in an exclusive partnership with Yolo Food Bank or would enter into a competing arrangement also with the County of Yolo

and City of West Sacramento. Bisch Decl. at ¶¶ 19-20; ¶¶ 21(b)-(l); Hatfield Decl. at ¶¶15-19; Bosley Deposition at 92:4-94:3. Even the declarations submitted by Defendants, which are all submitted as admissible evidence, are consistent with this because they all focus on the alleged conduct of Michael Bisch and Zane Hatfield in March 2022 in the context of a negotiation of their ongoing partnership with Mercy Coalition. *See e.g., generally* Declarations of Oscar Villegas, Angel Barrajas, and Chad Rinde in support of Motion to Strike.

The alleged specific defamatory conduct relating to the Mercy Coalition dispute and related actions of Michael Bisch and YFB management in March of 2022 was not part of public discourse. The Mercy Coalition Executive Director sent a private email on March 4, 2022 to a staff person at City of West Sacramento which was then forwarded to Yolo County, and labeled by City of West Sacramento immediately (without any effort to obtain Mr. Bisch's or Mr. Hatfield's view of events) as evidence of "unethical" practice by Michael Bisch. Bosley Deposition at 144:12-158:14; *see also* Juhler Decl. at Exhibit C. That same day, within hours, the Mercy Coalition director's longtime friend Supervisor Villegas called him and told him that Michael Bisch was "greedy" and engaged in a money grab. Bosley Deposition Exhibit 10 at [Bosley000221]. ***These were statements made by an elected official to a private citizen where the private citizen, Bosley, now admits that he and Villegas were long standing friends***. Bosley Deposition at 146:6-21. Further evidence that this was not part of any public discourse or official investigation is the fact that none of the individuals from City of West Sacramento bothered to call Plaintiff Bisch or Mr. Hatfield to get their version of events. Bisch Decl. at ¶ 23; Hatfield Decl. at ¶ 19. Bosley himself expressly concedes that the topic of the partnership between YFB and Mercy Coalition was not part of any public discourse, had never been the subject of any regulatory authority, and indicates he was never required to turn in any information regarding his agreement with YFB. Bosley Deposition at 80:13-25. It should be noted that Bosley concedes that he was also longtime friends with Aaron Laurel. *Id*. at 156:9-24. Mr. Laurel, supposedly in his capacity as City Manager of West Sacramento, when asked about the status of YFB's expected ARP funds in a private email from Michael Bisch, replies back ominously, "Yes. I would like an explanation for why YFB has attempted to extort one of our local service providers," expressly reflecting the ongoing narrative. Bisch Decl. at 21(c), Exhibit 14. Bisch later learned from Dan Ramos that Laurel would disseminate this defamatory narrative to his friend YFB Board member Dan Ramos, and that Laurel also disseminated the defamatory narrative to various city representatives at a meeting on March 11, 2022. Bisch Decl. at ¶ 21(b). The defamatory narrative was also disseminated widely among City and County officials. Singh Decl. at ¶ 5, Exhibit 4.

**2.  Section 425.6(e)(4) Does Not Provide Protection for the Speech or Conduct in Question**

Consistent with the principles set forth in *Shahbazian*, *Park* and *San Ramon Valley Fire*, a careful read of the Complaint shows that all the defamation and tortious interference allegations focus on specific private interactions between YFB and another private nonprofit Mercy Coalition in 2022, or on threats to withhold COVID relief funding to pressure actions against Bisch, and was not speech in connection with a public issue or issue of public interest.

**a.  As Pleaded**

A careful read of the Complaint shows that all the defamation and tortious interference allegations focus on speech that was not in connection with a public issue or issue of public interest: (i) **Tortious Interference allegations**: All allegations focus on the alleged withholding of ARPA (American Rescue Act Funds) funds (which COVID relief funds have nothing to do with SB1383) and the use of that express threat in a letter to the YFB Board where the letter expressly suggests discipline of YFB management (*i.e.*, Plaintiff Bisch) at the same time it threatens withholding of funds. Complaint at ¶¶ 64-66 (which then cross cite for each of the government entity defendants and individuals to extensive allegations of the conduct and statements made in connection with withholding ARPA funds and accusing Plaintiff Bisch of extortion—see Complaint at ¶ 35). None of these allegations took place in the context of any of the 2021 meetings, communications, advocacy, publications, forums or dialogue about the then pending SB 1383 legislation. *Cf.* Complaint at ¶¶ 27, 32 and 32(b). Indeed, the only connection between the events of 2022 and 2021 is that it is believed that Plaintiff Bisch's attempts to challenge the government entities on their public presentation and positioning in the pre mandate debate on SB1383 in 2021 created hostility and animosity against Plaintiff Bisch (see Complaint at ¶ 64:10-13) which ultimately resulted in Defendants decision to threaten withholding federal relief funds for COVID to try to pressure the YFB Board to take action against Bisch; (ii) **Defamation allegations**: All allegations focus on specific allegations made in private correspondence that Plaintiff Bisch engaged in extortion during the course of a private interaction between two nonprofits in March of 2022. Complaint at ¶¶ 73-74, which cross cite also to ¶ 35; see specifically ¶ 35(b) which identified the specific interaction in question as alleged extortion of Mercy Coalition. The alleged conduct that is defamatory took place in March 2022 after SB1383 was already a mandate, and after public sessions on SB1383 had closed. *Id.*; see also Complaint at ¶ 22 which specifically states that SB1383 became law of the land as of January 1 2022. *Cf.* Complaint at ¶¶ 27, 32 and 32(b) which make clear that the bulk of public discourse and hearings all occurred during 2021. Once again, the only connection between the alleged defamation of 2022 and public

discourse of 2021 is that it is believed that Plaintiff Bisch's attempts to challenge the government entities on their public presentation and positioning in the pre mandate debate on SB1383 created hostility and animosity against Plaintiff Bisch (see Complaint at ¶ 76) which ultimately resulted in unprotected conduct and speech that was defamatory.

### b.   As Evidenced

The evidence cited above for the Section 425.6(e)(2) analysis should be dispositive for the Section 425.6(e)(4) analysis because the same evidence which shows that the alleged conduct and speech did not concern issues under legislative review also show that the alleged conduct and speech was not protected speech in furtherance of a public issue or an issue of public interest. *See supra* at Section III(B)(1)(b). However, Plaintiff Bisch wishes to highlight in particular certain key pieces of evidence which show that the speech and conduct in question was not in furtherance of a public issue or an issue of public interest.

The tortious threats to withhold ARPA Funding unless YFB disciplined Plaintiff Bisch was made in a letter to the YFB Board. Bisch Decl. at ¶ 24(j), Bisch Exhibit 16; Bosley Deposition Exhibit 10 at [Bosley000219]. ARPA Funding was not part of the debate on SB1383, and the alleged extortionate or threatening conduct of Plaintiff Bisch was part of a private interaction and negotiation between two nonprofits who were not subject of any public hearing, discourse, or subject to any regulatory authority of any kind. Bisch Decl. at ¶ 20; Hatfield Decl. at ¶ 15; Bosley Deposition at 80:13-25. When Plaintiff Bisch privately inquired with City Manager Aaron Laurel (who Plaintiff has now found out was a longtime friend of Bosley, the executive director of Mercy Coalition, *see* Bosley Deposition at 156:10-14) about the status of the ARPA funding that would otherwise have been provided to a premier, leading nonprofit like YFB, Manager Laurel responded with an ominous reference to extortion of Mercy Coalition. Bisch Decl. at ¶ 24(c), Bisch Exhibit 14. None of these interactions, including the very letter that made the ARPA threat, were part of any public discourse at all on SB1383 or for that matter any other matter. Bisch Decl. at ¶ 20; Hatfield Decl. at ¶ 15; Bosley Deposition at 80:13-25; see also Singh Decl. at ¶ 5, Exhibit 4.

Moreover, if the governmental entities including elected officials had been acting in furtherance of public interest or a public issue, they would have investigated the allegations of Don Bosley by contacting Michael Bisch and Zane Hatfield, but they did not. Bisch Decl. at ¶ 23; Hatfield Decl. at ¶ 15. Within minutes of Bosley sending the email to City of West Sacramento, West Sacramento began the narrative of "unethical conduct" of Michael Bisch without investigation. Juhler Decl. at Exhibit D; see also Singh Decl. at ¶ 5, Exhibit 4. When Supervisor Villegas heard what happened to his longtime friend Don Bosley, he contacted Bosley that

afternoon, and immediately concluded that Bisch had acted inappropriately, without conducting any investigation at all. Bosley Deposition at Exhibit 10 [Bosley000221]; Bosley Deposition at 145:15-146:21,149:10-22, 163:18-164:10. When Bosley was asked how his friend Villegas could have reached that conclusion so quickly, even Bosley had to acknowledge that it must have been based on prior frustration with Michael Bisch in connection with Michael Bisch being vocal about SB1383. Bosley Deposition at 149:152:10. Further evidence that the speech was not in furtherance of public interest or public issues, and instead was motivated by an attempt to pressure YFB, can be found in the fact that Supervisor Villegas and Supervisor Barajas chose to pressure the three YFB Board members with financial interests impacted by the County and/or City of West Sacramento. Bisch Decl. at ¶¶ 24(i)-(j), ¶ 25(a)-(c), ¶¶ 26 (a)-(b), (g)-(k).

### 3. Private Statements Making Threats Are Not Protected If They Do Not Otherwise Fit into the Statutory Categories of Protected Speech Set Forth in Section 425.6

The only other case law citations Defendants provide to support the first prong of their anti SLAPP analysis are aimed to defend the obvious fact that all of the speech and conduct in question occurred in the setting of private emails, phone calls, and in person communications. As such, they cite to *Averill v. Superior Court*, 42 Cal. App. 4th 1170, 1174-76 (1996) and *City of Costa Mesa v. D'Alessio Investments*, LLC, Cal.App.4th 358, 371 (2013). These cases are inapposite to the facts at hand.

First, in *Averill*, the speech in question was clearly an exercise of free speech and indeed was speech of a private citizen to a group of reporters. Unlike in *Averill*, as set forth above (*see supra* at Section III(B)(1)), the speech in question here involved a private threat by elected government officials to a nonprofit board threatening to withhold ARPA funding if the board did not discipline Michael Bisch, and private statements by government officials (elected and appointed) to third parties (including YFB Board members, who were Plaintiff Bisch's employers) that Plaintiff Bisch had engaged in extortion and unethical practices. Bisch Decl. at ¶ 24(a)-(m), Bisch Exhibits 14-16, ¶¶26(a)-(b), (g)-(k); Hatfield Decl. at ¶ 23; Bosley Deposition at 191:9-13; 177:12-178:11, Exhibit 10 at BOSLEY000021. Bosley's narrative of his private interactions with Supervisor Villegas, his longtime friend, who immediately concluded Bisch had done something improper, crystallized how this private communication is quite distinct from the private speech that might be protected in cases like *Averill*, and the private speech of government employees in *City of Costa Mesa* where the employees were talking with private citizens who were third parties they did not know. The threat to withhold ARPA funding if YFB did not discipline its management (i.e., Michael Bisch) which was then followed by phone calls by Supervisors to YFB Board members demanding retribution by calling the YFB Board members with financial

interests affected by County decision making is also factually distinguishable from the private protected speech in *Averill* and *City of Costa Mesa*. Bisch Decl. at ¶ 24(a)-(m), Bisch Exhibits 14-16, ¶ 25(a)-(c), ¶ ¶26(a)-(b), (g)-(k); Hatfield Decl. at ¶ 23; Bosley Deposition at 146:11-21; 149:10-12; 191:9-13, 177:12-178:11; Juhler Decl. at Exhibit C; see also Singh Decl. at ¶ 5, Exhibit 4.

**C. Application of Anti SLAPP Case Law for Second Prong Analysis: Plaintiff Bisch Can Show That He Has a Probability of Prevailing on His Tortious Interference and Defamation Claims**

Consistent with *Ampex* and *Park* as discussed above, the second prong analysis requires the Court to determine whether Plaintiff has a probability of prevailing on its claims i.e., whether plaintiff can establish minimal merit with facts assumed to be true. Against this backdrop, Plaintiff Bisch can establish minimal merit or the probability of prevailing on both claims.

**1. Plaintiff Bisch Can Demonstrate a Probability of Prevailing on His Tortious Interference Claims Against All Defendants**

**a. Plaintiff Bisch Has Evidence to Establish All Required Elements of Tortious Interference Against Each Defendant**

Plaintiff can present significant evidence to meet the minimal merit standard required to establish a probability of prevailing on his tortious interference claims for each of the Defendants. The elements of tortious interference all have significant evidentiary support in this matter:

(i)     **The existence of a valid contract between Bisch and YFB**. Plaintiff Bisch was employed pursuant to an offer letter, the terms of which were continued by oral agreement with his board. The oral agreement agreed to continue his initial terms of offer, and he was afforded all the protections of various written policies applicable to all employees. Bisch Decl. at ¶¶ 2-3, Bisch Exhibit 1 and Bisch Exhibit 3.

(ii)     **Defendants all had knowledge that Plaintiff Bisch was employed as Executive Director**. Evidence of this includes but is not limited to the following:  Bisch Decl. at ¶¶ 2-9; ¶ 21(l), Exhibit 16. Plaintiff Bisch's employment and even his compensation as Executive Director was a matter of public record. Bisch Decl. at ¶ 4; Bisch had appeared as Executive Director for Yolo Food Bank at Yolo County Events, and had engaged in meetings, email and/or text communications with all Defendants. Bisch Decl. at ¶¶ 10(a)-(d), 17(a)-(i), 24(d)-(n).

(iii)     All Defendants were provided a copy of the March 18, 2022 letter which urged action against YFB management and threatened ARPA funding, and were actively participating in the narrative that Bisch acted unethically and in the plan to pressure YFB to discipline its management. Singh Decl. at ¶ 5, Exhibit 4. The letter expressly threatened to withhold ARPA Funding if YFB did not take action to address management

issues. The March 18, 2022 letter was preceded by and followed by calls from Supervisors specifically to YFB Board members to pressure the YFB board members to take action. YFB Board Chair Tom Muller, who was contacted by two different supervisors on April 27, 2022, stated expressly they wanted retribution. Bisch Decl. at ¶ 24(a)-(n), 26(a)-(k). That the government Defendants were seeking retribution was observed and or stated by multiple individuals. Bisch Decl. at Bisch Decl. at ¶ 24(a)-(n), 26(a)-(k), Hatfield Decl. at ¶ 23; Bosley Deposition at 191:25-192:16, and at Bosley Deposition Exhibit 10 at [BOSLEY000214]. The ARPA Funding was withheld, multiple calls were made, the letter was sent, and both Plaintiff Bisch and Zane Hatfield were both fired. Singh Decl. at ¶ 5, Exhibit 4; Bisch Decl. at ¶¶ 24(a)-(n), 26(a)-(s); Hatfield Decl. at ¶ 23; Bosley Deposition at Exhibit 10 at [BOSLEY000212-BOSLEY000214].

(iv)     There was resulting damage because Plaintiff Bisch was fired by the YFB Board. Plaintiff Bisch lost his job as a result of the pressure exerted by Defendants, and lost it in a manner that caused shame and humiliation and damage to his reputation as the false narrative as to why he was terminated spread. Bisch Decl. at ¶ 24; Bosley Deposition at Exhibit 10 at [BOSLEY000212-BOSLEY000214].

### b.    Plaintiff Bisch's Contract Was Not at Will and Even If It Was, Defendants Engaged in Independent Wrongful Acts Which Violated Plaintiff Bisch's Constitutional Rights

Contrary to Defendants' speculation, Plaintiff Bisch's contract was not at will. His offer letter set forth the initial terms of his employment, and those terms were continued by oral agreement. Bisch Decl. at ¶ 2. The offer letter itself expressly addressed whether any ongoing employment after the interim term was at will, *expressly stating that "thereafter" he could only be terminated for cause*. This was a specifically negotiated term which Plaintiff Bisch had requested, and the handbook for all employees contemplates the while generally all other employees would have an at will contract, the Board and Executive Director could agree otherwise for specific cases. Bisch Decl. at ¶ 2, Exhibit 3. That was precisely what was done here. The Board agreed to provide its Executive Director with employment that was only terminable for cause. Bisch Decl. at ¶¶ 2-3, Exhibit 1 and Exhibit 3.

Even if the agreement was at will, which it is not as shown by admissible evidence, there is evidence of "independent wrongfulness"— "[a]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Ixchel Pharma, LLC v. Biogen*, Inc., 9 Cal. 5th 1130, 1142, 470 P.3d 571, 576 (2020). In this case, therefore, the independent wrongfulness of the acts described above to establish liability for tortious interference were also violations of

Plaintiff Bisch's First and Fourteenth Amendment rights in the Complaint (Complaint at ¶¶ 42-60), and thus were unlawful as defined by *Ixchel*.

### c. Defendants Fail to Articulate a Privilege Which Would Attach to the Bad Faith Threats to Withhold ARPA Funding If YFB Did Not Discipline or Terminate Plaintiff Bisch

The threats to withhold ARPA funding expressed in the March 18, 2022 Letter (Bisch Exhibit 16) in order to pressure the YFB Board to silence, discipline, and/or terminate Plaintiff Bisch were done with malice and bad faith. Evidence of this bad faith may be found in numerous pieces of admissible evidence which show that the authors of the letter and the government entities had personal motivations to target Bisch, and also had targeted Bisch because Bisch had expressed disruptive views in 2021 about SB1383 compliance. Evidence of the malice may be seen in the following: (i) Don Bosley testifies that when Supervisor Villegas (who authored the letter threatening ARPA funding) contacted him on March 4th, just a few hours after Bosley reported the dispute with YFB, Villegas, his longtime friend, immediately concluded Bisch was acting improperly. When asked how that could be without any investigation, Bosley testified that it was preexisting based on the Villegas view of how Bisch handled the SB 1383 conflict the previous year. Bosley Deposition at 191:25-192:16. (ii) When Bosley's email was received on March 4, 2022, the City of West Sacramento, without any investigation, immediately labelled Bisch's actions as unethical; Juhler Decl. at Exhibit C; see also Singh Decl. at ¶ 5, Exhibit 4; (iii) Supervisor Laurel was disclosed to also be a longtime friend of Bosley, and instead of investigating what actually happened, he too also concluded that Bisch had acted to extort Mercy Coalition without proper investigation. Bisch Decl. at ¶¶ 24(c)-(d), Bisch Exhibit 14; Bosley Deposition at 154:13-155:7, 155:17-19, 156:9-24. Evidence of malice can also be found in statements Supervisors made to YFB Board members on or shortly before an April 27, 2022 board meeting, which statements prompted Chairman Muller to proclaim that the County was seeking retribution. Bisch Decl. at ¶¶ 26(g)-(j). Evidence of malice can be found in the fact that Villegas' close friend Bosley believed they caused the termination of Michael Bisch, though he later tries to backtrack in his testimony and claim he was just speculating—even though written communications to his Board show him telling his Board that Villegas has blasted Bisch to him, and expressly state that Bisch was fired because of pressure placed by the government. Bosley Deposition at 197:2-198:7; cf. Bosley Deposition Exhibit 10 at [BOSLEY000214]. Bosley had firsthand impressions and information about Villegas' conduct and statements because he spoke directly with Villegas about Bisch. Bosley Deposition at 175:2-179:5, Bosley Deposition Exhibit 10 at [BOSLEY000217].

**2. Plaintiff Bisch Can Demonstrate a Probability of Prevailing on His Defamation Claims**

    **a. Plaintiff Bisch Has Evidence to Establish All Required Elements of Defamation against Each Defendant, And That the Statements in Question about Extortion Were Indeed Defamatory**

Plaintiff can present significant evidence to meet the minimal merit standard required to establish a probability of prevailing on his defamation claims against Defendants. The elements of defamation are "1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." *Wong v. Jing,* 189 Cal.App.4th 1354, 1369, 117 Cal.Rptr.3d 747 (2010). Defendants themselves cite the relevant standard from *Innovative Business Partnerships, Inc. v. Inland Counties Regional Center, Inc*., 194 Cal.App.4th 623, 632 (2011) which states that a "defamatory statement "tends directly to injure a plaintiff in respect to his office, profession, trade or business…". Motion at 14:21-15:7. Evidence of false defamatory statements that were not hyperbole or opinion and were being used and published to indicate that Plaintiff Bisch was unethical include but are not limited to the following: (i) When Bosley reported the dispute with YFB to West Sacramento, West Sacramento staff immediately, without investigation as to the details of the relationship between YFB and Mercy Coalition, concluded that Plaintiff Bisch's practices were "unethical"; Juhler Decl. at Exhibit D; (ii) On that same day, without reaching out to Plaintiff Bisch or Zane Hatfield, Supervisor Villegas heard this narrative and contacted Bosley. Bosley Deposition at 149:10-22. As Bosley narrated to his own board, Villegas propagated the defamatory narrative, attacking Bisch and indicating that he would get all the Supervisors involved. Bosley Deposition Exhibit 10 at [Bosley000221]. (iii) A few days later, Bosley's close friend Aaron Laurel, who happened to be the City Manager of West Sacramento, was also spreading the narrative, meeting with other officials from other governments and then demanding to know from Plaintiff Bisch why he had "extorted" a local nonprofit. Bosley Deposition at 152:20-153:24, 154:13-155:7, 155:17-19, 156:9-24; Bisch Decl. at ¶ 24(c)-(d), Bisch Exhibit 14. Against the backdrop of Plaintiff Bisch's practices being labelled as unethical, the word "extort" was not being used as hyperbole. City Manager Laurel, Bosley's friend, contacted YFB Board member Dan Ramos and repeated the extortion narrative, and Plaintiff Bisch was immediately called by his employer (Ramos was on the Board that employed Bisch) and asked to explain himself; Bosley Deposition at 152:20-153:24, 154:13-155:7, 155:17-19, 156:9-24; Bisch Decl. at ¶ 24(c); (iv) The defamatory narrative was spread widely between City and County officials and included implicitly in the March 18, 2022 letter--even though the letter did not name Bisch, in prior conversations, Defendants representatives including certain Supervisors and Aaron Laurel were specifically naming Michael Bisch as having threatened and extorted a local nonprofit, and/or specifically identified Plaintiff Bisch as

engaging in unethical practices. Bosley Deposition at 194:22-195:9, Exhibit 10 at [Bosley000221]; Bisch Decl. at ¶¶ 24(c)-(n); see also Singh Decl. at ¶ 5, Exhibit 4; (v) The defamation continued with multiple calls by Supervisors to YFB to pressure the Board about Bisch as late as April 27, 2022. Bisch Decl. at ¶¶ 26(g)-(m). On the same day those statements were made to the YFB Board by Supervisors, Chairman Muller suggested possible termination of Bisch and Hatfield (no longer tenable at YFB). *Id.* at ¶ 26(j).

**b.    The Statements about Improper Threats and Extortion Were Not True Because YFB Had a Partnership with Mercy Coalition and Had a Reasonable Basis to Have Shifted Site Assignments and Had Not Cut Off Mercy Coalitions' Access to Food**

The statements that Plaintiff Bisch had acted to extort a local nonprofit and engaged in unethical practices were not true. What Defendants seemed either not to know or chose to ignore was that the March 2, 2022 phone call with Zane Hatfield and March 3, 2022 phone call with Michael Bisch were phone calls between the executive management of two private nonprofits, and the phone calls were consistent with YFB's contractual rights and obligations and reasonable as such. As it turns out, the partnership arrangement allowed either party to terminate at any time (*see i.e.*, Bosley Deposition at 66:8-13) and also YFB was perfectly within its rights to modify specific site access if there was concern that there would be a breach of YFB's obligation to comply with Feeding America Rules. Hatfield Decl. at ¶¶ 3, 6, 15-17. As it turns out, Bosley, as he conceded in his deposition, was not actually cut off from food. Bisch Decl. at ¶¶ 21-22; Hatfield Decl. at ¶ 18; Bosley Deposition at 116:22-25. The site restriction on certain Feeding America sites was a legitimate position for YFB to take because YFB had contractual obligations with Feeding America entities. Hatfield Decl. at ¶ 3. In brief, no unethical act or act to extort Mercy Coalition (using food access to secure their cooperation) had occurred. Moreover, Bosley conceded that there had been discussions of YFB paying Mercy Coalition an amount similar to the amount which the City of West Sacramento was going to pay Mercy Coalition. Bosley Deposition at 101:3-102:4; Hatfield Decl. at ¶¶ 15-17. The conversation was clearly part of a private business negotiation and not an extortionate threat or unethical practice.

**c.    The Reference to Possible Threats were Coupled with Statements to Third Parties That Michael Bisch Was Unethical and Engaged in Outrageous Conduct**

Defendants try to argue that some of the alleged defamatory statements used the word possible and did not mention Michael by name. It is important for the Court to note that this was a defamatory campaign with numerous emails, calls, and statements. There were unequivocal statements within the same group attributing unethical practices and extortion to Michael Bisch, culminating in a letter to the YFB Board that if the YFB Board did not deal with the issues, ARPA funding would be withheld. See *supra* at Section II(D). **The CPRA Response** documents provided by City of Woodland now show a shocking, widespread, clearly defamatory

narrative where Bisch was literally vilified as unethical repeatedly, and was the clear target of a plan to pressure YFB to terminate or "bounce" him.  Singh Decl. at ¶ 5, Exhibit 4. Emails show that Bisch was being identified by name with definitive accusations of unethical conduct and extortion. *Id*. Bosley himself, who spoke with his friends Supervisor Villegas and City Manager Laurel, told his Board that, based on his conversations with multiple government representatives, Bisch was blackmarked for misconduct. Bosley Deposition Exhibit 10 at [BOSLEY000214]. The cumulative effect of calls, statements, and writings were that Michael Bisch had engaged in unethical or improper conduct. Therefore, the presence of "possible" and other such disclaimers must be evaluated in the overall context of all of the communications.

### d.   The Use of The Word Extortion Was Not Hyperbole Because It Was Accompanied by Communications Asserting Michael Bisch Engaged in Unethical Conduct or Outrageous Conduct

In the cases cited by Defendants regarding the analysis of hyperbole in defamation actions, Defendants cite to cases with very different facts, where words like extortion are being used to describe aggressive business practices. *See Greenbelt Coop. Pbl'g Ass'n, Inc. v. Bresler,* 398 U.S. 6, 14 (1970); *Hogan v. Winder*, 762 F.3d 1096, 1107-1108 (10th Cir. 2014); *Remick v. Manfredy*, 238 F.3d 248, 262-263 (3rd. Cir. 2001), *Small Bus. Bodyguard Inc. v. House of Moxie, Inc*., 230 F. Supp. 3d 290, 313 (S.D.N.Y. 2017). Unlike in those cases cited by Defendants, the word extort here was used with the word unethical and coupled with phone calls where Defendants repeated the assertions that Bisch had engaged in unethical conduct. *See supra* at Sections II(C)-(D). Evidence that the narrative was relayed as more than just aggressive business behavior can be seen also in the fact that the Mercy Coalition incident was brought up one month later in the same YFB Board meeting which concluded with the Chairman stating that he was unsure whether Bisch and Hatfield could continue to work for the agency. Bisch Decl. at ¶ 26(j).

### e.   Defendants Fail to Show That Michael Bisch Is a Limited Purpose Public Figure

In order to characterize a private citizen as a limited purpose public figure, Defendants would need to show that: (i) there was a public controversy (ii) the private citizen undertook a voluntary act through he seeks to influence the resolution of the public issues involved. *Copp v. Paxton,* 45 Cal.App.4th 829, 845, 52 Cal.Rptr.2d 831 (1996). Applying these standards here, the declarations of Michael Bisch, Zane Hatfield, and deposition of Don Bosley all confirm that the public controversy over SB1383 had occurred in 2021, and was not substantively or temporally connected to the private partnership negotiations between Bosley and the management of YFB in 2022. See Bisch Decl. at ¶¶ 19-23; see Hatfield Decl. at ¶ 12; *see* Bosley Deposition at

73:15-21, 80:13-19, 146:6-10, 191:3-193:15. It is true that Michael Bisch made statements and gave presentations publicly about SB1383 during 2021. Bisch Decl. at ¶¶16, 17(a)-(i). Those statements did not concern ARPA funding or the partnership negotiations between Yolo Food Bank and Mercy Coalition; his statements in 2021 were about SB 1383 implementation on a broad and systemic level. *Id*.

### f.   Even If Bisch Was a Limited Purpose Public Figure, Plaintiff Can Show Actual Malice

Even if Michael Bisch was a limited purpose public figure in connection with the speech and conduct in question, Plaintiff Bisch can still show probability of prevailing and being able to produce **clear and convincing evidence** to establish malice. *See supra* at Section III(C)(1)(c) where evidence of malice is described. There is significant evidence, almost unequivocal, that the Supervisors were motivated by malice to retaliate and silence Bisch for being outspoken about SB1383 and used the Mercy Coalition incident as a pretext to do so, most compellingly illustrated by how quickly Supervisors and others concluded Bisch had acted wrongly and spread the "unethical" and "extortionate" narrative. *Id*.; *see also* Singh Decl. at ¶ 5, Exhibit 4. In addition, they deliberately called the YFB Directors who had financial interests impacted by County and/or City decision making, particularly Tom Muller, Dan Ramos, and James Durst. Bisch Decl. at ¶ 22(a)-(c); Hatfield Decl. at ¶ 23; Bosley Deposition at 191:9-193:15 and at Exhibit 10; *see supra* at Section III(B)(1)(b) and Section III(B)(2)(b). And they failed to investigate the matter properly, never bothering to research what were the other contractual requirements which constrained YFB's actions. Hatfield Decl. at ¶¶ 7-8, 17-19; *see supra* at Section III(B)(1)(b) and Section III(B)(2)(b).

### IV. CONCLUSION

For the reasons set forth above, the motion to strike should be denied in its entirety.

DATED: June 13, 2023                    Respectfully Submitted by,

/s/ Sanjiv N. Singh
Sanjiv N. Singh
SANJIV N. SINGH, A PLC

/s/ Michael B. Indrajana
Michael B. Indrajana
INDRAJANA LAW GROUP, A PLC

Attorneys for Plaintiff Michael Bisch.