SANJIV N. SINGH, A PROFESSIONAL LAW CORPORATION
Sanjiv N. Singh, Esq. (SBN 193525)
1700 S. El Camino Real Suite 503
San Mateo, CA 94402
Phone: (650) 389-2255
Email: ssingh@sanjivnsingh.com

INDRAJANA LAW GROUP, A PROFESSIONAL LAW CORPORATION
Michael B. Indrajana, Esq. (SBN 258329)
1700 S. El Camino Real Suite 503
San Mateo, CA 94402
Phone: (650) 597-0928
Email: michael@indrajana.com

Attorneys for Plaintiff MICHAEL BISCH

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BISCH, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF YOLO, CALIFORNIA, a public corporation; CITY OF WEST SACRAMENTO, a public corporation; CITY OF DAVIS, a public corporation; CITY OF WOODLAND, a public corporation; ANGEL BARAJAS, an individual; OSCAR VILLEGAS, an individual; CHAD RINDE, an individual; AARON LAUREL, an individual; KEN HIATT, an individual; MICHAEL WEBB, an individual; DONALD SAYLOR, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 2:23-cv-00455-MCE-DB<br><br>**DECLARATION OF SANJIV N. SINGH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE**<br><br>Judge: Hon. Morrison C. England<br>Hearing Date: TBD<br>Time:            TBD<br>Dept. No.:      7 |

### DECLARATION OF SANJIV N. SINGH

1.      My name is Sanjiv N. Singh. I am lead trial counsel for Plaintiff Michael Bisch in the above captioned matter. I have personal knowledge of the facts stated therein, and if sworn as a witness, I would be competent to testify thereto.

2.      Attached hereto as **Singh Exhibit 1** is a true and correct copy of excerpts of the Donald Bosley Deposition Transcript dated June 6, 2023. The witness was represented by his own counsel. He also produced documents the day before his deposition.

3.      Attached hereto as **Singh Exhibit 2** is a true and correct copy of Exhibit 10 to the Donald Bosley Deposition Transcript. I questioned the witness on numerous aspects of these documents, including his specific recollection of conversations with Yolo County Supervisor Oscar Villegas, with then employee Zane Hatfield, with Yolo County City Manager Aaron Lauren, and with then executive director of YFB, Plaintiff Michael Bisch.

4.      It was contemplated that Plaintiff would attach hereto as **Singh Exhibit 3 [OMITTED]** a true and correct copy of the sworn court reporter transcription of relevant portions of the April 27, 2022 Yolo Food Bank Zoom Video meeting recorded video. It was further contemplated that Plaintiff would attach as **Singh Exhibit 3A [OMITTED]** a true and correct copy of the relevant actual video excerpt of the April 27, 2022 Yolo Food Bank Zoom Video Meeting clip. I have confirmed through review of the Zoom video file, and through interview of Zane Hatfield and Michael Bisch that the video was legally obtained and recorded and that attendants were required, through Zoom software, to consent to the recording in order to participate.  The Board minutes we have reviewed show that the April 27, 2022 meeting was properly recorded with the consent of the Board. All participants who were present had to consent to be present on Zoom session.  Despite this, on the day we needed to file our briefs (today), we received notice at 4:34 PM that counsel for YFB claimed that the Zoom video of the meeting could not be submitted ***even in a motion to seal to this Court***, even though an identical copy of the Zoom video was in independent possession of Michael Bisch, and claimed incorrectly that the video was illegally recorded when it was not—it was recorded with consent of the Board.  Plaintiff Bisch will have to address the issue with the presiding state court where YFB counsel has attempted to designate the video as Confidential. Until then, these two highly probative pieces of evidence are withheld.

5.      Attached hereto as **Singh Exhibit 4** is a true and correct copy of relevant email correspondence and production from the City of Woodland obtained from a May 29, 2023 California Public Records Act

("CPRA") Request that my co-counsel Michael B. Indrajana served on City of Woodland. The City of Woodland responded with a production of documents, and had outside counsel work with us cooperatively to obtain the documents. Exhibit 4 is an excerpt of the 1168-page production with relevant documents which fall into several main categories:

    a. Communications which show express references to withholding funds from YFB until further notice and requiring notice to the Cities and County Administrator. The communications may be found at:

        i. CPRA WOODLAND 000008-000009:  May 24, 2022 Email from Defendant Ken Hiatt (City Manager for City of Woodland) to various representatives of Defendants City of Davis, City of Woodland, City of West Sacramento: "If the request is made by Yolo Food Bank for funding, no authorization of these initial year funds will be made without first consulting with the City Manager's and County Administrator.  CMs and CAO should be informed of any funding request made by YFB."

        ii. CPRA WOODLAND 000013-000014:  Duplicate of CPRA WOODLAND 000008-000009.

        iii. CPRA WOODLAND 000022-000023: May 6, 2022 Email from Marissa Juhler (Defendant Yolo County) to Defendant Chad Rinde (Defendant Yolo County) copied also to Taro Echiburu (Defendant Yolo County) and Ramin Yazdani (Defendant Yolo County) indicating that "in light of the recent letter from Yolo Food Bank wanting to reopen the discussion about them receiving Edible Food Recovery funding, we are awaiting decision from the Board Members who received that letter to them how to proceed. If we entertain offering funds back to YFB, there may not be a need for us to create the MOUS with the cities or house any of the funds. All funds would go directly back to YFB as originally planned."  This same page shows that this email was forwarded the same day by Defendant Rinde to all of the Cities including Defendants West Sacramento (to Defendant Aaron Laurel), City of Davis (to Defendant Michael Webb), City of Woodland (to Defendant Ken Hiatt), and to the City of Winters (Kathleen Trepa).

iv.   CPRA WOODLAND 000028:  May 23, 2022 Email from Defendant Ken Hiatt (City Manager for Defendant Woodland) telling other Woodland city employees that "If request is made by Yolo Food Bank for funding, no authorization for these initial year funds will be made without first consulting with the City Manager's and County Administrator. Similarly, CMs and CAO should be informed of any funding request made by YFB."

b.   Communications which expressly contain implicit or express statements about Michael Bisch, including multiple instances where the March 18, 2022 Letter from Oscar Villegas and Angel Barajas is forwarded to all the Cities, and where specific narratives of Michael Bisch/YFB being ***"unethical"*** are forwarded by employees of Defendant Yolo County to Defendant City of Woodland, Defendant City of Davis, and Defendant City of West Sacramento:

i.   CPRA WOODLAND 000038-000041

ii.   CPRA WOODLAND 000054-000060 (where Susan Strand, West Sacramento's Environmental Program Specialist on March 19, 2022 says, to Woodland, Davis, and Yolo County officials, **"Wow, that's an excellent letter. Thanks so much for sharing it Rosie. I have been so upset by this situation. It is great to finally see the unethical actions of Michael Bisch finally being fully addressed in public."**

iii.   CPRA WOODLAND 000061-000065

iv.   CPRA WOODLAND 000066-000069

v.   CPRA WOODLAND 000078-000081

vi.   CPRA WOODLAND 000082-000083

c.   Communications by Defendant Ken Hiatt (City Manager of Woodland) including:

i.   CPRA WOODLAND 000070-000077:  Mar 18, 2022 Email from Defendant Hiatt to City Council members of Defendant City of Woodland where one of the Council members, Tom Stallard, states after being sent March 18, 2022 Letter from Yolo County to YFB Board, **"A spicy meatball indeed. That board has to get Bisch under control or bounce him."**

ii.   CPRAW WOODLAND 0000662: March 18, 2022 Email response from Woodland City Council member Rich Lansburgh in response to Ken Hiatt's email forwarding the March 18, 2022 letter: **"That's a pretty strong position to take. But necessary."**

iii.   CPRA WOODLAND 000086-000088:  March 14, 2022 Email where Defendant Ken Hiatt forwards email to YFB Director Kate Stille with express statement by West Sacramento's then Environmental Services & Sustainability Manager Traci Goularte that, **"the outright unethical practices of YCFB is shocking."**

d.   Communications by Defendant City of Woodland to Defendant City of Davis:

i.   CPRA WOODLAND 000218-000220: March 7, 2022 Email at 10:23 AM where Defendant City of West Sacramento employee Traci Goularte forwarded the **"unethical practices"** email to Defendant City of Davis's Jennifer Gilbert and Defendant City of Woodland's Rosie Ledesma.

ii.   CPRA WOODLAND 000111:  March 7, 2022 Email at 10:41 AM where City of Davis Conservation Coordinator Jennifer Gilbert states to City of Woodland Environmental Resource Analyst Rosie Ledesma, **"Wow, I'm just…stunned by the news that West Sac shared. And sickened."**

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge or belief based on reliable information, that I have personal knowledge of the facts stated above, and that, if sworn as a witness, I would be competent to testify thereto.

Executed this 13 Day of June, 2023, in San Mateo, California.

_____
SANJIV N. SINGH

# SINGH EXHIBIT 1

DONALD BOSLEY - June 6, 2023

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF YOLO

3

4   MICHAEL BISCH,              )    Case No.
                                )    CV2022-1431
5                Plaintiff,     )
                                )
6           -vs-                )    Volume I
    YOLO FOOD BANK, et al.      )
7                               )
                 Defendants.    )
8   _____ )    Pages 1 - 216

9

10

11            VIDEOTAPED DEPOSITION OF

12                 DONALD BOSLEY

13                 JUNE 6, 2023

14

15

16

17

18

19   Reported by:

20   KAYLA KNOWLES, CSR #14071

21   --------------------------------------------------------

22              JAN BROWN & ASSOCIATES

23      WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery St., 3rd Floor, San Francisco, CA 94111

25          (415) 981-3498 or (800) 522-7096

                                                        1

DONALD BOSLEY - June 6, 2023

73

BY MR. SINGH:

11:40:14  1    Q.  Did you have any knowledge as to what -- and if
11:40:14  2    you don't, that's fine.
11:40:17  3        Did you have any knowledge as to what costs Yolo
11:40:18  4    Food Bank would incur in order to provide assistance to
11:40:22  5    Mercy Coalition?
11:40:27  6        MR. TURPEN:  Objection.  Vague.
11:40:28  7        THE WITNESS:  No, I did not.
11:40:29  8    BY MR. SINGH:
11:40:31  9        Q.  Okay.  The arrangement between Yolo Food Bank
11:40:53 10    and Mercy Coalition -- prior to March of '22, had there
11:40:56 11    ever been a dispute between Yolo Food Bank and Mercy
11:41:04 12    Coalition about that arrangement, to your knowledge?
11:41:08 13        A.  Not a one, that I am aware of.
11:41:11 14    **Q.  All right.  And -- and follow-up question:  Had**
11:41:15 15    **there ever been any public controversy, either in front**
11:41:19 16    **of any of the boards, interview with a newspaper,**
11:41:23 17    **anything like that?  Any kind of public controversy about**
11:41:27 18    **the relationship between Yolo Food Bank and Mercy**
11:41:30 19    **Coalition?**
11:41:34 20        **A.  No.**
11:41:34 21        Q.  Had there ever been, to your knowledge, prior to
11:41:41 22    March of 2022, any discussion in any public meeting,
11:41:44 23    board of supervisors meeting, city council meeting, for
11:41:51 24    example, about the relationship between YFB and Mercy
11:41:56 25

74

11:41:59  1    Coalition, to your knowledge?
11:42:00  2        A.  No, none that I'm aware of.
11:42:11  3        Q.  By March of 2022, SB 1383 was already in effect;
11:42:11  4    correct?
11:42:21  5        A.  Correct, just.
11:42:22  6        Q.  It had come into effect in January; correct?
11:42:26  7        A.  Correct.
11:42:26  8        Q.  Of that year.
11:42:27  9        A.  Uh-huh.
11:42:28 10        Q.  I am going to put in front of you -- okay.  This
11:43:18 11    is in the chat.  It's going to be internal -- and it's
11:43:21 12    going to be Deposition Exhibit 6.  It's also Internal
11:43:23 13    Exhibit 6.
11:43:35 14        (Exhibit No. 6 marked for identification.)
11:43:35 15    BY MR. SINGH:
11:43:48 16        Q.  I am going to ask you a few questions here.
11:43:57 17    We're going to go through a good portion of this.  Give
11:44:01 18    me a second here.  I am going to share screen.
11:44:15 19        So we've marked this -- your counsel kindly
11:44:20 20    segmented the production into pieces, which is actually
11:44:27 21    very helpful.  I appreciate that -- and turned one of
11:44:31 22    those pieces into an exhibit.  It's Exhibit 6, and
11:44:35 23    this -- it correlates with a tranche that he produced --
11:44:39 24    that your counsel produced responsive to the subpoena.
11:44:43 25    You'll see that, the way I named the PDF, I took the

75

11:44:48  1    native name that your counsel applied to the file, and I
11:44:53  2    just put it in brackets and I've made it Exhibit 6.
11:44:57  3        MR. SINGH:  So, Mr. Ehlers, you can correlate
11:44:59  4    that with what you produced.
11:42:14  5    BY MR. SINGH:
11:45:01  6        Q.  So, first, let's just take a look at what is
11:45:04  7    Bates-stamped Bosley1, Bosley000001, and it goes on
11:45:10  8    through, essentially, Bosley10.
11:45:24  9        Do you recognize this -- this -- take a look at
11:45:28 10    those Bates-stamped pages, 1 through 10.  Do you
11:45:31 11    recognize this as a series of e-mails exchanged between
11:45:35 12    you and employees of the Yolo Food Bank in 2023 in
11:45:39 13    connection with the execution of the partner agency
11:45:41 14    agreement we were just previously discussing?
11:45:44 15        A.  Yes.
11:45:45 16        Q.  Okay.  And is it correct that these e-mails
11:45:48 17    reflect that they were asking you to sign the partner
11:45:52 18    agency agreement, which you did and which you sent back
11:45:56 19    to them?
11:45:56 20        A.  Yes.
11:45:57 21        Q.  Okay.  During the course of this exchange, did
11:46:04 22    you attempt, at any point, to negotiate on the terms in
11:46:09 23    this partner agency agreement before executing it?
11:46:14 24        A.  I don't recall that I did, no.
11:46:17 25        Q.  Okay.  Because I don't see -- in the documents

76

11:46:22  1    that you provided, I don't see evidence of that.  That's
11:46:25  2    why I'm just trying to confirm that with you.
11:46:27  3        So you signed it; correct?
11:46:30  4        A.  Correct.
11:46:30  5        Q.  Okay.  And they told you in the e-mail -- you
11:46:36  6    see here Jim Newton, March 2nd, 2023, 10:42, sent you an
11:46:42  7    e-mail that said, "Good morning, Don.  I wanted to follow
11:46:45  8    up about the grocery recovery agreement.  I have not
11:46:51 10    received a signed copy from you yet and wanted to get
11:46:51 11    this on file."
11:46:52 12        Is it correct that, when you received this
11:46:53 13    e-mail, you looked at the document, you signed it, and
11:46:56 14    you sent it back to him?
11:46:57 15        A.  Yes.  Now, if I'm not mistaken, either in this
11:47:08 15    group or -- there are actually two agreements reflected.
11:47:13 16    One is the partner membership agreement; this here is the
11:47:17 17    grocery recovery partner agreement.  So those are --
11:47:21 18    those are -- and I believe we got those and returned
11:47:25 19    those, more or less, at about the same time.  This looks
11:47:30 20    like it all has to do with the grocery recovery.
11:47:33 21        Q.  I am just going to scroll through here quickly.
11:47:36 22        I don't see any other agreement in this
11:47:37 23    particular tranche.  We can come back to that in a
11:47:46 24    moment, but okay.  I'll take your word on that, and we'll
11:47:49 25    go back and take a look at this.

DONALD BOSLEY - June 6, 2023

77

```
11:47:49  1      A.  Well, you showed me the partner agreement
11:47:51  2   earlier today.
11:47:51  3      Q.  Okay.  So let's go back then.
11:48:06  4         Here's the partner agency agreement.  This was
11:48:09  5   Exhibit 5.  And, again, could be our mistake, and this is
11:48:13  6   why we can clarify things; so let's do it.
11:48:16  7         This is the exhibit I had previously.
11:48:20  8      A.  Okay.  Okay.
11:48:21  9      Q.  And Exhibit 6, which is what I am showing you
11:48:25 10   now -- let's look at these side by side.  "Grocery
11:48:30 11   Recovery Program Partner Agency Agreement," "Grocery
11:48:35 12   Recovery Partner Agency Agreement."
11:48:39 13      A.  Okay.
11:48:40 14      Q.  I could be wrong, but, to me, they look like the
11:48:42 15   same document, but walk me through this if these are
11:48:46 16   different.
11:48:46 17      A.  No, I think you're correct.  I think I'm
11:48:49 18   getting -- I know there were -- well, I'm pretty sure
11:48:51 19   there were two documents we signed at the time, but I'll
11:48:55 20   be happy to go back and double-check that.
11:48:57 21      Q.  That would be helpful.  We will also --
11:49:01 22         MR. SINGH:  Michael Indrajana, please just take
11:49:05 23   note.  I know you're offline right now, but I know you
11:49:08 24   can hear me.  Let's just double-check on our end as well.
11:42:14 25   BY MR. SINGH:
```

78

```
11:49:11  1      Q.  -- and we'll let you know.  But yeah, if you can
11:49:13  2   double-check with your counsel, we'll double-check as
11:49:15  3   well.
11:49:16  4         So I think what you're saying is there might be
11:49:21  5   another agreement, which is a partner membership
11:49:24  6   agreement, I think is the term you used, that was also
11:49:26  7   executed around the same time; correct?
11:49:28  8      A.  I believe that to be true.
11:49:29  9      Q.  Okay.  No problem.
11:49:32 10         (Speaking simultaneously.)
11:49:33 11   BY MR. SINGH:
11:49:33 12      Q.  We'll check.  I thought that I had made a
11:49:35 13   mistake on what I'd previously shown you, but I think we
11:49:40 14   determined that those are the same documents, but we'll
11:49:42 15   clarify anyway.
11:49:44 16         Okay.  So let's move forward.  I am back on
11:49:46 17   Exhibit 6.  I asked you a series of questions about this
11:49:48 18   e-mail exchange here, which took place on the first ten
11:49:52 19   pages of this Bates-stamped production.  Now I am going
11:49:55 20   to move to Bosley11, which jumps around in time; right?
11:50:01 21   So, obviously, as you can see, we went from '23 and now
11:50:06 22   we're at '21.
11:50:12 23         I am just curious.  When -- and I don't want to
11:50:15 24   know privileged information, but when you gave e-mails to
11:50:18 25   your counsel, did you give them in any particular order?
```

79

```
11:50:22  1      A.  I tried as best I could to answer the -- the
11:50:32  2   points in the -- in the subpoena point by point.  You
11:50:36  3   know, Point Number 1 asks for a certain individual, and I
11:50:40  4   tried to get all the interactions for that individual.
11:50:44  5         Now, some of the challenge arrived -- is that
11:50:46  6   some of those -- information was sent to multiple
11:50:50  7   individuals who information was asked for; so some of the
11:50:53  8   stuff about Mr. Hatfield here was maybe included in the
11:50:56  9   group that was written about for Mr. Bisch, but that was
11:51:01 10   how I approached it.
11:51:02 11      Q.  Okay.  Got it.
11:51:07 12         And the second agreement that you're talking
11:51:09 13   about, you think that that is an Edible Food Recovery
11:51:13 14   agreement?  What is the second agreement that you think
11:51:15 15   we're not looking at right now?
11:51:16 16      A.  I thought there was a general partner membership
11:51:22 17   agreement that didn't necessarily have to do with Edible
11:51:26 18   Food Recovery.  I could be mistaken, but that's what I
11:51:29 19   thought.
11:51:29 20      Q.  Okay.
11:51:33 21      A.  We can go back and check that.
11:51:36 22      Q.  I'll check.
11:51:36 23         I have one other question for you, just want to
11:51:41 24   probe your general understanding.  This is along the
11:51:43 25   lines of your role, the question I was asking about, your
```

80

```
11:51:47  1   knowledge base and your capacity as executive director
11:51:49  2   and board member of Mercy Coalition.
11:51:52  3         To your knowledge, were the agreement -- or
11:52:03  4   sorry.  I should say the working arrangement, whether
11:52:06  5   memorialized in a written agreement or not -- the working
11:52:09  6   arrangement between YFB and Mercy Coalition, was that
11:52:15  7   subject to any kind of regulation or oversight by City of
11:52:21  8   West Sacramento, to your knowledge?  And I'm not asking
11:52:29  9   for your --
11:52:30 10         (Speaking simultaneously.)
11:52:32 11         THE WITNESS:  Not to my knowledge.
11:52:33 12   BY MR. SINGH:
11:52:33 13      Q.  Was there some legal requirement to submit --
11:52:35 14   and, again, just your lay understanding.  I'm not asking
11:52:38 15   for a legal opinion.
11:52:39 16         Was there any requirement, to your knowledge, to
11:52:41 17   submit a copy of that agreement to City of West
11:52:46 18   Sacramento or Yolo County?
11:52:47 19      A.  I'm unaware of such a requirement.
11:52:53 20      Q.  And, for example, the agreement that you
11:52:55 21   executed with Yolo Food Bank in 2023, were you required
11:53:00 22   to submit a copy of that to either Yolo County or West
11:53:06 23   Sacramento?
11:53:06 24      A.  Not to my knowledge.  The Mercy Coalition was
11:53:10 25   not.  I can't speak for YFB, of course.
```

JAN BROWN & ASSOCIATES (415) 981-3498 (800) 522-7096

81

11:53:13   1      Q.  Am I correct, the entire time that you've been
11:53:17   2   working for Mercy Coalition, it is a private nonprofit?
11:53:21   3   Correct?
11:53:21   4      A.  Yes.
11:53:25   5      Q.  Okay.  So take a look on -- it starts at
11:53:36   6   Bosley11, and, I think, for the reasons you've
11:53:39   7   described -- and the reasons that you've described sound
11:53:45   8   like they make sense to me, that you were trying to
11:53:48   9   respond to our different topics.  But it looks like
11:53:51  10   the tranche shifts gears and goes back to '21, and it appears
11:53:56  11   to show some interaction between yourself, Michael Bisch,
11:53:59  12   and Zane Hatfield.  Do you see that?
11:54:01  13      A.  Yes.
11:54:02  14      Q.  When did you first meet Michael Bisch?
11:54:04  15      A.  If I'm not mistaken, I first had a substantive
11:54:16  16   conversation with Michael in a lunch arranged by Nolan
11:54:20  17   Sullivan from Yolo County.  We had lunch in Davis or
11:54:27  18   Woodland, and Nolan wanted to get us together because he
11:54:33  19   thought we had some ideas that could -- I don't know --
11:54:36  20   spark something between us or something like that; so --
11:54:36  21   so it wouldn't have been long after Michael was hired as
11:54:36  22   ED, I don't believe.  I just -- I'm not sure when that
11:54:44  23   was.
11:54:44  24      Q.  Okay.  Got it.
11:54:46  25          But obviously prior to this exchange that is

82

11:54:48   1   shown in '21, you had already known Michael and were
11:54:51   2   dealing with Michael in the context of the partnership;
11:54:51   3   correct?
11:54:53   4      A.  Yes.
11:54:53   5      Q.  Okay.  And you also knew Zane Hatfield, who was
11:54:59   6   working for Yolo Food Bank as well; correct?
11:55:03   7      A.  Yes.
11:55:03   8      Q.  And you regularly interacted with both of them
11:55:06   9   in the course of the partnership; correct?
11:55:08  10      A.  Yes, Zane --
11:55:08  11          (Speaking simultaneously.)
11:55:08  12   BY MR. SINGH:
11:55:08  13      Q.  Go ahead.
11:55:10  14      A.  I was going to say Zane from a programmatic
11:55:12  15   standpoint; Michael, more often that we would run into
11:55:16  16   each other at mixers or chamber events or things of this
11:55:18  17   nature.
11:55:18  18      Q.  Got it.
11:55:20  19          Interacting with Michael at the level of
11:55:20  20   executive directors?
11:55:23  21      A.  Yes.
11:55:23  22      Q.  Okay.  And interacting with Zane more on
11:55:26  23   day-to-day programmatic issues?
11:55:28  24      A.  I think that would be correct, yes.
11:55:30  25      Q.  Okay.  And in the course of these interactions,

83

11:55:36   1   particularly here, is it correct that these interactions
11:55:39   2   were focused on efforts of Mercy Coalition and Yolo Food
11:55:50   3   Bank to understand the direction that the County and the
11:55:56   4   other government entities, the Cities, were going in
11:56:00   5   connection with the SB 1383 prior to its implementation?
11:56:09   6      And take a look -- before you answer, take a look at
11:56:12   7   these e-mails if it refreshes your recollection.
11:56:17   8      A.  Yes.  These interactions had to do with a
11:56:19   9   request that came from Michael and/or Zane to make an
11:56:25  10   appearance at a board of supervisors meeting supporting
11:56:31  11   the food bank, in -- in general.
11:56:34  12          I do believe it was part of the ramp-up
11:56:37  13   conversation to SB 1383, but, in general, they -- as I
11:56:45  14   recall, they were just asking me to make an appearance
11:56:48  15   and advocate for the food bank's role and how important
11:56:55  16   they were to us at the Mercy Coalition and that -- and
11:56:57  17   that kind of advocacy, which I did endeavor to do on that
11:57:02  18   day, and then the -- the board meeting went long, and I
11:57:05  19   had to check out.  But I was there for that purpose.
11:57:08  20      Q.  Okay.  So you were trying to help support Yolo
11:57:13  21   Food Bank's position in connection with SB 1383 at that
11:57:17  22   time?
11:57:17  23      A.  I don't know that I fully understood SB 1383.  I
11:57:23  24   am not sure I still do, in some ways, but I -- the --
11:57:29  25   because we were partners of the food bank, in my mind,

84

11:57:34   1   and I wanted to support their role in the county, I -- I
11:57:39   2   agreed to their request to support and talk about the
11:57:44   3   food bank's meaning to us and how important they were to
11:57:48   4   us.
11:57:51   5      Q.  They had been a supportive partner to Mercy
11:57:55   6   Coalition; correct?
11:57:56   7      A.  Yes, absolutely.
11:57:56   8      Q.  In fact, I scrolled to Bosley22, where you wrote
11:58:05   9   this e-mail to Zane on July 28, 2021, at 5:57 p.m.  Do
11:58:08  10   you see it?
11:58:08  11      A.  Yes.
11:58:08  12      Q.  And in it you say, "Hi, Zane.  Hope you're doing
11:58:13  13   well.  YFB's partnership helped us secure a Dignity
11:58:17  14   Health community grant last year.  I have attached last
11:58:19  15   year's letter and would like to ask if you could, once
11:58:22  16   again, provide us with a letter of support for Dignity,
11:58:25  17   as we look to expand and grow those services."  Do you
11:58:27  18   see that?
11:58:27  19      A.  Yes.
11:58:27  20      Q.  Okay.  And did Zane and Michael ultimately
11:58:33  21   provide the letter that you requested?
11:58:35  22      A.  Yes.
11:58:36  23      Q.  Okay.  And correct me if I'm wrong because I --
11:58:42  24   earlier, when I asked you about whether there was a
11:58:45  25   partnership in '21 and '22, you gave an answer that sort

21  (Pages 81 to 84)

**89**

```
12:04:31   1    A. Formally?  No.  Oh, law?  No.
12:04:32   2    Q. And have you had any kind of certification
12:04:35   3  course or any kind of training course on the regulations
12:04:38   4  that applied to food bank or food collection operations?
12:04:44   5    A. No.
12:04:46   6    Q. Okay.  Had you had any training on the laws and
12:04:54   7  regulations that would apply to nonprofit leadership or
12:05:00   8  execution of board duties?
12:05:03   9    A. Not in any formal sense.  It would have been
12:05:12  10  self-study.
12:05:15  11    Q. If you had done any self-studying on those
12:05:19  12  topics, when would that have been?
12:05:21  13    A. Well, there is an important dynamic here to
12:05:29  14  understand.  As a pastor of a West Sacramento church, we
12:05:29  15  were technically a nonprofit -- well, not technically.
12:05:37  16  We were a nonprofit and, therefore, had to be adherent to
12:05:39  17  a lot of the nonprofit regulations and things.
12:05:43  18         While I was still pastoring there is when the
12:05:46  19  Mercy Coalition began in its pre-nonprofit form.  So as
12:05:52  20  we formalized as a nonprofit, we began to study the
12:05:57  21  differences between what we knew about nonprofit
12:05:59  22  management in a -- in a religious role versus what we
12:06:06  23  were doing in a community-based organization role.
12:06:10  24         So the answer -- the self-study related to food
12:06:15  25  recovery and things would have been, you know, mid-2015,
```

**90**

```
12:06:20   1  2013, ongoing through the end of that decade; so...
12:06:26   2    Q. Okay.  I'm moving down here to Bosley27.  We're
12:06:53   3  in the same exhibit.  And you'll see -- I'm going to
12:06:55   4  actually -- I think it goes in reverse chronology.  It
12:07:00   5  actually is a little bit all over, but understandably.
12:07:03   6         So there's a series of text messages that you
12:07:05   7  produced, some of which appear to be with Michael Bisch,
12:07:11   8  and go from -- they go through Bosley33.  So it's
12:07:15   9  basically from Bosley27 through 33.
12:07:20  10         So are these the only text messages that you
12:07:23  11  have between yourself and Zane Hatfield and yourself and
12:07:29  12  Michael Bisch?
12:07:34  13    A. Yes.
12:07:34  14    Q. So is it correct that your text messages with
12:07:36  15  Michael Bisch, according to your records, include a few
12:07:40  16  text messages in the fall of '21 and through December of
12:07:44  17  '21, some of which appear to be about SB 1383 --
12:07:49  18    A. Uh-huh.
12:07:51  19    Q. -- and then it appears that you do not have --
12:07:54  20  after the exchange in December 21st, the next text
12:08:00  21  exchange you have with him isn't until March 3rd of '22?
12:08:04  22    A. Uh-huh.
12:08:05  23    Q. Is that correct?
12:08:06  24    A. That is correct.  Most of our interactions in
12:08:09  25  that time were by phone.
```

**91**

```
12:08:11   1    Q. Okay.  And then, similarly, I just want to
12:08:16   2  clarify:  With Zane Hatfield, it appears that the only
12:08:24   3  record you have of a text exchange with him was in and
12:08:29   4  around March of 2022.
12:08:31   5    A. Uh-huh.  Similarly, Zane usually called, or I
12:08:31   6  called him; so there just wasn't much texting that
12:08:39   7  happened in those relationships.
12:08:39   8    Q. Okay.  Got it.
12:08:43   9         Let's now focus in on the events that obviously
12:08:53  10  are a significant focus for your -- in your declaration.
12:09:02  11  It appears -- and let's start with this text message.
12:09:05  12         It appears that, in and around March 2nd of 2022
12:09:13  13  in the morning, you sent a text message to Zane that you
12:09:15  14  got his message.  I'm assuming we're seeing a truncated
12:09:17  15  version of the message here.  Looks like it's somehow
12:09:20  16  dictated so there's a little bit of auto-voice
12:09:23  17  recognition error in it, but it appears to be a
12:09:27  18  transcribed message from Zane Hatfield, and then you're
12:09:28  19  responding to it that you got his message, and you guys
12:09:33  20  were going to try to connect with a call later that
12:09:33  21  afternoon; is that correct?
12:09:34  22    A. Yes.
12:09:35  23    Q. And you did, indeed, connect with a call later
12:09:38  24  that afternoon; correct?
12:09:40  25    A. Yes.
```

**92**

```
12:09:40   1    Q. Okay.  And the call that you had that afternoon,
12:09:56   2  who was on the call?
12:09:57   3    A. Just Zane and I.
12:10:00   4    Q. Okay.  And what was the topic of the call?
12:10:08   5    A. Zane was calling to see what our position was in
12:10:16   6  regard to signing a contract for the City of West
12:10:21   7  Sacramento for Edible Food Recovery.
12:10:23   8    Q. And at the time when he called you, was it
12:10:26   9  correct that you had had a long-standing partnership with
12:10:30  10  YFB?
12:10:30  11    A. Yes.
12:10:31  12    Q. And --
12:10:36  13         (Speaking simultaneously.)
12:10:37  14         THE WITNESS:  That I had exchanged several phone
12:10:39  15  calls with Michael over the previous three, four,
12:10:44  16  five months asking his thoughts on SB 1383, what Yolo
12:10:52  17  County -- or what the food bank wanted to get done, and,
12:10:55  18  ultimately, I would go back and talk to the City and the
12:10:57  19  County.  They would give me different accounts of how
12:11:01  20  things were happening than what Michael would do.  I
12:11:04  21  would typically call Michael back.
12:11:05  22         And so there were -- there were at least two or
12:11:08  23  three phone calls where I initiated to Michael and said,
12:11:11  24  "Hey, is this going to hurt you guys?  Explain this to
12:11:14  25  me."  And -- and to his credit, he took the time to --
```

**93**

```
12:11:17   1   to -- to -- you know, we spent a lot of time on the phone
12:11:22   2   talking through those things.
12:11:24   3   BY MR. SINGH:
12:11:24   4        Q.  Is it correct that Michael spent a lot of time
12:11:26   5   explaining to you why he believed that it actually would
12:11:30   6   be hurtful to WFB and also to the community to follow the
12:11:32   7   County's position?
12:11:32   8        A.  What Michael explained to me was that -- you
12:11:39   9   know, why the County's position was -- was wrong, and,
12:11:44  10   you know, that, you know, the -- to my understanding, as
12:11:48  11   Michael helped me understand it, you know, there was a
12:11:53  12   certain cost that YF -- that came to Yolo Food Bank for
12:11:59  13   them to sort of be the central figure in the Edible Food
12:12:04  14   Recovery program, SB 1383 initiative, and the County did
12:12:09  15   not agree with that cost, and he had evidence to the
12:12:13  16   contrary, and so they went back and forth.
12:12:16  17        We were sort of the little food bank in the
12:12:18  18   middle and one of the -- or the little food pantry in the
12:12:21  19   middle, one of several.  But anyway, yes, he explained
12:12:25  20   his position, and, you know, we went back and forth
12:12:29  21   on that through several phone calls.
12:12:31  22        Q.  So if I were to summarize, you were hearing
12:12:35  23   Michael Bisch's viewpoint on -- or, essentially, Michael
12:12:38  24   Bisch expressing YFB's viewpoint on the issues, and you
12:12:43  25   were also hearing, on the other hand, the County and the
```

**94**

```
12:12:46   1   City expressing their viewpoint to you on the same
12:12:48   2   issues; correct?
12:12:49   3        A.  Yes, correct.
12:12:49   4        Q.  Who from the County and the City were you
12:12:53   5   interfacing with, specifically by name?  If you can
12:12:56   6   provide those names, that would be helpful -- at that
12:12:56   7   time.
12:12:56   8        A.  Yes.  Most often, Marissa Juhler.  And I do have
12:13:05   9   a close relationship with Nolan Sullivan, who is now the
12:13:10  10   HSA director in Yolo County.  And I trust Nolan's
12:13:15  11   judgment, and I would go to Nolan and go, "Hey, this is
12:13:15  12   what I'm hearing from one side; this is what I'm hearing
12:13:19  13   from another," and Nolan would help me parse out some of
12:13:21  14   that.
12:13:27  15        Q.  Okay.  At any point in time during that
12:13:30  16   exchange, did you believe that Michael Bisch was doing
12:13:34  17   anything unethical?
12:13:35  18        A.  I was not aware of it, no.
12:13:35  19        Q.  At any point in time, did you believe that
12:13:38  20   anyone at YFB, including Zane Hatfield, was doing
12:13:38  21   anything unethical in advocating their viewpoints on
12:13:48  22   SB 1383 to you?
12:13:48  23        A.  I didn't think anybody on any side was doing
12:13:51  24   something unethical.  I just thought that they had a vehement
12:13:51  25   disagreement, but I had not reached the point where I
```

**95**

```
12:13:53   1   thought anybody was doing anything unethical.
12:13:55   2        Q.  Did you understand -- did you start to
12:13:59   3   appreciate or understand, one way or the other, as to
12:14:02   4   whether or not, essentially, YFB and the County were in
12:14:06   5   competition on some of these issues?
12:14:09   6        A.  I knew what Michael told me on one hand, and I
12:14:18   7   know what the County -- specifically the County told me
12:14:23   8   on the other, and -- and I know that then Michael would
12:14:27   9   say that's not a fact, and then, you know.  So -- so I
12:14:32  10   know what I was told.  We're not a big enough nonprofit,
12:14:38  11   and I'm not steeped enough in all of the details; so this
12:14:42  12   is what I was trying to do, was discern the -- discern
12:14:46  13   the difference and where the benefit -- the biggest
12:14:49  14   benefit would be in that equation.
12:14:50  15        Q.  Totally makes sense what you're saying, but I
12:14:53  16   want to go back because you kind of cut yourself off.
          17        You were saying, "Michael would tell me, on the
          18   one hand, that they weren't correct," and then you
          19   were -- I thought you were about to say what they would
          20   say.  I'm curious.  What would they say in reply?  So
          21   Michael would tell you that they weren't correct, you
12:15:06  22   would go back to them and tell them what he said, and
12:15:07  23   what would they say in reply?
12:15:20  24        (Reporter instruction.)
12:15:21  25        THE WITNESS:  Basically, as I recall it now, you
```

**96**

```
12:15:25   1   know -- I want to make sure I characterize this correctly
12:15:25   2   that -- even in some of my texts you can see that I'm
12:15:32   3   like, "I want to make sure I'm not mischaracterizing what
12:15:34   4   I'm hearing."
12:15:36   5        But, you know, the food bank was willing to get
12:15:43   6   the SB 1383 -- take that lead role for a certain amount
12:15:47   7   of money.  The County thought it was too much.  There was
12:15:51   8   a third-party analysis done, and, you know, Michael would
12:16:00  9   point to that and go, "Here's evidence that what they're
12:16:03  10   saying is untrue."  And so, you know, you just kind of
12:16:07  11   got this, this, and the -- and the County, long and short
          12   of it, is -- is, for whatever their reason was, said --
12:16:12  13   you know, said, "Well, we're not" -- you know, "that's
12:16:16  14   not the price we're willing to pay," and so they kind of
12:16:19  15   came to an impasse on that.  That was my understanding.
12:16:21  16   BY MR. SINGH:
12:16:22  17        Q.  No, I understand that.
12:16:23  18        But what specifically -- I'm assuming, because I
12:16:26  19   thought you said -- and correct me if I'm wrong -- that
12:16:30  20   you would hear Michael's viewpoint, and then you would go
12:16:32  21   and talk to them.
12:16:33  22        So my question is this:  At any point in time,
12:16:36  23   assuming that you did tell them what Michael was saying,
12:16:39  24   in other words, for example, that there was data showing
12:16:41  25   that what they were saying factually appeared to be
```

RONALD BOSLEY 14-2 June 6, 2022

## 101

```
12:21:20   1    but I'm just saying that's what he wanted; correct?
12:21:23   2         A.   Yes.
12:21:23   3         Q.   Okay.  And at some point, did he raise the issue
12:21:37   4    about -- is it correct that part of the component of the
12:21:42   5    proposed -- one of the components of the proposed
12:21:44   6    agreement from the City and County -- and, I guess,
12:21:48   7    specifically from the City -- was that the food recovery,
12:21:52   8    which you previously had been doing for free in your
12:21:55   9    partnership with YFB -- that they were prepared to pay a
12:22:00  10    certain amount to Mercy Coalition for food recovery?  Is
12:22:04  11    that correct?
12:22:04  12         A.   They were arranging to add an additional grocery
12:22:11  13    store to our pick-ups.  Grocery Outlet was the one we
12:22:18  14    were discussing, and -- and for that, the -- the one-year
12:22:23  15    contract for us, and -- and I believe the same -- well, I
12:22:27  16    don't want to -- I don't think we were the only ones who
12:22:30  17    got that offer -- was for $26,000 for us to do that for a
12:22:37  18    year.
12:22:37  19         Q.   And I'm not -- I'm not disputing nor trying to
12:22:38  20    suggest something untoward on that.
12:22:41  21              I'm just saying part of the proposal was that
12:22:43  22    you would receive 26- -- Mercy Coalition.  Not you --
12:22:46  23    Mercy Coalition would receive $26,000 in connection with
12:22:49  24    food recovery; correct?
12:22:50  25         A.   Correct.
```

## 102

```
12:22:50   1         Q.   And previously, in your partnership with YFB,
12:22:55   2    obviously, you were doing the food recovery without any
12:22:56   3    compensation; correct?
12:22:58   4         A.   Correct.
12:22:58   5         Q.   During the phone call, did Mr. Hatfield -- in
12:23:04   6    trying to, essentially, bring you into their camp and
12:23:08   7    have you align with their position, did he offer that YFB
12:23:13   8    would provide a similar amount of money to Mercy
12:23:19   9    Coalition for food recovery?
12:23:21  10         A.   You know --
12:23:25  11         Q.   On that phone call, did he make that offer?
12:23:27  12         A.   I remember that offer or that suggestion being
12:23:37  13    put out there; I just can't remember if it was that phone
12:23:41  14    call, and I can't remember if it was Zane or Michael that
12:23:43  15    said it.  But YFB -- one of those guys did suggest
12:23:47  16    vague -- I mean, generally -- there wasn't any contract
12:23:49  17    or anything, but generally, they suggested that, you
12:23:52  18    know, "we can provide" -- "maybe we should consider
12:23:57  19    funding the pantries ourselves.  We could do that," or
12:24:00  20    "if it's all about" -- "yeah, if it's all about money,
12:24:04  21    then we can" -- "we can" -- "we could meet that."
12:24:07  22         Q.   I want to come back to something you just said
12:24:09  23    because you said, "Well, there wasn't any contract."
12:24:11  24              Well, correct me if I'm wrong.  According to
12:24:12  25    your prior testimony, you had been operating in a
```

## 103

```
12:24:15   1    partnership with them, at that point, according to you,
12:24:19   2    without a contract or anything; correct?
12:24:19   3         A.   I meant there wasn't any contract saying YFB
12:24:22   4    would give us money.
12:24:23   5         Q.   Sure.  But what I'm saying is that also --
12:24:25   6    according to you, the rest of your partnership had been
12:24:28   7    operating without contract too, and they were providing
12:24:30   8    you access to food; correct?
12:24:35   9         A.   I was merely making the point that, at this
12:24:35  10    point of the conversation, it was just a general offer
12:24:39  11    from either Zane or Michael or -- or almost kind of a
12:24:43  12    whimsical, "Hey, maybe we should just pay you.  We could
12:24:46  13    probably arrange that," something to that effect.  So
12:24:49  14    that's all I'm saying.  It hadn't reached any contractual
12:24:53  15    stage in relation to money for services or anything like
12:24:56  16    that.
12:24:56  17         Q.   Did we lose connection?
12:25:16  18         A.   I'm still here.
12:25:17  19         Q.   Can you hear me?
12:25:18  20         A.   I can.
12:25:18  21         Q.   Yeah, I just lost connection, and we got a --
12:25:22  22    honestly, the new reality of being in the Bay Area is you
12:25:25  23    never know weather conditions or otherwise.  I'm looking
12:25:29  24    outside of my window, and I don't see any tornados.
12:25:33  25              MR. SINGH:  But, Michael, did we lose connection
```

## 104

```
12:25:36   1    on our end, or did anyone else lose connection on the
12:25:39   2    other end?
12:25:45   3              MR. TURPEN:  Sanjiv, I think you maybe just cut
12:25:45   4    out for a little bit.
12:25:49   5              MR. SINGH:  Yeah, so I'm trying to diagnose
12:25:49   6    whether the issue is here in San Mateo, because there
12:25:54   7    were intermittent outages here by my house, which is
12:25:55   8    about 15 minutes away, last week that knocked out
12:25:59   9    Internet for about five days, but I'm trying to figure
12:26:01  10    out whether we have a significant problem or just a minor
12:26:04  11    hiccup.
12:26:04  12              You can hear me now?
12:26:06  13              MR. TURPEN:  We can hear you now.  I think you
12:26:09  14    just froze for a little bit and then started waving your
12:26:11  15    arms.
12:26:11  16              MR. SINGH:  Yeah, yeah, yeah.  Okay.  I'll need
12:26:16  17    some assistance from the court reporter as to where the
12:26:17  18    last comprehensible part of my talking was before I cut
12:26:17  19    off.
12:26:19  20              (Record read.)
12:26:59  21    BY MR. SINGH:
12:26:59  22         Q.   Okay.  So just to follow through, Mr. Bosley,
12:27:05  23    your -- according to you, you just don't remember when
12:27:11  24    that statement was made, but you're not disputing that
12:27:14  25    those statements were made regarding the possibility of
```

RONALD BOSLEY - 2 - June 6, 2022

109

```
12:33:19   1      purchase food, even at a discounted rate -- rate from
12:33:24   2      Yolo Food Bank.  That was our understanding.  We assumed
12:33:27   3      it because no mention was made of that being cut off.
12:33:31   4           But the -- since YFB had set up the original
12:33:36   5      food recovery program with Raley's and Nugget, we assumed
12:33:42   6      that they also had the authority to turn off that spigot
12:33:46   7      for us.  We later learned that that was really not true,
12:33:51   8      but that is -- that is the message that they gave us.
12:33:54   9           Q.  Sorry.  What -- you said "turn off that spigot."
12:33:59  10      What spigot?
12:34:01  11           A.  The ability to get food from Nugget and Raley's,
12:34:05  12      recovered food that we would then reroute to our homeless
12:34:07  13      clients and -- and those in great need around the state.
12:34:10  14           Q.  So, again, I want to go back to the question.
12:34:15  15           You communicated to the City and the County
12:34:20  16      effectively that Yolo Food Bank had cut off food access
12:34:24  17      to Mercy Coalition.
12:34:26  18           What I'm trying to explore with you is:  Had you
12:34:30  19      been cut off from any particular sites, or were you cut
12:34:36  20      off from food access?  So let me ask you this question.
12:34:40  21      Was it your understanding, as of your phone call with
12:34:43  22      Zane -- did you understand that your contract was being
12:34:47  23      terminated with YFB?
12:34:49  24           A.  As of my phone call with Zane, I was told that
12:34:57  25      the Yolo Food Bank board was pressuring him to -- to
```

110

```
12:35:05   1      communicate to us that they would consider taking away
12:35:09   2      our food at -- our food access to Nugget and Raley's.
12:35:15   3           As of the phone call with Zane, that was not in
12:35:18   4      action yet; it was merely a threat hanging in the air.
12:35:22   5           Q.  You've used the word "threat."
12:35:24   6           A.  Yeah.
12:35:25   7           Q.  Did YFB -- you were in a partnership with YFB;
12:35:25   8      correct?
12:35:32   9           A.  Yes.
12:35:32  10           Q.  And YFB -- Mercy Coalition, in the course of
12:35:38  11      pursuing that partnership, takes steps to protect its
12:35:41  12      interest; correct?
12:35:43  13           A.  What are you getting at?  I'm --
12:35:46  14           Q.  I'm asking you a question.
12:35:48  15           During the course of your partnership with YFB,
12:35:50  16      you, as the executive director, take actions to protect
12:35:52  17      the interests of Mercy Coalition; correct?
12:35:54  18           A.  Of course.
12:35:55  19           Q.  And you did; correct?
12:35:59  20           MR. EHLERS:  Objection.  Vague.
12:36:00  21           THE WITNESS:  What are you referring to?
12:36:01  22      BY MR. SINGH:
12:36:02  23           Q.  One of the actions that you took was to explore
12:36:04  24      the possibility of an arrangement with the City of West
12:36:11  25      Sacramento and the County, a separate agreement, and
```

111

```
12:36:12   1      enter into that separate agreement with those entities;
12:36:13   2      correct?
12:36:13   3           A.  Correct.  We explored that possibility, yes.
12:36:16   4           Q.  And you did that despite the fact that YFB
12:36:19   5      expressed their viewpoint that they didn't think that
12:36:22   6      would be beneficial to your relationship with them;
12:36:22   7      correct?
12:36:27   8           A.  Yes.
12:36:27   9           Q.  Okay.  How is that -- how is YFB taking action
12:36:36  10      to protect its interests unethical?
12:36:41  11           MR. EHLERS:  Objection.  Vague.  Calls for a
12:36:43  12      legal conclusion.
12:36:44  13           MR. TURPEN:  Same objection.
12:36:45  14      BY MR. SINGH:
12:36:46  15           Q.  You can answer as a layperson because it's my
12:36:47  16      understanding you used the term "unethical" to describe
12:36:51  17      the statements and what you viewed as the conduct of
12:36:55  18      Michael Bisch and Zane Hatfield in these phone calls.
12:36:57  19           So what was it either Zane or Michael did or
12:37:01  20      said that was unethical?
12:37:04  21           MR. EHLERS:  Objection.  Assumes facts not in
12:37:07  22      evidence and argumentative.
12:37:08  23           Answer if you can.
12:37:09  24           MR. TURPEN:  Same objections.
12:37:17  25           (Speaking simultaneously.)
```

112

```
12:37:18   1      BY MR. SINGH:
12:37:18   2           Q.  Withdrawn.  Withdrawn.  Based on the objections,
12:37:20   3      I am going to lay a little more foundation and, we're
12:37:23   4      going to come back to that.
12:37:24   5           So you -- you basically have talked about this
12:37:28   6      phone call with Zane.  Tell me the -- what exactly did
12:37:32   7      Zane say, to the best of your recollection, in connection
12:37:38   8      with Raley's and Nuggets?  About your access to Raley's
12:37:42   9      and Nuggets.
12:37:45  10           A.  To the best of my recollection, what Zane said
12:37:49  11      clearly was, "Well, our board is asking me whether we
12:37:57  12      shouldn't just cut you off entirely from Raley's and
12:38:04  13      Nugget."  I think the wording is more precise in an
12:38:09  14      e-mail that I sent to my board -- that you have -- last
12:38:13  15      March 30th or 31st where I recounted, sort of, the
12:38:16  16      blow-by-blow of these things, and I believe I had Zane's
12:38:17  17      wording in there pretty close to word for word.
12:38:20  18           Q.  Your recollection of his word?
12:38:27  19           A.  Yes.
12:38:27  20           Q.  At any point in describing your recollection of
12:38:31  21      his wording, did you mention the offer to pay you for the
12:38:35  22      food recovery?
12:38:37  23           A.  I don't remember that that was that -- part of
12:38:41  24      that conversation.  But whether it was or not, I did not
12:38:43  25      mention it, no.
```

28 (Pages 109 to 112)

**113**

12:38:44  1   Q.  And, in fact, as you, I think, just said a few
12:38:48  2   minutes ago, you didn't even remember that until today,
12:38:50  3   until I refreshed your recollection on that; correct?
12:38:53  4       A.  That's correct.
12:38:53  5       Q.  So an entity is telling you that they're going
12:39:00  6   to limit your access or cut off your access to these
12:39:05  7   sites and telling you also that they're going to --
12:39:06  8   they're trying to get you to align with their position
12:39:09  9   and offering you -- offering -- trying to offer
12:39:13 10   competitive terms similar to what the County was offering
12:39:16 11   you.  Can you explain to me, how was that unethical?
12:39:23 12       MR. EHLERS:  I am going to object.  It's
12:39:25 13   argumentative, again, and misstates testimony.
12:39:27 14       Answer if you can.
12:39:28 15       MR. TURPEN:  Same objection.  And it's vague.
12:39:31 16   BY MR. SINGH:
12:39:32 17       Q.  Withdrawn.
12:39:32 18       Did you, at any point in time, label the speech
12:39:35 19   or conduct of Zane Hatfield as unethical?  Yes or no?
12:39:39 20       A.  Yes.
12:39:39 21       Q.  Did you, at any point in time, label the speech
12:39:42 22   or conduct of Michael Bisch as unethical?  Yes or no?
12:39:46 23       A.  Yes.
12:39:47 24       Q.  Okay.  So let's go back to your two yeses you
12:39:50 25   just gave, and I want to ask you why in both cases.

**114**

12:39:51  1       Why did you say that Zane Hatfield had acted
12:39:57  2   unethically?  And please be as precise as possible.
12:40:01  3       MR. TURPEN:  Objection.  Argumentative.
12:40:04  4       MR. EHLERS:  Same objection.
12:40:05  5       Answer if you can.
12:40:06  6       THE WITNESS:  In my opinion -- and perhaps I
12:40:14  7   have a different standard of ethical than others.  In my
12:40:21  8   opinion, when we have access to 9 1/2 tons of food that
12:40:26  9   we can reroute to people who are homeless, living on the
12:40:31 10   streets, people who have nothing, and because I disagree
12:40:38 11   with your interpretation and you're going to take that
12:40:42 12   away and you're going to hold yourself up as a champion
12:40:47 13   for food sustainability in our county while you're taking
12:40:52 14   9 1/2 tons of food a year out of a service provider's
12:40:56 15   hands because they won't back you in the way that you
12:40:59 16   want to, that is unethical.  When you fail to recognize
12:41:05 17   that Yolo Food Bank is not the only partner that we have
12:41:10 18   to work with in this arrangement -- the City and the
12:41:16 19   County were also our partners.  In your view, the way
12:41:20 20   you're framing it, somebody was going to get screwed
12:41:24 21   in -- one of our partners.
12:41:26 22       I had to decide, and I decided the way that was
12:41:29 23   going to get me access to a third grocery store so I
12:41:32 24   could feed more people.  Now, that may not have gone over
12:41:36 25   well with the food bank, but when you act -- when you

**115**

12:41:42  1   threaten to cut off food for people because -- because
12:41:48  2   you're trying to strong-arm us into aligning with you,
12:41:52  3   that is unethical to me.  When you say that Yolo Food
12:41:56  4   Bank is pressuring you to make that threat, I'll bet
12:42:01  5   everything I've got that that's a lie, and that is
12:42:04  6   unethical.  So I hope that's concise enough for you, sir.
12:42:11  7   BY MR. SINGH:
12:42:11  8       Q.  And so what evidence did you have that the Yolo
12:42:15  9   Food Bank board was not aligned with Mr. Hatfield's
12:42:19 10   position?
12:42:19 11       A.  No evidence at all.  No evidence at all.
12:42:21 12       But I know a couple of people on the board, and
12:42:24 13   I have always respected the food bank long before Michael
12:42:30 14   Bisch for its way that it did business of a high
12:42:32 15   character.  And even -- I was just very, very
12:42:37 16   confident -- I have no evidence, but I'm confident in the
12:42:40 17   character of -- of the board and of the organization as a
12:42:44 18   whole.
12:42:44 19       Q.  Were you aware that one of the board members of
12:42:51 20   Yolo Food Bank -- that their food pantry had opted out of
12:42:56 21   the proposed County and City of West Sac agreement?  They
12:43:05 22   were not accepting it?  Were you aware of that, that at
12:43:05 23   the very time that you were having this discussion with
12:43:07 24   Zane and you're saying you're confident that it's a lie
12:43:10 25   that the board was backing him up on this -- are you

**116**

12:43:14  1   aware that there were members of the board who had
12:43:17  2   declined entering into the same agreements with the City
12:43:22  3   and the County?
12:43:22  4       A.  I was unaware.  I was certainly aware that Jen
12:43:29  5   Engstrom, one of the board members who was willing to be
12:43:32  6   our partner -- and we were actively in discussions about
12:43:35  7   that.  So, you know -- but I have no knowledge of what
12:43:43  8   other -- any other food pantries that were offered the --
12:43:50 10   I have no knowledge of what they -- what they did or how
12:43:50 10   they --
12:43:51 11       Q.  And how did -- can you explain to me how did --
12:43:54 12   because think now I have a better understanding of why
12:44:01 13   you used this term "unethical."
12:44:01 14       How were you, in fact, as a factual matter, cut
12:44:08 15   off from the other food services that were available to
12:44:15 16   you through your partnership with YFB, other than Raley's
12:44:15 17   and Nuggets?
12:44:19 18       MR. TURPEN:  Objection.  Vague.
12:44:19 19       THE WITNESS:  I never thought that we were cut
12:44:21 20   off from those sources.
12:44:21 21   BY MR. SINGH:
12:44:21 22       Q.  You were not; correct?  You were not cut off
12:44:23 23   from the other food sources available to you through YFB;
12:44:29 24   correct?
12:44:29 25       A.  Correct.

RONALD ROSLEY - June 6, 2022

141

```
14:28:11   1    speculation.
14:28:11   2          But you can answer.
14:28:12   3          MR. TURPEN:  Same objections.
14:28:16   4    BY MR. SINGH:
14:28:17   5       Q.  You can answer.
14:28:17   6       A.  Yeah, that was a pretty reasonable assumption.
14:28:20   7    I assumed she answers to someone.
14:28:21   8       Q.  And when you sent it, that's, in fact, what you
14:28:25   9    wanted to happen; correct?
14:28:28  10          MR. TURPEN:  Objection.  Vague.
14:28:37  11          (Speaking simultaneously.)
14:28:39  12          MR. TURPEN:  Argumentative.
14:28:42  13          (Reporter clarification.)
14:28:42  14          THE WITNESS:  It was not what I wanted to
14:28:44  15    happen; it was what I was pretty sure would happen.  As I
14:28:47  16    just said to you, it actually grieved me to know that it
14:28:52  17    would happen and probably blow back on the food bank and
14:28:56  18    Michael.  That's not the same as wanting it to happen.
14:29:00  19    BY MR. SINGH:
14:29:00  20       Q.  Interesting.  So I have a question for you.
14:29:03  21          If you knew that there was going to be blowback,
14:29:05  22    as you just said, wouldn't it be important that the facts
14:29:11  23    that you were putting in your e-mail were complete and
14:29:14  24    accurate?
14:29:20  25          MR. EHLERS:  Objection.  Misstates the witness's
```

142

```
14:29:23   1    previous testimony and is argumentative.
14:29:26   2          Answer if you can.
14:29:26   3          (Speaking simultaneously.)
14:29:28   4    BY MR. SINGH:
14:29:28   5       Q.  Hold on.  I am going to withdraw the question.
14:29:30   6    I am going to ask it another way.
14:29:32   7          You just said that you knew that there would be
14:29:34   8    blowback; so my question to you is this:  Since you knew
14:29:36   9    that, per your own verbatim testimony, what steps did you
14:29:42  10    take to ensure that the statements that you put in that
14:29:46  11    e-mail were accurate?
14:29:51  12          MR. TURPEN:  Objection.  Vague.  Assumes facts.
14:29:54  13    Argumentative.
14:29:57  14          THE WITNESS:  I put accurate facts in the
14:30:00  15    e-mail.  That's how I -- that's how I ensured it.  I
14:30:04  16    expressed our position and that we could not sign it.  I
14:30:07  17    expressed my dismay with the ongoing rift between the
14:30:12  18    food bank and the jurisdictions and probably let out a
14:30:19  19    little too much frustration in saying, "You know what?
14:30:23  20    You guys figure it out.  Get back to me.  Somebody, in
14:30:26  21    the meantime, tell me where I can get some food."
14:30:29  22          And -- but that is the -- that comprised the
14:30:35  23    e-mail that we sent.  It was not meant to be a, you know,
14:30:39  24    a manifesto on what the -- what the whole thing was all
14:30:42  25    about.
```

143

```
14:30:43   1    BY MR. SINGH:
14:30:46   2       Q.  I'm going to ask the question again because I
14:30:49   3    keep getting these objections, which I'm not sure are
14:30:52   4    applicable, but I want to work with Mr. Turpen's
14:30:55   5    objections because I want this clean for the record.
14:30:57   6          What steps did you take -- so I'm eliminating
14:31:01   7    all qualifiers here.  Just give me a simple answer, and
14:31:05   8    if it's the same answer as what you gave previously,
14:31:08   9    that's fine.
14:31:08  10          What steps did you take from the time you got
14:31:11  11    off the phone with Michael Bisch on March 3rd -- before
14:31:18  12    you sent this e-mail on March 4th to Susan Strand, what
14:31:22  13    steps did you take to make sure that the facts you put in
14:31:25  14    the e-mail to Susan Strand were accurate?
14:31:25  15       A.  Same answer as previous.
14:31:30  16       Q.  Thank you.
14:31:32  17          MR. TURPEN:  Same objections.
14:31:36  18          MR. SINGH:  What -- what -- sorry.  Can you
14:31:38  19    explain to me the basis for your objections in the way I
14:31:40  20    just worded it?
14:31:42  21          MR. TURPEN:  Yeah.  You're --
14:31:43  22          MR. SINGH:  I don't understand.  What's the
14:31:44  23    basis for the objection?
14:31:45  24          MR. TURPEN:  Yeah, that's fine.  I could explain
14:31:47  25    my objections to you, but I'm still stating them for the
```

144

```
14:31:50   1    record, and there's no -- there's no need for us to
14:31:51   2    engage in it.  But it's --
14:31:52   3          MR. SINGH:  Okay.  That's fine.
14:31:53   4          MR. TURPEN:  It's vague.
14:31:53   5          (Speaking simultaneously.)
14:31:54   6          MR. TURPEN:  Okay.  Sure.
14:31:56   7          MR. SINGH:  It's fine.
14:31:57   8          MR. TURPEN:  Great.
14:31:58   9          MR. SINGH:  That's fine.
14:31:58  10    BY MR. SINGH:
14:31:59  11       Q.  So -- okay.  Moving on.
14:32:19  12          So you sent the e-mail to Susan Strand, and, I
14:32:36  13    think, if I heard you correctly, you did not reach out to
14:32:39  14    her again about that -- about the issues in the e-mail
14:32:42  15    relating to Michael Bisch and YFB?
14:32:45  16       A.  That is correct.
14:32:47  17       Q.  But I think you said people started calling you?
14:32:52  18       A.  That is correct.
14:32:55  19       Q.  Almost -- within a very short period of time;
14:32:55  20    correct?
14:33:02  21       A.  Over the following week, week and a half, yes.
14:33:06  22    Maybe two weeks.
14:33:06  23       Q.  As you expect -- as you expected, because you
14:33:10  24    expected there to be blowback; correct?
14:33:12  25       A.  I expected there would be some interest, yes.
```

JAN BROWN & ASSOCIATES (415) 981-3498 (800) 522-7096

RONALD ROSLEY - June 6, 2023

---

**145**

```
14:33:15   1        Q.  And it's -- it's interesting because, in your --
14:33:24   2   you refer to Susan Strand as "my contact at West
14:33:29   3   Sacramento regarding SB 1383 funds."  Can you explain to
14:33:33   4   me what do you mean by that, "my contact at West
14:33:37   5   Sacramento"?
14:33:37   6        A.  I didn't really mean anything other than she was
14:33:43   7   the person that was -- I most talked to at the City about
14:33:49   8   the logistics of a potential contract and the letter; so
14:33:55   9   sometimes she and Marissa Juhler and others, maybe Traci
14:34:01  10   once or twice, would -- would talk to me as a group.
14:34:04  11   They would come visit.  But -- but when it was just
14:34:07  12   working with the City contract, that was just strictly
14:34:10  13   Susan.  So -- so really didn't mean anything by it other
14:34:13  14   than that's who I'm talking to.
14:34:15  15        Q.  Okay.  Is it correct that -- when did you hear
14:34:19  16   from Supervisor Villegas about YFB?
14:34:26  17        A.  Supervisor Villegas called me later that
14:34:29  18   afternoon, the afternoon of March 4th.
14:34:31  19        Q.  Same day?
14:34:33  20        A.  Yes.
14:34:35  21        Q.  And what did he say to you?
14:34:40  22        A.  I honestly cannot remember how it began, but I
14:34:50  23   ended up sharing with him the -- what had gone on in the
14:34:56  24   previous couple of days with -- with Zane and Michael
14:35:00  25   phone calls and us being told that we didn't have our
```

---

**146**

```
14:35:04   1   food pickups anymore, and -- and he was shocked, as I had
14:35:13   2   been the day before, and thought the move was -- I
14:35:19   3   remember him saying the word "brazen," that it was
14:35:22   4   brazen.  And -- and he was -- and he was -- he was
14:35:29   5   pretty -- he was pretty dismayed by it all.
14:35:31   6        Q.  Did Supervisor Villegas have any kind of
14:35:39   7   regulatory authority, to your knowledge, over Mercy
14:35:42   8   Coalition or YFB?
14:35:43   9        A.  I don't think it was over the Mercy Coalition.
14:35:47  10   I -- I can't speak for YFB.
14:35:50  11        Q.  What was your understanding of why he was
14:35:52  12   calling you?
14:35:52  13        A.  Well, I assume because, in his -- in his role as
14:36:03  14   a county supervisor, that the work that was being done on
14:36:07  15   Edible Food Recovery and SB 1383, that some of that
14:36:11  16   decision-making flowed through him.
14:36:14  17            He also, in full disclosure, is a -- is a
14:36:18  18   long-time friend.  You know, we went to school in West
14:36:21  19   Sac in the same era.  And, anyway, we've known each other
14:36:21  20   and worked on many, many, many projects through the years
14:36:26  21   back when he was a city councilman; so...
14:36:27  22        Q.  Understand.
14:36:31  23            Is it also correct that you are long-time
14:36:33  24   friends with Dan Ramos?  I think you referred to him as
14:36:37  25   "Danny."
```

---

**147**

```
14:36:38   1        A.  Yes, that is correct.
14:36:39   2        Q.  And what is your -- do you have a partner or
14:36:42   3   spouse?
14:36:42   4        A.  I'm sorry.  Please state it again.
14:36:44   5        Q.  Do you have a partner or spouse?
14:36:46   6        A.  Oh, yes.  Yeah, my spouse, Melody.
14:36:50   7        Q.  So is it correct that you and Melody went to
14:36:51   8   high school with Danny Ramos and have known him over many
14:36:58   9   decades?
14:36:58  10        A.  Yes.  We knew the Ramos family.  Melody is a
14:37:02  11   little older than me; so she and Danny were closer in
14:37:02  12   class, but we worked on projects through the years,
14:37:08  13   including the Collings Teen Center, getting that up and
14:37:11  14   running and some other things; so yes, we've known Danny
14:37:12  15   for a long time.
14:37:12  16        Q.  I have a question for you because you just said
14:37:15  17   that, full disclosure, you and Supervisor Villegas know
14:37:19  18   each other personally; correct?
14:37:21  19        A.  Yes.
14:37:21  20        Q.  And are long-time friends, correct?
14:37:24  21        A.  Yes.
14:37:24  22        Q.  You both have cell phones.  Do you have each
14:37:27  23   other's cell phone numbers?  Correct?
14:37:29  24        A.  Yes, that's correct.
14:37:30  25        Q.  Did you produce text messages between you and he
```

---

**148**

```
14:37:35   1   related to this litigation in connection with my request
14:37:38   2   for documents?
14:37:40   3        A.  Yes, I did.  We did not have text messages about
14:37:47   4   it.  I was actually kind of surprised when I looked on
14:37:51   5   there, and I don't kill my text messages.  They're --
14:37:54   6   they're not there.  We didn't talk by text about this.
14:37:57   7        Q.  So let's spend a little bit of time here on
14:38:04   8   Mr. Villegas.  So how many years have you guys been close
14:38:09   9   friends?
14:38:10  10        A.  Well, when I say "close friends," we don't
14:38:17  11   vacation together, but we have worked together -- you
14:38:22  12   know, and known each other.  We don't go out socially or
14:38:23  13   anything like that, but it's through our work together
14:38:25  14   that we have been together, and that -- that acquaintance
14:38:30  15   or that friendship that's developed is probably 25 years.
14:38:33  16        Q.  That's a long time.
14:38:36  17            So do you donate to his campaign?
14:38:40  18        A.  No.
14:38:42  19        Q.  Did you donate to any of the supervisors'
14:38:46  20   campaigns?
14:38:48  21            MR. TURPEN:  Objection.  Vague.
14:38:51  22   BY MR. SINGH:
14:38:51  23        Q.  Is that a no?
14:38:52  24        A.  No, I did not.
14:38:53  25        Q.  Did you support his reelection in any way,
```

---

37 (Pages 145 to 148)

149

14:38:58  1    putting aside financial support?
14:39:03  2         MR. TURPEN: Objection. Vague.
14:39:04  3         THE WITNESS: No, other than, you know, voting
14:39:07  4    for him, I guess.
14:39:07  5    BY MR. SINGH:
14:39:09  6         Q.  Okay. What I mean is did you, for example, in
14:39:11  7    any Mercy Coalition event, fundraiser, et cetera, do
14:39:16  8    anything to promote Supervisor Villegas?
14:39:18  9         A.  No.
14:39:19  10        Q.  Okay. So when your friend Villegas called you,
14:39:32  11   you told him what you told Susan Strand; is that correct?
14:39:40  12        A.  Yes.
14:39:40  13        Q.  And he called you that same afternoon. So I
14:39:44  14   want to make sure I understand this.
14:39:47  15        I think you're saying you guys have been friends
14:39:49  16   for 25 years, but on that day, your only initial
14:39:55  17   communication was with Susan Strand, and he happened to
14:39:58  18   call you because he heard it from Susan, or he heard it
14:40:02  19   from you? I'm confused.
14:40:05  20        A.  I don't -- I don't know. I don't know who he
14:40:09  21   heard it from. The -- yeah, so I don't. But I did not
14:40:15  22   reach out to him that day; he called me.
14:40:17  23        Q.  He just happened to hear about it
14:40:23  24   coincidentally?
14:40:24  25        A.  No. I --

150

14:40:26  1         MR. EHLERS: Objection. Argumentative. Asked
14:40:27  2    and answered.
14:40:28  3         THE WITNESS: I said I don't -- yeah.
14:40:29  4         MR. TURPEN: Same objections.
14:40:31  5         THE WITNESS: I said I don't know how he heard
14:40:34  6    about it.
14:40:34  7    BY MR. SINGH:
14:40:35  8         Q.  Okay. Did he -- actually, here's a question.
14:40:37  9         When he spoke to you, did he tell you how he
14:40:39  10   heard about it?
14:40:40  11        A.  No, he did not.
14:40:44  12        Q.  So you go on the phone with him, and he just
14:40:52  13   happened to know? He didn't say, "Hey, I heard this was
14:40:58  14   going on"?
14:40:58  15        A.  I do not remember how the conversation started.
14:41:00  16   I truly don't.
14:41:01  17        Q.  But he called you?
14:41:02  18        A.  Yes.
14:41:02  19        Q.  So what did he say to you in response to what
14:41:51  20   you told him?
14:41:51  21        A.  As I said, he was shocked and a bit of
14:42:00  22   disbelief, thought the move was brazen, and was dismayed
14:42:12  23   to hear about it.
14:42:13  24        Q.  Did he ask you any questions about whether or
14:42:17  25   not you had been cut off from the other YFB channels of

151

14:42:21  1    food?
14:42:21  2         A.  No, he did not.
14:42:24  3         Q.  And did you offer him any insights on that?
14:42:28  4         A.  No, I did not.
14:42:32  5         Q.  Did you inform him about the offer to pay you
14:42:36  6    for food recovery that you indicated previously that you
14:42:40  7    remembered either Michael Bisch or Zane Hatfield had made
14:42:44  8    to you?
14:42:45  9         A.  I cannot recall if I shared that with him or
14:42:48  10   not. I truly don't remember.
14:42:55  11        Q.  So after your -- anything else from the
14:42:57  12   conversation with Mr. Villegas that you do remember?
14:43:05  13        A.  No.
14:43:05  14        Q.  So what did -- what did your friend Villegas say
14:43:09  15   he was going to do?
14:43:09  16        A.  He didn't say he was going to do anything.
14:43:15  17        Q.  You said earlier, when you sent -- sent the
14:43:21  18   e-mail to Susan Strand, that you knew there was going to
14:43:24  19   be blowback; correct? Do you remember saying that?
14:43:26  20        A.  Uh-huh. I thought it was likely, yes.
14:43:30  21        Q.  Okay. So after Supervisor Villegas, your
14:43:32  22   friend, called you, did you feel even more certain that
14:43:38  23   there was going to be blowback?
14:43:41  24        A.  I continued to feel the same amount of
14:43:47  25   likelihood that there would -- there would be trouble

152

14:43:53  1    from it, yes.
14:43:54  2         Q.  What else -- do you have any other recollection
14:43:58  3    that your friend Villegas indicated he was going to --
14:44:01  4    that he was planning on doing? Did he mention anything
14:44:05  5    to you at that time?
14:44:06  6         A.  He made no mention whatsoever of what he was
14:44:12  7    going to do.
14:44:16  8         Q.  Okay. How did the call with your friend
14:44:18  9    Villegas end?
14:44:19  10        A.  In the typical way. "Good-bye. See you later."
14:44:27  11        Q.  When was the next time you saw your friend
14:44:30  12   Villegas after that?
14:44:34  13        A.  I don't know. I really -- I really don't. I
14:44:41  14   don't recall an event or anything that came up anytime
14:44:43  15   soon where I would have seen him.
14:44:45  16        But we do cross paths at chamber events and
14:44:50  17   things like this with some regularity. Probably every
14:44:56  18   couple months I would run into him somewhere, but I don't
14:44:58  19   recall a specific one. Sorry.
14:44:58  20        Q.  Okay. And then did you, at some point, speak
14:45:03  21   also with West Sacramento City Manager Aaron Laurel?
14:45:06  22        A.  Yes.
14:45:08  23        Q.  When did that happen?
14:45:10  24        A.  That happened -- it was about a week later --
14:45:19  25   well, let's see. Where is my -- man, I should have this

38 (Pages 149 to 152)

RONALD BOSLEY - June 1, 2023

153

```
14:45:29   1    thing pulled up.  If you give me just a moment, I'll give
14:45:36   2    you an exact date.
14:45:37   3         Q.  Sure.  What are you looking at, just so I know?
14:45:41   4         A.  The e-mail that I sent to my board on
14:45:44   5    March 31st.
14:45:45   6         Q.  Sure.  You can go ahead and look at that.
14:45:46   7         A.  That -- that kind of breaks down the
14:45:48   8    step-by-step.  Just one second.  I'm sorry.
14:46:23   9         March 11th.
14:46:26  10         Q.  Okay.  And what did you tell -- or here, let me
14:46:29  11    ask it another way.
14:46:31  12         Did you tell Sacramento City Manager Aaron
14:46:34  13    Laurel essentially the same story that you told Susan
14:46:38  14    Strand?
14:46:38  15         A.  I told him the same story that I had told
14:46:44  16    Supervisor Villegas, which was -- what I told Susan had
14:46:48  17    no details in it.  What I told Supervisor Villegas and
14:46:53  18    what I told Aaron Laurel was the sequence of phone calls
14:46:58  19    from Zane, the -- getting the call from Corkey that we
14:47:05  20    had been cut off from the grocery stores, and then the
14:47:08  21    follow-up conversation with Michael on those -- that
14:47:11  22    whole sequence on March 2nd and 3rd.  I shared that with
14:47:15  23    both Supervisor Villegas and, a week later, with Aaron
14:47:18  24    Laurel.
14:47:19  25         Q.  And did Aaron Laurel, to your knowledge -- or
```

154

```
14:47:30   1    sorry.
14:47:30   2         Did Aaron Laurel ask you any questions?
14:47:32   3         A.  I am sure he did.  I don't remember what they
14:47:40   4    were, but --
14:47:41   5         Q.  What did he -- what did he say he was going to
14:47:46   6    do about it?
14:47:48   7         MR. TURPEN:  Objection.  Vague.  Assumes facts.
14:47:49   8    BY MR. SINGH:
14:47:50   9         Q.  What did he say he was going to do about this
14:47:52  10    situation?
14:47:52  11         MR. TURPEN:  Same objections.
14:47:55  12    BY MR. SINGH:
14:47:56  13         Q.  Go ahead.
14:47:56  14         A.  Similarly, he did not say what he was going to
14:47:59  15    do about it.
14:48:00  16         Q.  Did he have -- to your knowledge, did West
14:48:04  17    Sacramento City Manager Aaron Laurel have any kind of
14:48:07  18    regulatory oversight about the interactions between YFB
14:48:11  19    and Mercy Coalition, to your knowledge, at that time?
14:48:16  20         A.  No.
14:48:18  21         Q.  Okay.  And, you know, where it says, "I
14:48:22  22    recounted the same information to West Sacramento City
14:48:27  23    Manager Aaron Laurel," you called him, or he called you?
14:48:27  24         A.  He called me.
14:48:28  25         Q.  He called you on your cell phone, or he -- where
```

155

```
14:48:32   1    did he call you?
14:48:32   2         A.  It was my cell phone.
14:48:36   3         Q.  How did he get your cell phone number?
14:48:39   4         A.  I don't know.  I -- I have dealt with Aaron on a
14:48:46   5    number of issues through the years; so we have each
14:48:49   6    other's cell phone numbers.  I can't remember at which
14:48:51   7    point we give them to each other, but --
14:48:54   8         Q.  Is your friend too?
14:48:56   9         A.  I'm sorry.  Say it again.
14:48:57  10         Q.  Is your friend too?
14:49:01  11         MR. TURPEN:  Objection.  Vague.  Argumentative.
14:49:03  12         And, Sanjiv, please just make sure you don't cut
14:49:07  13    off the witness while he's speaking.  It seems, from my
14:49:08  14    perspective here, that you might be cutting off his
14:49:12  15    answers.
14:49:12  16    BY MR. SINGH:
14:49:12  17         Q.  Is he your friend too?
14:49:13  18         A.  We have good relationship -- we have good
14:49:18  19    working relationship together.
14:49:20  20         Q.  That's not my question.
14:49:23  21         Is he your friend?
14:49:23  22         MR. TURPEN:  Same objections.
14:49:25  23         MR. EHLERS:  I'll object that that's vague.
14:49:29  24         But answer if you can.
14:49:30  25         MR. SINGH:  Nothing vague about that.  "Friend"
```

156

```
14:49:32   1    is a plain English word.
14:49:36   2    BY MR. SINGH:
14:49:36   3         Q.  Is he friend -- is he your friend?  Simple
14:49:36   4    question.
14:49:37   5         A.  I do consider --
14:49:37   6         (Speaking simultaneously.)
14:49:38   7         MR. EHLERS:  I still think it's vague.
14:49:40   8    BY MR. SINGH:
14:49:40   9         Q.  Go ahead.  You do consider what?
14:49:42  10         A.  I do consider him to be a friend, not on -- with
14:49:46  11    the same history or anything that I have with some of the
14:49:47  12    others I've mentioned, but yes, we have worked together
14:49:50  13    in a friendly manner; so I consider him a friend.
14:49:53  14         Q.  How long have you been friends with Aaron
14:50:05  15    Laurel?
14:50:07  16         A.  I -- I first met Aaron in 2014.  There was a
14:50:14  17    particular -- he wasn't city manager yet, but there was a
14:50:17  18    particular initiative we were working on and called
14:50:21  19    "Bridge to Housing"; so that was when I first met Aaron.
14:50:25  20    And over the years, I crossed paths with him a couple of
14:50:28  21    different times before he became city manager; so...
14:50:31  22         Q.  So by that point in time, that would be -- 2014;
14:50:42  23    so approximately eight years?
14:50:44  24         A.  I've known Aaron for eight years, yes.
14:50:48  25         Q.  Okay.  And then, at some point, you also talked
```

RONALD BOSLEY                    June 2, 2022

---

**157**

```
14:50:52   1   to Marissa Juhler; correct?
14:50:58   2       A.  Yes.  I just can't remember when that was.  But
14:51:05   3   I don't feel like it was in the same time frame it was.
14:51:09   4   But -- but yes, at some point, I did talk to Marissa as
14:51:14   5   well.
14:51:14   6       Q.  When you -- when you sent the e-mail to Susan
14:51:17   7   Strand, did you expect that she would forward that e-mail
14:51:20   8   to people in the County?
14:51:24   9       A.  I -- I -- I expected that they would -- they
14:51:29  10   would get it one way or another, whether from her
14:51:32  11   directly or somebody else, because it was a collaborative
14:51:34  12   effort on this food recovery program; so yes, I assumed
14:51:38  13   it would reach the County.
14:51:40  14       Q.  Okay.  So when Marissa Juhler -- when you were
14:51:43  15   contacted -- and I'm assuming she contacted you.  You
14:51:46  16   didn't contact her; correct?
14:51:47  17       A.  Correct.
14:51:47  18       Q.  What did -- what did she say to you?
14:51:51  19       A.  The one thing I remember about the conversation
14:51:58  20   with Marissa was that I thought she was being very, very
14:52:07  21   cautious and careful with her words, and so it was a very
14:52:11  22   matter-of-fact, even-keel conversation.  And -- but I
14:52:19  23   actually can't recall a single thing she said in the
14:52:23  24   conversation; I just know we had it.
14:52:25  25       Q.  You can't recall a single thing that was said in
```

---

**158**

```
14:52:31   1   the conversation?
14:52:31   2       A.  I can't recall a single thing that she said in
14:52:35   3   the conversation.  I just --
14:52:36   4       Q.  What did you say in the conversation?
14:52:38   5       A.  I'm sorry?
14:52:39   6       Q.  What did you say in the conversation?
14:52:41   7       A.  I believe I shared with her the same sequence
14:52:47   8   from March 2nd and 3rd and the surrounding dates as -- as
14:52:51   9   I had with some of the other City officials and County
14:52:56  10   officials.
14:52:57  11       Q.  For example, the same content -- same
14:52:59  12   information that you shared with your friend Villegas?
14:53:01  13       A.  With Supervisor Villegas, yes.
14:53:04  14       Q.  Yeah, with your friend.
14:53:07  15           So let me -- I am going to introduce a new
14:53:12  16   exhibit, keep us moving.
14:53:23  17       MR. EHLERS:  Before you do that, Counsel, I will
14:53:26  18   say for the record that, on that prior -- two questions
14:53:30  19   ago, you did cut off the witness's answer again; so I
14:53:33  20   would reiterate, like Mr. Turpen asked earlier, if you
14:53:34  21   would please let the witness finish his answers
14:53:36  22   before you begin to speak.  He's trying to do the same
14:53:39  23   with you.
14:53:40  24       MR. SINGH:  You know, part of it is I think we
14:53:42  25   are having -- he trails off at the end; so I think he's
```

---

**159**

```
14:53:45   1   done talk -- I'll try to be watchful of it.  I am
14:53:49   2   actually not trying to cut him off, but I get a trail
14:53:50   3   off.  I don't know if he came closer.  I will try to
14:53:53   4   be watchful as well of doing that.  But I am getting a
14:53:56   5   trail off, and then it's like he -- I think he stops; so
14:54:00   6   I will be more cognizant of that.  Thank you.
14:54:07   7           Okay.  One moment here.
14:54:20   8       MR. TURPEN:  Sanjiv, while you're doing this,
14:54:20   9   we've been going about an hour.  Is now a good time for a
14:54:23  10   break?
14:54:24  11       MR. SINGH:  Yeah.  You guys, actually, that
14:54:26  12   might be good because I am not -- around while you guys
14:54:27  13   are waiting.  You guys want to take a five, seven-minute
14:54:30  14   break?
14:54:32  15       MR. EHLERS:  Sure.  That's plenty for us.
14:54:36  16       MR. TURPEN:  Works for me.
14:54:36  17       THE VIDEOGRAPHER:  Okay.  The time is 2:54.
14:54:38  18   We're going off the record.
15:03:19  19       (Off the record.)
15:10:03  20       THE VIDEOGRAPHER:  The time is 3:10, and we're
15:10:14  21   back on the record.
15:10:19  22       MR. SINGH:  Okay.  So I am going throw up a
15:10:22  23   couple of exhibits in rapid sequence here so we can just
15:10:26  24   get them, and this will hopefully streamline the
15:10:26  25   remainder of the deposition.  Let me drop it into the
```

---

**160**

```
15:10:31   1   chat.  So this is going to be marked -- Madam Court
15:10:31   2   Reporter, I believe I am at Exhibit 7; is that correct?
15:10:31   3       (Reporter clarification.)
15:11:18   4       (Exhibit No. 7 marked for identification.)
15:11:18   5   BY MR. SINGH:
15:11:18   6       Q.  Okay.  I put in front of you what I have marked
15:11:21   7   as Exhibit 7, and this is following some of the tranching
15:11:25   8   that was done, but it's taken out of one of the tranches
15:11:30   9   that your counsel produced to us.
15:11:33  10           This is an e-mail that was sent by Susan Strand
15:11:36  11   to you on the morning of March 18th, 2022; so this is a
15:11:43  12   couple weeks after the initial interaction that prompted
15:11:44  13   you to send her an e-mail.
15:11:46  14           Do you see an e-mail in front of you on the
15:11:47  15   share screen?
15:11:48  16       A.  I do.
15:11:48  17       Q.  And you recall receiving this e-mail?
15:11:51  18       A.  I think I do, yes.
15:11:56  19       Q.  Okay.  And then you responded to it up here;
15:11:56  20   correct?
15:12:06  21       A.  Yes, it looks like it, right.
15:12:07  22       Q.  Do you see on this last paragraph here it says,
15:12:12  23   "As you might imagine, we feel quite caught in the middle
15:12:15  24   of a larger fight here"?
15:12:18  25       A.  Uh-huh.
```

---

40 (Pages 157 to 160)

161

```
15:12:19   1        Q.  So you recognized that there was a conflict
15:12:23   2   between YFB and some of the government entities about how
15:12:28   3   to handle SB 1383; correct?
15:12:30   4        A.  Yes.
15:12:30   5        Q.  And you said here, "I do feel badly for where
15:12:42   6   it's left you, Traci, Marissa, and your colleagues."
15:12:47   7        Can you explain to me why you felt badly for
15:12:50   8   them?
15:12:50   9        A.  As I recall, I felt badly because they had
15:12:57  10   worked diligently over a period of months to put together
15:13:02  11   a program and a contract and felt like we were probably
15:13:08  12   on track to having that contract, and then the -- you
15:13:12  13   know, really, kind of, out of thin air, the rug got
15:13:16  14   pulled out from under that; so that -- I felt badly about
15:13:20  15   the -- the knee jerk to them.
15:13:21  16        Q.  And am I correct, in this communication also,
15:13:26  17   from what I can see, you make no mention about options at
15:13:33  18   the YFB warehouse or the offer that had been made to pay
15:13:37  19   you for food recovery; in other words, that YFB offer to
15:13:41  20   pay you for food recovery?  I don't see it in here.
15:13:44  21        A.  I make no mention of the warehouse thing, as you
15:13:46  22   say.
15:13:47  23        And let's be clear.  YFB did not make me an
15:13:52  24   offer to pay us for food recovery.  YFB had mused out
15:13:58  25   loud about maybe they should think about just paying us.
```

162

```
15:14:04   1   That's very different.
15:14:05   2        Q.  You were negotiating the issues with YFB;
15:14:08   3   correct?
15:14:08   4        A.  No.  We were never --
15:14:12   5        Q.  I thought you were -- let me make sure I
15:14:12   6   understand you.
15:14:13   7        Back in -- on March 3rd -- or March 2nd, I
15:14:20   8   believe you had said that you had not yet decided whether
15:14:25   9   you were going to sign the City contract.
15:14:27  10        A.  Okay.  I'm sorry.  I thought you said I was
15:14:29  11   negotiating with YFB.
15:14:32  12        Yes, we -- we were in the final stages of
15:14:35  13   looking at that contract with the City, yes.
15:14:39  14        Q.  Okay.  And then as we scroll up here, she
15:14:48  15   responds to you, "Hi, Don.  I'm so glad to hear that
15:14:57  16   Mercy Coalition access to food from Raley's and Nugget
15:15:01  17   has been restored."  Do you see that?
15:15:04  18        A.  Yes.
15:15:04  19        Q.  Did you ever miss a pickup from Raley's and
15:15:07  20   Nugget?  Did you actually ever miss --
15:15:10  21        A.  No, we did not.
15:15:11  22        Q.  And then right here it says, "I am also very
15:15:24  23   happy to hear that you have been very vocal about your
15:15:28  24   experience."
15:15:29  25        Is she referring to that single e-mail that you
```

163

```
15:15:34   1   sent her?
15:15:35   2        MR. TURPEN:  Objection.  Vague.  Calls for
15:15:36   3   speculation.
15:15:37   4   BY MR. SINGH:
15:15:37   5        Q.  Let me withdraw and ask.
15:15:40   6        When she -- when you read this and she said, "I
15:15:43   7   am also happy to hear that you have been very vocal about
15:15:49   8   your experience," what was your understanding of what she
15:15:55   9   was referring to there?
15:15:57  10        A.  I assume she meant that I was willing to speak
15:16:01  11   about it to anyone who wanted to ask me, which I think I
15:16:05  12   even reiterated here, yes, so...
15:16:07  13        Q.  See here it says, "We felt the actions of YFB
15:16:13  14   were outrageous, but at the time, we wanted to respect
15:16:16  15   your privacy and not make your situation any worse"?  Do
15:16:21  16   you see that?
15:16:21  17        A.  Yes.
15:16:22  18        Q.  Okay.  You had contacted Susan Strand on
15:16:31  19   March 4th; correct?
15:16:35  20        A.  Yes, that's correct.
15:16:35  21        Q.  And then, same day, you got a phone call from
15:16:40  22   your friend Villegas; correct?
15:16:42  23        A.  I got a phone call from Supervisor Villegas,
15:16:46  24   yes, I did.
15:16:46  25        Q.  And you didn't know how your friend Villegas had
```

164

```
15:16:48   1   heard about it; correct?
15:16:51   2        A.  I do not recall, no.
15:16:53   3        Q.  She says here, this sentence, "I think Marissa
15:17:08   4   is looking into if Feeding America rules have been
15:17:13   5   violated."
15:17:14   6        What was your understanding of what she was
15:17:16   7   saying there when you read this e-mail?
15:17:18   8        A.  At the time, I didn't understand it because I
15:17:20   9   did not understand how Feeding America and that whole
15:17:23  10   network and everything worked.  I really didn't; so...
15:17:26  11        Q.  That's an important point; so -- what you just
15:17:29  12   said.
15:17:31  13        Did you understand the relationship of Feeding
15:17:34  14   America rules to Raley's and Nugget?  Did you have any
15:17:39  15   understanding about that at all at this time?
15:17:40  16        A.  I believe --
15:17:42  17        MR. TURPEN:  Objection.  Vague.
15:17:45  18   BY MR. SINGH:
15:17:45  19        Q.  Withdrawn.
15:17:46  20        At this time, in March of 2022 -- at any point
15:17:51  21   in March of 2022, did you have an understanding as to
15:17:54  22   whether or not there were relevant Feeding America rules
15:17:58  23   that applied to Raley's and Nugget?
15:18:03  24        MR. EHLERS:  I'll object that it's asked and
15:18:05  25   answered.
```

JAN BROWN & ASSOCIATES (415) 981-3498 (800) 522-7096

RONALD ROSLEY - June 6, 2023

---

165

```
15:18:05   1       But answer again, if you can.
15:18:07   2       THE WITNESS:  Yes, you've asked me this already,
15:18:09   3   and the answer is the same.  No, I did not.
15:18:28   4       MR. SINGH:  Okay.  So now I am going to
15:18:30   5   introduce another exhibit.  Let me drop it into the chat
15:18:35   6   as well.
15:18:39   7       MR. EHLERS:  Wile you're doing that, Counsel,
15:18:41   8   Exhibit 7 never showed up in the chat visible to me;
15:18:45   9   so --
15:18:45  10       MR. SINGH:  Because I loaded it but forgot to
15:18:48  11   press send.  My apologies.
15:18:51  12       And now you should see it.  Do you see it?
15:18:55  13       MR. EHLERS:  I got it now.  Yes, thank you.
15:18:57  14       MR. SINGH:  And I won't forget to press "send"
15:18:59  15   on Exhibit 8.
15:19:06  16       (Exhibit No. 8 marked for identification.)
15:19:06  17       MR. SINGH:  Okay.
15:19:07  18       MR. EHLERS:  Got it.  Thank you.
15:19:08  19   BY MR. SINGH:
15:19:08  20       Q.  Do you see Exhibit 8 in front of you, which
15:19:10  21   we're marking as Exhibit 8 for this deposition?
15:19:12  22       A.  Yes, I do.
15:19:17  23       Q.  So this was a $80,000 in funding that was awarded
15:19:27  24   to Mercy Coalition; correct?
15:19:34  25       A.  That is correct.
```

166

```
15:19:34   1       Q.  And it's ARP funds; right?
15:19:39   2       A.  That is correct.
15:19:40   3       Q.  And it was awarded through County of Yolo;
15:19:40   4   correct?
15:19:48   5       A.  That is also correct.
15:19:50   6       Q.  Whose office first informed you about this
15:19:52   7   award?  Which office first informed you about this award?
15:19:56   8       A.  I believe I first heard about it at a -- yes, at
15:20:09   9   a homeless resource fair that was attended by Supervisor
15:20:16  10   Villegas's staff, and they congratulated me thinking I
15:20:19  11   already knew about the award, but I had not heard about
15:20:24  12   it yet.  So that was the first -- that was the first --
15:20:28  13   it was his staffers who -- who made me aware.
15:20:30  14       Q.  So just so I understand this correctly -- so you
15:20:34  15   have this conflict with YFB in March of '22; correct?
15:20:43  16   Correct?
15:20:44  17       A.  Yes.
15:20:44  18       Q.  You get immediately called by your friend
15:20:47  19   Villegas on the same day that you send the e-mail to
15:20:52  20   Susan Strand.  Same day, you get contacted by your friend
15:20:56  21   Villegas; correct?
15:20:59  22       A.  Yes, I was contacted the same day by Supervisor
15:21:03  23   Villegas.
15:21:03  24       Q.  Okay.  And you are then, during the course of
15:21:09  25   the summer, during August -- August of '22, you learn
```

167

```
15:21:16   1   about a lawsuit that Michael Bisch has filed against YFB
15:21:21   2   for his termination; correct?
15:21:27   3       A.  I don't remember when I learned about it, but
15:21:30   4   whenever it was on the news, that's when I learned about
15:21:32   5   it.
15:21:33   6       Q.  And within a -- just to be clear on chronology,
15:21:38   7   from the time that you sent the e-mail to Susan Strand on
15:21:44   8   March 1, 2022, within two to three months after that,
15:21:50   9   Michael Bisch was terminated from YFB; correct?
15:21:54  10       A.  I don't know the exact time of his termination,
15:21:57  11   but somewhere in that neighborhood, yes.
15:22:00  12       Q.  How did you first learn of his termination?
15:22:02  13       A.  How did I learn of it?  It was a news item that
15:22:14  14   moved somewhere that somebody sent me a link, and I
15:22:17  15   honestly can't remember who, and -- so it was -- it was a
15:22:22  16   news link by -- by some local news outlet.
15:22:27  17       Q.  Did Danny Ramos send you the news link?
15:22:31  18       A.  No, no.
15:22:32  19       Q.  Did Danny Ramos talk to you about the
15:22:37  20   termination of Michael Bisch?
15:22:44  21       MR. EHLERS:  Objection.  Vague.  Vague as to
15:22:44  22   time.
15:22:47  23       MR. TURPEN:  Same objections.
15:22:47  24   BY MR. SINGH:
15:22:47  25       Q.  At any point in 2022, frankly.  At any point in
```

168

```
15:22:51   1   2022, did Danny Ramos talk to you about the termination
15:22:55   2   of Michael Bisch?
15:22:56   3       A.  At no point in 2022 did Danny talk to me about
15:23:00   4   the termination of Michael Bisch.  He reached out to me
15:23:05   5   to try and meet with me and Michael to try and smooth
15:23:10   6   things over after the initial flap and arranged a lunch
15:23:14   7   that Michael and I attended with my program manager,
15:23:19   8   Nicole Ring-Collins, and his efforts, at that time, were
15:23:24   9   focused on trying to calm the landscape down and get
15:23:30  10   everybody working together again.  But at no point in my
15:23:34  11   interaction with Danny did he ever talk to me about
15:23:37  12   Michael's termination or possible termination.
15:23:42  13       Q.  Okay.  I'll come back to that in a moment.
15:23:42  14       So just to get the sequence of events right --
15:23:45  15   so you send the e-mail to Susan Strand.  Villegas
15:23:50  16   contacts you.  Ultimately, at some point, you learn about
15:23:54  17   the termination of Michael Bisch.  And at some point, you
15:23:59  18   learn about the lawsuit that's been filed by Michael
15:24:05  19   Bisch against YFB; correct?
15:24:05  20       A.  Yes.
15:24:05  21       Q.  Okay.  And then, at some point, in the fall of
15:24:12  22   '22, from the staff of Villegas's office, you learn of an
15:24:21  23   $80,000 award of ARP funds to Mercy Coalition; right?
15:24:29  24       MR. EHLERS:  Objection.  Vague as to time.
15:24:30  25       You can answer.
```

173

```
15:30:36   1         (Exhibit No. 10 marked for identification.)
15:30:36   2    BY MR. SINGH:
15:30:36   3         Q.  Okay.  So we have an exhibit here that has a
15:30:39   4    collection of e-mails, and it goes from Bosley212 to
15:30:51   5    Bosley236.  I am going to start with e-mails that were
15:30:58   6    closer to the time of when you first had the interactions
15:31:05   7    with Zane Hatfield and Michael Bisch.
15:31:13   8         So it appears that, on the evening of March 3rd,
15:31:16   9    you sent an e-mail to your board; correct?
15:31:22  10         A.  Yes.
15:31:23  11         Q.  And that's shown here in the exhibit, March 3rd
15:31:26  12    at 5:43 p.m.; correct?
15:31:30  13         A.  Yes.
15:31:31  14         Q.  Did you, in any way, explore or discuss the
15:31:44  15    issue of whether or not there was access to other YFB
15:31:49  16    food sources other than Raley's or Nugget in this e-mail
15:31:54  17    exchange?
15:31:55  18         A.  To YFB food sources?
15:31:59  19         Q.  Yes, like the warehouse.
15:32:01  20         A.  No, I did not.
15:32:02  21         Q.  Okay.  And right down here, you say, "I'll leave
15:32:16  22    the cat fight to YFB and the government entities."
15:32:20  23         This is -- when you wrote this, you were
15:32:22  24    conveying to the board that your view was that there were
15:32:26  25    competing interests that were being played out in a
```

174

```
15:32:29   1    conflict between YFB and the government entities;
15:32:32   2    correct?  That's what you were communicating to your
15:32:34   3    board?
15:32:35   4         A.  Yes.
15:32:37   5         Q.  And you felt like Mercy Coalition was caught in
15:32:41   6    the middle of it?
15:32:41   7         A.  Yes.
15:32:44   8         Q.  Okay.  Scroll up.
15:32:44   9         So your board -- I can see there's some -- is
15:33:09  10    Jennifer LeGrand one of your board members?
15:33:12  11         A.  Yes, she is.
15:33:13  12         Q.  And Anna Darzins is also?  I believe you
15:33:17  13    mentioned her by name as a board member?
15:33:17  14         A.  Yes.
15:33:17  15         Q.  Okay.  So they're just responding, essentially,
15:33:21  16    acknowledging receipt of your e-mail and encouraging your
15:33:25  17    efforts; correct?
15:33:38  18         A.  Yes.
15:33:38  19         Q.  Okay.  Did they know that you had sent an e-mail
15:33:38  20    to Susan Strand, ultimately?  I know you haven't sent it
15:33:40  21    on March 3rd.  But when you sent the e-mail to Susan
15:33:43  22    Strand, did you forward a copy of that e-mail to your
15:33:45  23    board?
15:33:45  24         A.  I don't recall that I did.  I -- I don't believe
15:33:54  25    I did.  I suppose it's possible.  I can't really
```

175

```
15:33:58   1    remember.
15:33:58   2         Q.  Did you let your board know that you were
15:34:02   3    talking on March 4th to Villegas?
15:34:03   4         A.  You mean after the fact?
15:34:08   5         Q.  Yeah.  In other words, after you had the
15:34:09   6    conversation with Villegas, did you -- did you let your board
15:34:12   7    know that you did that?
15:34:14   8         A.  I believe I did.
15:34:15   9         Q.  Okay.  And so you sent them an e-mail update on
15:34:21  10    Saturday morning, March 5th; correct?
15:34:26  11         A.  Yes, that is correct.
15:34:27  12         Q.  And you said -- I think this is consistent with
15:34:30  13    your notion of what you had described as "blowback"
15:34:33  14    before.  You said, "Predictively, word got around fast
15:34:40  15    yesterday."  Do you see this?  March 5, 2022 -- 2022?
15:34:41  16         A.  Yes.
15:34:42  17         Q.  And by the way, I just want to be clear.
15:34:46  18         You write all of your own e-mails; right?  You
15:34:47  19    don't have an assistant who writes for you.  You write
15:34:47  20    all of this?
15:34:48  21         A.  Yes.
15:34:50  22         Q.  Okay.  So these are all your words.
15:34:53  23         So here it says, "I received an afternoon call
15:34:56  24    from County Supervisor Oscar Villegas, a long-time friend
15:35:04  25    and supporter.  Oscar affirmed that Michael has
```

176

```
15:35:08   1    essentially gone off the rails, completely driven by
15:35:14   2    greed and a power grab.  Like City partners who I've
15:35:22   3    informed earlier in the day, Oscar was shocked by
15:35:24   4    Michael's brazen decision to cut off our access to food
15:35:26   5    recovery.  He spent 30 minutes on the phone chronicling
15:35:37   6    the facts of the Wednesday and Thursday in directions
15:35:40   7    with YFB, and the whole board of supervisors will be
15:35:42   8    digging into this."
15:35:45   9         Earlier, I asked you about your recollection
15:35:46  10    about what you spoke to Oscar Villegas about.  Does this
15:35:52  11    refresh your recollection as to what you spoke to Oscar
15:35:57  12    Villegas about?
15:35:58  13         A.  Yes.
15:35:59  14         Q.  Okay.  So let's walk through it.  Hopefully, we
15:36:03  15    get a little more detail.
15:36:03  16         So just to be clear -- because I am confused by
15:36:09  17    timing here in some of these statements -- you sent an
15:36:12  18    e-mail to Susan Strand on March 4th, 2022; correct?
15:36:16  19         A.  Correct.
15:36:16  20         Q.  And that was the first ever communication you
15:36:18  21    had had with City of West Sacramento about your
15:36:24  22    dissatisfaction and views about your interaction with YFB
15:36:28  23    and your perception of what had happened with Zane
15:36:32  24    Hatfield and Michael Bisch; correct?
15:36:34  25         A.  Yes.  That was my first interaction or sharing
```

44 (Pages 173 to 176)

**177**

```
15:36:39   1   the broad scope of what had happened on March 2nd and
15:36:43   2   3rd, yes.
15:36:43   3       Q.  Within hours of sending that e-mail, you got a
15:36:46   4   call from Oscar Villegas; correct?
15:36:51   5       A.  Yes.
15:36:51   6       Q.  And you hadn't -- according to what you said,
15:36:57   7   you hadn't spoken to him prior to that about Michael
15:37:02   8   Bisch; correct?
15:37:03   9       A.  Yes.
15:37:04  10       Q.  Or about Zane Hatfield; correct?
15:37:07  11       A.  Yes.
15:37:08  12       Q.  So when it says here, "Oscar affirmed that
15:37:12  13   Michael has essentially gone off the rails, completely
15:37:17  14   driven by greed and a power grab," what source of
15:37:21  15   information -- I'm trying to figure out, in your
15:37:25  16   conversation between the two of you, what's your
15:37:27  17   recollection of what facts he was relying on to -- to
15:37:32  18   make those conclusions that you're summarizing here?
15:37:36  19       A.  I have -- I assume what he is affirming was my
15:37:42  20   view at that point, like where I'm going, what's going
15:37:46  21   on.  I feel like we've gone -- you know, something is
15:37:50  22   going crazy here, and -- and he affirmed that he felt
15:37:56  23   that, in their interactions with -- with YFB and with
15:38:01  24   Michael, that, you know, this was -- this was the
15:38:07  25   behavior he had been witnessing -- or maybe not
```

**178**

```
15:38:11   1   witnessing but at least been privy to.
15:38:14   2       Q.  I am confused.
15:38:16   3       What other -- is there some other behavior?
15:38:18   4       A.  In their -- in the County's ongoing discussions
15:38:24   5   or negotiations or battles around SB 1383, there just had
15:38:36   6   been Oscar's view that this -- this had been -- this had
15:38:39   7   been Michael's behavior.
15:38:41   8       Q.  When you say "this had been Michael's behavior,"
15:38:45   9   what was "this"?
15:38:45  10       A.  The behavior described here, that he was being
15:38:48  11   driven by greed and a power grab.
15:38:51  12       Q.  Greed for what?
15:38:52  13       A.  Well --
15:38:59  14       MR. EHLERS:  I'll object to the extent that
15:39:01  15   calls for speculation.
15:39:01  16       But if you know.
15:39:03  17   BY MR. SINGH:
15:39:03  18       Q.  Yeah, let me rephrase that.
15:39:04  19       What was your understanding of the greed to
15:39:06  20   which Mr. Villegas was referring to?
15:39:08  21       A.  I assume he meant that the -- YFB wanted all the
15:39:15  22   money, you know, or a lot of money.  More money than the
15:39:19  23   County was willing to -- to give him, so...
15:39:21  24       Q.  When you were having this conversation with
15:39:29  25   Mr. Villegas, did you have any concerns as to whether or
```

**179**

```
15:39:37   1   not you and Mr. Villegas were acting improperly?
15:39:41   2       A.  No.
15:39:47   3       Q.  He's an elected official; correct?  At that
15:39:50   4   time, you knew that.
15:39:50   5       A.  Yes.
15:39:51   6       Q.  And you've also previously testified that he was
15:39:53   7   your friend; correct?
15:39:57   8       MR. EHLERS:  Objection.  Misstates the
15:39:58   9   testimony.
15:39:59  10       But go ahead and answer.
15:40:00  11       THE WITNESS:  Yes, he is my --
15:40:02  12       MR. TURPEN:  Same objections.
15:40:04  13       THE WITNESS:  He is my work friend in the same
15:40:06  14   way that I considered Michael and Zane to be my work
15:40:09  15   friends prior to this incident; so yes, that's on the
15:40:12  16   same level, that's correct.
15:40:13  17   BY MR. SINGH:
15:40:25  18       Q.  Did you have any concern, as you were having
15:40:27  19   this conversation with Villegas, that your conversation
15:40:33  20   with this elected official would have blowback on Michael
15:40:40  21   Bisch? on his employment?
15:40:42  22       MR. EHLERS:  Objection.  Vague.
15:40:43  23       You can answer.
15:40:45  24       MR. TURPEN:  Same objection.
          25   ///
```

**180**

```
15:40:46   1   BY MR. SINGH:
15:40:46   2       Q.  Let me rephrase it.
15:40:47   3       You, right here, narrated a conversation between
15:40:49   4   yourself and Mr. Villegas about your interactions with
15:40:52   5   Michael Bisch; correct?
15:40:54   6       A.  Uh-huh.
15:40:54   7       Q.  Is that a yes?
15:40:56   8       A.  Yes.  Sorry.
15:40:57   9       Q.  That's okay.
15:40:59  10       And you're narrating this to your board;
15:40:59  11   correct?
15:41:03  12       A.  Yes.
15:41:03  13       Q.  When you were having the conversation with
15:41:09  14   Mr. Villegas on March 4th, did you have a concern that
15:41:16  15   the conversation you were having with this elected
15:41:19  16   official could have a direct effect on the job of Michael
15:41:24  17   Bisch?
15:41:24  18       A.  When I had the conversation with Mr. Villegas, I
15:41:28  19   had a concern that Michael's actions towards us the
15:41:33  20   previous couple of days would have a negative effect on
15:41:36  21   him and on the food bank.  It wasn't just about Michael.
15:41:41  22   At the moment, the -- at that moment, the food bank
15:41:44  23   itself was also under fire because of that behavior; so
15:41:48  24   yes, I was concerned about all of that.
15:41:51  25       Q.  Did you have any knowledge about the private
```

RONALD BOSLEY - June 6, 2023

181

```
15:41:55   1   dialogue of the YFB board as to how they perceived the
15:42:00   2   actions of the County and the Cities?
15:42:05   3        MR. EHLERS:  Objection.  Vague, and vague as to
15:42:06   4   time.
15:42:06   5        You can answer.
15:42:07   6   BY MR. SINGH:
15:42:07   7        Q.  Did you have any knowledge at that time?  Had
15:42:10   8   anyone disclosed to you any details about how members of
15:42:13   9   the YFB board actually viewed the action of the City
15:42:14  10   and/or the County?
15:42:15  11        A.  None whatsoever.  I'm sorry.  Let me -- let me
15:42:25  12   amend.
15:42:27  13        Michael himself, when we would have
15:42:30  14   conversations, would characterize the board as also being
15:42:36  15   upset with the -- with the City, the County, the -- well,
15:42:41  16   the jurisdictions for how they were interpreting SB 1383
15:42:45  17   and how the funds were to be distributed.  So that --
15:42:49  18   I -- that was the only view into the YFB board's
15:42:53  19   thinking, was what Michael sort of shared with me in
15:42:56  20   passing in our conversations.
15:43:01  21        Q.  Did you believe that was a truthful statement?
15:43:03  22   Did you believe Michael Bisch was telling you the truth?
15:43:05  23        A.  At the time, I had no reason to believe
15:43:08  24   otherwise.
15:43:08  25        Q.  Okay.  It says here that, "Villegas spent
```

182

```
15:43:17   1   30 minutes on the phone chronicling the facts of the
15:43:21   2   Wednesday and Thursday interactions with YFB."
15:43:24   3        What did you mean by that?  He was chronicling
15:43:26   4   the facts that you were telling him, or he was recounting
15:43:28   5   other facts to you?
15:43:32   6        A.  No, he was -- he was simply getting my story
15:43:34   7   from me and asking questions about it as I told it.  When
15:43:39   8   I say "chronicling," I don't actually know he was writing
15:43:43   9   it down or anything; I just mean he was -- he wanted to
15:43:44  10   get the story.
15:43:45  11        Q.  Do you know whether Mr. Villegas ever reached
15:43:48  12   out to Michael Bisch?
15:43:49  13        A.  I have no idea.
15:43:51  14        Q.  Do you know whether Mr. Villegas actually
15:43:54  15   reached out to Zane Hatfield?
15:43:56  16        A.  I have no idea.
15:43:56  17        Q.  Why was he only having a conversation with you?
15:44:00  18        MR. EHLERS:  Objection.  Calls for speculation.
15:44:02  19   BY MR. SINGH:
15:44:02  20        Q.  Do you know?
15:44:02  21        MR. TURPEN:  And same objection.  It's vague,
15:44:04  22   and it's argumentative.
15:44:06  23        THE WITNESS:  I have no idea.
15:44:07  24   BY MR. SINGH:
15:44:07  25        Q.  Did he make any statements to you as to -- to,
```

183

```
15:44:11   1   "Hey, I'm only going to talk to you, but I'm not talking
15:44:14   2   to" -- withdrawn.
15:44:15   3        Did he make any statements to you that indicated
15:44:17   4   he was only talking to you rather than talking to you and
15:44:21   5   the other side of the conflict, which would have been
15:44:24   6   Michael Bisch and Zane Hatfield?
15:44:25   7        A.  He made no such statements.
15:44:27   8        Q.  Did you think he was going to talk to both sides
15:44:30   9   to get a fair sense of what had happened?
15:44:32  10        A.  I didn't have a thought on what he was going to
15:44:37  11   do.
15:44:37  12        Q.  Okay.  Moving up.
15:44:45  13        So who is -- is it Ali David or David -- it's
15:44:48  14   Ali David -- oh, I see.  So David is her last name.
15:44:48  15        A.  Yeah, her last name is David.  Yes.
15:44:56  16        Q.  So Ali David is also a board member?
15:44:56  17        A.  Correct.
15:44:57  18        Q.  So she sends you a reply in which she indicates
15:45:03  19   she's relieved that YFB has accountability.
15:45:03  20        Do you know what she meant by that?  What was
15:45:03  21   your understanding -- when you received this e-mail from
15:45:03  22   her that "YFB has accountability," what was your
15:45:19  23   understanding of that?
15:45:19  24        A.  I think my understanding was that, if there was
15:45:22  25   going to be behavior like that exhibited towards us on
```

184

```
15:45:25   1   March 2nd and 3rd, that someone was going to hold the
15:45:29   2   individuals responsible accountable for it.
15:45:31   3        Q.  Okay.  I want to go back for a moment to your
15:45:34   4   dialogue with Oscar Villegas because I just want to
15:45:37   5   really make sure I understand something.
15:45:39   6        You knew, at that time when he called you, he
15:45:44   7   was calling you in his capacity as an elected official;
15:45:48   8   is that correct?  Was that your belief?
15:45:50   9        A.  That is correct.
15:45:51  10        Q.  And at any point in time, did he indicate that
15:45:55  11   he was going to -- during this call, did he indicate, as
15:45:58  12   part of his chronicling of the facts, that he was going
15:46:02  13   to reach out to Michael Bisch and Zane Hatfield to get
15:46:05  14   their version of what happened?  At any point in time,
15:46:09  15   did he tell you that?
15:46:11  16        MR. EHLERS:  Objection.  Asked and answered.
15:46:12  17        THE WITNESS:  Since --
15:46:13  18        MR. TURPEN:  Same objection, and it's vague.
15:46:15  19   BY MR. SINGH:
15:46:16  20        Q.  Go ahead.
15:46:16  21        A.  He did not indicate that.
15:46:18  22        Q.  So on March 10th, you send another e-mail to
15:46:35  23   your board; correct?  And I'm showing it here.  This is
15:46:38  24   Bates Stamp Bosley220.  Do you see that?
15:46:41  25        A.  Yes, that's correct.
```

46 (Pages 181 to 184)

RONALD POSLEY - June 6, 2023

**189**

```
15:54:41  1   "The City and County are our fierce defenders and friends
15:54:46  2   at the moment"?  What did you mean by that statement?
15:54:49  3        A.  I simply meant that, when they heard about our
15:54:56  4   treatment and how Michael and Zane were trying to coerce
15:55:02  5   us into aligning with them, that they rose quickly and
15:55:08  6   fiercely to our defense.
15:55:11  7        Q.  Did you have any concerns at all -- let me ask
15:55:16  8   you another question.
15:55:18  9        Did you have any knowledge at this point as to
15:55:21 10   whether or not Villegas had attempted in his chronicling
15:55:29 11   to contact Michael Bisch or Zane Hatfield for their
15:55:33 12   version of events?
15:55:36 13        (Speaking simultaneously.)
15:55:37 14        MR. TURPEN:  Objection.  Vague.
15:55:42 15        THE WITNESS:  No, I had no knowledge of that.
15:55:46 16        (Reporter clarification.)
15:55:46 17   BY MR. SINGH:
15:55:48 18        Q.  Did you have any knowledge as to whether Susan
15:55:50 19   Strand or Ms. Juhler from Yolo County had contacted
15:55:54 20   Michael Bisch or Zane Hatfield to try to get their
15:55:58 21   version of events?
15:55:58 22        A.  I did not have any knowledge of that.
15:56:02 23        Q.  So why -- why were the City and County your
15:56:10 24   fierce defenders?  What was your understanding as to why
15:56:13 25   they were your fierce defenders?
```

**190**

```
15:56:15  1        A.  Why did I feel that way, or for what reason were
15:56:21  2   they our defenders?
15:56:22  3        Q.  No, I don't want you to speculate.
15:56:29  4        I'm asking what you -- you wrote this.  You
15:56:30  5   said, "City and County are our fierce defenders."  So I'm
15:56:32  6   asking:  What was your understanding as to why they
15:56:35  7   were your fierce defenders?
15:56:37  8        A.  I'm sorry.  I really am trying to clarify.  Are
15:56:45  9   you asking what made them our fierce defenders --
15:56:45 10        Q.  What was your understanding --
15:56:48 11        A.  -- or did I feel like they were our fierce
15:56:49 12   defenders?
15:56:49 13        Q.  Yeah, why did you write this?
15:56:55 14        A.  Okay.  Thank you.
15:56:56 15        Because they -- in my conversations with them,
15:56:59 16   as -- as I had had my conversation with Oscar, my
15:57:06 17   conversation with Aaron, and particularly those two, that
15:57:09 18   they felt like we had been wrongly treated and -- and
15:57:14 19   wanted to make sure that kind of thing did not continue
15:57:16 20   to happen, so...
15:57:19 21        Q.  Would you agree, as a general principle, that a
15:57:24 22   City or elected official -- a City-appointed official or
15:57:27 23   elected official for a city or county who is
15:57:30 24   investigating a matter -- that they should talk to both
15:57:33 25   sides if there's a dispute that they're investigating?
```

**191**

```
15:57:39  1        MR. EHLERS:  Objection.  Incomplete
15:57:42  2   hypothetical, and vague.
15:57:43  3   BY MR. SINGH:
15:57:43  4        Q.  You can answer.
15:57:44  5        MR. TURPEN:  Same objections.
15:57:46  6        THE WITNESS:  That is not for me to judge.  I am
15:57:49  7   not an elected.
15:57:51  8   BY MR. SINGH:
15:58:06  9        Q.  Okay.  When you say here in the opening
15:58:08 10   paragraph -- when you say, "The County Board of
15:58:11 11   Supervisors are all livid with Michael Bisch," how did
15:58:15 12   you know that they were all livid with Michael Bisch?
15:58:18 13        A.  Oscar shared that with me in our conversation.
15:58:26 14        Q.  Sorry.  I am confused.
15:58:26 15        Which conversation?
15:58:27 16        A.  There was only one.
15:58:30 17        Q.  But that was back on March 4th.
15:58:37 18        A.  Right.
15:58:37 19        Q.  This is an update on March 30th.
15:58:45 20        A.  Yes.
15:58:46 21        Q.  So your knowledge that they were all livid with
15:58:51 22   Michael Bisch was based on that single phone call on
15:58:52 23   March 4th?
15:58:52 24        A.  That's correct.
15:58:55 25        Q.  He hadn't -- I mean, would you agree he couldn't
```

**192**

```
15:58:59  1   possibly have investigated the matter on March 4th?
15:59:02  2   Correct?
15:59:02  3        A.  I don't believe that he was -- when he said that
15:59:05  4   the supervisors were upset with Michael, I don't think he
15:59:09  5   was referring to our situation yet.  I think that they
15:59:12  6   were upset with Michael already, and this was, you know,
15:59:18  7   kind of another domino and something that had been
15:59:20  8   escalating.  That was my broad understanding.
15:59:24  9        It may be erroneous, but that was how I -- I
15:59:27 10   really am sitting here trying to think of another
15:59:30 11   conversation I had with Oscar about this situation.  I'm
15:59:32 12   not sure we ever had another one, other than me asking
15:59:38 13   whether Serena was our lawyer in the text.  But about the
15:59:38 14   details of this, I'm not sure Oscar and I had a
15:59:43 15   conversation about it after March 4th.  I can't recall
15:59:45 16   one.
15:59:45 17        Q.  But your impression, when you spoke to him on
15:59:49 18   March 4th, was that they were already upset with Michael
15:59:54 19   Bisch?
15:59:54 20        A.  Yes.
15:59:55 21        Q.  Based on what?
15:59:59 22        A.  I -- I could not say.
15:59:59 23        Q.  Based on his views of SB 1383?
16:00:02 24        A.  I cannot say.  I -- I -- you would have to ask
16:00:07 25   them.
```

48 (Pages 189 to 192)

**193**

Q. Okay. But let me just make sure I understand this correctly.

It was your impression on that March 4th phone call that all of them were upset, not just Mr. Villegas?

A. That was my impression, yes.

Q. Okay. Who is Martha, by the way?

A. Mayor Martha Guerrero, the mayor of West Sacramento.

Q. Yeah, just want to make sure.

And city manager is?

A. Aaron Laurel.

Q. And you say "the City." What did you mean by that?

A. Oh, I think I probably just meant all of the above or, you know, plus City staffers or anybody to --

Q. Okay. Let's go up here.

This, on Bosley216, is a March 31st e-mail, and this is what you call "some basic info on the problems of Yolo Food Bank." Do you see that?

A. Yes.

Q. Okay. And then a couple of the paragraphs you're narrating the history of the conflict between YFB and the Cities/County; correct?

A. A little bit, yes.

Q. Right here, for example, you say, "YFB says the

**194**

Cities/County are trying are trying to do it on the cheap, which might well be true. Cities/County say YFB is trying to hold them hostage." Do you see that?

A. Yep.

Q. So you then recount your version of the events on the 2nd and 3rd; correct?

A. Yes.

Q. And then it recounts your interaction with Aaron Laurel as well; correct?

A. Yes.

Q. Right here, it says, "The food bank appears to be considering some form of discipline or censure for Michael, but I can't say for sure."

How did you know that?

A. Simply by the way that Danny was working so hard to try and get reconciliation, and things of this nature -- he never said that directly, but -- but it was clear from the edges that, you know, a tug of war was going on, you know, jurisdictions being upset, YFB trying to respond; so it was a -- it was a speculation. It wasn't off of direct knowledge.

Q. You say here, this paragraph in the middle, just to -- we're on Bates Stamp 217, Bosley217. "Martha didn't condone Aaron's handling of things but expressed disbelief and anger that Michael would arrange a meeting

**195**

in a public place for the purposes of embarrassing her and the City."

What was Aaron's handling of things that Martha didn't condone?

A. In the -- it was earlier in that paragraph when Michael -- or excuse me -- Aaron replied to an e-mail from Michael and asked him why he was extorting the Mercy Coalition. It was in that same paragraph, if you're looking for it.

Q. I saw it.

A. Okay.

Q. Thank you. Okay. Let's keep moving up here.

So this is June 3, 2022, Don Bosley, and it says, "If you're not aware of it yet, the Yolo Food Bank fired Michael Bisch." And my first question is: How did you learn of it?

MR. TURPEN: Objection. Asked and answered.

BY MR. SINGH:

Q. How did -- you're writing it here. What -- what prompted you to write this letter? How did you learn of this event?

A. I believe it was from a news account, or possibly I seem to recall that the food bank put out a newsletter or something, but I can't remember. It was

**196**

either that -- it was one or the other, a food bank newsletter or one of the news accounts.

Q. It says here, "There were many issues and complaints against him."

What was your factual basis for writing that?

A. Conversations with the electeds and other folks; so the same stuff we've been going over all day.

Q. But I want to understand this because this is important. It's a person's reputation and career, after all.

So it says here, "There were many issues and complaints again him." List to me all the individuals who provided you information for that statement.

A. The -- as I have said before, Oscar shared that there was widespread dismay with -- with Michael's reactions; Mayor Martha shared that there was dismay; Aaron Laurel shared that there was dismay, so...

Q. Anyone else?

A. That's pretty much it.

Q. No one else? You sure?

A. I mean, off -- you know, I had conversations with Danny, but I don't think Danny got into the particulars of it. He was just -- he really was just trying to smooth things over, not stir them up. And no, I think -- I think that's -- I think that's it.

197

```
16:06:45   1      Q.  Let's go to the next paragraph.
16:06:51   2      "But all the government leaders" -- right here.
16:06:53   3   "All the government leaders, both of City jurisdictions
16:06:56   4   and the County, are aware of his unacceptable actions,
16:07:00   5   though.  I have no doubt that their pressure on the YFB
16:07:03   6   board ultimately had a lot to do with this decision to
16:07:07   7   terminate."
16:07:08   8      So let's break this down.  "All the government
16:07:14   9   leaders."  Who are you referring to?
16:07:16  10      A.  Same leaders that I've been referring to.
16:07:19  11      Q.  List them, please.
16:07:28  12      A.  The leaders with which I had interactions.
16:07:34  13   The -- the County Board of Supervisors -- well, I didn't
16:07:37  14   have interactions with all of them.  But through Oscar,
16:07:40  15   the County Board of Supervisors, City Manager Aaron
16:07:44  16   Laurel, Mayor Martha Guerrero.  Yeah, that's -- that's
16:07:53  17   broadly it.  Obviously, that doesn't encompass all of the
16:07:57  18   government leaders.  It was spoken colloquially, but yes.
16:08:02  19      Q.  Tell me about Martha Guerrero.  What did she
16:08:07  20   tell you?
16:08:08  21      A.  Martha was on a fact-finding mission with us to
16:08:20  22   San Jose to look at the Recovery Cafe in San Jose, a
16:08:24  23   program we were considering at the time.  And after
16:08:30  24   lunch -- afterward, she pulled me aside and -- and some
16:08:35  25   of the -- some of the trickle-down from Michael Bisch's
```

198

```
16:08:40   1   actions; and -- and Aaron Laurel had sent him the e-mail
16:08:48   2   backstorying us; and then Michael had confronted Martha
16:08:50   3   at a restaurant.  She didn't appreciate it, and so she --
16:08:53   4   you know, so she was, like the leaders before her,
16:08:56   5   expressing disbelief at his strong-arm tactics of us
16:09:05   6   and -- and shock and -- and dismay that we all found
16:09:10   7   ourselves in this position.
16:09:12   8      Q.  Did -- to your knowledge, did she or anyone from
16:09:15   9   her office reach out to Michael Bisch or Zane Hatfield to
16:09:20  10   get their version of events?
16:09:21  11      A.  I do not have any knowledge of that.
16:09:23  12      Q.  Okay.  And then you say, "Both of City
16:09:32  13   jurisdictions and County are aware of his unacceptable
16:09:35  14   actions."
16:09:35  15      What did you mean what you wrote "unacceptable
16:09:37  16   action"?
16:09:38  17      A.  His pressuring us into not taking the -- the
16:09:42  18   Edible Food Recovery contract with the City and the
16:09:46  19   manner in which he did it, by threatening to withhold
16:09:52  20   and, in fact, actually saying that he was going to -- you
16:09:55  21   know, sending word that they were withholding our food
16:09:57  22   from Raley's and Nugget.  They, like me, thought that was
16:10:02  23   unacceptable.
16:10:02  24      Q.  "They," being who?
16:10:04  25      A.  The government leaders that I talked to.
```

199

```
16:10:09   1      Q.  But you don't know whether the government
16:10:11   2   leaders spoke to Michael Bisch or Zane Hatfield; correct?
16:10:16   3      A.  I don't know.
16:10:16   4      Q.  Okay.  But you told your board what you wrote
16:10:22   5   here.  So let me ask you this.
16:10:24   6      It says, "I have no doubt that their pressure on
16:10:28   7   the YFB board ultimately had a lot to do with this
16:10:33   8   decision to terminate."
16:10:35   9      So I want to understand.  "Their pressure."  Who
16:10:39  10   does "their" refer to?
16:10:41  11      A.  I was speculating that the pressure from the
16:10:45  12   jurisdictions, the government representatives and the
16:10:49  13   electeds, was having an influence on the food bank's
16:10:54  14   decision to terminate Michael.
16:10:56  15      Q.  And this was based on your dialogue and your
16:11:04  16   observations of these -- your dialogue with and your
16:11:07  17   observations of these government officials?
16:11:07  18      A.  It is speculation based on that dialogue, yes.
16:11:09  19   It was not --
16:11:10  20      Q.  Including your dialogue with Supervisor
16:11:13  21   Villegas?
16:11:13  22      A.  Did you just cut me off again?
16:11:13  23      MR. EHLERS:  Yeah, I was going to say you just
16:11:13  24   cut the witness off again, Counsel.
16:11:19  25      MR. SINGH:  You know, we're having -- and we
```

200

```
16:11:21   1   spoke to the video -- I am literally hearing him stop.
16:11:21   2   So I don't know.  We've been -- we actually -- while you
16:11:27   3   guys were on break, I spoke to Ms. Parker -- and ask
16:11:30   4   her -- whether she was experiencing a lag; so I am trying
16:11:33   5   my best because, literally, it sounds like he has stopped
16:11:37   6   from our end, and we can hear the --
16:11:39   7      (Speaking simultaneously.)
16:11:40   8      MR. TURPEN:  From my -- from my end, you're
16:11:42   9   cutting him off mid-sentence; so maybe it's best to just
16:11:44  10   give him a second to finish his sentence.
16:11:45  11      MR. SINGH:  Yeah, fair enough.  Okay.
16:11:47  12   BY MR. SINGH:
16:11:47  13      Q.  So would you like to --
16:11:49  14      MR. SINGH:  Actually, Madam Court Reporter, can
16:11:49  15   you read back the witness's answer so we have a clean
16:11:49  16   record here?
16:11:49  17      (Record read.)
16:12:06  18      THE WITNESS:  It was speculation based on my
16:12:08  19   conversations with those government officials.  It was
16:12:13  20   not the result of anyone directly telling me that their
16:12:14  21   pressure resulted in his termination.
16:12:16  22   BY MR. SINGH:
16:12:16  23      Q.  Here you said -- you're calling it speculation,
16:12:27  24   but here in this communication, you said, "I have no
16:12:30  25   doubt that their pressure on the YFB board ultimately had
```

DONALD BOSLEY - June 6, 2023

1                    REPORTER'S CERTIFICATE

2

3           I certify that the foregoing proceedings in the

4    within-entitled cause were reported at the time and place

5    therein named; that said proceedings were reported by me,

6    a duly Certified Shorthand Reporter of the State of

7    California, and were thereafter transcribed into

8    typewriting.

9

10          I further certify that I am not of counsel or

11   attorney for either or any of the parties to said cause

12   of action, nor in any way interested in the outcome of

13   the cause named in said cause of action.

14

15          IN WITNESS WHEREOF, I have hereunto set my hand

16   this 8th day of June, 2023.

17

18

19

20

21

22

23   _____

24          KAYLA KNOWLES, CSR No. 14071

25          Certified Shorthand Reporter

                                                    216

SINGH EXHIBIT 2



**From:**      Don Bosley <don@wsmercycoalition.org>
**Sent:**       Thursday, August 18, 2022 6:26 AM
**To:**         Sandy Yim; Karen LeGrand; Aleecia Gutierrez; Ali David; Brandon Hooker; Erin McEwen; Anna Darzins
**Cc:**         Cynthia Mares; Nicole Ring-Collins; Lynn Phelps
**Subject:**    !Yolo Food Bank crisis with Michael Bisch


Good morning, Board and staff

Wanted to make you aware of this situation (see link below).

https://fox40.com/news/local-news/former-yolo-food-bank-director-suing-organization-for-wrongful-termination/

I met with new YFB executive director Karen Baker yesterday and they're in full-on crisis control mode; Michael's actions in the wake of his firing have caused several major donors to question what YFB is doing, and the food bank's funding structure is very much threatened.

Unfortunately, I and we are at the center of this thing. It was Michael's interactions with us last March that caused the City and County to finally decide they were fed up with Michael, and began the path that ultimately led to Michael being fired.  Up to this point, the food bank has tried to take a high-road approach and not comment on Michael's inflammatory assertions in social media and conventional media, but now they have to defend themselves.  The food bank has asked me for a timeline of our key interactions with Michael and his lieutenants last spring, which I will give them. I imagine it's possible that I may be called on for testimony. I guess it's also possible that at some point someone may ask for corroboration from Cynthia, who overheard the first threatening phone call to us from then-YFB program director Zane Hatfield (I happened to have it on speakerphone at the time); and Nicole, who joined me at a lunch with Michael and YFB board member Danny Ramos a few weeks later. Lynn also received one of the phone calls that informed us that our food access to Nugget and Raley's was cut off.

Of course, we'd much prefer to stay out of it. But Michael's actions with us were repeatedly and undeniably unethical and manipulative, and I guess we inadvertently became the only small food pantry that sorta pushed back against them. I believe he's vindictively doing great damage to the most important food partner in our County, and it would be unethical and irresponsible of us to put our heads in the sand while potentially thousands of families have their food sustainability threatened.

I don't know where this will lead, but I would caution you all to watch your conversations, your emails and your texts on this issue very carefully. It may be tempting to jump into any social-media threads on this, but I would advise all of us against it.

Sigh.


*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*

BOSLEY000212

*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

BOSLEY000213

| | |
|---|---|
| **From:** | Lynn Phelps <lynn@wsmercycoalition.org> |
| **Sent:** | Friday, June 3, 2022 11:26 AM |
| **To:** | Don Bosley |
| **Cc:** | Aleecia Gutierrez; Ali David; Anna Darzins; Brandon Hooker; Erin McEwen; Karen LeGrand; Nicole Ring; Sandy Yim; Cynthia Mares; Melody Bosley |
| **Subject:** | Re: Yolo Food Bank fires ED |

I saw the email today. Thank you for input.

On Fri, Jun 3, 2022, 11:22 AM Don Bosley <don@wsmercycoalition.org> wrote:
Good morning, board and friends -

If you're not aware of it yet, the Yolo Food Bank fired Michael Bisch as its ED on Tuesday night. There were many issues and complaints against him, but our situation unfortunately wound up being the spark that ignited an inferno around him the last couple months.

YFB has not publicly discussed the reasons for his firing, and so a fair amount of the community is up in arms that this accomplished leader would be cut loose. But all the government leaders, both of city jurisdictions and the county, are aware of his unacceptable actions, tho. I have no doubt that their pressure on the YFB Board ultimately had a lot to do with this decision to terminate.

I'm just making you aware in case some of this comes washing back our direction. Once again, I think our best call is to stay out of the fray and - if anyone's insistent - you can refer them to me. I suppose we need to be watchful for trolls again as well. Michael has no love lost for the Coalition or me personally and I have found him to be a combative personality. I wouldn't be surprised if he goes down swinging. Discernment and restraint in all quarters, please.

Thanks,

*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

1

BOSLEY000214

*Connection | Strategic | Developer | Positivity | Belief*

1

BOSLEY000215

| | |
|---|---|
| **From:** | B H <bhooker2000@gmail.com> |
| **Sent:** | Thursday, March 31, 2022 6:11 PM |
| **To:** | Don Bosley |
| **Cc:** | Aleecia Gutierrez; Anna Darzins; Erin McEwen; Helena Helmold; Karen LeGrand; Nicole Ring; Ali David; Sandy Yim |
| **Subject:** | Re: YFB talking points |

Thank you for this Don and representing the mercy coalition through prayer. Thank you for your leadership on this.

On Thu, Mar 31, 2022, 4:22 PM Don Bosley <don@wsmercycoalition.org> wrote:
Hi, Board ... here's some basic info on the problems with Yolo Food Bank.

* We currently are recovering 9 1/2 tons of food per year combined from Nugget and Raley's, through an arrangement set up by Yolo Food Bank.

* SB1383 is the law that went into effect Jan. 1 requiring "generators" (supermarkets, eventually restaurants, food manufacturers) to begin recovering more portions of their edible food to keep it out of the County landfill. It's both a move towards getting more food out to people and keeping the waste process more environmentally friendly.

* YFB has seen this law coming for years and given the County a price tag to do the required food recovery across the county. The Supervisors balked at the cost, and began crafting their own food-recovery program with the cities, at least through the early years of the law. That didn't set well with the food bank, and particularly Michael. The process, the metrics and the cost assumptions are all complicated and both sides are claiming theirs are right. YFB says the cities/county are trying to do it on the cheap (which might well be true); Cities/County say YFB is trying to hold them hostage.

* Last fall YFB began lobbying us and other partner agencies to "not abandon the food bank" when the County proposals started coming our way. The County named us as one of nine "pantries" around the county that it would fund to the tune of $26k each for capacity-building related to food recovery (refrigeration, scales, trucks, worker stipends, etc.). We were leaning towards signing a contract with the City on this, as you may recall. I had several conversations with Michael about this and Aleecia had at least one; he was disappointed but also spent a lot of his time belittling government reps, accusing them of slandering the food bank, and insinuating that everyone was being idiotic or unethical, or both.

* On Feb. 24, Zane Hatfield, YFB's program director, called and asked where we stood on the City offer. I told him that we'd decided to sit tight while the food bank and the City/County sides figured out how they were going to sort out their impasse.

* On March 2, Zane called again, at about 4pm. (Cynthia heard this exchange because I had it on speakerphone ... I probably should've taken it off, but it didn't occur to me). I reiterated that we were treading water for the moment. Zane said to me that his board had been pressuring him and asking him, "What's to keep us from just cutting them off from (Nugget and Raley's)." I was pretty stunned. "Zane, that sounds an awful lot like a threat ... " I told him. I assumed he would walk it back. He didn't. I began expressing my ... disappointment ... that they would actually threaten to take food out of our hands, to care for impoverished and homeless people, as a strong-arm tactic. It never got uncordial, but it definitely was strained.

* Next morning, March 3, YFB's operations manager Corky began calling, trying to reach Lynn, then Nicole, then myself, all before 9am, to inform us that we'd been cut off at Nugget and Raley's beginning 3/17. I was blown away. It honestly felt like someone had had a tantrum somewhere. I texted Michael and we talked by phone later in the day. He told me, among other things, that we'd chosen our vision and it wasn't theirs; that he couldn't believe I couldn't see the difference between the right and wrong in this, comparing it to not being able to see the difference between Russia and Ukraine; and held fast to his dictate that we were cut off from our food recovery. We later

BOSLEY000216

learned that he actually had no authority whatsoever to cut us off; one of his Board members, a Nugget owner, was absolutely incensed.

* March 4, I sent a note to the City staff saying we definitely wouldn't be signing a food-bank contract anytime soon, and I explained somewhat matter-of-factly what had happened with the food bank. That was the last time I took initiative to share anything about the incident with anyone outside of MC.  By that afternoon Oscar Villegas was on the phone to me, followed in the days to come by acting HHSA director Nolan Sullivan; city manager Aaron Laurel; mayor Martha Guerrero; Dan Ramos; and the head of the Contra Costa Food Bank, who oversees the part of the Feeding America program that sends a vast amount of food to Yolo Food Bank.

* On March 10, Michael called to see how I was feeling about things after a week of processing. He was cordial. I told him we were still making no moves, and that I'd informed the city that we wouldn't be signing any contracts soon. Michael's response: "In that case, we can restore your access to the food recovery."   I was glad to get the food, but the bald-faced quid-pro-quo was just oily feeling.

* Next day, March 11, I got a call from city manager Aaron Laurel, who'd just learned about the food bank's treatment of us and was livid. Michael had emailed him on another matter, and as soon as Aaron got off the phone with me, he responded to Michael's email by asking why YFB was trying to extort the Mercy Coalition.  (Within days Michael arranged a meeting with Mayor Martha at a restaurant and pulled out a printout of Aaron's email to confront her about her city manager's unprofessionalism. Martha didn't condone Aaron's handling of things but expressed disbelief and anger that Michael would arrange a meeting in a public place for the purpose of embarrassing her and the city ... while never taking any responsibility for his own actions)

* Early the following week Michael called me to tell me about his interaction with Aaron, and to express his surprise, because he'd thought we'd patched things up. I told him that we had, but that his original move against us was still cycling around and causing reactions.  I'm not sure he believed that I wasn't out there whispering negativity in the ear of electeds and city officials.

You know most of the details since then (included in my email last night).  I know the food bank and city/county officials have been going around in some very unpleasant conversations. The food bank appears to be considering some form of discipline or censure for Michael, but I can't say for sure.  I'm sure we haven't heard the last of it.

Sigh. What a ridiculous and unsavory thing to recap.  Anyway, there you have it.

Thanks!


*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

Connection | Strategic | Developer | Positivity | Belief

BOSLEY000217

**From:**       Don Bosley <don@wsmercycoalition.org>
**Sent:**       Wednesday, March 30, 2022 9:03 PM
**To:**         Ali David
**Subject:**    Re: Cafe and YFB updates

Thank you, Ali. I appreciate that.  Mostly I just feel sad for him. He truly looked miserable and tormented yesterday.

*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

On Wed, Mar 30, 2022 at 7:50 PM Ali David <msalidavid@gmail.com> wrote:
No matter how personal it is for Michael, you should NOT feel personally responsible for any of his feelings. Just restating the obvious. =)

On Wed, Mar 30, 2022, 5:20 PM Don Bosley <don@wsmercycoalition.org> wrote:
Good afternoon, MC Board!  Hope you're all having a fantastic week.  Things have been happening so fast that I haven't had the chance to keep you up to date, but here's a few things you should be aware of:

COME BACK CAFE
* Sunday, we submitted our extensive application for Recovery Cafe Network. We should hear back by April 11 on our admission to the May training cohort.

* Our visit in San Jose on Monday was tremendous.  Ali, Sandy, Nicole, Jason Schrimsher and myself joined Mayor Martha for the trip, and we were able to spend more than two hours onsite and another hour at lunch processing together. We learned so much about programming, funding, the road they've traveled ... and got to spend some time with several Members who just strolled right up and shared with us.

* Martha loves the model and is wholeheartedly ready to go.  By yesterday she'd spoken to both Aaron Laurel, city manager, and Oscar Villegas, County supervisor, about her visit and the cafe model.  They each have copies of our project Quick Sheet and Aaron supposedly has a couple of thoughts on potential sites (I don't know where).

* At Martha's urging I sent Aaron today a breakdown of space would we need at any site to get the cafe off the ground. I'm attaching it here, in case any of you have feedback on that.

* The realtor for 929 Drever says that they have an offer in process, but I didn't know if that was realtor gamesmanship - we'll see.  He knows we're interested and will let me know if something changes.

* I also submitted a proposal for a $7500 ARP mini-grant yesterday to potentially help cover the costs of the $5000 network fee, travel costs to San Jose, and some initial promotion (like logo design).

YOLO FOOD BANK DUST-UP

BOSLEY000218

\* This thing won't go away or quickly resolve, it's becoming apparent.  The City, the city manager, Martha, and the County Board of Supervisors are all livid with Michael Bisch about the way he's done business in general, and our interaction with him has become Exhibit A. (Martha spent 30 minutes at lunch with us expressing her ... dismay ... with the whole situation).  The food bank board is trying to stop the bleeding, especially since the Board of Supes sent them a very formal and pointed letter of rebuke and is threatening to hold up some of their ARP funding.

\* Dan Ramos is on the YFB board and met with me last week to "investigate" the incident.  Danny went to school with Melody and I and we have history going back decades, including his pivotal role in obtaining the teen-center building for YFC. After a YFB board meeting last week he asked if I would meet with he and Michael to "break some bread" and try to smooth things over and get past this.  Basically, he wanted to be able to say to the electeds that we had all met and everything was ok. I agreed to meet them because I didn't want it said that we weren't open to conversation.

\* The meeting was yesterday. But after hearing Martha's take on Monday, I decided to take Nicole along with me just to make sure I had a witness to whatever might come down.  The meeting was fine. Danny did most of the talking. Michael showed late, looked miserable, said little (which is unusual), and had to leave early because a son's car had broken down, or something like that.  Honestly, it was all a little awkward and forced. Neither Nicole nor I said much, either (also unusual!).  Danny's original plan was to type up a letter stating that we'd met and all was well, and have Michael and I sign it ... but I told him I didn't want to sign any letter. Instead, I just told him to invite anyone to call me who wanted to.

\* So: while the City and County are our fierce defenders and friends at the moment, I would not be surprised if we, or I, were slandered or sullied by Michael somewhere along the line. Nicole observed, and I had to concur, that he looked like he hated me.  Maybe that's not true, but just putting it out there as a heads-up. I'll follow through with my promise to send some talking points out to the Board, in case this thing should come your way.

Sorry for all the wordiness ... just wanting to keep you all in the loop.  Talk to you soon.


*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

BOSLEY000219

| | |
|---|---|
| **From:** | B H <bhooker2000@gmail.com> |
| **Sent:** | Thursday, March 10, 2022 5:35 PM |
| **To:** | Don Bosley |
| **Cc:** | Aleecia Gutierrez; Anna Darzins; Erin McEwen; Helena Helmold; Karen LeGrand; Nicole Ring; Ali David; Sandy Yim |
| **Subject:** | Re: YFB update: Back in business :) |

Thank you for representing us in the best way possible Don. This was a difficult situation and you let God guide your steps for the coalition. Thank you so much.

On Thu, Mar 10, 2022 at 4:09 PM Don Bosley <don@wsmercycoalition.org> wrote:
> Good afternoon, Board ... thanks for the excellent meeting last night.
>
> Wanted to update you all that Michael Bisch called me today and we had a pretty good conversation. I told him that, as it stood, we weren't planning to sign contracts with anyone, and he said in that case he'd restore our food recovery access to Nugget and Raley's.
>
> It's hard not to feel like we were manipulated and played a little bit, and I remain unimpressed with the tactics of YFB leadership on this. There will be more uncomfortable conversations as the City/County take stock of their partners being coerced out of contracts.  But for the moment we've got our food back, and hopefully the whole episode becomes an onramp for holistically and equitably addressing food sustainability in Yolo County.
>
> Thanks to all for your wisdom and support.
>
>
>
> *Don Bosley*
> *Executive Director*
> *Mercy Coalition of West Sacramento*
> *P.O. Box 2060*
> *West Sacramento CA 95691*
> *916.997.6332*
> *He/Him/His*
>
> *Connection | Strategic | Developer | Positivity | Belief*

BOSLEY000220

**From:** Ali David <msalidavid@gmail.com>
**Sent:** Saturday, March 5, 2022 9:29 AM
**To:** Don Bosley
**Cc:** Karen LeGrand; Anna Darzins; B H; Aleecia Gutierrez; Erin McEwen; Helena Helmold; Nicole Ring
**Subject:** Re: Yolo Food Bank troubles

That's a great thing that our staff (including Don) are taking the situation in stride.

I'm relieved that YFB has accountability as it is needed in any organization.

Peace and goodwill be on all in these circumstances.

Ali

On Sat, Mar 5, 2022, 8:27 AM Don Bosley <don@wsmercycoalition.org> wrote:
Thanks to all for the encouragement and feedback. An update:

Predictably, word got around fast yesterday. I received an afternoon call from County Supervisor Oscar Villegas, our longtime friend and supporter. Oscar affirmed that Michael has essentially gone off the rails, completely driven by "greed" and "a power grab." Like city partners who I'd informed earlier in the day, Oscar was shocked by Michael's "brazen" decision to cut off our access to food recovery. He spent 30 minutes on the phone chronicling the facts of the Wednesday and Thursday interactions with YFB, and the whole Board of Supervisors will be digging into this.

There is now an outcry coming at Michael and the YFB Board from several directions, and at this point we're just standing back and answering questions if anyone wants to ask us. Meanwhile, I've asked Lynn and Nicole to do a grocery buy next week as if we had no access to recovery food, so that I can determine the cost of meeting all our food commitments without food recovery. If our access status isn't reversed, I'll have the information I need to begin going after grant or donor sources that may be able to help us fill the gap. Staff and I met yesterday and talked together about the importance of identifying the high road at every step and taking it, regardless of whatever slander or punitive decisions that Michael/YFB may invoke. They also understand the importance of not making this situation into a public gossip wheel or talking point; whatever frustrated processing we may need to do, we'll do it internally. I have to say, they all really impressed me with their maturity, resilience, and confidence that new answers would present themselves. Quite a crew we've assembled there.

I'll continue to keep you updated with any significant developments. And of course we'll have a chance to talk about it at next Wednesday's board meeting.

Have a blessed weekend!

*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

1

BOSLEY000221

On Fri, Mar 4, 2022 at 6:48 PM Karen LeGrand <karen.legrand@gmail.com> wrote:
Thanks for letting us know and for handling the situation graciously.  It's very disappointing, but I'm honored to be part of an organization that keeps the primary goal to serve people and honor partners.  Praying God will sort this out and restore relationships.

Take care,
Karen

On Fri, Mar 4, 2022 at 10:00 AM Anna Darzins <annadarzins@gmail.com> wrote:
 Thank you Don. This is a difficult situation. I really appreciate your care in attending to it.

 On Fri, Mar 4, 2022 at 9:54 AM B H <bhooker2000@gmail.com> wrote:
 We are going to pray and let the Lord help us find the way Don.

 Thank you for hanging in there. Great to see you and the team yesterday. You were all a well oiled machine. :)

 On Thu, Mar 3, 2022 at 5:43 PM Don Bosley <don@wsmercycoalition.org> wrote:
 Good evening, Board ... updating you here on some unfortunate circumstances that have unfolded in our relationship with Yolo Food Bank.

 In short, YFB is apparently dissatisfied that we are not rallying to their side in their demand that Yolo County fund them fully for food recovery in the region.  Instead, as we've discussed in the past, the County Supervisors and city jurisdictions have chosen to fund a less-expensive food recovery network to meet the SB1383 requirement; you may recall that they had identified nine smaller food pantries, including us, that they would pay up to $26k for capacity-building in food recovery. It appeared we were on our way to a food recovery contract with Grocery Outlet that would bring us more food recovery resources.

 Yesterday I received a call from Zane Hatfield, YFB's program director, in which he indicated that if we did not stand in solidarity with YFB, then they would consider cutting off our current access to food recovery at Nugget and Raley's (we've had this deal through YFB off-and-on for years). Zane indicated that his Board was pressing him to consider these kind of ultimatums. I was pretty stunned that they would actually be threatening to cut off our resources unless we got into alignment with them; it felt to me like being bullied by a union boss or something. I expressed my dismay and disbelief to Zane, and how this action ran counter to the character that I've always known YFB to have.

 This morning we were informed by YFB that our food recovery at Raley's and Nugget will end on the 17th.

 I talked late this afternoon to YFB executive director Michael Bisch, whose bitterness toward the County, the cities, and now partners like us is pretty palpable. The interaction was disappointing, to put it mildly.  He basically indicated that we clearly had a different vision than them, and now we could just live with it.

 I also talked with my good friend Nolan Sullivan at County HHS; there's no one in these matters whose wisdom I trust more. Nolan has been a consultant presence on the YFB Board and had real doubts about Zane's assertion that their Board was behind this kind of pressure. In fact, to his knowledge the Board had wanted Michael to ratchet down his ire.

 Anyway, just wanted to bring you all up to speed. We will begin making plans for alternative food sources - I'm confident we'll find a way to get that done.  I'll leave the catfight to YFB and the government entities; I personally have no interest in taking money from any of them at this point, but I'd be happy for us to do some food recovery for free (as we've always done) if someone makes an avenue available to us.

 I'll keep you in the loop on any significant updates.

BOSLEY000222

*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

--
**Anna Darzins**
University of California, Berkeley
School of Social Welfare
Disability Studies
Haas Scholar, Researcher
**(916)370-7640**

3

BOSLEY000223

| | |
|---|---|
| **From:** | Don Bosley <don@wsmercycoalition.org> |
| **Sent:** | Thursday, February 2, 2023 6:32 PM |
| **To:** | Strand, Susan |
| **Cc:** | Marissa Juhler; Kent-Stone, Traci |
| **Subject:** | Re: Lunch at the Recovery Cafe? |

Teams would work great. Thank you, Susan.

*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

On Thu, Feb 2, 2023 at 6:13 PM Strand, Susan <SUSANST@cityofwestsacramento.org> wrote:

That's right.  I guess a virtual meeting makes the most sense then.  Do you both have access to Teams?  I can send a Zoom meeting request if that's preferable.

**SUSAN STRAND**

**Senior Analyst, Recycling**



1110 West Capitol Avenue

West Sacramento, CA  95691

Office:  (916) 617-4590

Mobile: (916) 439-0184

Susanst@cityofwestsacramento.org

www.westsacrecycles.org



BOSLEY000224

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Thursday, February 2, 2023 5:52 PM
**To:** Strand, Susan <SUSANST@cityofwestsacramento.org>
**Cc:** Marissa Juhler <Marissa.Juhler@yolocounty.org>; Kent-Stone, Traci <tracik@cityofwestsacramento.org>
**Subject:** Re: Lunch at the Recovery Cafe?

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Since it's a Thursday, it won't be open that day and may be used by Downtown Streets Team ...

*Don Bosley*

*Executive Director*

*Mercy Coalition of West Sacramento*

*P.O. Box 2060*

*West Sacramento CA 95691*

*916.997.6332*

*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

On Thu, Feb 2, 2023 at 5:49 PM Strand, Susan <SUSANST@cityofwestsacramento.org> wrote:

I believe both Traci and I are available the 23rd at noon.  Should we meet at the Recovery Café?

2

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Thursday, February 2, 2023 4:56 PM
**To:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Cc:** Strand, Susan <SUSANST@cityofwestsacramento.org>; Kent-Stone, Traci <tracik@cityofwestsacramento.org>
**Subject:** Re: Lunch at the Recovery Cafe?

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

**WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

---

Thank you all!  I can make the 2/22 at 2pm, or 2/23 at noon ... I couldn't make the 24th.


I appreciate you all squeezing us in during a busy season!  Seems like virtual would be the best way to go given these availabilities ...


Thanks!




*Don Bosley*

*Executive Director*

*Mercy Coalition of West Sacramento*

*P.O. Box 2060*

*West Sacramento CA 95691*

*916.997.6332*

*He/Him/His*


*Connection | Strategic | Developer | Positivity | Belief*

BOSLEY000226

On Thu, Feb 2, 2023 at 4:45 PM Marissa Juhler <Marissa.Juhler@yolocounty.org> wrote:

Wonderful.  Great to get this on the books.  Here is my availability that week:


2/22 at 2pm

2/23 at Noon

2/24 at 9am


Sincerely,


*Marissa Juhler*


Interim Division Director

Landfill Operations & Waste Reduction Manager

Integrated Waste Management Division

Yolo County Central Landfill

44090 County Road 28H

Woodland, CA 95776

530-666-8813

Fax 530-666-8853




NOW OPEN EVERY THURSDAY

Special 50% Off Event - Saturday 2/18/23

9:oo am – 3:00 pm

4

**From:** Strand, Susan <SUSANST@cityofwestsacramento.org>
**Sent:** Thursday, February 2, 2023 4:43 PM
**To:** don <don@wsmercycoalition.org>; Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Cc:** Kent-Stone, Traci <tracik@cityofwestsacramento.org>
**Subject:** RE: Lunch at the Recovery Cafe?

Hi Don and Marissa,

Traci and I were just discussing to need to get to work on our next funding agreement with Mercy Coalition and the Recovery Café.

Both Traci and I have very packed schedules the next couple of weeks, but we may have some time to meet the week of the 20th.

I'm not sure if there is a date and time that week that would work for you and Marissa.

I'd love to visit the Recovery Café in action but am open to whichever place and time works best for everyone.

Regards,

**SUSAN STRAND**

**Senior Analyst, Recycling**



1110 West Capitol Avenue

West Sacramento, CA  95691

Office:  (916) 617-4590

Mobile: (916) 439-0184

Susanst@cityofwestsacramento.org

www.westsacrecycles.org



BOSLEY000228

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Thursday, February 2, 2023 4:02 PM
**To:** Marissa Juhler <Marissa.Juhler@yolocounty.org>; Strand, Susan <SUSANST@cityofwestsacramento.org>
**Subject:** Lunch at the Recovery Cafe?

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

**WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Good afternoon, Marissa and Susan!  Hope you're both doing splendidly.

I appreciated the conversation this afternoon, Marissa, and so I thought I'd reach out and see if we could schedule a meeting with y'all soon to consider what the Edible Food Recovery landscape may look like for 2023-24.  We'd love to have you come enjoy lunch at the Recovery Cafe, if you like, and see some of the (literal) fruits of your labors ... but if time is a crunch, I'd be happy to come to you or meet virtually as well ...

Thanks for considering - look forward to seeing you all soon!

*Don Bosley*

*Executive Director*

*Mercy Coalition of West Sacramento*

*P.O. Box 2060*

*West Sacramento CA 95691*

*916.997.6332*

*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

6

BOSLEY000229

This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act. [THIS EMAIL ORIGINATED FROM OUTSIDE YOLO COUNTY. PLEASE USE CAUTION AND VALIDATE THE AUTHENTICITY OF THE EMAIL PRIOR TO CLICKING ANY LINKS OR PROVIDING ANY INFORMATION. IF YOU ARE UNSURE, PLEASE CONTACT THE HELPDESK (x5000) FOR ASSISTANCE]

This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act.

This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act.

BOSLEY000230

**From:**        Don Bosley <don@wsmercycoalition.org>
**Sent:**        Friday, August 5, 2022 3:33 PM
**To:**          Nicole Ring-Collins
**Subject:**     Fwd: Edible Food Recovery for the Recovery Cafe
**Attachments:** invite.ics

Wanna join me for this one as well?  This is the re-engagement with the City/Waste Management Edible Food Recovery money ... the one we backed out of because of the food bank flap.  They may well have $26,000 that we can use in the cafe, and perhaps twice that next year ...

*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

---------- Forwarded message ---------
From: **Marissa Juhler** <Marissa.Juhler@yolocounty.org>
Date: Fri, Aug 5, 2022 at 2:31 PM
Subject: Edible Food Recovery for the Recovery Cafe
To: don <don@wsmercycoalition.org>, Goularte, Traci <tracig@cityofwestsacramento.org>, Strand, Susan <SUSANST@cityofwestsacramento.org>, Pamela Hedrick <Pamela.Hedrick@yolocounty.org>

BOSLEY000231

**From:**      Serena Warner <swarner@akk-law.com>
**Sent:**      Monday, May 15, 2023 8:51 AM
**To:**        Don Bosley
**Subject:**   RE: Bisch lawsuit against Yolo, et al - Inquiry from County's Attorney

Perfect – see you soon.

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Monday, May 15, 2023 8:50 AM
**To:** Serena Warner <swarner@akk-law.com>
**Subject:** Re: Bisch lawsuit against Yolo, et al - Inquiry from County's Attorney

Hi, Serena!  Just realized I didn't respond to this ... yes, I'll be available for this Zoom call at 9.  See you in a few ...

*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*

On Sat, May 13, 2023 at 1:55 PM Serena Warner <swarner@akk-law.com> wrote:

> Perfect, can we plan for 9:00 am on Monday? Is Zoom okay? I am including a link below, but if you would prefer a phone call instead, that is fine with me.
>
> I am specifically interested in what the Yolo Food Bank/Bisch communicated to about not accepting the County's SB 1383 funding back in 2022, and then who you spoke to either at the County or in West Sacramento about what Yolo Food Bank told you.  Thank you for carving out some time to discuss.
>
> Serena Warner is inviting you to a scheduled Zoom meeting.
>
> Topic: Bisch Litigation Meeting
>
> Time: May 15, 2023 09:00 AM Pacific Time (US and Canada)

1

Join Zoom Meeting

https://us02web.zoom.us/j/84545535926

*Serena Warner*

**Attorney/Partner**

**Angelo, Kilday & Kilduff LLP**

601 University Ave, Ste. 150

Sacramento, CA 95825

(916) 564-6100 ext. 235

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Friday, May 12, 2023 4:26 PM
**To:** Serena Warner <swarner@akk-law.com>
**Subject:** Re: Bisch lawsuit against Yolo, et al - Inquiry from County's Attorney

Hi, Serena.  Sure thing - I can be available Monday anytime between 8:30am-10am or 2-4pm ...

Thanks!

*Don Bosley*

*Executive Director*

*Mercy Coalition of West Sacramento*

*P.O. Box 2060*

*West Sacramento CA 95691*

*916.997.6332*

*He/Him/His*

BOSLEY000233

*Connection | Strategic | Developer | Positivity | Belief*

On Fri, May 12, 2023 at 2:41 PM Serena Warner <swarner@akk-law.com> wrote:

Hello Don,


I am an attorney representing Yolo, Davis, West, Sac and Woodland, and the named individuals, in a lawsuit brought by Mike Bisch regarding his release from the YFB Director position. I understand that prior to his release he had contacted you about not accepting SB 1383 funds from Yolo. I am hoping I could set up a call with you later today or Monday to ask a few questions. Would you have 15 minutes of time sometime soon?


Thank you,

Serena

*Serena Warner*

**Attorney/Partner**

**Angelo, Kilday & Kilduff LLP**

601 University Ave, Ste. 150

Sacramento, CA 95825

(916) 564-6100 ext. 235

BOSLEY000234

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Wednesday, May 24, 2023 1:02 PM
**To:** Serena Warner
**Subject:** Re: Bisch Litigation - Draft Declaration


Hi, Serena.  Hope your week is going well ...

Not surprisingly, I suppose, Michael's lawyer's subpoenaed me for a zoom appearance on June 6, along with all related communications and documents from 26 different entities or individuals.  It's no problem, but I do have 1 question: I don't need a lawyer myself for this, right?  Let me know if it's inappropriate to ask you ... :)

Thanks,


*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*

*Connection | Strategic | Developer | Positivity | Belief*


On Mon, May 15, 2023 at 12:45 PM Serena Warner <swarner@akk-law.com> wrote:

Hello Don,


Thank you again for talking with me today. I did my best to synthesize our conversation. Please feel free to make any corrections – or let me know what corrections are needed and I can make them for you. I am also attaching a copy of the exhibit that is referenced in the declaration.


If the declaration looks good to you, please sign and date it, and send back to me.


Thank you!


Serena

*Serena Warner*

**Attorney/Partner**
**Angelo, Kilday & Kilduff LLP**

BOSLEY000235

601 University Ave, Ste. 150

Sacramento, CA 95825

(916) 564-6100 ext. 235

BOSLEY000236

SINGH EXHIBIT 4

| From: | Marissa Juhler <Marissa.Juhler@yolocounty.org> |
|---|---|
| To: | Ken Hiatt |
| CC: | Chad Rinde; Kathleen Trepa; Mike Webb (MWebb@cityofdavis.org); Aaron Laurel; Rosie Ledesma |
| Sent: | 5/25/2022 1:16:19 PM |
| Subject: | RE: COW Comments on SB1383 - Drat Pooled Funding Program Term Sheet |

Thank you for the feedback Ken. I will incorporate these items into the draft document and discuss with MAC and WAC.  If anyone else has additional input, please respond by June 10th.

Sincerely,

### *Marissa Juhler*

Landfill Operations & Waste Reduction Manager
Integrated Waste Management Division
Yolo County Central Landfill
44090 County Road 28H
Woodland, CA 95776
530-666-8813
Fax 530-666-8853



(NEXT BLUE BARN SALE)
MAY 20th & 21st
(9:oo am – 3:00 pm)

**From:** Ken Hiatt <Ken.Hiatt@cityofwoodland.org>
**Sent:** Tuesday, May 24, 2022 4:45 PM
**To:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Cc:** Chad Rinde <Chad.Rinde@yolocounty.org>; Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>; Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>
**Subject:** COW Comments on SB1383 - Drat Pooled Funding Program Term Sheet

Marissa,

Thanks again for timing time to speak to us last week.  As requested, I have reviewed the draft program with staff and would offer the comments below for consideration:

1. Allocation of pooled funds should be made proportionate to the amount of money contributed by each jurisdiction.  Also, the total funding should be $386,930, not $410,230, which is the original amount the consultants had suggested for YFB (see pg. 22-24), and what our appropriation was based on when we took it to our Council in December. The $410,230 amount includes software ($23,300) that we did not budget for YFB when we originally appropriated the funds.

2. How will the program coordinator position be funded?  Who will they report to?  Worth clarifying in the document?

3. Confirm that the program outline is only for two years and if a pooled fund is established, will only be authorized to make allocations of the initial year funds ($386,930).

4. If request is made by Yolo Food Bank for funding, no authorization of these initial year funds will be made without first consulting with the City Manager's and County Administrator.  Similarly, CM's and

5. I have heard concerns from Tier 1 generators regarding approach/communication surrounding the compliance inspections conducted by the County. What is the status of engaging with the Tier 1 businesses to solicit their feedback on how best to handle compliance verification/reporting? Woodland Staff reports that they are experiencing difficulty in getting Tier 1 businesses to be responsive to our proactive efforts to educate or coordinate with them.

Thanks,



**Ken Hiatt - City Manager**
City of Woodland

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, May 06, 2022 1:41 PM
**To:** Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>
**Subject:** FW: [EXTERNAL]Yolo Manager's Call

Hi Kathleen,

This is additional information on your questions related to SB1383 funding. Hopefully this helps us discussion to come shortly.

**Chad**

**From:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Sent:** Friday, May 6, 2022 9:27 AM
**To:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Cc:** Taro Echiburu <Taro.Echiburu@yolocounty.org>; Ramin Yazdani <Ramin.Yazdani@yolocounty.org>
**Subject:** RE: [EXTERNAL]Yolo Manager's Call

Chad,

In light of the recent letter from the Yolo Food Bank wanting to reopen the discussion about them receiving Edible Food Recovery funding, we are awaiting direction from the Board Members who received that letter to tell us how to proceed. If we entertain offering that funding back to YFB, there may not be a need for us to create the MOUs with the cities or house any of the funds. All funds would go directly to the YFB as originally planned.

I am certainly not advocating for this approach however it is a new reality we are facing since receiving that letter. I did make Kimberly Hood aware however that we are already in the process of offering these funds to UCD, the Woodland Food Closet and Yolo Crisis Nursery since we needed to move to Plan B when the YFB rejected our offer. I am in a holding pattern until I get further direction.

If however, you want to answer Kathleen directly on how we would handle funds should we continue to move forward with Plan B, and not entertain reopening these funds to the YFB:

1. Yes, we are all contributing what was previously agreed to and voted on by each elected body. However it was slightly modified downward since we originally had 44 Tier 1 Generators but have since determined that 2 of those are no longer required under the law to participate. This brought our count down to 42 Tier 1 Generators and we reduced everyone's financial commitment commensurate to that. For sake of planned, we are simply saying that these original amounts are now "not to exceed" amounts.
   a. Yolo $17,311
   b. Winters $34,622
   c. Davis $155,799
   d. West Sac $276,976
   e. Woodland $276,976

2. As described in the attached document (See Table 1), each jurisdiction shall manage a portion of the funds on their own for direct payment to the smaller pantries. This is true for Davis, West Sac and Woodland who can directly pay the $26-39K suggested amount to each smaller pantry out of their larger sum and only contribute the remaining portion to the fund. Winters and Yolo County however are required to commit a portion to this program that is not within the $39K per panty limit therefore we will both rely on the larger pot being set up first to assist us in distributing the funds to our smaller pantries. In the attached document the City of Winters should deposit $19,535 into the fund. Once these funds are deposited, the City of Winters can request the County to cut a check to RISE for $26-39K based upon what you and RISE agree to in the terms of your agreement.

3. If money goes unused, the current intent is for the money to stay in the fund until the Cities and County can find an edible food recovery project to fund. (Currently our pantry in Esparto refuses to accept our funding because of their relationship with the YFB, so we know that $9,768 of our contribution is sitting unused and available for a regional project)

4. While we do have some challenges to consider, in light of the most recent letter issued by the YFB, the current plan is to have the Waste Advisory Committee (WAC) appoint a new Technical Advisory Committee (TAC) , specifically to oversee these funds, with one representative from each jurisdiction. The TAC would review any regional projects and approve how the funds are allocated out to the community. If at any time the TAC cannot come to an agreement on how the funds are to be spent, they would present the item to the WAC for vote. This is outline in the attached MOU however only works if the $410,230 overall funding is not given back to the YFB.

Sincerely,

*Marissa Juhler*

Landfill Operations & Waste Reduction Manager
Integrated Waste Management Division
Yolo County Central Landfill
44090 County Road 28H
Woodland, CA 95776
530-666-8813
Fax 530-666-8853



(NEXT BLUE BARN SALE)
MAY 20th & 21st
(9:oo am – 3:00 pm)

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Thursday, May 5, 2022 11:00 AM
**To:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Cc:** Taro Echiburu <Taro.Echiburu@yolocounty.org>
**Subject:** Fwd: [EXTERNAL]Yolo Manager's Call

Hi Marissa,

Do you have an update or have a suggestion about the best way to respond to Kathleen's detailed questions? I could add you to the City manager meeting again if that might be best.

Chad

Begin forwarded message:

**From:** Kathleen Trepa <kathleen.trepa@cityofwinters.org>
**Date:** May 5, 2022 at 8:40:59 AM PDT
**To:** Chad Rinde <Chad.Rinde@yolocounty.org>

CPRA WOODLAND 000010

| **From:** | Ken Hiatt </O=WOODLAND/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KEN HIATT0B4> |
| **To:** | 'Marissa.Juhler@yolocounty.org' |
| **CC:** | 'Chad Rinde'; Kathleen Trepa; Mike Webb (MWebb@cityofdavis.org); Aaron Laurel; Rosie Ledesma |
| **Sent:** | 5/24/2022 4:44:44 PM |
| **Subject:** | COW Comments on SB1383 - Drat Pooled Funding Program Term Sheet |
| **Attachments:** | Funding Pogram.Term Sheet.Draft.3.28.22.pdf |

Marissa,

Thanks again for timing time to speak to us last week. As requested, I have reviewed the draft program with staff and would offer the comments below for consideration:

1. Allocation of pooled funds should be made proportionate to the amount of money contributed by each jurisdiction. Also, the total funding should be $386,930, not $410,230, which is the original amount the <u>consultants had suggested for YFB (see pg. 22-24)</u>, and what our appropriation was based on when we took it to our Council in December. The $410,230 amount includes software ($23,300) that we did not budget for YFB when we originally appropriated the funds.

2. How will the program coordinator position be funded? Who will they report to? Worth clarifying in the document?

3. Confirm that the program outline is only for two years and if a pooled fund is established, will only be authorized to make allocations of the initial year funds ($386,930).

4. If request is made by Yolo Food Bank for funding, no authorization of these initial year funds will be made without first consulting with the City Manager's and County Administrator. Similarly, CM's and CAO should be informed of any funding request made by YFB.

5. I have heard concerns from Tier 1 generators regarding approach/communication surrounding the compliance inspections conducted by the County. What is the status of engaging with the Tier 1 businesses to solicit their feedback on how best to handle compliance verification/reporting? Woodland Staff reports that they are experiencing difficulty in getting Tier 1 businesses to be responsive to our proactive efforts to educate or coordinate with them.

Thanks,



**Ken Hiatt - City Manager**
City of Woodland

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, May 06, 2022 1:41 PM
**To:** Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>
**Subject:** FW: [EXTERNAL]Yolo Manager's Call

Hi Kathleen,

This is additional information on your questions related to SB1383 funding. Hopefully this helps us discussion to come shortly.

**Chad**

**From:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Sent:** Friday, May 6, 2022 9:27 AM

**To:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Cc:** Taro Echiburu <Taro.Echiburu@yolocounty.org>, Ramin Yazdani <Ramin.Yazdani@yolocounty.org>
**Subject:** RE: [EXTERNAL]Yolo Manager's Call

Chad,

In light of the recent letter from the Yolo Food Bank wanting to reopen the discussion about them receiving Edible Food Recovery funding, we are awaiting direction from the Board Members who received that letter to tell us how to proceed.  If we entertain offering that funding back to YFB, there may <u>not</u> be a need for us to create the MOUs with the cities or house any of the funds.  All funds would go directly to the YFB as originally planned.

I am certainly not advocating for this approach however it is a new reality we are facing since receiving that letter.  I did make Kimberly Hood aware however that we are already in the process of offering these funds to UCD, the Woodland Food Closet and Yolo Crisis Nursery since we needed to move to Plan B when the YFB rejected our offer.  I am in a holding pattern until I get further direction.

If however, you want to answer Kathleen directly on how we <u>would</u> handle funds should we continue to move forward with Plan B, and not entertain reopening these funds to the YFB:

1. Yes, we are all contributing what was previously agreed to and voted on by each elected body. However it was slightly modified downward since we originally had 44 Tier 1 Generators but have since determined that 2 of those are no longer required under the law to participate.  This brought our count down to 42 Tier 1 Generators and we reduced everyone's financial commitment commensurate to that.  For sake of planned, we are simply saying that these original amounts are now "not to exceed" amounts.
   a. Yolo $17,311
   b. Winters $34,622
   c. Davis $155,799
   d. West Sac $276,976
   e. Woodland $276,976
2. As described in the attached document (See Table 1), each jurisdiction shall manage a portion of the funds on their own for direct payment to the smaller pantries.  This is true for Davis, West Sac and Woodland who can directly pay the $26-39K suggested amount to each smaller pantry out of their larger sum and only contribute the remaining portion to the fund.  Winters and Yolo County however are required to commit a portion to this program that is not within the $39K per panty limit therefore we will both rely on the larger pot being set up first to assist us in distributing the funds to our smaller pantries.  In the attached document the City of Winters should deposit $19,535 into the fund.  Once these funds are deposited, the City of Winters can request the County to cut a check to RISE for $26-39K based upon what you and RISE agree to in the terms of your agreement.
3. If money goes unused, the current intent is for the money to stay in the fund until the Cities and County can find an edible food recovery project to fund. (Currently our pantry in Esparto refuses to accept our funding because of their relationship with the YFB, so we know that $9,768 of our contribution is sitting unused and available for a regional project)
4. While we do have some challenges to consider, in light of the most recent letter issued by the YFB, the current plan is to have the Waste Advisory Committee (WAC) appoint a new Technical Advisory Committee (TAC) , specifically to oversee these funds, with one representative from each jurisdiction.  The TAC would review any regional projects and approve how the funds are allocated out to the community.  If at any time the TAC cannot come to an agreement on how the funds are to be spent, they would present the item to the WAC for vote.  This is outline in the attached MOU however only works if the $410,230 overall funding is not given back to the YFB.

Sincerely,

*Marissa Juhler*

Landfill Operations & Waste Reduction Manager
Integrated Waste Management Division
Yolo County Central Landfill
44090 County Road 28H
Woodland, CA 95776
530-666-8813

CPRA WOODLAND 000014

Thanks,
Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, May 06, 2022 1:41 PM
**To:** Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>
**Subject:** FW: [EXTERNAL]Yolo Manager's Call

Hi Kathleen,

This is additional information on your questions related to SB1383 funding. Hopefully this helps us discussion to come shortly.

**Chad**

**From:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Sent:** Friday, May 6, 2022 9:27 AM
**To:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Cc:** Taro Echiburu <Taro.Echiburu@yolocounty.org>; Ramin Yazdani <Ramin.Yazdani@yolocounty.org>
**Subject:** RE: [EXTERNAL]Yolo Manager's Call

Chad,

In light of the recent letter from the Yolo Food Bank wanting to reopen the discussion about them receiving Edible Food Recovery funding, we are awaiting direction from the Board Members who received that letter to tell us how to proceed.  If we entertain offering that funding back to YFB, there may not be a need for us to create the MOUs with the cities or house any of the funds.  All funds would go directly to the YFB as originally planned.

I am certainly not advocating for this approach however it is a new reality we are facing since receiving that letter.  I did make Kimberly Hood aware however that we are already in the process of offering these funds to UCD, the Woodland Food Closet and Yolo Crisis Nursery since we needed to move to Plan B when the YFB rejected our offer.  I am in a holding pattern until I get further direction.

If however, you want to answer Kathleen directly on how we would handle funds should we continue to move forward with Plan B, and not entertain reopening these funds to the YFB:
1. Yes, we are all contributing what was previously agreed to and voted on by each elected body. However it was slightly modified downward since we originally had 44 Tier 1 Generators but have since determined that 2 of those are no longer required under the law to participate.  This brought our count down to 42 Tier 1 Generators and we reduced everyone's financial commitment commensurate to that.   For sake of planned, we are simply saying that these original amounts are now "not to exceed" amounts.
   a. Yolo $17,311
   b. Winters $34,622
   c. Davis $155,799
   d. West Sac $276,976

e.  Woodland $276,976

2. As described in the attached document (See Table 1), each jurisdiction shall manage a portion of the funds on their own for direct payment to the smaller pantries.  This is true for Davis, West Sac and Woodland who can directly pay the $26-39K suggested amount to each smaller pantry out of their larger sum and only contribute the remaining portion to the fund.  Winters and Yolo County however are required to commit a portion to this program that is not within the $39K per panty limit therefore we will both rely on the larger pot being set up first to assist us in distributing the funds to our smaller pantries.  In the attached document the City of  Winters should deposit $19,535 into the fund.  Once these funds are deposited, the City of Winters can request the County to cut a check to RISE for $26-39K based upon what you and RISE agree to in the terms of your agreement.

3.  If money goes unused, the current intent is for the money to stay in the fund until the Cities and County can find an edible food recovery project to fund. (Currently our pantry in Esparto refuses to accept our funding because of their relationship with the YFB, so we know that $9,768 of our contribution is sitting unused and available for a regional project)

4.  While we do have some challenges to consider, in light of the most recent letter issued by the YFB, the current plan is to have the Waste Advisory Committee (WAC) appoint a new Technical Advisory Committee (TAC) , specifically to oversee these funds, with one representative from each jurisdiction.  The TAC would review any regional projects and approve how the funds are allocated out to the community.  If at any time the TAC cannot come to an agreement on how the funds are to be spent, they would present the item to the WAC for vote.  This is outline in the attached MOU however only works if the $410,230 overall funding is not given back to the YFB.

Sincerely,

*Marissa Juhler*

Landfill Operations & Waste Reduction Manager
Integrated Waste Management Division
Yolo County Central Landfill
44090 County Road 28H
Woodland, CA 95776
530-666-8813
Fax 530-666-8853



(NEXT BLUE BARN SALE)
MAY 20th & 21st
(9:oo am – 3:00 pm)

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Thursday, May 5, 2022 11:00 AM
**To:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Cc:** Taro Echiburu <Taro.Echiburu@yolocounty.org>
**Subject:** Fwd: [EXTERNAL]Yolo Manager's Call

Hi Marissa,

Do you have an update or have a suggestion about the best way to respond to Kathleen's detailed questions? I could add you to the City manager meeting again if that might be best.

Chad

Begin forwarded message:

**From:** Kathleen Trepa <kathleen.trepa@cityofwinters.org>
**Date:** May 5, 2022 at 8:40:59 AM PDT

**From:** Ken Hiatt </O=WOODLAND/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KEN HIATT0B4>
**To:** Rosie Ledesma
**CC:** Brent Meyer
**Sent:** 5/23/2022 11:30:40 AM
**Subject:** SB 1383 Draft Funding Program Term Sheet
**Attachments:** Funding Pogram.Term Sheet.Draft.3.28.22.pdf

Rosie,

Marissa spoke to our CM/CAO ground this past Friday regarding status of SB1383 coordination.   She asked for comments back on the attached approach to coordinating on "regional" (aka Yolo-wide) pooled funding considerations as well as compliance.  I scanned it this weekend and have the following comments to submit pending your review:

1.   Allocation of pooled funds should be made proportionate to the amount of money contributed by each jurisdiction.
2.   How will the program coordinator position be funded?  Who will they report to?
3.   Confirm that the program outline is only for two years and if a pooled fund is established, will only be authorized to make allocations of the initial year funds ($410,230).
4.   If request is made by Yolo Food Bank for funding, no authorization of these initial year funds will be made without first consulting with the City Manager's and County Administrator.  Similarly, CM's and CAO should be informed of any funding request made by YFB.
5.   I have heard concerns from Tier 1 generators regarding approach/communication surrounding the compliance inspections conducted by the County.  What is the status of engaging with the Tier 1 businesses to solicit their feedback on how best to handle compliance verification/reporting?

Thanks,
Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, May 06, 2022 1:41 PM
**To:** Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>
**Subject:** FW: [EXTERNAL]Yolo Manager's Call

Hi Kathleen,

This is additional information on your questions related to SB1383 funding. Hopefully this helps us discussion to come shortly.

**Chad**

**From:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Sent:** Friday, May 6, 2022 9:27 AM
**To:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Cc:** Taro Echiburu <Taro.Echiburu@yolocounty.org>; Ramin Yazdani <Ramin.Yazdani@yolocounty.org>
**Subject:** RE: [EXTERNAL]Yolo Manager's Call

Chad,

In light of the recent letter from the Yolo Food Bank wanting to reopen the discussion about them receiving Edible Food Recovery funding, we are awaiting direction from the Board Members who received that letter to tell us how to proceed.  If we entertain offering that funding back to YFB, there may not be a need for us to create the MOUs with the cities or house any of the funds.  All funds would go directly to the YFB as originally planned.

| From: | Rosie Ledesma </O=WOODLAND/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS /CN=RSALAS> |
|---|---|
| To: | Pinar Kose; Carlson, Robert@CalRecycle |
| Sent: | 4/5/2022 10:31:03 AM |
| Subject: | FW: County Letter to Yolo Food Bank Board |
| Attachments: | 2022-0318-FINAL Letter to YFB Board.pdf |

**From:** Ken Hiatt <Ken.Hiatt@cityofwoodland.org>
**Sent:** Friday, March 18, 2022 6:42 PM
**To:** Mayra Vega <Mayra.Vega@cityofwoodland.org>; Vicky Fernandez
<Vicky.Fernandez@cityofwoodland.org>; Rich Lansburgh <Rich.Lansburgh@cityofwoodland.org>; Tom
Stallard <Tom.Stallard@cityofwoodland.org>; Tania Garcia Cadena
<Tania.GarciaCadena@cityofwoodland.org>
**Cc:** Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>
**Subject:** FW: County Letter to Yolo Food Bank Board

Council,

Forwarding the attached communication from Yolo County to the Board of the Yolo Food Bank. The letter was
prompted by recent actions taken by the Food Bank that have impacted various food recovery organizations in
the County. The Food Bank executive director continues to challenge the County and city's approach to
implementation of SB 1383 in spite of our collective efforts to try and work collaboratively with them.

I will keep you informed as this situation evolves.

Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, March 18, 2022 5:09 PM
**To:** Tom@mullerag.com; jdurst@durstorganicgrowers.com; Westsacramento@groceryoutlet.com;
hartmad3@sutterhealth.org; MattMariani@MarianiNut.com; danramos@ramco-ent.com;
esspang@ucdavis.edu; kate.stille@nuggetmarket.com; LWalker@thatsmybank.com
**Cc:** Philip Pogledich <Philip.Pogledich@yolocounty.org>; Mike Webb (MWebb@cityofdavis.org)
<mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>; Kathleen Trepa
<kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; michael
<michael@yolofoodbank.org>
**Subject:** County Letter to Yolo Food Bank Board

Good evening Yolo Food Bank Board of Directors,

Attached, please find a letter that I am sending on behalf of the Yolo County Board of Supervisors. I would
appreciate if you can ensure that your full board has received a copy. While we endevoured to send
electronically to the full board, I was unable to obtain an e-mail for Ms. Schmitz and a thus a hard copy was be
sent to her attention.

Thank you,

*Chad D. Rinde, CPA*
Interim County Administrator
County of Yolo
Off: (530) 666-8050



# COUNTY OF YOLO
### Board of Supervisors

District 1, **Oscar Villegas, Vice-Chair**
District 2, **Don Saylor**
District 3, **Gary Sandy**
District 4, **Jim Provenza**
District 5, **Angel Barajas, Chair**

625 Court Street, Room 204 ▪ Woodland, CA 95695
(530) 666-8195 ▪ FAX (530) 666-8193
www.yolocounty.org

Interim County Administrator, **Chad Rinde**
Deputy Clerk of the Board, **Julie Dachtler**

March 18, 2022

Board of Directors
Yolo Food Bank
233 Harter Ave
Woodland, CA 95776

Re:     Request for Review of Actions Related to Alleged Termination of Nonprofit Contracts for Accepting Edible
        Food Recovery Grant Funding

Dear Chair Muller and Directors:

This letter requests that your Board of Directors act immediately to protect local food recovery organizations—a vital part of the County food recovery network—against actions that compromise their ability to provide food to those in need. We continue to gather information about the role of Yolo Food Bank leadership in these actions, which may include deterring small food pantries, churches, and other organizations from accepting local government funding and retaliating against those that accept funding by curtailing their access to donated food. While we hope your leadership's role has been mischaracterized, the community stakes are too high for us to delay requesting your immediate attention to these concerns.

As you know, the County is dedicated to improving the food security of its residents. The County administers CalFresh, WIC, and other programs and efforts focused on local food security, nutrition, and public health. The County granted $500,000 to Yolo Food Bank in 2019 to expand food recovery and distributions. During the COVID-19 pandemic, the County and Yolo Food Bank partnered to increase food recovery and distribution efforts, with the County providing nearly $1,500,000 and significant County staff to support Yolo Food Bank operations. The County has also tentatively allocated $3,000,000 in American Recovery Plan Act ("ARPA") funding to local food security, including a grant of up to $2,000,000 to New Seasons Community Development Corporation to support construction of a regional food hub in Capay Valley. Finally, the County and the cities of Davis, West Sacramento, Winters, and Woodland (collectively, the "Cities"), are offering $761,698 to Yolo Food Bank (which declined funding) and nine other community organizations to increase food recovery and distribution capacity pursuant to Senate Bill 1383 ("SB 1383").

The latter effort, relating to SB 1383 implementation, appears to be central to the developing crisis that prompted this letter. The $761,698 allocated by the County and Cities to SB 1383 implementation in 2022 will achieve many capacity and logistics improvements for the recipient food recovery entities. For example, the County's proposed 2022 funding to Countryside Church would enable the purchase of scales, a new cold storage refrigerator, and a new freezer, and would also provide additional funding for staff salaries, stipends, or other discretionary expenditures to allow the collection of edible food from the Esparto Valley Market, thus redirecting food from the landfill to those in need.  Additional funding in future years would further help the Church—the only entity serving the Esparto area—improve its capacity to collect and distribute food.

CPRA WOODLAND 000039

Board of Directors, Yolo Food Bank
Page 2

We acknowledge that Yolo Food Bank leadership disagree with the local approach to SB 1383 implementation and have advocated for local governments to "fully fund[] a surplus edible food recovery program countywide"[1] by providing a greater local contribution ($2 million or more annually) to Yolo Food Bank. We also recognize that your CEO, Michael Bisch, contends that the local approach to SB 1383 compliance is somehow legally deficient and that Yolo Food Bank has rejected local government funding offered in connection with SB 1383.[2] Some members of your Board have expressed a similar view regarding local efforts to comply with SB 1383, indicating that the County and Cities must provide more funding directly to Yolo Food Bank to reduce or eliminate its need to fundraise to support local food recovery efforts.[3]

The County has previously considered these perspectives. Among other things, the County retained an independent consultant to study local food recovery capacity and conferred with CalRecycle to ensure the County's edible food recovery program complies with SB 1383. The implementation decisions made at the October 12, 2021 meeting of the Yolo County Board of Supervisors reflect our assessment of the most appropriate near-term approach to local SB 1383 implementation. We decline to debate competing approaches further in this letter except to say that whatever disagreement may exist regarding local implementation of SB 1383, we must prevent it from harming the charitable organizations that feed those in need. Local community organizations must not be forced to choose between access to food and accepting funding to improve their work.

Mr. Bisch has responded to inquiries from the County regarding this issue to clarify that the Yolo Food Bank has the "exclusive right to solicit food donations from Feeding America affiliated donors in Yolo County and responsibility to then equitably distribute said food throughout the County." And that the Yolo Food Bank may, in turn, "choose to subcontract this work in some instances with partner nonprofits on mutually agreeable terms." But it is our understanding that the Yolo Food Bank may now be threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery programs. Such actions, if accurate, are contrary to the shared goals of redirecting edible food from the landfill to those in need, regardless of disputes we may have regarding SB 1383 requirements.

We ask that you take all steps necessary to ensure that Yolo Food Bank leadership is not responsible and, if you determine otherwise, do whatever is needed to immediately end this situation. This could include reassuring all local community partners that Yolo Food Bank will not restrict food distribution or otherwise retaliate against those accepting SB 1383 funding to improve their capacity to feed more people. The County stands ready to take any actions necessary to resolve this crisis but will not be forced to the table—to the extent that may be the underlying goal—to revisit the discretionary policy decisions already made regarding near-term SB 1383 implementation.

We would be remiss if we did not express our concern that the actions attributed to Yolo Food Bank's leadership, if true, create a serious question about their commitment to local food security and the best interests of our

---

[1] Yolo Food Bank letter to Board of Supervisors and City Councils, July 10, 2021 (available at: https://yolofoodbank.org/in-the-news/food-recovery-support-letter/).

[2] M. Bisch letter to R. Yazdani, Oct. 3, 2021; see also Anon., *New Yolo Food Bank Mission and Vision Prioritize Nutrition, Food Equity, and Resilience as Pandemic Lingers in New Year,* Davis Vanguard, Jan. 22, 2022 (quoting Michael Bisch as stating: "As a result, in 2022 we're pivoting toward investing our donors' generous contributions in the food equity work of our new mission and vision, *setting aside state-mandated activities that are the responsibility of local governments to fund and execute such as SB 1383 edible food recovery*. Yolo Food Bank must focus upon advancing the healthy outcomes that all local residents deserve, thereby increasing their quality of life.").

[3] J. Durst, *Guest Commentary: Feeding All Residents, Especially Vulnerable Children, Highest Priority,* Davis Vanguard, Sept. 20, 2021.

Board of Directors, Yolo Food Bank
Page 3

communities. We urge you to perform your own assessment as the Board of Directors and, additionally, to evaluate matters beyond the scope of the immediate controversy. While we acknowledge that the final decision is within your sound discretion, your attention to the matters described herein will assure us that Yolo Food Bank remains an essential community partner—one of a small number of non-profit organizations that the community simply cannot do without. If your priorities are instead evolving away from reliably collaborating to enhance local food security, we will evaluate increasing the role of other partners and direct funding (including ARPA funding) to those entities rather than Yolo Food Bank.

We look forward to moving past the current challenges and reaffirming our strong partnership with Yolo Food Bank. We sincerely appreciate your consideration of the concerns raised in this letter and look forward to hearing from you shortly.


Sincerely,

Angel Barajas
Chair
Yolo County Board of Supervisors

Oscar Villegas
Vice Chair
Yolo County Board of Supervisors


cc:     Board of Supervisors, Yolo County
        Chad Rinde, Interim County Administrative Officer
        Philip Pogledich, County Counsel
        Mike Webb, City Manager, City of Davis
        Aaron Laurel, City Manager, City of West Sacramento
        Kathleen Trepa, City Manager, City of Winters
        Ken Hiatt, City Manager, City of Woodland

| From: | Tania Garcia Cadena </O=WOODLAND/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=0B1B9F9B864F4155821A230A224D2B86-TANIA GARCIA CA> |
|---|---|
| To: | Ken Hiatt |
| Sent: | 3/20/2022 8:05:33 PM |
| Subject: | Re: County Letter to Yolo Food Bank Board |

Ken,
I, obviously, find this very concerning. The Woodland Volunteer Food Closet has not seen any form of retaliation for participating in SB1383 funding, but we've been questioned about our role at two different meetings. Last month we were informed that the Yolo Food Bank would be modifying their mission, but that staff was unable to share any details at this time. I'm looking forward to a positive outcome from this situation.
Thank you for sharing.
Tania

---

**From:** Ken Hiatt
**Sent:** Friday, March 18, 2022 6:41:48 PM
**To:** Mayra Vega; Vicky Fernandez; Rich Lansburgh; Tom Stallard; Tania Garcia Cadena
**Cc:** Rosie Ledesma
**Subject:** FW: County Letter to Yolo Food Bank Board

Council,

Forwarding the attached communication from Yolo County to the Board of the Yolo Food Bank.   The letter was prompted by recent actions taken by the Food Bank that have impacted various food recovery organizations in the County.  The Food Bank executive director continues to challenge the County and city's approach to implementation of SB 1383 in spite of our collective efforts to try and work collaboratively with them.

I will keep you informed as this situation evolves.

Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, March 18, 2022 5:09 PM
**To:** Tom@mullerag.com; jdurst@durstorganicgrowers.com; Westsacramento@groceryoutlet.com; hartmad3@sutterhealth.org; MattMariani@MarianiNut.com; danramos@ramco-ent.com; esspang@ucdavis.edu; kate.stille@nuggetmarket.com; LWalker@thatsmybank.com
**Cc:** Philip Pogledich <Philip.Pogledich@yolocounty.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>; Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; michael <michael@yolofoodbank.org>
**Subject:** County Letter to Yolo Food Bank Board

Good evening Yolo Food Bank Board of Directors,

Attached, please find a letter that I am sending on behalf of the Yolo County Board of Supervisors. I would appreciate if you can ensure that your full board has received a copy. While we endevoured to send electronically to the full board, I was unable to obtain an e-mail for Ms. Schmitz and a thus a hard copy was be sent to her attention.

Thank you,

**Chad D. Rinde, CPA**
Interim County Administrator
County of Yolo
Off:  (530) 666-8050

CPRA WOODLAND 000055

| | |
|---|---|
| **From:** | Strand, Susan <SUSANS@cityofwestsacramento.org> |
| **To:** | Rosie Ledesma |
| **CC:** | Jennifer Gilbert; Adrienne Heinig; Goularte, Traci; Kristine DeGuerre; Marissa Juhler; Pamela Hedrick; Maris Samsel |
| **Sent:** | 3/19/2022 8:47:14 PM |
| **Subject:** | Re: County Letter to Yolo Food Bank Board |
| **Attachments:** | 2022-0318-FINAL Letter to YFB Board.pdf |

Wow, that's an excellent letter. Thanks so much for sharing it Rosie. I have been so upset by this situation. It is great to finally see the unethical actions of Michael Bisch finally being fully addressed in public.
Susan

On Mar 18, 2022, at 7:12 PM, Rosie Ledesma <rosie.ledesma@cityofwoodland.org> wrote:

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Forwarding in case you haven't seen this.

Thank you, Yolo County! (Aka Marissa!)
_____

**From:** Ken Hiatt <Ken.Hiatt@cityofwoodland.org>
**Sent:** Friday, March 18, 2022 6:41:48 PM
**To:** Mayra Vega <Mayra.Vega@cityofwoodland.org>; Vicky Fernandez <Vicky.Fernandez@cityofwoodland.org>; Rich Lansburgh <Rich.Lansburgh@cityofwoodland.org>; Tom Stallard <Tom.Stallard@cityofwoodland.org>; Tania Garcia Cadena <Tania.GarciaCadena@cityofwoodland.org>
**Cc:** Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>
**Subject:** FW: County Letter to Yolo Food Bank Board

Council,

Forwarding the attached communication from Yolo County to the Board of the Yolo Food Bank. The letter was prompted by recent actions taken by the Food Bank that have impacted various food recovery organizations in the County. The Food Bank executive director continues to challenge the County and city's approach to implementation of SB 1383 in spite of our collective efforts to try and work collaboratively with them.

I will keep you informed as this situation evolves.

Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, March 18, 2022 5:09 PM
**To:** Tom@mullerag.com; jdurst@durstorganicgrowers.com; Westsacramento@groceryoutlet.com; hartmad3@sutterhealth.org; MattMariani@MarianiNut.com; danramos@ramco-ent.com; esspang@ucdavis.edu; kate.stille@nuggetmarket.com; LWalker@thatsmybank.com
**Cc:** Philip Pogledich <Philip.Pogledich@yolocounty.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>; Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; michael <michael@yolofoodbank.org>
**Subject:** County Letter to Yolo Food Bank Board

Good evening Yolo Food Bank Board of Directors,

Attached, please find a letter that I am sending on behalf of the Yolo County Board of Supervisors. I would appreciate if you can ensure that your full board has received a copy. While we endeavoured to send electronically to the full board, I was unable to obtain an e-mail list with all board members and copy was also

CPRA WOODLAND 000056

sent to her attention.

Thank you,

**Chad D. Rinde, CPA**
Interim County Administrator
County of Yolo
Off:  (530) 666-8050

This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act.



# COUNTY OF YOLO
## Board of Supervisors

District 1, **Oscar Villegas, Vice-Chair**
District 2, **Don Saylor**
District 3, **Gary Sandy**
District 4, **Jim Provenza**
District 5, **Angel Barajas, Chair**

625 Court Street, Room 204 ▪ Woodland, CA 95695
(530) 666-8195 ▪ FAX (530) 666-8193
www.yolocounty.org

Interim County Administrator, **Chad Rinde**
Deputy Clerk of the Board, **Julie Dachtler**

March 18, 2022

Board of Directors
Yolo Food Bank
233 Harter Ave
Woodland, CA 95776

Re:    Request for Review of Actions Related to Alleged Termination of Nonprofit Contracts for Accepting Edible Food Recovery Grant Funding

Dear Chair Muller and Directors:

This letter requests that your Board of Directors act immediately to protect local food recovery organizations—a vital part of the County food recovery network—against actions that compromise their ability to provide food to those in need. We continue to gather information about the role of Yolo Food Bank leadership in these actions, which may include deterring small food pantries, churches, and other organizations from accepting local government funding and retaliating against those that accept funding by curtailing their access to donated food. While we hope your leadership's role has been mischaracterized, the community stakes are too high for us to delay requesting your immediate attention to these concerns.

As you know, the County is dedicated to improving the food security of its residents. The County administers CalFresh, WIC, and other programs and efforts focused on local food security, nutrition, and public health. The County granted $500,000 to Yolo Food Bank in 2019 to expand food recovery and distributions. During the COVID-19 pandemic, the County and Yolo Food Bank partnered to increase food recovery and distribution efforts, with the County providing nearly $1,500,000 and significant County staff to support Yolo Food Bank operations. The County has also tentatively allocated $3,000,000 in American Recovery Plan Act ("ARPA") funding to local food security, including a grant of up to $2,000,000 to New Seasons Community Development Corporation to support construction of a regional food hub in Capay Valley. Finally, the County and the cities of Davis, West Sacramento, Winters, and Woodland (collectively, the "Cities"), are offering $761,698 to Yolo Food Bank (which declined funding) and nine other community organizations to increase food recovery and distribution capacity pursuant to Senate Bill 1383 ("SB 1383").

The latter effort, relating to SB 1383 implementation, appears to be central to the developing crisis that prompted this letter. The $761,698 allocated by the County and Cities to SB 1383 implementation in 2022 will achieve many capacity and logistics improvements for the recipient food recovery entities. For example, the County's proposed 2022 funding to Countryside Church would enable the purchase of scales, a new cold storage refrigerator, and a new freezer, and would also provide additional funding for staff salaries, stipends, or other discretionary expenditures to allow the collection of edible food from the Esparto Valley Market, thus redirecting food from the landfill to those in need.  Additional funding in future years would further help the Church—the only entity serving the Esparto area—improve its capacity to collect and distribute food.

CPRA WOODLAND 000058

Board of Directors, Yolo Food Bank
Page 2

We acknowledge that Yolo Food Bank leadership disagree with the local approach to SB 1383 implementation and have advocated for local governments to "fully fund[] a surplus edible food recovery program countywide"[1] by providing a greater local contribution ($2 million or more annually) to Yolo Food Bank. We also recognize that your CEO, Michael Bisch, contends that the local approach to SB 1383 compliance is somehow legally deficient and that Yolo Food Bank has rejected local government funding offered in connection with SB 1383.[2] Some members of your Board have expressed a similar view regarding local efforts to comply with SB 1383, indicating that the County and Cities must provide more funding directly to Yolo Food Bank to reduce or eliminate its need to fundraise to support local food recovery efforts.[3]

The County has previously considered these perspectives. Among other things, the County retained an independent consultant to study local food recovery capacity and conferred with CalRecycle to ensure the County's edible food recovery program complies with SB 1383. The implementation decisions made at the October 12, 2021 meeting of the Yolo County Board of Supervisors reflect our assessment of the most appropriate near-term approach to local SB 1383 implementation. We decline to debate competing approaches further in this letter except to say that whatever disagreement may exist regarding local implementation of SB 1383, we must prevent it from harming the charitable organizations that feed those in need. Local community organizations must not be forced to choose between access to food and accepting funding to improve their work.

Mr. Bisch has responded to inquiries from the County regarding this issue to clarify that the Yolo Food Bank has the "exclusive right to solicit food donations from Feeding America affiliated donors in Yolo County and responsibility to then equitably distribute said food throughout the County." And that the Yolo Food Bank may, in turn, "choose to subcontract this work in some instances with partner nonprofits on mutually agreeable terms." But it is our understanding that the Yolo Food Bank may now be threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery programs. Such actions, if accurate, are contrary to the shared goals of redirecting edible food from the landfill to those in need, regardless of disputes we may have regarding SB 1383 requirements.

We ask that you take all steps necessary to ensure that Yolo Food Bank leadership is not responsible and, if you determine otherwise, do whatever is needed to immediately end this situation. This could include reassuring all local community partners that Yolo Food Bank will not restrict food distribution or otherwise retaliate against those accepting SB 1383 funding to improve their capacity to feed more people. The County stands ready to take any actions necessary to resolve this crisis but will not be forced to the table—to the extent that may be the underlying goal—to revisit the discretionary policy decisions already made regarding near-term SB 1383 implementation.

We would be remiss if we did not express our concern that the actions attributed to Yolo Food Bank's leadership, if true, create a serious question about their commitment to local food security and the best interests of our

---

[1] Yolo Food Bank letter to Board of Supervisors and City Councils, July 10, 2021 (available at: https://yolofoodbank.org/in-the-news/food-recovery-support-letter/).

[2] M. Bisch letter to R. Yazdani, Oct. 3, 2021; see also Anon., *New Yolo Food Bank Mission and Vision Prioritize Nutrition, Food Equity, and Resilience as Pandemic Lingers in New Year,* Davis Vanguard, Jan. 22, 2022 (quoting Michael Bisch as stating: "As a result, in 2022 we're pivoting toward investing our donors' generous contributions in the food equity work of our new mission and vision, *setting aside state-mandated activities that are the responsibility of local governments to fund and execute such as SB 1383 edible food recovery*. Yolo Food Bank must focus upon advancing the healthy outcomes that all local residents deserve, thereby increasing their quality of life.").

[3] J. Durst, *Guest Commentary: Feeding All Residents, Especially Vulnerable Children, Highest Priority,* Davis Vanguard, Sept. 20, 2021.

Board of Directors, Yolo Food Bank
Page 3

communities. We urge you to perform your own assessment as the Board of Directors and, additionally, to evaluate matters beyond the scope of the immediate controversy. While we acknowledge that the final decision is within your sound discretion, your attention to the matters described herein will assure us that Yolo Food Bank remains an essential community partner—one of a small number of non-profit organizations that the community simply cannot do without. If your priorities are instead evolving away from reliably collaborating to enhance local food security, we will evaluate increasing the role of other partners and direct funding (including ARPA funding) to those entities rather than Yolo Food Bank.

We look forward to moving past the current challenges and reaffirming our strong partnership with Yolo Food Bank. We sincerely appreciate your consideration of the concerns raised in this letter and look forward to hearing from you shortly.

Sincerely,

Angel Barajas
Chair
Yolo County Board of Supervisors

Oscar Villegas
Vice Chair
Yolo County Board of Supervisors

cc:     Board of Supervisors, Yolo County
        Chad Rinde, Interim County Administrative Officer
        Philip Pogledich, County Counsel
        Mike Webb, City Manager, City of Davis
        Aaron Laurel, City Manager, City of West Sacramento
        Kathleen Trepa, City Manager, City of Winters
        Ken Hiatt, City Manager, City of Woodland

CPRA WOODLAND 000060

| From: | Jennifer Gilbert <JGilbert@cityofdavis.org> |
|-------|----------------------------------------------|
| To: | Rosie Ledesma |
| Sent: | 3/18/2022 7:12:17 PM |
| Subject: | Automatic reply: County Letter to Yolo Food Bank Board |

Hello,

I am out of the office and will respond to your email when I return on Monday, March 28. I will respond to email messages when I return.

For questions regarding the Bulky Waste Landfill Voucher, or for information on how to recycle something, please contact Recology Davis at RecologyDavis@Recology.com or 530-756-4646.

If you need immediate assistance, please contact the Public Works Utilities and Operations Department main office at PWWeb@CityofDavis.org, or call 530-757-5686.

Thank you,

Jennifer Gilbert
Conservation Coordinator
City of Davis Public Works Utilities and Operations
1717 5th Street |Davis, CA 95616
530-757-5688 | DavisRecycling.org

| From: | Rich Lansburgh </O=WOODLAND/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=6B8A7CE3938E44DBA903C3A30199C105-RICH LANSBURGH> |
|---|---|
| To: | Ken Hiatt |
| Sent: | 3/18/2022 7:15:30 PM |
| Subject: | Re: County Letter to Yolo Food Bank Board |
| Attachments: | 2022-0318-FINAL Letter to YFB Board.pdf |

==That's a pretty strong position to take.  But necessary.==

Sent from my iPhone

On Mar 18, 2022, at 6:41 PM, Ken Hiatt <Ken.Hiatt@cityofwoodland.org> wrote:

Council,

Forwarding the attached communication from Yolo County to the Board of the Yolo Food Bank.   The letter was prompted by recent actions taken by the Food Bank that have impacted various food recovery organizations in the County.  The Food Bank executive director continues to challenge the County and city's approach to implementation of SB 1383 in spite of our collective efforts to try and work collaboratively with them.

I will keep you informed as this situation evolves.

Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, March 18, 2022 5:09 PM
**To:** Tom@mullerag.com; jdurst@durstorganicgrowers.com; Westsacramento@groceryoutlet.com; hartmad3@sutterhealth.org; MattMariani@MarianiNut.com; danramos@ramco-ent.com; esspang@ucdavis.edu; kate.stille@nuggetmarket.com; LWalker@thatsmybank.com
**Cc:** Philip Pogledich <Philip.Pogledich@yolocounty.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>; Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; michael <michael@yolofoodbank.org>
**Subject:** County Letter to Yolo Food Bank Board

Good evening Yolo Food Bank Board of Directors,

Attached, please find a letter that I am sending on behalf of the Yolo County Board of Supervisors. I would appreciate if you can ensure that your full board has received a copy. While we endevoured to send electronically to the full board, I was unable to obtain an e-mail for Ms. Schmitz and a thus a hard copy was be sent to her attention.

Thank you,

*Chad D. Rinde, CPA*
Interim County Administrator
County of Yolo
Off:  (530) 666-8050



# COUNTY OF YOLO
## Board of Supervisors

District 1, **Oscar Villegas, Vice-Chair**
District 2, **Don Saylor**
District 3, **Gary Sandy**
District 4, **Jim Provenza**
District 5, **Angel Barajas, Chair**

625 Court Street, Room 204 ▪ Woodland, CA 95695
(530) 666-8195 ▪ FAX (530) 666-8193
www.yolocounty.org

Interim County Administrator, **Chad Rinde**
Deputy Clerk of the Board, **Julie Dachtler**

March 18, 2022

Board of Directors
Yolo Food Bank
233 Harter Ave
Woodland, CA 95776

Re:     Request for Review of Actions Related to Alleged Termination of Nonprofit Contracts for Accepting Edible
Food Recovery Grant Funding

Dear Chair Muller and Directors:

This letter requests that your Board of Directors act immediately to protect local food recovery organizations—a vital part of the County food recovery network—against actions that compromise their ability to provide food to those in need. We continue to gather information about the role of Yolo Food Bank leadership in these actions, which may include deterring small food pantries, churches, and other organizations from accepting local government funding and retaliating against those that accept funding by curtailing their access to donated food. While we hope your leadership's role has been mischaracterized, the community stakes are too high for us to delay requesting your immediate attention to these concerns.

As you know, the County is dedicated to improving the food security of its residents. The County administers CalFresh, WIC, and other programs and efforts focused on local food security, nutrition, and public health. The County granted $500,000 to Yolo Food Bank in 2019 to expand food recovery and distributions. During the COVID-19 pandemic, the County and Yolo Food Bank partnered to increase food recovery and distribution efforts, with the County providing nearly $1,500,000 and significant County staff to support Yolo Food Bank operations. The County has also tentatively allocated $3,000,000 in American Recovery Plan Act ("ARPA") funding to local food security, including a grant of up to $2,000,000 to New Seasons Community Development Corporation to support construction of a regional food hub in Capay Valley. Finally, the County and the cities of Davis, West Sacramento, Winters, and Woodland (collectively, the "Cities"), are offering $761,698 to Yolo Food Bank (which declined funding) and nine other community organizations to increase food recovery and distribution capacity pursuant to Senate Bill 1383 ("SB 1383").

The latter effort, relating to SB 1383 implementation, appears to be central to the developing crisis that prompted this letter. The $761,698 allocated by the County and Cities to SB 1383 implementation in 2022 will achieve many capacity and logistics improvements for the recipient food recovery entities. For example, the County's proposed 2022 funding to Countryside Church would enable the purchase of scales, a new cold storage refrigerator, and a new freezer, and would also provide additional funding for staff salaries, stipends, or other discretionary expenditures to allow the collection of edible food from the Esparto Valley Market, thus redirecting food from the landfill to those in need.  Additional funding in future years would further help the Church—the only entity serving the Esparto area—improve its capacity to collect and distribute food.

CPRA WOODLAND 000063

Board of Directors, Yolo Food Bank
Page 2

We acknowledge that Yolo Food Bank leadership disagree with the local approach to SB 1383 implementation and have advocated for local governments to "fully fund[] a surplus edible food recovery program countywide"[1] by providing a greater local contribution ($2 million or more annually) to Yolo Food Bank. We also recognize that your CEO, Michael Bisch, contends that the local approach to SB 1383 compliance is somehow legally deficient and that Yolo Food Bank has rejected local government funding offered in connection with SB 1383.[2] Some members of your Board have expressed a similar view regarding local efforts to comply with SB 1383, indicating that the County and Cities must provide more funding directly to Yolo Food Bank to reduce or eliminate its need to fundraise to support local food recovery efforts.[3]

The County has previously considered these perspectives. Among other things, the County retained an independent consultant to study local food recovery capacity and conferred with CalRecycle to ensure the County's edible food recovery program complies with SB 1383. The implementation decisions made at the October 12, 2021 meeting of the Yolo County Board of Supervisors reflect our assessment of the most appropriate near-term approach to local SB 1383 implementation. We decline to debate competing approaches further in this letter except to say that whatever disagreement may exist regarding local implementation of SB 1383, we must prevent it from harming the charitable organizations that feed those in need. Local community organizations must not be forced to choose between access to food and accepting funding to improve their work.

Mr. Bisch has responded to inquiries from the County regarding this issue to clarify that the Yolo Food Bank has the "exclusive right to solicit food donations from Feeding America affiliated donors in Yolo County and responsibility to then equitably distribute said food throughout the County." And that the Yolo Food Bank may, in turn, "choose to subcontract this work in some instances with partner nonprofits on mutually agreeable terms." But it is our understanding that the Yolo Food Bank may now be threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery programs. Such actions, if accurate, are contrary to the shared goals of redirecting edible food from the landfill to those in need, regardless of disputes we may have regarding SB 1383 requirements.

We ask that you take all steps necessary to ensure that Yolo Food Bank leadership is not responsible and, if you determine otherwise, do whatever is needed to immediately end this situation. This could include reassuring all local community partners that Yolo Food Bank will not restrict food distribution or otherwise retaliate against those accepting SB 1383 funding to improve their capacity to feed more people. The County stands ready to take any actions necessary to resolve this crisis but will not be forced to the table—to the extent that may be the underlying goal—to revisit the discretionary policy decisions already made regarding near-term SB 1383 implementation.

We would be remiss if we did not express our concern that the actions attributed to Yolo Food Bank's leadership, if true, create a serious question about their commitment to local food security and the best interests of our

---

[1] Yolo Food Bank letter to Board of Supervisors and City Councils, July 10, 2021 (available at: https://yolofoodbank.org/in-the-news/food-recovery-support-letter/).

[2] M. Bisch letter to R. Yazdani, Oct. 3, 2021; see also Anon., *New Yolo Food Bank Mission and Vision Prioritize Nutrition, Food Equity, and Resilience as Pandemic Lingers in New Year,* Davis Vanguard, Jan. 22, 2022 (quoting Michael Bisch as stating: "As a result, in 2022 we're pivoting toward investing our donors' generous contributions in the food equity work of our new mission and vision, *setting aside state-mandated activities that are the responsibility of local governments to fund and execute such as SB 1383 edible food recovery*. Yolo Food Bank must focus upon advancing the healthy outcomes that all local residents deserve, thereby increasing their quality of life.").

[3] J. Durst, *Guest Commentary: Feeding All Residents, Especially Vulnerable Children, Highest Priority,* Davis Vanguard, Sept. 20, 2021.

CPRA WOODLAND 000064

Board of Directors, Yolo Food Bank
Page 3

communities. We urge you to perform your own assessment as the Board of Directors and, additionally, to evaluate matters beyond the scope of the immediate controversy. While we acknowledge that the final decision is within your sound discretion, your attention to the matters described herein will assure us that Yolo Food Bank remains an essential community partner—one of a small number of non-profit organizations that the community simply cannot do without. If your priorities are instead evolving away from reliably collaborating to enhance local food security, we will evaluate increasing the role of other partners and direct funding (including ARPA funding) to those entities rather than Yolo Food Bank.

We look forward to moving past the current challenges and reaffirming our strong partnership with Yolo Food Bank. We sincerely appreciate your consideration of the concerns raised in this letter and look forward to hearing from you shortly.

Sincerely,

Angel Barajas
Chair
Yolo County Board of Supervisors

Oscar Villegas
Vice Chair
Yolo County Board of Supervisors

cc:     Board of Supervisors, Yolo County
        Chad Rinde, Interim County Administrative Officer
        Philip Pogledich, County Counsel
        Mike Webb, City Manager, City of Davis
        Aaron Laurel, City Manager, City of West Sacramento
        Kathleen Trepa, City Manager, City of Winters
        Ken Hiatt, City Manager, City of Woodland

| From: | Rosie Ledesma </O=WOODLAND/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=RSALAS> |
| To: | Jennifer Gilbert; Adrienne Heinig; Susan Strand; Traci Goularte; Kristine DeGuerre; Marissa Juhler; Pamela Hedrick |
| CC: | Maris Samsel |
| Sent: | 3/18/2022 7:11:59 PM |
| Subject: | Fwd: County Letter to Yolo Food Bank Board |
| Attachments: | 2022-0318-FINAL Letter to YFB Board.pdf |

Forwarding in case you haven't seen this.

Thank you, Yolo County! (Aka Marissa!)

**From:** Ken Hiatt <Ken.Hiatt@cityofwoodland.org>
**Sent:** Friday, March 18, 2022 6:41:48 PM
**To:** Mayra Vega <Mayra.Vega@cityofwoodland.org>; Vicky Fernandez
<Vicky.Fernandez@cityofwoodland.org>; Rich Lansburgh <Rich.Lansburgh@cityofwoodland.org>; Tom
Stallard <Tom.Stallard@cityofwoodland.org>; Tania Garcia Cadena
<Tania.GarciaCadena@cityofwoodland.org>
**Cc:** Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>
**Subject:** FW: County Letter to Yolo Food Bank Board

Council,

Forwarding the attached communication from Yolo County to the Board of the Yolo Food Bank.   The letter was
prompted by recent actions taken by the Food Bank that have impacted various food recovery organizations in
the County.  The Food Bank executive director continues to challenge the County and city's approach to
implementation of SB 1383 in spite of our collective efforts to try and work collaboratively with them.

I will keep you informed as this situation evolves.

Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, March 18, 2022 5:09 PM
**To:** Tom@mullerag.com; jdurst@durstorganicgrowers.com; Westsacramento@groceryoutlet.com;
hartmad3@sutterhealth.org; MattMariani@MarianiNut.com; danramos@ramco-ent.com;
esspang@ucdavis.edu; kate.stille@nuggetmarket.com; LWalker@thatsmybank.com
**Cc:** Philip Pogledich <Philip.Pogledich@yolocounty.org>; Mike Webb (MWebb@cityofdavis.org)
<mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>; Kathleen Trepa
<kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; michael
<michael@yolofoodbank.org>
**Subject:** County Letter to Yolo Food Bank Board

Good evening Yolo Food Bank Board of Directors,

Attached, please find a letter that I am sending on behalf of the Yolo County Board of Supervisors. I would
appreciate if you can ensure that your full board has received a copy. While we endevoured to send
electronically to the full board, I was unable to obtain an e-mail for Ms. Schmitz and a thus a hard copy was be
sent to her attention.

Thank you,

***Chad D. Rinde, CPA***
Interim County Administrator
County of Yolo
Off:  (530) 666-8050



# COUNTY OF YOLO
## Board of Supervisors

District 1, **Oscar Villegas, Vice-Chair**
District 2, **Don Saylor**
District 3, **Gary Sandy**
District 4, **Jim Provenza**
District 5, **Angel Barajas, Chair**

625 Court Street, Room 204 ▪ Woodland, CA 95695
(530) 666-8195 ▪ FAX (530) 666-8193
www.yolocounty.org

Interim County Administrator, **Chad Rinde**
Deputy Clerk of the Board, **Julie Dachtler**

March 18, 2022

Board of Directors
Yolo Food Bank
233 Harter Ave
Woodland, CA 95776

Re:     Request for Review of Actions Related to Alleged Termination of Nonprofit Contracts for Accepting Edible
        Food Recovery Grant Funding

Dear Chair Muller and Directors:

This letter requests that your Board of Directors act immediately to protect local food recovery organizations—a vital part of the County food recovery network—against actions that compromise their ability to provide food to those in need. We continue to gather information about the role of Yolo Food Bank leadership in these actions, which may include deterring small food pantries, churches, and other organizations from accepting local government funding and retaliating against those that accept funding by curtailing their access to donated food. While we hope your leadership's role has been mischaracterized, the community stakes are too high for us to delay requesting your immediate attention to these concerns.

As you know, the County is dedicated to improving the food security of its residents. The County administers CalFresh, WIC, and other programs and efforts focused on local food security, nutrition, and public health. The County granted $500,000 to Yolo Food Bank in 2019 to expand food recovery and distributions. During the COVID-19 pandemic, the County and Yolo Food Bank partnered to increase food recovery and distribution efforts, with the County providing nearly $1,500,000 and significant County staff to support Yolo Food Bank operations. The County has also tentatively allocated $3,000,000 in American Recovery Plan Act ("ARPA") funding to local food security, including a grant of up to $2,000,000 to New Seasons Community Development Corporation to support construction of a regional food hub in Capay Valley. Finally, the County and the cities of Davis, West Sacramento, Winters, and Woodland (collectively, the "Cities"), are offering $761,698 to Yolo Food Bank (which declined funding) and nine other community organizations to increase food recovery and distribution capacity pursuant to Senate Bill 1383 ("SB 1383").

The latter effort, relating to SB 1383 implementation, appears to be central to the developing crisis that prompted this letter. The $761,698 allocated by the County and Cities to SB 1383 implementation in 2022 will achieve many capacity and logistics improvements for the recipient food recovery entities. For example, the County's proposed 2022 funding to Countryside Church would enable the purchase of scales, a new cold storage refrigerator, and a new freezer, and would also provide additional funding for staff salaries, stipends, or other discretionary expenditures to allow the collection of edible food from the Esparto Valley Market, thus redirecting food from the landfill to those in need.  Additional funding in future years would further help the Church—the only entity serving the Esparto area—improve its capacity to collect and distribute food.

CPRA WOODLAND 000067

Board of Directors, Yolo Food Bank
Page 2

We acknowledge that Yolo Food Bank leadership disagree with the local approach to SB 1383 implementation and have advocated for local governments to "fully fund[] a surplus edible food recovery program countywide"[1] by providing a greater local contribution ($2 million or more annually) to Yolo Food Bank. We also recognize that your CEO, Michael Bisch, contends that the local approach to SB 1383 compliance is somehow legally deficient and that Yolo Food Bank has rejected local government funding offered in connection with SB 1383.[2] Some members of your Board have expressed a similar view regarding local efforts to comply with SB 1383, indicating that the County and Cities must provide more funding directly to Yolo Food Bank to reduce or eliminate its need to fundraise to support local food recovery efforts.[3]

The County has previously considered these perspectives. Among other things, the County retained an independent consultant to study local food recovery capacity and conferred with CalRecycle to ensure the County's edible food recovery program complies with SB 1383. The implementation decisions made at the October 12, 2021 meeting of the Yolo County Board of Supervisors reflect our assessment of the most appropriate near-term approach to local SB 1383 implementation. We decline to debate competing approaches further in this letter except to say that whatever disagreement may exist regarding local implementation of SB 1383, we must prevent it from harming the charitable organizations that feed those in need. Local community organizations must not be forced to choose between access to food and accepting funding to improve their work.

Mr. Bisch has responded to inquiries from the County regarding this issue to clarify that the Yolo Food Bank has the "exclusive right to solicit food donations from Feeding America affiliated donors in Yolo County and responsibility to then equitably distribute said food throughout the County." And that the Yolo Food Bank may, in turn, "choose to subcontract this work in some instances with partner nonprofits on mutually agreeable terms." But it is our understanding that the Yolo Food Bank may now be threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery programs. Such actions, if accurate, are contrary to the shared goals of redirecting edible food from the landfill to those in need, regardless of disputes we may have regarding SB 1383 requirements.

We ask that you take all steps necessary to ensure that Yolo Food Bank leadership is not responsible and, if you determine otherwise, do whatever is needed to immediately end this situation. This could include reassuring all local community partners that Yolo Food Bank will not restrict food distribution or otherwise retaliate against those accepting SB 1383 funding to improve their capacity to feed more people. The County stands ready to take any actions necessary to resolve this crisis but will not be forced to the table—to the extent that may be the underlying goal—to revisit the discretionary policy decisions already made regarding near-term SB 1383 implementation.

We would be remiss if we did not express our concern that the actions attributed to Yolo Food Bank's leadership, if true, create a serious question about their commitment to local food security and the best interests of our

---

[1] Yolo Food Bank letter to Board of Supervisors and City Councils, July 10, 2021 (available at: https://yolofoodbank.org/in-the-news/food-recovery-support-letter/).

[2] M. Bisch letter to R. Yazdani, Oct. 3, 2021; see also Anon., *New Yolo Food Bank Mission and Vision Prioritize Nutrition, Food Equity, and Resilience as Pandemic Lingers in New Year,* Davis Vanguard, Jan. 22, 2022 (quoting Michael Bisch as stating: "As a result, in 2022 we're pivoting toward investing our donors' generous contributions in the food equity work of our new mission and vision, *setting aside state-mandated activities that are the responsibility of local governments to fund and execute such as SB 1383 edible food recovery*. Yolo Food Bank must focus upon advancing the healthy outcomes that all local residents deserve, thereby increasing their quality of life.").

[3] J. Durst, *Guest Commentary: Feeding All Residents, Especially Vulnerable Children, Highest Priority,* Davis Vanguard, Sept. 20, 2021.

CPRA WOODLAND 000068

Board of Directors, Yolo Food Bank
Page 3

communities. We urge you to perform your own assessment as the Board of Directors and, additionally, to evaluate matters beyond the scope of the immediate controversy. While we acknowledge that the final decision is within your sound discretion, your attention to the matters described herein will assure us that Yolo Food Bank remains an essential community partner—one of a small number of non-profit organizations that the community simply cannot do without. If your priorities are instead evolving away from reliably collaborating to enhance local food security, we will evaluate increasing the role of other partners and direct funding (including ARPA funding) to those entities rather than Yolo Food Bank.

We look forward to moving past the current challenges and reaffirming our strong partnership with Yolo Food Bank. We sincerely appreciate your consideration of the concerns raised in this letter and look forward to hearing from you shortly.

Sincerely,

Angel Barajas
Chair
Yolo County Board of Supervisors

Oscar Villegas
Vice Chair
Yolo County Board of Supervisors

cc:     Board of Supervisors, Yolo County
        Chad Rinde, Interim County Administrative Officer
        Philip Pogledich, County Counsel
        Mike Webb, City Manager, City of Davis
        Aaron Laurel, City Manager, City of West Sacramento
        Kathleen Trepa, City Manager, City of Winters
        Ken Hiatt, City Manager, City of Woodland

| | |
|---|---|
| **From:** | Tom Stallard <tstallard@legrlent.com> |
| **To:** | Ken Hiatt |
| **Sent:** | 3/18/2022 6:55:17 PM |
| **Subject:** | Re: County Letter to Yolo Food Bank Board |
| **Attachments:** | 2022-0318-FINAL Letter to YFB Board.pdf |

==A spicy meatball, indeed. That board has to get Bisch under control or bounce him.==

On Mar 18, 2022, at 6:41 PM, Ken Hiatt <Ken.Hiatt@cityofwoodland.org> wrote:

Council,

Forwarding the attached communication from Yolo County to the Board of the Yolo Food Bank.   The letter was prompted by recent actions taken by the Food Bank that have impacted various food recovery organizations in the County.  The Food Bank executive director continues to challenge the County and city's approach to implementation of SB 1383 in spite of our collective efforts to try and work collaboratively with them.

I will keep you informed as this situation evolves.

Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, March 18, 2022 5:09 PM
**To:** Tom@mullerag.com; jdurst@durstorganicgrowers.com; Westsacramento@groceryoutlet.com; hartmad3@sutterhealth.org; MattMariani@MarianiNut.com; danramos@ramco-ent.com; esspang@ucdavis.edu; kate.stille@nuggetmarket.com; LWalker@thatsmybank.com
**Cc:** Philip Pogledich <Philip.Pogledich@yolocounty.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>; Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; michael <michael@yolofoodbank.org>
**Subject:** County Letter to Yolo Food Bank Board

Good evening Yolo Food Bank Board of Directors,

Attached, please find a letter that I am sending on behalf of the Yolo County Board of Supervisors. I would appreciate if you can ensure that your full board has received a copy. While we endevoured to send electronically to the full board, I was unable to obtain an e-mail for Ms. Schmitz and a thus a hard copy was be sent to her attention.

Thank you,

**Chad D. Rinde, CPA**
Interim County Administrator
County of Yolo
Off:  (530) 666-8050



# COUNTY OF YOLO
## Board of Supervisors

District 1, **Oscar Villegas, Vice-Chair**
District 2, **Don Saylor**
District 3, **Gary Sandy**
District 4, **Jim Provenza**
District 5, **Angel Barajas, Chair**

625 Court Street, Room 204 ▪ Woodland, CA 95695
(530) 666-8195 ▪ FAX (530) 666-8193
www.yolocounty.org

Interim County Administrator, **Chad Rinde**
Deputy Clerk of the Board, **Julie Dachtler**

March 18, 2022

Board of Directors
Yolo Food Bank
233 Harter Ave
Woodland, CA 95776

Re:     Request for Review of Actions Related to Alleged Termination of Nonprofit Contracts for Accepting Edible
        Food Recovery Grant Funding

Dear Chair Muller and Directors:

This letter requests that your Board of Directors act immediately to protect local food recovery organizations—a vital part of the County food recovery network—against actions that compromise their ability to provide food to those in need. We continue to gather information about the role of Yolo Food Bank leadership in these actions, which may include deterring small food pantries, churches, and other organizations from accepting local government funding and retaliating against those that accept funding by curtailing their access to donated food. While we hope your leadership's role has been mischaracterized, the community stakes are too high for us to delay requesting your immediate attention to these concerns.

As you know, the County is dedicated to improving the food security of its residents. The County administers CalFresh, WIC, and other programs and efforts focused on local food security, nutrition, and public health. The County granted $500,000 to Yolo Food Bank in 2019 to expand food recovery and distributions. During the COVID-19 pandemic, the County and Yolo Food Bank partnered to increase food recovery and distribution efforts, with the County providing nearly $1,500,000 and significant County staff to support Yolo Food Bank operations. The County has also tentatively allocated $3,000,000 in American Recovery Plan Act ("ARPA") funding to local food security, including a grant of up to $2,000,000 to New Seasons Community Development Corporation to support construction of a regional food hub in Capay Valley. Finally, the County and the cities of Davis, West Sacramento, Winters, and Woodland (collectively, the "Cities"), are offering $761,698 to Yolo Food Bank (which declined funding) and nine other community organizations to increase food recovery and distribution capacity pursuant to Senate Bill 1383 ("SB 1383").

The latter effort, relating to SB 1383 implementation, appears to be central to the developing crisis that prompted this letter. The $761,698 allocated by the County and Cities to SB 1383 implementation in 2022 will achieve many capacity and logistics improvements for the recipient food recovery entities. For example, the County's proposed 2022 funding to Countryside Church would enable the purchase of scales, a new cold storage refrigerator, and a new freezer, and would also provide additional funding for staff salaries, stipends, or other discretionary expenditures to allow the collection of edible food from the Esparto Valley Market, thus redirecting food from the landfill to those in need.  Additional funding in future years would further help the Church—the only entity serving the Esparto area—improve its capacity to collect and distribute food.

CPRA WOODLAND 000071

Board of Directors, Yolo Food Bank
Page 2

We acknowledge that Yolo Food Bank leadership disagree with the local approach to SB 1383 implementation and have advocated for local governments to "fully fund[] a surplus edible food recovery program countywide"[1] by providing a greater local contribution ($2 million or more annually) to Yolo Food Bank. We also recognize that your CEO, Michael Bisch, contends that the local approach to SB 1383 compliance is somehow legally deficient and that Yolo Food Bank has rejected local government funding offered in connection with SB 1383.[2] Some members of your Board have expressed a similar view regarding local efforts to comply with SB 1383, indicating that the County and Cities must provide more funding directly to Yolo Food Bank to reduce or eliminate its need to fundraise to support local food recovery efforts.[3]

The County has previously considered these perspectives. Among other things, the County retained an independent consultant to study local food recovery capacity and conferred with CalRecycle to ensure the County's edible food recovery program complies with SB 1383. The implementation decisions made at the October 12, 2021 meeting of the Yolo County Board of Supervisors reflect our assessment of the most appropriate near-term approach to local SB 1383 implementation. We decline to debate competing approaches further in this letter except to say that whatever disagreement may exist regarding local implementation of SB 1383, we must prevent it from harming the charitable organizations that feed those in need. Local community organizations must not be forced to choose between access to food and accepting funding to improve their work.

Mr. Bisch has responded to inquiries from the County regarding this issue to clarify that the Yolo Food Bank has the "exclusive right to solicit food donations from Feeding America affiliated donors in Yolo County and responsibility to then equitably distribute said food throughout the County." And that the Yolo Food Bank may, in turn, "choose to subcontract this work in some instances with partner nonprofits on mutually agreeable terms." But it is our understanding that the Yolo Food Bank may now be threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery programs. Such actions, if accurate, are contrary to the shared goals of redirecting edible food from the landfill to those in need, regardless of disputes we may have regarding SB 1383 requirements.

We ask that you take all steps necessary to ensure that Yolo Food Bank leadership is not responsible and, if you determine otherwise, do whatever is needed to immediately end this situation. This could include reassuring all local community partners that Yolo Food Bank will not restrict food distribution or otherwise retaliate against those accepting SB 1383 funding to improve their capacity to feed more people. The County stands ready to take any actions necessary to resolve this crisis but will not be forced to the table—to the extent that may be the underlying goal—to revisit the discretionary policy decisions already made regarding near-term SB 1383 implementation.

We would be remiss if we did not express our concern that the actions attributed to Yolo Food Bank's leadership, if true, create a serious question about their commitment to local food security and the best interests of our

---

[1] Yolo Food Bank letter to Board of Supervisors and City Councils, July 10, 2021 (available at: https://yolofoodbank.org/in-the-news/food-recovery-support-letter/).

[2] M. Bisch letter to R. Yazdani, Oct. 3, 2021; see also Anon., *New Yolo Food Bank Mission and Vision Prioritize Nutrition, Food Equity, and Resilience as Pandemic Lingers in New Year,* Davis Vanguard, Jan. 22, 2022 (quoting Michael Bisch as stating: "As a result, in 2022 we're pivoting toward investing our donors' generous contributions in the food equity work of our new mission and vision, *setting aside state-mandated activities that are the responsibility of local governments to fund and execute such as SB 1383 edible food recovery.* Yolo Food Bank must focus upon advancing the healthy outcomes that all local residents deserve, thereby increasing their quality of life.").

[3] J. Durst, *Guest Commentary: Feeding All Residents, Especially Vulnerable Children, Highest Priority,* Davis Vanguard, Sept. 20, 2021.

Board of Directors, Yolo Food Bank
Page 3

communities. We urge you to perform your own assessment as the Board of Directors and, additionally, to evaluate matters beyond the scope of the immediate controversy. While we acknowledge that the final decision is within your sound discretion, your attention to the matters described herein will assure us that Yolo Food Bank remains an essential community partner—one of a small number of non-profit organizations that the community simply cannot do without. If your priorities are instead evolving away from reliably collaborating to enhance local food security, we will evaluate increasing the role of other partners and direct funding (including ARPA funding) to those entities rather than Yolo Food Bank.

We look forward to moving past the current challenges and reaffirming our strong partnership with Yolo Food Bank. We sincerely appreciate your consideration of the concerns raised in this letter and look forward to hearing from you shortly.


Sincerely,

Angel Barajas
Chair
Yolo County Board of Supervisors

Oscar Villegas
Vice Chair
Yolo County Board of Supervisors


cc:     Board of Supervisors, Yolo County
        Chad Rinde, Interim County Administrative Officer
        Philip Pogledich, County Counsel
        Mike Webb, City Manager, City of Davis
        Aaron Laurel, City Manager, City of West Sacramento
        Kathleen Trepa, City Manager, City of Winters
        Ken Hiatt, City Manager, City of Woodland

CPRA WOODLAND 000073

| **From:** | Ken Hiatt </O=WOODLAND/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KEN HIATT0B4> |
| **To:** | Mayra Vega; Vicky Fernandez; Rich Lansburgh; Tom Stallard; Tania Garcia Cadena |
| **CC:** | Rosie Ledesma |
| **Sent:** | 3/18/2022 6:41:48 PM |
| **Subject:** | FW: County Letter to Yolo Food Bank Board |
| **Attachments:** | 2022-0318-FINAL Letter to YFB Board.pdf |

Council,

Forwarding the attached communication from Yolo County to the Board of the Yolo Food Bank.   The letter was prompted by recent actions taken by the Food Bank that have impacted various food recovery organizations in the County.  The Food Bank executive director continues to challenge the County and city's approach to implementation of SB 1383 in spite of our collective efforts to try and work collaboratively with them.

I will keep you informed as this situation evolves.

Ken

**From:** Chad Rinde <Chad.Rinde@yolocounty.org>
**Sent:** Friday, March 18, 2022 5:09 PM
**To:** Tom@mullerag.com; jdurst@durstorganicgrowers.com; Westsacramento@groceryoutlet.com; hartmad3@sutterhealth.org; MattMariani@MarianiNut.com; danramos@ramco-ent.com; esspang@ucdavis.edu; kate.stille@nuggetmarket.com; LWalker@thatsmybank.com
**Cc:** Philip Pogledich <Philip.Pogledich@yolocounty.org>; Mike Webb (MWebb@cityofdavis.org) <mwebb@cityofdavis.org>; Aaron Laurel <aaronl@cityofwestsacramento.org>; Kathleen Trepa <kathleen.trepa@cityofwinters.org>; Ken Hiatt <Ken.Hiatt@cityofwoodland.org>; michael <michael@yolofoodbank.org>
**Subject:** County Letter to Yolo Food Bank Board

Good evening Yolo Food Bank Board of Directors,

Attached, please find a letter that I am sending on behalf of the Yolo County Board of Supervisors. I would appreciate if you can ensure that your full board has received a copy. While we endevoured to send electronically to the full board, I was unable to obtain an e-mail for Ms. Schmitz and a thus a hard copy was be sent to her attention.

Thank you,

**Chad D. Rinde, CPA**
Interim County Administrator
County of Yolo
Off:  (530) 666-8050



# COUNTY OF YOLO
## Board of Supervisors

District 1, **Oscar Villegas, Vice-Chair**
District 2, **Don Saylor**
District 3, **Gary Sandy**
District 4, **Jim Provenza**
District 5, **Angel Barajas, Chair**

625 Court Street, Room 204 ▪ Woodland, CA 95695
(530) 666-8195 ▪ FAX (530) 666-8193
www.yolocounty.org

Interim County Administrator, **Chad Rinde**
Deputy Clerk of the Board, **Julie Dachtler**

March 18, 2022

Board of Directors
Yolo Food Bank
233 Harter Ave
Woodland, CA 95776

Re:     Request for Review of Actions Related to Alleged Termination of Nonprofit Contracts for Accepting Edible
        Food Recovery Grant Funding

Dear Chair Muller and Directors:

This letter requests that your Board of Directors act immediately to protect local food recovery organizations—a vital part of the County food recovery network—against actions that compromise their ability to provide food to those in need. We continue to gather information about the role of Yolo Food Bank leadership in these actions, which may include deterring small food pantries, churches, and other organizations from accepting local government funding and retaliating against those that accept funding by curtailing their access to donated food. While we hope your leadership's role has been mischaracterized, the community stakes are too high for us to delay requesting your immediate attention to these concerns.

As you know, the County is dedicated to improving the food security of its residents. The County administers CalFresh, WIC, and other programs and efforts focused on local food security, nutrition, and public health. The County granted $500,000 to Yolo Food Bank in 2019 to expand food recovery and distributions. During the COVID-19 pandemic, the County and Yolo Food Bank partnered to increase food recovery and distribution efforts, with the County providing nearly $1,500,000 and significant County staff to support Yolo Food Bank operations. The County has also tentatively allocated $3,000,000 in American Recovery Plan Act ("ARPA") funding to local food security, including a grant of up to $2,000,000 to New Seasons Community Development Corporation to support construction of a regional food hub in Capay Valley. Finally, the County and the cities of Davis, West Sacramento, Winters, and Woodland (collectively, the "Cities"), are offering $761,698 to Yolo Food Bank (which declined funding) and nine other community organizations to increase food recovery and distribution capacity pursuant to Senate Bill 1383 ("SB 1383").

The latter effort, relating to SB 1383 implementation, appears to be central to the developing crisis that prompted this letter. The $761,698 allocated by the County and Cities to SB 1383 implementation in 2022 will achieve many capacity and logistics improvements for the recipient food recovery entities. For example, the County's proposed 2022 funding to Countryside Church would enable the purchase of scales, a new cold storage refrigerator, and a new freezer, and would also provide additional funding for staff salaries, stipends, or other discretionary expenditures to allow the collection of edible food from the Esparto Valley Market, thus redirecting food from the landfill to those in need.  Additional funding in future years would further help the Church—the only entity serving the Esparto area—improve its capacity to collect and distribute food.

CPRA WOODLAND 000075

Board of Directors, Yolo Food Bank
Page 2

We acknowledge that Yolo Food Bank leadership disagree with the local approach to SB 1383 implementation and have advocated for local governments to "fully fund[] a surplus edible food recovery program countywide"[1] by providing a greater local contribution ($2 million or more annually) to Yolo Food Bank. We also recognize that your CEO, Michael Bisch, contends that the local approach to SB 1383 compliance is somehow legally deficient and that Yolo Food Bank has rejected local government funding offered in connection with SB 1383.[2] Some members of your Board have expressed a similar view regarding local efforts to comply with SB 1383, indicating that the County and Cities must provide more funding directly to Yolo Food Bank to reduce or eliminate its need to fundraise to support local food recovery efforts.[3]

The County has previously considered these perspectives. Among other things, the County retained an independent consultant to study local food recovery capacity and conferred with CalRecycle to ensure the County's edible food recovery program complies with SB 1383. The implementation decisions made at the October 12, 2021 meeting of the Yolo County Board of Supervisors reflect our assessment of the most appropriate near-term approach to local SB 1383 implementation. We decline to debate competing approaches further in this letter except to say that whatever disagreement may exist regarding local implementation of SB 1383, we must prevent it from harming the charitable organizations that feed those in need. Local community organizations must not be forced to choose between access to food and accepting funding to improve their work.

Mr. Bisch has responded to inquiries from the County regarding this issue to clarify that the Yolo Food Bank has the "exclusive right to solicit food donations from Feeding America affiliated donors in Yolo County and responsibility to then equitably distribute said food throughout the County." And that the Yolo Food Bank may, in turn, "choose to subcontract this work in some instances with partner nonprofits on mutually agreeable terms." But it is our understanding that the Yolo Food Bank may now be threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery programs. Such actions, if accurate, are contrary to the shared goals of redirecting edible food from the landfill to those in need, regardless of disputes we may have regarding SB 1383 requirements.

We ask that you take all steps necessary to ensure that Yolo Food Bank leadership is not responsible and, if you determine otherwise, do whatever is needed to immediately end this situation. This could include reassuring all local community partners that Yolo Food Bank will not restrict food distribution or otherwise retaliate against those accepting SB 1383 funding to improve their capacity to feed more people. The County stands ready to take any actions necessary to resolve this crisis but will not be forced to the table—to the extent that may be the underlying goal—to revisit the discretionary policy decisions already made regarding near-term SB 1383 implementation.

We would be remiss if we did not express our concern that the actions attributed to Yolo Food Bank's leadership, if true, create a serious question about their commitment to local food security and the best interests of our

---

[1] Yolo Food Bank letter to Board of Supervisors and City Councils, July 10, 2021 (available at: https://yolofoodbank.org/in-the-news/food-recovery-support-letter/).

[2] M. Bisch letter to R. Yazdani, Oct. 3, 2021; see also Anon., *New Yolo Food Bank Mission and Vision Prioritize Nutrition, Food Equity, and Resilience as Pandemic Lingers in New Year,* Davis Vanguard, Jan. 22, 2022 (quoting Michael Bisch as stating: "As a result, in 2022 we're pivoting toward investing our donors' generous contributions in the food equity work of our new mission and vision, *setting aside state-mandated activities that are the responsibility of local governments to fund and execute such as SB 1383 edible food recovery*. Yolo Food Bank must focus upon advancing the healthy outcomes that all local residents deserve, thereby increasing their quality of life.").

[3] J. Durst, *Guest Commentary: Feeding All Residents, Especially Vulnerable Children, Highest Priority,* Davis Vanguard, Sept. 20, 2021.

Board of Directors, Yolo Food Bank
Page 3

communities. We urge you to perform your own assessment as the Board of Directors and, additionally, to evaluate matters beyond the scope of the immediate controversy. While we acknowledge that the final decision is within your sound discretion, your attention to the matters described herein will assure us that Yolo Food Bank remains an essential community partner—one of a small number of non-profit organizations that the community simply cannot do without. If your priorities are instead evolving away from reliably collaborating to enhance local food security, we will evaluate increasing the role of other partners and direct funding (including ARPA funding) to those entities rather than Yolo Food Bank.

We look forward to moving past the current challenges and reaffirming our strong partnership with Yolo Food Bank. We sincerely appreciate your consideration of the concerns raised in this letter and look forward to hearing from you shortly.

Sincerely,

Angel Barajas
Chair
Yolo County Board of Supervisors

Oscar Villegas
Vice Chair
Yolo County Board of Supervisors

cc:     Board of Supervisors, Yolo County
        Chad Rinde, Interim County Administrative Officer
        Philip Pogledich, County Counsel
        Mike Webb, City Manager, City of Davis
        Aaron Laurel, City Manager, City of West Sacramento
        Kathleen Trepa, City Manager, City of Winters
        Ken Hiatt, City Manager, City of Woodland

CPRA WOODLAND 000077

| **From:** | Chad Rinde <Chad.Rinde@yolocounty.org> |
|---|---|
| **To:** | Tom@mullerag.com; jdurst@durstorganicgrowers.com; Westsacramento@groceryoutlet.com; hartmad3@sutterhealth.org; MattMariani@MarianiNut.com; danramos@ramco-ent.com; esspang@ucdavis.edu; kate.stille@nuggetmarket.com; LWalker@thatsmybank.com |
| **CC:** | Philip Pogledich; Mike Webb (MWebb@cityofdavis.org); Aaron Laurel; Kathleen Trepa; Ken Hiatt; michael |
| **Sent:** | 3/18/2022 5:09:15 PM |
| **Subject:** | County Letter to Yolo Food Bank Board |
| **Attachments:** | 2022-0318-FINAL Letter to YFB Board.pdf |

Good evening Yolo Food Bank Board of Directors,

Attached, please find a letter that I am sending on behalf of the Yolo County Board of Supervisors. I would appreciate if you can ensure that your full board has received a copy. While we endevoured to send electronically to the full board, I was unable to obtain an e-mail for Ms. Schmitz and a thus a hard copy was be sent to her attention.

Thank you,

**Chad D. Rinde, CPA**
Interim County Administrator
County of Yolo
Off:  (530) 666-8050



# COUNTY OF YOLO
## Board of Supervisors

District 1, **Oscar Villegas, Vice-Chair**
District 2, **Don Saylor**
District 3, **Gary Sandy**
District 4, **Jim Provenza**
District 5, **Angel Barajas, Chair**

625 Court Street, Room 204 ▪ Woodland, CA 95695
(530) 666-8195 ▪ FAX (530) 666-8193
www.yolocounty.org

Interim County Administrator, **Chad Rinde**
Deputy Clerk of the Board, **Julie Dachtler**

March 18, 2022

Board of Directors
Yolo Food Bank
233 Harter Ave
Woodland, CA 95776

Re:     Request for Review of Actions Related to Alleged Termination of Nonprofit Contracts for Accepting Edible
          Food Recovery Grant Funding

Dear Chair Muller and Directors:

This letter requests that your Board of Directors act immediately to protect local food recovery organizations—a vital part of the County food recovery network—against actions that compromise their ability to provide food to those in need. We continue to gather information about the role of Yolo Food Bank leadership in these actions, which may include deterring small food pantries, churches, and other organizations from accepting local government funding and retaliating against those that accept funding by curtailing their access to donated food. While we hope your leadership's role has been mischaracterized, the community stakes are too high for us to delay requesting your immediate attention to these concerns.

As you know, the County is dedicated to improving the food security of its residents. The County administers CalFresh, WIC, and other programs and efforts focused on local food security, nutrition, and public health. The County granted $500,000 to Yolo Food Bank in 2019 to expand food recovery and distributions. During the COVID-19 pandemic, the County and Yolo Food Bank partnered to increase food recovery and distribution efforts, with the County providing nearly $1,500,000 and significant County staff to support Yolo Food Bank operations. The County has also tentatively allocated $3,000,000 in American Recovery Plan Act ("ARPA") funding to local food security, including a grant of up to $2,000,000 to New Seasons Community Development Corporation to support construction of a regional food hub in Capay Valley. Finally, the County and the cities of Davis, West Sacramento, Winters, and Woodland (collectively, the "Cities"), are offering $761,698 to Yolo Food Bank (which declined funding) and nine other community organizations to increase food recovery and distribution capacity pursuant to Senate Bill 1383 ("SB 1383").

The latter effort, relating to SB 1383 implementation, appears to be central to the developing crisis that prompted this letter. The $761,698 allocated by the County and Cities to SB 1383 implementation in 2022 will achieve many capacity and logistics improvements for the recipient food recovery entities. For example, the County's proposed 2022 funding to Countryside Church would enable the purchase of scales, a new cold storage refrigerator, and a new freezer, and would also provide additional funding for staff salaries, stipends, or other discretionary expenditures to allow the collection of edible food from the Esparto Valley Market, thus redirecting food from the landfill to those in need.  Additional funding in future years would further help the Church—the only entity serving the Esparto area—improve its capacity to collect and distribute food.

CPRA WOODLAND 000079

Board of Directors, Yolo Food Bank
Page 2

We acknowledge that Yolo Food Bank leadership disagree with the local approach to SB 1383 implementation and have advocated for local governments to "fully fund[] a surplus edible food recovery program countywide"[1] by providing a greater local contribution ($2 million or more annually) to Yolo Food Bank. We also recognize that your CEO, Michael Bisch, contends that the local approach to SB 1383 compliance is somehow legally deficient and that Yolo Food Bank has rejected local government funding offered in connection with SB 1383.[2] Some members of your Board have expressed a similar view regarding local efforts to comply with SB 1383, indicating that the County and Cities must provide more funding directly to Yolo Food Bank to reduce or eliminate its need to fundraise to support local food recovery efforts.[3]

The County has previously considered these perspectives. Among other things, the County retained an independent consultant to study local food recovery capacity and conferred with CalRecycle to ensure the County's edible food recovery program complies with SB 1383. The implementation decisions made at the October 12, 2021 meeting of the Yolo County Board of Supervisors reflect our assessment of the most appropriate near-term approach to local SB 1383 implementation. We decline to debate competing approaches further in this letter except to say that whatever disagreement may exist regarding local implementation of SB 1383, we must prevent it from harming the charitable organizations that feed those in need. Local community organizations must not be forced to choose between access to food and accepting funding to improve their work.

Mr. Bisch has responded to inquiries from the County regarding this issue to clarify that the Yolo Food Bank has the "exclusive right to solicit food donations from Feeding America affiliated donors in Yolo County and responsibility to then equitably distribute said food throughout the County." And that the Yolo Food Bank may, in turn, "choose to subcontract this work in some instances with partner nonprofits on mutually agreeable terms." But it is our understanding that the Yolo Food Bank may now be threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery programs. Such actions, if accurate, are contrary to the shared goals of redirecting edible food from the landfill to those in need, regardless of disputes we may have regarding SB 1383 requirements.

We ask that you take all steps necessary to ensure that Yolo Food Bank leadership is not responsible and, if you determine otherwise, do whatever is needed to immediately end this situation. This could include reassuring all local community partners that Yolo Food Bank will not restrict food distribution or otherwise retaliate against those accepting SB 1383 funding to improve their capacity to feed more people. The County stands ready to take any actions necessary to resolve this crisis but will not be forced to the table—to the extent that may be the underlying goal—to revisit the discretionary policy decisions already made regarding near-term SB 1383 implementation.

We would be remiss if we did not express our concern that the actions attributed to Yolo Food Bank's leadership, if true, create a serious question about their commitment to local food security and the best interests of our

---

[1] Yolo Food Bank letter to Board of Supervisors and City Councils, July 10, 2021 (available at: https://yolofoodbank.org/in-the-news/food-recovery-support-letter/).

[2] M. Bisch letter to R. Yazdani, Oct. 3, 2021; see also Anon., *New Yolo Food Bank Mission and Vision Prioritize Nutrition, Food Equity, and Resilience as Pandemic Lingers in New Year,* Davis Vanguard, Jan. 22, 2022 (quoting Michael Bisch as stating: "As a result, in 2022 we're pivoting toward investing our donors' generous contributions in the food equity work of our new mission and vision, *setting aside state-mandated activities that are the responsibility of local governments to fund and execute such as SB 1383 edible food recovery*. Yolo Food Bank must focus upon advancing the healthy outcomes that all local residents deserve, thereby increasing their quality of life.").

[3] J. Durst, *Guest Commentary: Feeding All Residents, Especially Vulnerable Children, Highest Priority,* Davis Vanguard, Sept. 20, 2021.

Board of Directors, Yolo Food Bank
Page 3

communities. We urge you to perform your own assessment as the Board of Directors and, additionally, to evaluate matters beyond the scope of the immediate controversy. While we acknowledge that the final decision is within your sound discretion, your attention to the matters described herein will assure us that Yolo Food Bank remains an essential community partner—one of a small number of non-profit organizations that the community simply cannot do without. If your priorities are instead evolving away from reliably collaborating to enhance local food security, we will evaluate increasing the role of other partners and direct funding (including ARPA funding) to those entities rather than Yolo Food Bank.

We look forward to moving past the current challenges and reaffirming our strong partnership with Yolo Food Bank. We sincerely appreciate your consideration of the concerns raised in this letter and look forward to hearing from you shortly.


Sincerely,

Angel Barajas
Chair
Yolo County Board of Supervisors

Oscar Villegas
Vice Chair
Yolo County Board of Supervisors


cc:    Board of Supervisors, Yolo County
       Chad Rinde, Interim County Administrative Officer
       Philip Pogledich, County Counsel
       Mike Webb, City Manager, City of Davis
       Aaron Laurel, City Manager, City of West Sacramento
       Kathleen Trepa, City Manager, City of Winters
       Ken Hiatt, City Manager, City of Woodland

CPRA WOODLAND 000081

**From:** Rosie Ledesma </O=WOODLAND/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS /CN=RSALAS>
**To:** Brent Meyer
**Sent:** 3/16/2022 4:37:30 PM
**Subject:** FW: For your review and comment

FYI

**From:** Rosie Ledesma
**Sent:** Monday, March 07, 2022 3:34 PM
**To:** Ken Hiatt <Ken.Hiatt@cityofwoodland.org>
**Subject:** FW: For your review and comment

See the email below from Mercy Coalition, a food recovery partner with YFB and one of the organizations W Sac had identified to fund for expanded capacity.

**From:** Goularte, Traci <tracig@cityofwestsacramento.org>
**Sent:** Monday, March 07, 2022 10:24 AM
**To:** Jennifer Gilbert <JGilbert@cityofdavis.org>; Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>
**Subject:** FW: For your review and comment

FYI

**From:** Goularte, Traci <tracig@cityofwestsacramento.org>
**Sent:** Friday, March 4, 2022 10:16 AM
**To:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Cc:** Strand, Susan <SUSANST@cityofwestsacramento.org>; Messer, Christine <christinem@cityofwestsacramento.org>
**Subject:** FW: For your review and comment
**Importance:** High

Good Morning Marissa,
We just received the email below from our only viable food recovery agency in our City. I'm at a loss! The outright unethical business practices of YCFB is shocking. What are your thoughts on how to proceed? Should I send this email to CalRecycle?

Thanks,
Traci

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Friday, March 4, 2022 10:06 AM
**To:** Strand, Susan <SUSANST@cityofwestsacramento.org>
**Cc:** Goularte, Traci <tracig@cityofwestsacramento.org>; Messer, Christine <christinem@cityofwestsacramento.org>; Aleecia Gutierrez <aleecia@frontiernet.net>
**Subject:** Re: For your review and comment

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

> **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field.

Good morning, Susan ...

Unfortunately, the Mercy Coalition is going to need to take a pause on this process for a moment. We need to re-weigh all of the implications in light of some decisions that our partners at the Yolo Food Bank have made this week. Wednesday afternoon, they made clear that they might close our access to Nugget and Raley's in their food recovery program if we failed to stand in solidarity with them. I've got a lot to explain here, but

CPRA WOODLAND 000082

shock at that threat, they made good on it less than 24 hours later and yesterday did indeed inform us that our Nugget and Raley's access was finished as of 3/1. Understand that last year we recovered 9 1/2 tons of food from Raley's and Nugget in meeting our various food commitments in the city, so that's a big loss.

My pause now has nothing to do with "winning Raley's and Nugget back." Frankly, this situation between the City/County and YFB has become so toxic that I'm not sure MC wants any part of it. At this point I'm certainly leaning towards not taking any money from either side for food recovery, which we've always done for free. All we want to do is feed needy people. If we have a contract with anyone at this point, it'll simply be for agreed pickup times and logistics. At least that's how I'm thinking this morning.

I realize this will probably light a new round of scorching chaos in this unfortunate situation. It grieves me to see it happening in a county that has always been known for such generous and healthy collaboration.

In the meantime, please don't send out this letter with reference to us. My Board and I need to get a little more clarity for ourselves on where we're going to wind up in this.

I'm sure we'll be talking soon ...

_Mercy Coalition of West Sacramento_

Connection | Strategic | Developer | Positivity | Belief

On Thu, Mar 3, 2022 at 6:00 PM Strand, Susan <SUSANST@cityofwestsacramento.org> wrote:
Hi Don,
Would you have any issue with the City sending the attached letter to West Sacramento Tier 1 Generators? We include your name and contact information as the City's partner and Mercy Coalition contact for increasing edible food recovery capacity inside of West Sacramento. This letter is particularly address to Jenn and Matt Engstrom. Of course, the other letters would be addressed to the appropriate Tier 1 Generator and all letter will be sent on City letter head.
Please let me know if you would like me to make any edits to this letter.
I hope you are well.
Regards,

**SUSAN STRAND**
**Administrative Analyst, Recycling**



1110 West Capitol Avenue
West Sacramento, CA  95691
Office:  (916) 617-4590
Mobile: (916) 439-0184
Susanst@cityofwestsacramento.org
www.westsacrecycles.org



This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including

| | |
|---|---|
| **From:** | Ken Hiatt </O=WOODLAND/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KEN HIATT0B4> |
| **To:** | 'Kate Stille' |
| **Sent:** | 3/14/2022 3:17:45 PM |
| **Subject:** | FW: For your review and comment |

Per our call... see communication below where Nugget is referenced.

**From:** Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>
**Sent:** Monday, March 07, 2022 3:34 PM
**To:** Ken Hiatt <Ken.Hiatt@cityofwoodland.org>
**Subject:** FW: For your review and comment

See the email below from Mercy Coalition, a food recovery partner with YFB and one of the organizations W Sac had identified to fund for expanded capacity.

**From:** Goularte, Traci <tracig@cityofwestsacramento.org>
**Sent:** Monday, March 07, 2022 10:24 AM
**To:** Jennifer Gilbert <JGilbert@cityofdavis.org>; Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>
**Subject:** FW: For your review and comment

FYI

**From:** Goularte, Traci <tracig@cityofwestsacramento.org>
**Sent:** Friday, March 4, 2022 10:16 AM
**To:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Cc:** Strand, Susan <SUSANST@cityofwestsacramento.org>; Messer, Christine <christinem@cityofwestsacramento.org>
**Subject:** FW: For your review and comment
**Importance:** High

Good Morning Marissa,
We just received the email below from our only viable food recovery agency in our City. I'm at a loss! The outright unethical business practices of YCFB is shocking. What are your thoughts on how to proceed? Should I send this email to CalRecycle?

Thanks,
Traci

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Friday, March 4, 2022 10:06 AM
**To:** Strand, Susan <SUSANST@cityofwestsacramento.org>
**Cc:** Goularte, Traci <tracig@cityofwestsacramento.org>; Messer, Christine <christinem@cityofwestsacramento.org>; Aleecia Gutierrez <aleecia@frontiernet.net>
**Subject:** Re: For your review and comment

| |
|---|
| **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. |

| |
|---|
| **WARNING:** The sender of this email could not be validated and may not match the person in the "From" field. |

Good morning, Susan ...

Unfortunately, the Mercy Coalition is going to need to take a pause on this process for a moment. We need to re-weigh all of the implications in light of some decisions that our partners at the Yolo Food Bank have made this week. Wednesday afternoon, they made clear that they might close our access to Nugget and Raley's in their food recovery program if we failed to stand in solidarity with them. In their own words, I was explicitly

shock at that threat, they made good on it less than 24 hours later and yesterday did indeed inform us that our Nugget and Raley's access was finished as of 5/17. Understand that last year we recovered 9 1/2 tons of food from Raley's and Nugget in meeting our various food commitments in the city, so that's a big loss.

My pause now has nothing to do with "winning Raley's and Nugget back." Frankly, this situation between the City/County and YFB has become so toxic that I'm not sure MC wants any part of it. At this point I'm certainly leaning towards not taking any money from either side for food recovery, which we've always done for free. All we want to do is feed needy people. If we have a contract with anyone at this point, it'll simply be for agreed pickup times and logistics. At least that's how I'm thinking this morning.

I realize this will probably light a new round of scorching chaos in this unfortunate situation. It grieves me to see it happening in a county that has always been known for such generous and healthy collaboration.

In the meantime, please don't send out this letter with reference to us. My Board and I need to get a little more clarity for ourselves on where we're going to wind up in this.

I'm sure we'll be talking soon ...


_Mercy Coalition of West Sacramento_



Connection | Strategic | Developer | Positivity | Belief


On Thu, Mar 3, 2022 at 6:00 PM Strand, Susan <SUSANST@cityofwestsacramento.org> wrote:
Hi Don,
Would you have any issue with the City sending the attached letter to West Sacramento Tier 1 Generators?
We include your name and contact information as the City's partner and Mercy Coalition contact for increasing edible food recovery capacity inside of West Sacramento. This letter is particularly address to Jenn and Matt Engstrom. Of course, the other letters would be addressed to the appropriate Tier 1 Generator and all letter will be sent on City letter head.
Please let me know if you would like me to make any edits to this letter.
I hope you are well.
Regards,

**SUSAN STRAND**
**Administrative Analyst, Recycling**



1110 West Capitol Avenue
West Sacramento, CA 95691
Office: (916) 617-4590
Mobile: (916) 439-0184
Susanst@cityofwestsacramento.org
www.westsacrecycles.org



This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including

attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act.

This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act. [THIS EMAIL ORIGINATED FROM OUTSIDE YOLO COUNTY. PLEASE USE CAUTION AND VALIDATE THE AUTHENTICITY OF THE EMAIL PRIOR TO CLICKING ANY LINKS OR PROVIDING ANY INFORMATION. IF YOU ARE UNSURE, PLEASE CONTACT THE HELPDESK (x5000) FOR ASSISTANCE]

This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act.

CPRA WOODLAND 000088

**From:** Jennifer Gilbert <JGilbert@cityofdavis.org>
**To:** Rosie Ledesma
**Sent:** 3/7/2022 10:41:05 AM
**Subject:** RE: Yolo Food Bank: nonprofit partner agreements

Thank you Rosie!

Wow, I'm just….stunned by the news that West Sac shared. And sickened. L

**From:** Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>
**Sent:** Monday, March 7, 2022 10:38 AM
**To:** Jennifer Gilbert <JGilbert@cityofdavis.org>; Susan Strand <susanst@cityofwestsacramento.org>; Traci
Goularte <tracig@cityofwestsacramento.org>
**Subject:** FW: Yolo Food Bank: nonprofit partner agreements

> **External email. Please verify sender before opening attachments or clicking on links.**

Here you go.

**From:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Sent:** Monday, November 16, 2020 8:52 AM
**To:** 'Jennifer Gilbert' <JGilbert@cityofdavis.org>; Rosie Ledesma <Rosie.Ledesma@cityofwoodland.org>;
'Strand, Susan' <SUSANST@cityofwestsacramento.org>; Kristine Deguerre
<Kristine.deguerre@cityofwinters.org>; 'Sue Vang' <eusvang@UCDAVIS.EDU>
**Cc:** Pamela Hedrick <Pamela.Hedrick@yolocounty.org>
**Subject:** FW: Yolo Food Bank: nonprofit partner agreements

Happy Monday Everyone!

I wanted to forward you this email in preparation for a discussion at our MAC meeting this coming Thursday. I have asked Pam to add Food Recovery to the agenda after a lengthy conversation with the Food Bank last week. What you are seeing here is their interpretation of the food rescue system throughout the county. I wanted to make sure you all got a copy to help with discussions each of us will need to have with our higher ups regarding the contractual obligation the smaller entities, such as STEAC and the UCD Pantry, already have with the Yolo Food Bank. It is their opinion, that since all these entities already funnel all their food contractually through the Food Bank, there is no competition out there and that a sole source contract should be in place between the jurisdictions and the Food Bank for us to able to comply with SB 1383. Lots to discuss…..

*Sincerely,*

*Marissa Juhler*
*Waste Reduction and Sustainability Manager*
*Yolo County Central Landfill*
*44090 County Road 28H*
*Woodland, CA 95776*
530-666-8813
Fax 530-666-8853

**From:** michael@yolofoodbank.org [mailto:michael@yolofoodbank.org]
**Sent:** Friday, November 13, 2020 5:01 PM
**To:** Marissa Juhler
**Subject:** Yolo Food Bank: nonprofit partner agreements

Hi Marissa,

Thanks for setting aside so much time for me today. Feeding America food banks have exclusive regional

**From:** Goularte, Traci <tracig@cityofwestsacramento.org>
**To:** Jennifer Gilbert; Rosie Ledesma
**Sent:** 3/7/2022 10:23:52 AM
**Subject:** FW: For your review and comment

FYI

**From:** Goularte, Traci <tracig@cityofwestsacramento.org>
**Sent:** Friday, March 4, 2022 10:16 AM
**To:** Marissa Juhler <Marissa.Juhler@yolocounty.org>
**Cc:** Strand, Susan <SUSANST@cityofwestsacramento.org>; Messer, Christine
<christinem@cityofwestsacramento.org>
**Subject:** FW: For your review and comment
**Importance:** High

Good Morning Marissa,
We just received the email below from our only viable food recovery agency in our City. I'm at a loss! The
outright unethical business practices of YCFB is shocking. What are your thoughts on how to proceed? Should
I send this email to CalRecycle?

Thanks,
Traci

**From:** Don Bosley <don@wsmercycoalition.org>
**Sent:** Friday, March 4, 2022 10:06 AM
**To:** Strand, Susan <SUSANST@cityofwestsacramento.org>
**Cc:** Goularte, Traci <tracig@cityofwestsacramento.org>; Messer, Christine
<christinem@cityofwestsacramento.org>; Aleecia Gutierrez <aleecia@frontiernet.net>
**Subject:** Re: For your review and comment

| CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. |
|---|

| WARNING: The sender of this email could not be validated and may not match the person in the "From" field. |
|---|

Good morning, Susan ...

Unfortunately, the Mercy Coalition is going to need to take a pause on this process for a moment. We need to
re-weigh all of the implications in light of some decisions that our partners at the Yolo Food Bank have made
this week. Wednesday afternoon, they made clear that they might close our access to Nugget and Raley's in
their food recovery program if we failed to stand in solidarity with them, in their words. When I expressed my
shock at that threat, they made good on it less than 24 hours later and yesterday did indeed inform us that our
Nugget and Raley's access was finished as of 3/17. Understand that last year we recovered 9 1/2 tons of food
from Raley's and Nugget in meeting our various food commitments in the city, so that's a big loss.

My pause now has nothing to do with "winning Raley's and Nugget back." Frankly, this situation between the
City/County and YFB has become so toxic that I'm not sure MC wants any part of it. At this point I'm certainly
leaning towards not taking any money from either side for food recovery, which we've always done for free. All
we want to do is feed needy people. If we have a contract with anyone at this point, it'll simply be for agreed
pickup times and logistics. At least that's how I'm thinking this morning.

I realize this will probably light a new round of scorching chaos in this unfortunate situation. It grieves me to see
it happening in a county that has always been known for such generous and healthy collaboration.

In the meantime, please don't send out this letter with reference to us. My Board and I need to get a little more
clarity for ourselves on where we're going to wind up in this.

I'm sure we'll be talking soon ...

CPRA WOODLAND 000218

*Don Bosley*
*Executive Director*
*Mercy Coalition of West Sacramento*
*P.O. Box 2060*
*West Sacramento CA 95691*
*916.997.6332*
*He/Him/His*


*Connection | Strategic | Developer | Positivity | Belief*


On Thu, Mar 3, 2022 at 6:00 PM Strand, Susan <SUSANST@cityofwestsacramento.org> wrote:
Hi Don,
Would you have any issue with the City sending the attached letter to West Sacramento Tier 1 Generators?
We include your name and contact information as the City's partner and Mercy Coalition contact for increasing edible food recovery capacity inside of West Sacramento.  This letter is particularly address to Jenn and Matt Engstrom.  Of course, the other letters would be addressed to the appropriate Tier 1 Generator and all letter will be sent on City letter head.
Please let me know if you would like me to make any edits to this letter.
I hope you are well.
Regards,

**SUSAN STRAND**
**Administrative Analyst, Recycling**



1110 West Capitol Avenue
West Sacramento, CA  95691
Office:  (916) 617-4590
Mobile: (916) 439-0184
Susanst@cityofwestsacramento.org
www.westsacrecycles.org



This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act.
This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act. [THIS EMAIL ORIGINATED FROM OUTSIDE YOLO COUNTY. PLEASE USE CAUTION AND VALIDATE THE AUTHENTICITY OF THE EMAIL PRIOR TO CLICKING ANY LINKS OR PROVIDING ANY INFORMATION. IF YOU ARE UNSURE, PLEASE CONTACT THE HELPDESK (x5000) FOR ASSISTANCE]
This message may contain confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, re-transmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this email in error, and delete the copy you received. The sender does not accept liability for any errors or omissions in the contents of this

message, which arise as a result of e-mail transmission. E-mail correspondence with the City, including attachments, may be subject to the California Public Records Act, and as such may be subject to public disclosure unless otherwise exempt by the Act.

CPRA WOODLAND 000220