UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL BISCH,

Plaintiff,

v.

COUNTY of YOLO, et al.,

Defendants.

No.  2:23-cv-00455-DC-SCR

ORDER AND

FINDINGS AND RECOMMENDATIONS

(Redacted for Public Docketing)

Plaintiff Michael Bisch is the former executive director of the Yolo Food Bank ("YFB"). He alleges the defendants—municipal entities within Yolo County, their chief administrators, and certain of their elected officials—unlawfully acted to silence him and cause his firing in response to his efforts to ensure a new state law concerning food waste and food insecurity was properly implemented.  Plaintiff asserts both federal constitutional claims and state law claims. Defendants' Motion to Dismiss (ECF No. 39) seeks dismissal of Plaintiff's federal claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Defendants' Motion to Strike (ECF No. 40) seeks to strike Plaintiff's state law claims under California's "Anti-SLAPP" statute.  District Judge Coggins referred the motions to the undersigned for the issuance of findings and recommendations.  ECF No. 64.  The undersigned also addresses a pending request to seal related to the Motion to Strike.  ECF No. 49.  The undersigned now recommends that both the Motion to Dismiss and the Motion to Strike be granted in part and denied in part.

1

I.      **Background and Procedural History**

A.  **New Legislation on Food Waste and Food Security**

In September 2016, California Senate Bill ("SB") 1383 was signed into law.  ECF No. 1 ¶ 21.  According to Plaintiff, "[i]n addition to establishing organic waste repurposing targets for California, the law and related State regulations established a number of public food assistance mandates," which Plaintiff refers to as "Food Assistance Mandates."[1]  *Id*.  The Food Assistance Mandates went into effect in 2022 and require local jurisdictions to develop programs "to collect and distribute food for human consumption."  *Id*.  The Food Assistance Mandates are a "pathway for dramatically reducing food insecurity[.]."  *Id*. ¶ 22.  The implementation of SB 1383 in Yolo County forms the backdrop for this lawsuit, which Plaintiff filed on March 10, 2023.

B.  **Plaintiff's Complaint**

Plaintiff sues Yolo County, a Yolo County Administrator (Chad Rinde), and three members of the Yolo County Board of Supervisors (Angel Barajas, Oscar Villegas, and Don Saylor); the cities of West Sacramento, Davis, and Woodland, and their respective city managers (Aaron Laurel, Michael Webb, and Ken Hiatt); and several "Doe Defendants" (collectively, "Defendants").  ECF No. 1 ¶¶ 3-14.  The undersigned will refer to Yolo County and the defendant cities collectively as the "Government Entity Defendants."  The undersigned will refer to the Yolo County Supervisors, the County administrator, and the city managers collectively as the "Individual Defendants."

Plaintiff broadly alleges that the Government Entity Defendants have "jointly operated a countywide solid waste management enterprise," referred to by Plaintiff as the "Yolo SWM Enterprise."  *Id*. ¶ 20.  The Yolo SWM Enterprise "appeared to circumvent … the Food Assistance Mandates [of SB 1383] by executing what is believed to be a multi-year alleged scheme" involving initial concealment of the existence of the Food Assistance Mandates from the public and local officials; secret lobbying of state officials to delay, rescind, or otherwise weaken the Food Assistance Mandates; public misrepresentations about the Food Assistance Mandates;

---

[1] Defendants refer to the Food Assistance Mandates as the Edible Food Recovery Program.  ECF No. 40-1 at 8.  Plaintiff appears to recognize the terms as interchangeable.  ECF No. 1 ¶ 21.

2

"pursui[t] of a 'box checking' strategy with no actual intent of achieving the Food Assistance Mandates targets"; inappropriate pressure on YFB for benefits and services at below market value and/or below service cost; and covering up their actions, and attempting to silence Plaintiff in reaction to his efforts to shed light on these other actions. *Id*. ¶ 22.

### 1. Factual Allegations

Beginning in or around January 2018, Plaintiff began serving as interim executive director for YFB. He later became the executive director. *Id*. ¶ 26. "Beginning in June 2019, YFB executive staff led by Plaintiff Bisch began meeting with officials of the governmental entity Defendants (i.e., the Yolo SWM Enterprise described above) to propose a collaborative process for developing a Food Assistance Mandates compliant, countywide edible food recovery and distribution program." *Id*. ¶ 27. Plaintiff alleges that representatives of the Government Entity Defendants "made it generally clear that they were resistant to complying with the Food Assistance Mandates and resistant to collaborating with YFB because" those entities "were not willing to create a funding mechanism for the Food Assistance Mandates" as allegedly required by state law. *Id*. Plaintiff provides various examples from 2019 that allegedly illustrate such resistance. *Id*. Plaintiff also alleges that the Government Entity Defendants "were secretly lobbying the state legislature and regulators … to delay or rescind the Food Assistance Mandates." *Id*.

Plaintiff alleges that by September 2019, he was "speaking publicly on issues related to the Food Assistance Mandates[,]" including at a statewide CalRecycle conference. *Id*. ¶ 28. At that conference he "truthfully and in good faith informed the attendees that it appeared to him that the Defendant entities were not taking any action at all" to implement the Food Assistance Mandates. *Id*. The Government Entity Defendants "became aware of Plaintiff's public statements about their conduct." *Id*.

Over the course of 2020, YFB worked to promote the implementation of the Food Assistance Mandates without the support of the Government Entity Defendants. *Id*. ¶ 29. By December 2020 the Government Entity Defendants "began what appeared to … be a public disinformation campaign regarding the Food Assistance Mandates, appearing to circulate false

and/or misleading information[.]" *Id.* ¶ 30.  These developments were "highly concerning to Plaintiff Bisch, the YFB executive staff, and the YFB Board," who "believed in good faith that they had to speak up and fight against the disinformation campaign which the Defendant governmental entities appeared to have launched, and did so accordingly." *Id.*

Around March 2021, Plaintiff "learned of a renewed effort by Defendant governmental entities … to lobby the state legislature to delay, defund, and ultimately rescind the Food Assistance Mandates." *Id.* ¶ 31.  And by or around May or June 2021, the Government Entity Defendants "had developed several strategies for evading the Food Assistance Mandates," which allegedly included making false statements about (1) available surplus food, (2) agreements with food recovery organizations, and (3) the focus of SB 1383.  *Id.* ¶ 32.  "During this time, Plaintiff Bisch reasonably believed, and believes now, that these were knowingly and/or recklessly false statements made by government officials in violation of rules and regulations governing their conduct." *Id.*

Plaintiff "reported repeatedly" to the Government Entity Defendants that "efforts to circumvent the Food Assistance Mandates were failing." *Id.* ¶ 33.  In return, Plaintiff and YFB staff "were repeatedly harassed and retaliated against by the Defendants[.]"  The alleged harassment included "numerous instances of public and private accusations misrepresenting and or [sic] berating the actions and/or positions" of Plaintiff and YFB staff.  *Id.*  These included a statement by a defendant in a private phone call with Plaintiff stating that Plaintiff was making an improper "money grab" in his Food Assistance Mandates advocacy, unwelcome statements made by a defendant Yolo County Supervisor and an alleged proxy of Defendants in public meetings, and sustained attempts to push YFB to accept an "untenable funding proposal," including a letter dated September 27, 2021 from the Government Entity Defendants to YFB demanding that YFB re-allocate $1.4 million of YFB funding received from the State to meet local Food Assistance Mandates.  *Id.*  Plaintiff alleges that due to this "undue pressure and retaliatory behavior by the Defendant governmental entities and their agents," the YFB Board of Directors (the "YFB Board") pressured Plaintiff "to stop speaking publicly to government agencies or third parties" about Defendants' compliance with the Food Assistance Mandates.  *Id.*  For example, at a

November 4, 2021 meeting between YFB Board Members, a Yolo County official, and Plaintiff, Plaintiff "was cautioned about his communications with the community[.]" *Id.*

Plaintiff reported the Yolo SWM Enterprise's noncompliance with the Food Assistance Mandates to CalRecycle on three separate occasions in the period of February to April 2022. *Id.* ¶ 34. Plaintiff reported the same to the Yolo SWM Enterprise itself twice during that period. *Id.* Plaintiff also shared his concerns with the YFB board, certain YFB staff, certain community stakeholders, and the Sacramento Business Journal. *Id.*

During the first quarter of 2022, Plaintiff and YFB executive staff "believed that the Yolo SWM Enterprise and/or governmental Defendant entities appeared to be taking steps which interfered directly with YFB's mission-critical contractual arrangements with its nonprofit partners and indirectly with YFB food and fund donors and ultimately targeted Plaintiff Bisch[.]" *Id.* ¶ 35. For example, certain Defendants and other officials allegedly met on March 11, 2022 "to discuss" Plaintiff's "public advocacy on the Food Assistance Mandates and whistleblower activities." *Id.* At this meeting, a defendant allegedly falsely stated that Plaintiff had extorted a West Sacramento-based non-profit organization, Mercy Coalition—and repeated that statement in an email to Plaintiff later that day. *Id.* The officials at the March 11, 2022 meeting allegedly agreed "to reach out to their respective Yolo County supervisor(s) to silence and put pressure on Plaintiff Bisch." *Id.* Certain Defendants also made accusations against Plaintiff to the regional food bank overseeing YFB and to the Feeding America headquarters. *Id.*

On March 18, 2022, Defendant Rinde emailed a "formal letter" from the Yolo County Board of Supervisors to Plaintiff and the YFB Board, threatening to redirect American Rescue Plan Act of 2021 ("ARPA") funding from YFB to other local nonprofits (the "March 18 Letter"). *Id.* Plaintiff alleges this letter was "also speaking for and in direct coordination with the municipal Defendants who had been urging Defendant YOLO and coordinating with Defendant YOLO to muzzle, silence, or force the ouster of Plaintiff Bisch." *Id.* On March 24, 2022, the YFB Board chairperson called Plaintiff and said something to the effect of, "Staff needs to ease off on" Food Assistance Mandates for the sake of funding. *Id.* On March 30, 2022, the interim Health and Human Services Agency director for Yolo County told Plaintiff the Yolo Board of

Supervisors was not prepared to release certain funding to YFB pending a response to their March 18, 2022 letter. *Id*. On April 22, 2022, the YFB Board responded to the March 18, 2022 letter, stating that Plaintiff was being replaced as the "primary liaison" between YFB and the Yolo SWM Enterprise. *Id*.

On April 27, 2022, during a YFB Board meeting, three YFB Board members stated they had received calls that day from Defendant Yolo County Supervisors Barajas and Villegas "demanding 'retribution' against Bisch" and a YFB staff member who had also been reporting complaints about implementation of the Food Assistance Mandates. *Id*.[2] At that YFB Board meeting, the YFB Board chairperson made a statement to the effect of YFB's "continuing employment of Plaintiff Bisch" and the other staff member being "no longer tenable." *Id*.

On May 31, 2022, the YFB Board terminated Plaintiff's employment, citing as a "primary reason" that Yolo County officials "were upset with Plaintiff Bisch's 'communications.'" *Id*. ¶ 36. Two weeks after Plaintiff's termination, Defendant Yolo County signed the "stalled" grant agreement with YFB, leading to the release of the funds that Yolo County had previously withheld. *Id*. ¶¶ 37-38. A few months later, Yolo County approved additional funding from the same source for YFB. *Id*. ¶ 40. After Plaintiff's termination, a City of Davis Councilmember allegedly commented to Plaintiff something to the effect of, "if you hadn't said anything [about the Food Assistance Mandates], you'd still have a job, right? After all, that's the only source of conflict for you." *Id*. ¶ 39.

### 2.  Causes of Action

Plaintiff asserts the following causes of action, each against all Defendants: (1) retaliation in violation of the First Amendment, (2) violation of due process through interference with employment, (3) tortious interference with contractual relations, and (4) defamation and

---

[2] As discussed in analysis of the Motion to Strike below, a transcript from the meeting at which statements concerning retribution were made does not clearly support the claim that Barajas demanded "retribution" against Plaintiff and does not mention Villegas and "retribution" at all. *See infra*, Section III.D.3.a.iii. However, the Court credits that allegation for purposes of the Motion to Dismiss analysis.

defamation per se.  ECF No. 1 ¶¶ 42-81.  Plaintiff seeks various categories of damages, prejudgment interest, and reasonable attorneys' fees and costs.  *Id*. at 64-65.

### C. Litigation History

Plaintiff filed an action against YFB and YFB Board Members in Yolo County Superior Court on August 17, 2022.  *See Michael Bisch v. Yolo Food Bank, et al.,* Case No. CV2022-1431.  Plaintiff filed this federal court action on March 10, 2023.  Defendants first filed a motion to dismiss and a motion to strike on May 16, 2023.  District Judge England initially took those motions under submission.  On October 20, 2023, after staying this action pending resolution of a discovery dispute in Plaintiff's related state court case, District Judge England denied the motion to dismiss and motion to strike without prejudice to refiling "after the stay in this matter is lifted."  ECF No. 22.  On June 24, 2024, the Judge England lifted the stay and set a further schedule for the litigation of this action.

On October 3, 2024, Defendants filed the instant Motion to Dismiss and Motion to Strike ("MTS").  Judge England ordered those motions submitted without argument.[3]  ECF No. 41.  Due to Judge England's retirement, this action was then transferred to District Judge Coggins.  ECF No. 43.  After receiving extensions of time to file opposition and reply briefs, the briefing on the instant motions was completed on January 10, 2025.  ECF Nos. 53 & 54.  On August 1, 2025, Judge Coggins referred the instant motions to the undersigned for the issuance of findings and recommendations in accordance with 28 U.S.C. § 636(b)(1)(B) and (C).

On September 22, 2025, Plaintiff petitioned for a writ of mandamus from the Ninth Circuit Court of Appeals directing this Court to enter default against all Defendants and to vacate the current scheduling order.  Case No. 25-5958, Doc. No. 1 at 5-6 (9th Cir.).  On October 23, 2025, the Ninth Circuit denied the petition "without prejudice to the filing of a mandamus petition if the district court does not rule on the pending motions within 60 days."  ECF No. 66 (9th Cir.

---

[3] Plaintiff briefly argues that Defendants should be sanctioned for refiling the same MTS without considering new evidence that Plaintiff developed and presented after the original MTS was dismissed without prejudice. ECF No. 50 at 22. However, the Court permitted the refiling of the MTS, ECF No. 22, and while some of Plaintiff's newly-developed evidence is relevant to the analysis, it hardly shows that the MTS violates Rule 11(b). In any event, Plaintiff's request for sanctions was not presented pursuant to a properly noticed motion. No sanctions should issue.

Order).  However, on the same day that the Ninth Circuit denied the mandamus petition, Plaintiff sought leave from this Court to file supplemental exhibits from Plaintiff's related state court trial in opposition to the pending MTS.  ECF Nos. 65.  Judge Coggins referred that motion to file supplemental exhibits, which Defendants opposed, to the undersigned.  ECF Nos. 67, 68.

On November 6, 2025, the undersigned heard Plaintiff's motion for leave to file supplemental exhibits.  ECF No. 71.  At the hearing, the undersigned raised a concern that such a filing would delay the adjudication of the MTS.  In response, Plaintiff's counsel disclaimed any intent to refile a petition for writ of mandamus should the instant motions remain unresolved after the 60 days identified in the Ninth Circuit's order.  On November 7, 2025, the undersigned granted in part and denied in part Plaintiff's motion, allowing Plaintiff the opportunity to file a limited category of exhibits and transcripts from the state court trial.  ECF No. 72.  On November 17, 2025, Plaintiff filed a supplemental brief with supplemental exhibits.  ECF No. 73. Defendants filed a reply on November 24, 2025.  ECF No. 74.

## II.     Motion to Dismiss

### A.  Legal Standards for a Motion to Dismiss under Rule 12(b)(6)

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true all well-pleaded factual allegations in the complaint and construes the allegations in the light most favorable to the plaintiff.  *Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1086 (9th Cir. 2020).  However, the court need not assume the truth of legal conclusions cast in

the form of factual allegations. *Paulsen v. CNF, Inc.*, 559 F.3d 1061, 1071 (9th Cir. 2009). While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the ... laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

### B. Analysis

#### 1. First Amendment Retaliation (First Cause of Action)

The parties dispute how Plaintiff's First Amendment retaliation claim should be characterized and, therefore, what substantive legal standard applies. Defendants argue that it is a public employment-based retaliation claim or, alternatively, a claim where government officials' alleged unlawful pressure transforms the actions of a private entity—here, YFB—into state action. Plaintiff argues that his claim is best evaluated as a generic First Amendment retaliation claim.

The Court declines to apply public employee retaliation doctrine. Plaintiff was the executive director of a private nonprofit organization, not an employee of a municipal entity. Plaintiff does not allege that YFB or its Board of Directors engaged in state action. Accordingly, Defendants' authority concerning the legal test for retaliation in the public employment context does not apply. ECF No. 39-1 at 3 (citing *Hyland v. Wonder*, 117 F.3d 405 (9th Cir. 1997), which concerned the alleged retaliatory dismissal of a volunteer juvenile probation officer who worked for the City and County of San Francisco).[4]

The Court also declines to apply the coercion-or-significant-encouragement doctrine

---

[4] Unless otherwise noted, the ECF page citations to documents in the record are to the ECF auto-generated page numbers at the top of each document.

articulated in *Blum v. Yaretsky*, 457 U.S. 991 (1982).  That doctrine furnishes one of the tests for determining when a private entity like YFB is subject to constitutional limitations.  A private entity is "not ordinarily constrained by the First Amendment."  *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019).  However, that changes when the private entity is coerced or significantly encouraged by the government to such a degree that its choice of actions "must in law be deemed to be that of the State."  *Blum*, 457 U.S. at 1004.  While Plaintiff alleges that Defendants—all government actors—pressured YFB to muzzle his speech and terminate him, Plaintiff is not suing YFB in this action but instead is suing Defendants for their own allegedly retaliatory conduct.[5]  Accordingly, because YFB is not a party in this case, the Court need not determine whether *its* actions were constrained by the U.S. Constitution, by application of *Blum*'s coercion or significant encouragement standard.

The Court instead applies the generic retaliation standard to Plaintiff's allegations against Defendants to determine if Plaintiff states a First Amendment retaliation claim.  The elements of such a claim in the Ninth Circuit are (1) the plaintiff engaged in constitutionally protected activity; (2) "as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action."  *Mulligan v. Nichols*, 835 F.3d 983, 988 (9th Cir. 2016) (quoting *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010)).  Assuming these elements are established, "a plaintiff need only show that the defendant 'intended to interfere' with the plaintiff's First Amendment rights and that it suffered some injury as a result; the plaintiff is not required to demonstrate that its speech was actually suppressed or inhibited."  *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*,

---

[5] In suggesting that the *Blum* framework applies, Defendants cite *German v. Fox*, 267 Fed. Appx. 231 (4th Cir. 2008).  As in the instant case, *German* concerned allegations that the plaintiff's protected speech led to his firing.  However, *German* is otherwise materially distinguishable.  The plaintiff in *German* sued his former employer, a private nonprofit entity; several other private individuals; and a single government official.  Given this array of defendants, it was necessary for the court to determine—using the *Blum* framework—whether the private entity defendants could be sued as state actors.  In the instant case, there are no private entity defendants, making state action analysis unnecessary.  Moreover, it is not clear whether the plaintiff in *German* argued that the broader generic retaliation framework applied to the actions of the government official.

824 F.3d 858, 867 (9th Cir. 2016).  There is no question that Plaintiff engaged in constitutionally protected activity concerning the implementation of SB 1383.  The Court accordingly focuses on the second and third elements.

Plaintiff's allegations about a defamatory pressure campaign, which included threats to withhold funding from the organization that he headed, sufficiently alleges adverse action as to Defendants Barajas, Villegas, Saylor, Rinde, and Yolo County.  ECF No. 1 ¶ 33-34.  As explained below, Defendants cannot be liable for retaliation for their speech alone, and only Barajas, Villegas, Saylor, Rinde, and Yolo County are plausibly alleged to have been sufficiently involved in threatening to withhold funding to push the allegations into the territory where a person of ordinary firmness would have been chilled.

Plaintiff asserts, "[i]t should be undisputed that the prospect of losing a job in a small city and/or county like Yolo would chill the First Amendment activities of a person of ordinary firmness."  ECF No. 51 at 17.  But the case law presents a more complicated picture.  The Ninth Circuit has repeatedly found that, without more, disparaging speech by government officials— even when such speech leads to the loss of employment—is insufficiently adverse to establish a claim for unconstitutional retaliation.  *See Mulligan*, 835 F.3d at 989 ("we have set a high bar when analyzing whether speech by government officials is sufficiently adverse to give rise to a First Amendment retaliation claim").  The Ninth Circuit reviewed this doctrine in *Mulligan*:

> In *Gini v. Las Vegas Metropolitan Police Department*, 40 F.3d 1041, 1043-44 (9th Cir. 1994), the plaintiff alleged that she had lost her federal job as a result of allegedly defamatory statements made by a city police officer to her federal superiors following her filing of an Internal Affairs complaint.  We affirmed the dismissal of her retaliation claim against the city.  *Id*. at 1045. We noted that an act of defamation by government officials was insufficient to create a right to a remedy under the First Amendment in the absence of "state action affecting [a plaintiff's] rights, benefits, relationship or status with the state." *Id*.  Similarly, in *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998), which involved a claim by a police officer against his government employer, we held that "[m]ere threats and harsh words" are not ordinarily sufficient to constitute an adverse employment action for purposes of a First Amendment claim.  As we stated in *Nunez*, "[i]t would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation." *Id.*

*Mulligan*, 835 F.3d at 989.  *Mulligan* distinguished such reputationally harmful speech from other types of speech and action that are sufficiently adverse.  "[A]dverse retaliatory actions" are

11

normally "exercise[s] of governmental power that are *regulatory, proscriptive, or compulsory* in nature and have *the effect of punishing someone* for his or her speech." *Id.* at 988 (emphasis added) (citations and quotations omitted). For example, in *Mendocino Envt'l Cntr. v. Mendocino City*, 192 F.3d 1283, 1289-91, 1302-03 (9th Cir. 1999), the government action was sufficiently adverse where police officers made false accusations against environmental activists, leading to arrests and search warrants. As *Mulligan* noted, "That was speech that did more than simply damage the plaintiffs' reputation, it also intimated that punishment would imminently follow." *Mulligan*, 835 F.3d at 990.

*Mulligan* itself involved a claim that the City of Los Angeles and the Los Angeles Police Protective League "chilled his right to speak freely by engaging in speech of their own that significantly damaged his reputation and ultimately caused him to lose his job." *Id.* at 988-89. The Ninth Circuit found the "accusations and media leaks by the LAPPL and its leadership are not enough to demonstrate a constitutional violation." *Id.* at 989. Such speech by the defendants did not involve a "decision" or "state action" affecting Mulligan's "rights, benefits, relationship or status with the state[,]" or "a valuable governmental benefit or privilege." *Id.* (citations and quotations omitted). "Although Mulligan's reputation was undoubtedly damaged by the increased media attention, which eventually resulted in the loss of his job, such reputational harm is not actionable under § 1983 unless it is accompanied by some more tangible interests." *Id.* (citations and quotations omitted).

In the face of this authority, Plaintiff relies on *Addison v. City of Baker City*, 258 F.Supp.3d 1207, 1216-19 (D. Or. 2017), which concerned a years' long campaign against the plaintiff by a police department, including issuing a stalking complaint against him, which a court dismissed; adding his name added to a dispatch watchlist, which in turn led to numerous police stops and warnings; and the police chief informing the plaintiff's new employer about his past encounters with law enforcement, while failing to disclose the dismissal of the stalking complaint. As a result, the plaintiff was fired from his new job. In declining to grant summary judgment in favor of the defendants, the district court in *Addison* relied on Ninth Circuit's statement in *Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003), "that there is not 'an exclusive,

12

category-based limitation on the kind of retaliatory action that is actionable under the First Amendment,'" and noted that *Coszalter* "does not allow the government 'to take severe retaliatory actions—such as ... engaging in campaigns of harassment and humiliation—because those actions do not result in the loss of a valuable governmental benefit or privilege.'" *Id*. at 1222 (quoting *Costzalter*, 320 F.3d at 975-76).

Neither *Addison*'s analysis, nor the general principle from *Costzalter* on which it rests, demonstrate that Defendants' allegedly defamatory speech was sufficiently adverse—standing alone—to chill a person of ordinary firmness, even though it led to Plaintiff's firing.  The speech that Plaintiff alleges Defendants engaged in—expressing grave concern about Plaintiff's positions and actions to the YFB Board and calling for "retribution"—fall far short of the severity of the coercive law enforcement conduct and speech in *Addison*.  Moreover, *Addison* simply recognizes the unremarkable proposition that "[i]nformal measures, such as the threat of invoking *legal sanctions* and other means of *coercion, persuasion, and intimidation*, can violate the First Amendment also."  258 F.Supp.3d at 1222 (emphasis added) (citations and quotations omitted).  But Plaintiff has not pleaded facts showing retaliatory speech that rises to anything like the threat of legal sanctions or other formally coercive speech.[6]

Accordingly, if all Defendants had allegedly done was bad mouth Plaintiff to the YFB Board, Plaintiff's retaliation claim would be subject to dismissal.  However, the alleged campaign by Defendants included threats to withhold critical funding to YFB.  Those threats to withhold funding push Defendants' own speech and action over the line of being sufficiently adverse. "Even if Defendants are otherwise entitled to withhold a benefit or impose conditions on it, they may not do so as a means of retaliating to deter disfavored speech." *Am. Ass'n of Univ. Professors v. Trump*, 2025 WL 3187762, at *15 (N.D. Cal. Nov. 15, 2025).  The Supreme Court has repeatedly condemned the withholding of funding in order to suppress speech as a special harm to the First Amendment. *See Perry v. Sindermann,* 408 U.S. 593595-97 (1972) (finding a non-tenured professor's "lack of a contractual or tenure right to re-employment," to be

---

[6] Moreover, as Defendants properly note, Plaintiff's "opposition disclaims that [Yolo] County, or any other Defendant, controlled YFB so as to command his discharge."  ECF No. 53 at 3.

13

"immaterial" to the First Amendment analysis where officials declined to offer a new contract in response to protected speech and issued a press statement describing the professor's "insubordination"); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998) (explaining that the government may generally elect to subsidize some speakers over others, but "even in the provision of subsidies, the Government may not ai[m] at the suppression of dangerous ideas") (citation and quotation omitted).  Accordingly, a public entity "may not retaliate against a person by depriving him of a valuable government benefit that that person previously enjoyed, conditioning receipt of a government benefit on a promise to limit speech, or refusing to grant a benefit on the basis of speech." *Ariz. Students' Ass'n*, 824 F.3d at 869.  Plaintiff alleges that Defendants' campaign of derogatory speech against him included threats to withhold funding from YFB, the organization that he led at the time.  These allegations that Defendants withheld funding from YFB in an attempt to get him fired move the allegations in this case beyond the pure speech allegations that were insufficiently adverse in *Mulligan, Gini, and Nunez*. Accordingly, Plaintiff plausibly alleges that Defendants' speech and action was sufficiently adverse so as to chill a person of ordinary firmness.

Plaintiff has also *generally* alleged a substantial causal relationship between his protected speech and Defendants' retaliatory campaign.  The Ninth Circuit has identified three categories of facts or circumstances that a plaintiff may rely on to establish causation: (i) the temporal proximity of the retaliation and protected conduct, (ii) expressed opposition to the speech, or (iii) facts to demonstrate that the explanations were pretextual.  *See Coszalter*, 320 F.3d at 975-77 (9th Cir. 2003).  Plaintiff alleges that Defendants' campaign against him began as his criticism of Defendants' implementation of SB 1383 sharpened in 2021 and early 2022.  For example, Plaintiff alleges that on February 11, 2022, he emailed CalRecyle officials and informed them that the Yolo SWM Enterprise was "significantly underestimating the total amount of edible food generated in Yolo County," copying Defendants Webb, Hiatt, and Rinde on the email.  ECF No. 1 ¶ 34.  Plaintiff alleges that Defendants began to "harass[]" him in the summer of 2021, and later escalated their attacks in the form of the March 2022 Letter and communications to pressure YFB Board Members to fire Plaintiff.  ECF No. 1 ¶¶ 33-35.  This temporal proximity is sufficient in

14

the context of the contentious implementation of SB 1383 to generally demonstrate causation, for purposes of determining whether this claim may proceed.

However, Defendants argue that necessary causation facts are missing as to Defendants Rinde, Laurel, Hiatt, Saylor, and Webb, as well as West Sacramento, Davis, and Woodland. ECF No. 39 at 2. In effect, Defendants assert that these particular Defendants have not been adequately linked to the alleged retaliation. Again, to establish the causation element of a First Amendment retaliation claim, a Plaintiff must show "a substantial causal relationship between the constitutionally protected activity and the adverse action." *Mulligan*, 835 F.3d at 988. More broadly, §1983 requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. *See Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976). A plaintiff may demonstrate that connection by alleging facts showing: (1) a defendant's "personal involvement in the constitutional deprivation," or (2) that a defendant set "in motion a series of acts by others" or "knowingly refus[ed] to terminate a series of acts by others, which [the defendant] knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011) (quotation marks and citation omitted).

The specific actions allegedly taken by Rinde, Laurel, Hiatt, and Webb in the retaliatory campaign are relatively few.[7] **Rinde (Interim/Acting Yolo County Administrator)**: Plaintiff

---

[7] Many of the hundreds of references to each of the Individual Defendants in the Complaint take the form of broad allegations that they all acted together in concert to this or that end. *See, e.g.*, ECF No. 1 ¶ 36 ("Beginning mid-March 2022, various efforts by the … individual Defendants, specifically, including but not limited to Defendants ANGEL BARAJAS, OSCAR VILLEGAS, DONALD SAYLOR, CHAD RINDE, AARON LAUREL, KEN HIATT, and MICHAEL WEBB, to pressure the YFB Board to terminate Plaintiff Bisch's employment ensued and ultimately proved successful on May 31, 2022."). In presenting the case this way, Plaintiff approaches the line of an impermissible shotgun pleading. *See Sollberger v. Wachovia Secs., LLC*, No. SACV 09-0766 AG (ANx), 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010) ("Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff's allegations. … One common type of shotgun pleading comes in cases with multiple defendants where the plaintiff uses the omnibus term "Defendants" throughout a complaint by grouping defendants together without identifying what the particular defendants specifically did wrong.").

15

alleges Rinde disseminated "various outrageous accusations" against Plaintiff "to third party entities and individuals," including statements that YFB is "possibly terminating or threatening to terminate access to food" for other food recovery agencies. ECF No. 1 ¶ 35.k. Plaintiff also alleges Rinde emailed the March 18 2022 letter to the YFB Board and participated in delaying "a previously scheduled [ARPA] grant agreement meeting" on March 30. *Id.* ¶¶ 35.n, q. **Laurel (West Sacramento City Manager)**: Plaintiff alleges that Laurel made false statements at a meeting of municipal officials on March 11 "accusing Plaintiff Bisch of extorting a West Sacramento nonprofit (i.e. the Mercy Coalition[])," copied Hiatt on an email to Plaintiff accusing him of the same, and informed YFB Board Member Dan Ramos on a phone call that Plaintiff "cut-off" food supplies to Mercy Coalition. *Id.* ¶¶ 35.b, c, f. **Hiatt (Woodland City Manager):** Plaintiff alleges Hiatt informed YFB Board Member Kate Stille on a phone call something to the effect of Plaintiff cutting-off food supplies to Mercy Coalition. *Id.* ¶ 35.f. **Webb (Davis City Manager):** Plaintiff alleges that Webb informed YFB Board Member Ramos on a phone call something to the effect of Plaintiff cutting-off food supplies to Mercy Coalition.[8] *Id.* ¶ 35.f.

Defendants note that Plaintiff's allegations demonstrate that the YFB Board stood behind Plaintiff through most of Defendants' alleged campaign against him, and only moved to terminate him after calls made by Defendants Barajas and Villegas on April 27, 2022 demanding "retribution." Defendants are correct that Laurel, Hiatt, and Webb, as well as West Sacramento, Davis, and Woodland are insufficiently tied to the adverse action. None of them were alleged to have been directly involved in threatening to withhold ARPA funding from YFB. As described above, this is the key alleged fact nudging Plaintiff's claim into territory where the speech of a person of ordinary firmness would have been chilled. While Laurel, Hiatt, and Webb are alleged to have said negative things about Plaintiff to YFB Board Members Ramos and Stille, such speech is not sufficiently adverse to show unconstitutional retaliation. As a result, the undersigned will recommend that the retaliation claim against Laurel, Hiatt, and Webb, as well as against the cities they administered—West Sacramento, Davis, and Woodland—be dismissed.

---

[8] Plaintiff also alleges that in July 2021, Webb accused Plaintiff (to Hiatt) "of some kind of improper 'money grab' in his Food Assistance Mandates advocacy[.]" ECF No. 1 ¶ 33.

The remaining Individual Defendants are sufficiently linked to the threats to withhold ARPA funding.  Plaintiff alleges that Rinde emailed the March 18 2022 letter to the YFB Board that threatened to withhold ARPA funding and delayed an ARPA grant meeting with YFB on March 30, 2022.  Plaintiff alleges that Defendant Saylor, a Yolo County Supervisor, threatened to withhold funding during a call with a YFB Board Member in March 2022 "until YFB addresses the problem of Plaintiff Bisch."  ECF No 1 ¶ 35.l.  The allegations also clearly connect Barajas and Villegas to the threat to withhold ARPA funding.  In short, Plaintiff states a claim for retaliation against Barajas, Villegas, Saylor, and Yolo County, the entity they represented as Supervisors.

## 2.  Due Process (Second Cause of Action)

Plaintiff is pursuing both procedural and substantive due process theories.  Given that Plaintiff was employed and then discharged by a private non-profit organization, that his First Amendment retaliation claim subsumes any stigma-plus claim, and that Plaintiff has not been prevented from practicing his profession, Plaintiff does not plausibly state a claim under either theory.

### a.  Procedural Due Process

Defendants characterize Plaintiff's procedural due process claim as "vacuous."  ECF No. 53 at 5.  The undersigned largely agrees.  As Defendants' note, "Bisch expressly denies qualifying as a *de facto* public employee."  *Id*. at 3 (citing ECF No. 51 at 13).  Nor has Plaintiff alleged facts showing that he could only be terminated for cause.  *See Bd. of Regents v. Roth,* 408 U.S. 564 (1972) (holding that at-will employment negates a protected property interest in continued employment).  Accordingly, Plaintiff has not plausibly alleged a protected property interest in his job, depriving his claim of a necessary element.  *See Krainski v. State ex rel. Bd. of Regents*, 616 F.3d 963, 970 (9th Cir. 2010) ("A procedural due process claim has two elements: deprivation of a constitutionally protected liberty or property interest and denial of adequate procedural protection.").

Plaintiff relies exclusively on *Merritt v. Mackey*, 827 F.2d 1368 (9th Cir. 1987), to support his procedural due process claim.  However, as Defendants persuasively argue, *Merritt* is

17

materially distinguishable, at a minimum because the plaintiff in that case could only be terminated for cause and because the defendants in that case had made his firing an express requirement of government funding.  By contrast, Plaintiff has not alleged that he could only be terminated for cause, and he has not alleged that Defendants expressly demanded his termination. *See* ECF No. 1 ¶ 36 (alleging that the March 18 Letter "impl[ied] that Bisch should be fired in order for YFB to get the awaited funding").  Plaintiff has not stated a procedural due process claim.

### b.  Substantive Due Process

Plaintiff alleges that Defendants violated his substantive due process right to liberty—the liberty at issue being his ability to work as a non-profit executive director.  As a threshold matter, Plaintiff's substantive due process claim—which is premised on the same alleged campaign to impugn Plaintiff and pressure YFB to terminate him as his First Amendment retaliation claim— should be dismissed because it is redundant to that retaliation claim.  "In this case, because the First Amendment explicitly covers [Plaintiff's] claim, the First Amendment, not the Fourteenth Amendment's guarantee of substantive due process, should guide the analysis of [Plaintiff's] claims." *Hufford v. McEnaney*, 249 F.3d 1142, 1151 (9th Cir. 2001) (citation and quotations omitted).  The *Addison* case that Plaintiff relies on with respect to retaliation adopted this very reasoning to dismiss the plaintiff's substantive due process claim.  *See Addison*, F.Supp.3d at 1235 (finding that a plaintiff "cannot 'double up' constitutional claims" and that that "is precisely what Addison seeks to do—his substantive due process claim is based on the same conduct as is his First Amendment retaliation claim") (quoting *Ramirez v. Butte–Silver Bow Cty.*, 298 F.3d 1022, 1029 (9th Cir. 2002), *aff'd sub nom. Groh v. Ramirez*, 540 U.S. 551 (2004)).

Plaintiff attempts to distinguish *Hufford* based on its facts.  In *Hufford*, the retaliation and substantive due process claims were based on the plaintiff's termination after reporting the existence of hardcore pornography on a fire station's computers.  Plaintiff notes that in *Hufford*, unlike in his case, there was no allegation of "moral turpitude" against the plaintiff.  ECF No. 51 at 23.  But Plaintiff does not explain why that distinction matters in determining whether the rule described in *Hufford* applies.  It is not the severity of the alleged unconstitutional misconduct that

18

determines whether a substantive due process claim remains actionable.  All that matters is that alleged misconduct is also pled and actionable as retaliation.

Even if Plaintiff's substantive due process claim could proceed despite sharing a nexus with his retaliation claim, Plaintiff does not plausibly allege a substantive due process violation. Plaintiff asserts two closely-related substantive due process theories: (1) that Defendants' defamatory campaign meets the "stigma-plus" standard, and (2) Defendants deprived him of being able to practice his profession as a non-profit executive director.

A "stigma plus" claim requires deprivation of an underlying property or liberty interest.[9] *Siegert v. Gilley*, 500 U.S. 226, 233 (1991); *Paul v. Davis*, 424 U.S. 693, 701, 710-712 (1976) ("defamatory publications, however seriously they may have harmed respondent's reputation, did not deprive him of any 'liberty' or 'property' protected by due process").  Plaintiff has not plausibly alleged that he has lost the liberty to work as a non-profit executive director.  He alleges that the damage to his reputation from Defendants' actions harm his chances to obtain similar future employment.  But a stigma plus claim requires more.  *See Paul*, 424 U.S. at 708-712 (noting that reputational damage alone is insufficient and a plaintiff must instead show deprivation of a legal right, such as revocation of a previously held license); *Blantz v. Cal. Dep't of Corrections and Rehabilitation*, 727 F.3d 917, 925 (9th Cir. 2013) (affirming dismissal of nurse's due process claim based on negative professional references because "stigmatizing statements do not deprive a worker of liberty unless they effectively bar her from *all* employment in her field") (emphasis in original); *see also Krainski*, 616 F.3d at 971 (granting qualified immunity and deeming general complaints about "impaired future employment opportunities" and "loss of liberty" insufficient to show due process violation in context of university disciplinary process).

---

[9] Defendants point out that courts typically consider a stigma plus claim to be an aspect of procedural due process.  *See Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 997-98 (9th Cir. 2007), aff'd on other grounds 128 S. Ct. 2146.  However, the doctrinal borders here are hazy.  A stigma plus claim would turn on similar questions to a claim for destruction of the right to practice a particular profession, which is clearly a creature of substantive due process. Accordingly, the Court analyzes the two theories together under the substantive due process banner.

Similarly, a claim that a plaintiff has been deprived of the liberty to practice a profession generally requires some regulatory action by the government, such as the revocation of a license. *See Conn v. Gabbert*, 526 U.S. 286, 292-293 (1999) (holding that interruption of lawyer's representation through execution of a search warrant did not interfere with lawyer's right to pursue profession, as only "a complete prohibition of the right to engage in a calling" would be actionable). As Defendants point out, there is no licensing scheme for non-profit leadership. Moreover, Plaintiff's substantive due process theory is particularly tenuous where Defendants are not alleged to have publicized—beyond their own circle of government officials—any of the allegedly stigmatizing statements about him (i.e., that he "extorted" other non-profit organizations). Plaintiff has not plausibly alleged that Defendants' actions will prevent him from obtaining work again as a non-profit leader.

### 3. Qualified Immunity

The Individual Defendants argue they are entitled to qualified immunity. The undersigned is recommending that Plaintiff's retaliation claim be dismissed against Laurel, Hiatt, and Webb, as well as West Sacramento, Davis, and Woodland, and that his due process claim be dismissed as to all Defendants. Accordingly, the Court will only consider whether Barajas, Villegas, Saylor, and Rinde should be granted qualified immunity as to Plaintiff's First Amendment retaliation claim. They argue they are entitled to qualified immunity because in the First Amendment context the right to private employment was not clearly established at the time of the events in question, and a reasonable official could have believed that Plaintiff spoke purely in his capacity as Yolo Food Bank's executive director.

An official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his or her] shoes would have understood that he [or she] was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in the light of pre-existing law, the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation and quotation omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Furthermore,

20

"general statements of the law are not inherently incapable of giving fair and clear warning, and in [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Id.* at 741 (citations and quotations omitted).

Defendants argue that "no controlling Supreme Court or Ninth Circuit opinion embraced First Amendment retaliation liability for loss of private employment due to speech by government officials in response to a private citizen's accusations of their misconduct." ECF No. 53 at 8. Plaintiff does not meaningfully rebut this argument, citing authority concerning free speech generally and mine-run retaliation cases involving retaliatory law enforcement investigations or arrests, none of which adequately establishes the precise right at issue here. However, crediting Plaintiff's specific allegations for purposes of qualified immunity analysis, it should have been clear to Barajas, Villegas, Saylor, and Rinde that it violates the First Amendment to engage in a sustained defamatory campaign while withholding funding in an attempt to cause the termination of a private employee, in retaliation for that employee's protected speech. Despite the line of cases examined in *Mulligan*, it should have been clear to them that going beyond mere speech, to action including the withholding of funding to YFB, would violate the First Amendment. Indeed, the Ninth Circuit recognized decades earlier in *Coszalter*, that severe campaigns of harassment can be the basis of a § 1983 claim for First Amendment retaliation. *See* 320 F.3d at 975-76; *see also Aydelotte v. Town of Skykomish*, 757 F.App'x 582, 583 (9th Cir. 2018) ("The [district] court failed to view the facts in the light most favorable to Aydelotte, as it was required to do on summary judgment. Moreover, it considered each incident of harassing behavior separately in its qualified immunity analysis, as opposed to assessing whether Aydelotte's right to be free from a campaign of harassment and humiliation in retaliation for his speech was clearly established.") (citations and quotations omitted). Moreover, it was clearly established within the Ninth Circuit at the relevant time that government officials "may not retaliate against a person by …. conditioning receipt of a government benefit on a promise to limit speech, or refusing to grant a benefit on the basis of speech." *Ariz. Students' Ass'n*, 824 F.3d at 869. At this early stage in the case, Barajas, Villegas, Saylor, and Rinde are not entitled to qualified immunity.

21

III.    **Anti-SLAPP Motion to Strike**

A.  **Legal Standards**

A strategic lawsuit against public participation ("SLAPP") seeks to chill or punish a party's exercise of constitutional rights to free speech or to petition the government for redress of grievances. *See Rusheen v. Cohen*, 37 Cal.4th 1048, 1055-1056 (2006). The California legislature enacted Code of Civil Procedure § 425.16 ("the Anti-SLAPP statute"), to provide a procedural remedy to quickly dispose of lawsuits brought to chill the valid exercise of those constitutional rights. *Id.* These provisions apply to SLAPPs brought against public entities and public employees. *See San Ramon Valley Fire Prot. Dist. v. Contra Costa County Employees' Ret. Ass'n*, 125 Cal.App.4th 343, 353 (2004) ("We have no doubt that a public official or government body, just like any private litigant, may make an anti-SLAPP motion where appropriate."). A federal court can adjudicate a special motion to strike under California's Anti-SLAPP statute as to state law claims. *See Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 890 F.3d 828, 834-35 (9th Cir. 2018) ("*Planned Parenthood*").

In considering an Anti-SLAPP motion, courts engage in a two-step analytical process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity … If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." *Taus v. Loftus*, 40 Cal.4th 683, 712 (2007). The defendant has the burden on the first prong of this analysis to show that the claim arises from protected activity, and the plaintiff has the burden on the second prong of affirmatively demonstrating a probability of prevailing on the claim. *See Governor Gray Davis Com. v. American Taxpayers Alliance*, 102 Cal.App.4th 449, 457-60 (2002).

On the first prong, "a court must decide whether a plaintiff's claim arises from any act 'in furtherance of the person's right of petition or free speech,' Cal. Civ. Proc. Code § 425.16(b)(1), which necessarily involves reviewing the 'content' and 'context' of the factual allegations in a plaintiff's complaint." *Gopher Media LLC v. Melone*, 154 F.4th 696, 712 (9th Cir. 2025) (en banc) (quoting *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133, 149 (2019)). "The only

22

means specified in section 425.16 by which a moving defendant can satisfy the 'arising from' requirement is to demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e)" of § 425.16. *Park v. Board of Trustees of California State University*, 2 Cal.5th 1057, 1063 (2017). Subdivision (e) defines acts "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" to include any written or oral statements: (1) made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) statements in a place open to the public or a public forum in connection with an issue of public interest; or (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. Cal. Code Civ. Proc. § 425.16(e). In determining whether the defendant has met its threshold showing that the cause of action arises from protected activity, the focus "is not the form of the plaintiff's cause of action but, rather, the defendant's activity that gives rise to his or her asserted liability, and whether that activity constitutes protected speech or petitioning." *Navellier v. Sletten*, 29 Cal.4th 82, 92 (2002).

On the second prong, "the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Navellier*, 29 Cal.4th at 89 (cleaned up). If the plaintiff cannot demonstrate a probability of prevailing on the claim, the cause of action is stricken, and attorney's fees and costs are assessed against the plaintiff. *See* Cal. Code Civ. Proc. § 425.16(c).

Federal courts review Anti-SLAPP "motions to strike under different standards depending on the motion's basis." *Planned Parenthood*, 890 F.3d at 834. "[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated. [O]n the other hand, when an anti-SLAPP motion to strike challenges the factual sufficiency of a

23

claim, then the Federal Rule of Civil Procedure 56 standard will apply.  But in such a case, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court." *Id*. at 834-35.

### B.  The Court Will Treat the MTS as a Factual Challenge

The parties have briefed the MTS both as to the allegations in the Complaint and the evidence they submitted.  While the parties refer to certain facts "as pleaded," Defendants nonetheless raise a factual challenge as to Plaintiff's two state law claims.  "[W]hen an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply.  But in such a case, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court." *Planned Parenthood*, 890 F.3d at 834-35.  While Plaintiff has elsewhere challenged the lack of formal discovery in this case, *see* Case No. 25-5958 (9th Cir.) (Petition for Writ of Mandamus), Plaintiff has now had the opportunity to supplement the record with evidence from the extensive discovery in his state court case, the trial record from that case, and the results of California Public Record Act requests.  Defendants also produced over 14,000 pages of discovery to Plaintiff between March and May 2025, ECF No. 55-1 ¶ 6, though Plaintiff has not sought to supplement the MTS record with documents from those productions.  Plaintiff's MTS briefing did not request the opportunity to engage in additional discovery.

Plaintiff argues that "because Defendants challenge both the legal sufficiency and factual sufficiency of Plaintiff's claims … the Court must apply both standards [Rule 12(b)(6) and Rule 56] at the same time for the different parts of Defendants' Motion to Strike." ECF No. 5 at 21.  However, Plaintiff does not explain what it would mean to apply both standards to different parts of the Motion to Strike, and the Court will not seek to do so.  It would be a waste of judicial resources for the Court to first examine Plaintiff's state law claims as pleaded in the Complaint only to then immediately examine them on the entire record.  The Court accordingly will approach the MTS as a factual challenge on the full record presented by the parties.

### C.  Parties' Factual Contentions

The parties present a significant evidentiary record as to the MTS, which now includes

supplemental exhibits from Plaintiff's state court trial.  The Court begins by describing the parties' factual contentions based on that evidence.

### 1.  Defendants' Factual Contentions

Defendants rely on both the allegations in Plaintiff's complaint and their own evidence presented through exhibits and declarations.  Defendants note that Plaintiff alleges various instances beginning in May or June 2021 when the Edible Food Recovery Plan was under consideration by one or more of the Government Entity Defendants.  ECF No. 40-1 at 15.  On October 12, 2021, the Yolo County Board of Supervisors met and considered the County's food recovery options under SB 1383.  ECF No. 9-6 (Ex. H to Villegas Decl.); ECF No. 9-2 (Barajas Decl. ¶ 2.)[10]  Each of the cities also took legislative action by agreeing to a funding proposal concerning food recovery for 2021.  *See* ECF No. 9-3 (Juhler Decl. ¶ 2.)[11]

Defendants also present evidence that on March 4, 2022, Mercy Coalition's executive director, Don Bosley, reported to officials from the City of West Sacramento that YFB "made clear that they might close our access to Nugget and Raley's in their food recovery program if we failed to stand in solidarity with them, in their words."  *Id.* (Ex. C to Juhler Decl.); *see also* ECF No. 9-4 (Ex. F to Bosley Decl.)  This "threat" caused "shock" and YFB "made good on it less than 24 hours later," cutting off Mercy Coalition's access to those two grocery chains for food recovery purposes.  ECF No. 9-4 (Ex. F to Bosley Decl.)  Thus, Mercy Coalition did not pursue a SB 1383 contract with Yolo County and its partners.  Bosley confirmed this information to a Yolo County official, Marisa Juhler, who in turn communicated that information from Bosley to another Yolo County official.  Soon thereafter, on March 9, 2022, Jim Durst, the manager of a local food pantry in Esparto and a YFB Board Member, emailed Juhler that his food pantry could not pursue a SB 1383 contract with Yolo County because such contract would jeopardize his food pantry's existing agreement with YFB.  *See* ECF No. 9-3 (Ex. D to Juhler Decl.)

---

[10]  The parties at times cite to declarations and exhibits put in the record when the MTS was first filed in 2023, as with the citation here.  Although the Court denied that MTS without prejudice, the declarations and exhibits remain in the record and may properly be cited, even if largely redundant to declarations and exhibits filed in relation to the instant MTS.

[11]  Juhler's declaration includes two consecutive paragraphs marked "2."  The citation here is to the second, ECF No. 9-3 at 2:11-13.

After learning of this information, Defendant Rinde emailed Plaintiff on March 16, 2022, relaying that Yolo County staff had heard YFB was "possibly terminating or threatening to terminate access to food for those food recovery agencies that may opt-in to accept funding from the County and cities" and requesting copies of the YFB contracts with the local pantries in order to determine what about accepting County funding would jeopardize the agreements with YFB. ECF No. 9-5 (Ex. G to Rinde Decl.)  On March 17, 2022, Rinde followed up with Plaintiff and inquired whether "YFB [was] terminating or threatening to terminate subcontracts with partner nonprofits who consider or accept funding from the County related to expansion of the edible food recovery program." *Id.*  Plaintiff responded on March 18, 2022 that Rinde's email was "inaccurate," but provided no substantive explanation. *Id.*

On March 18, 2022, Defendants Yolo Board of Supervisors Chair Angel Barajas and Vice Chair Oscar Villegas signed a letter addressed to YFB to apprise YFB's Board of the information received from the local food pantries.  Their March 18 Letter also requested that YFB review the issue. *See* ECF No. 9-2 (Ex. A to Barajas Decl.)  In mid-March 2022, Supervisor Villegas contacted YFB Board Member Daniel Ramos and expressed concerns about the lack of cooperation between YFB and Yolo County and its partners on SB 1383 implementation and its impact on the smaller food pantries.  ECF No.  9-6 (Villegas Decl. ¶ 6.)

On April 27, 2022, Supervisor Barajas received an email from Tico Zendejas, Executive Director of RISE, Inc., which operates a food pantry, forwarding an email from YFB informing Zendejas that YFB would be cancelling holiday food baskets to RISE.  ECF No. 9-2 (Ex. B to Barajas Decl.)  Supervisor Barajas and Zendejas spoke about the cancellation of the food basket program and how it would impact hundreds of families in Yolo County's rural communities. *Id.* (Barajas Decl. ¶ 5.)  Barajas contacted YFB Board Member Tom Muller the same day to ask if he was aware of YFB's cancellation. *Id.* (Barajas Decl. ¶ 6.)  A couple of weeks later, Barajas received a voice mail indicating that the holiday food baskets were "not going to end" and stating that the YFB Board had been shocked by the holiday food basket cancellation. *Id*.

### 2.  Plaintiff's Factual Contentions

Plaintiff contends that Defendants' "summary of facts is erroneous on multiple fronts."

26

ECF No. 50 at 11.  In fact, as discussed at some length below, *infra* Section III.D.3, Plaintiff exaggerates and mischaracterizes much of the evidence.  However, the Court nonetheless notes his factual contentions here.

Plaintiff highlights communications on March 4 and March 18, 2022 made by non-party officials from the City of West Sacramento alleging YFB and Plaintiff were engaging in "unethical" practices regarding Mercy Coalition.  ECF No. 40-5 (Ex. C to Juhler Decl.); ECF No. 50-2 (Ex. 5 to Singh Decl.)

Plaintiff also highlights Bosley's representation that Defendant Villegas made hostile statements about Plaintiff ("completely driven by 'greed' and 'a power grab'") prior to the March 18 Letter that Villegas and Barajas sent the to the YFB Board.  *See* ECF No. 14-2 (Ex. 2 to Singh Decl. at BOSLEY000221.)  Bosley also testified that on March 4, 2022, Villegas shared with him that "The County Board of Supervisors are all livid with Michael Bisch." ECF No. 50-2 (Bosley Depo Tr. at 191:9-13.)  Bosley believed, based on his conversations with Villegas, that the County viewed Bisch negatively because of their prior "battles around SB 1383." ECF No. 50 at 14:7-8 (Bosley Depo Tr. at 177:12-178:11.)

Plaintiff also highlights his email exchange with West Sacramento City Manager Laurel. When Plaintiff inquired about the status of ARPA funding on March 11, 2022, Laurel responded, "Yes, I would like an explanation for why YFB has attempted to extort one of our local service providers." ECF No. 50-1 (Bisch Decl. ¶ 24(d)); *id.* (Ex. 14 to Bisch Decl.) (Laurel stating, "it's not about SB 1383. It's about … Mercy Coalition[.]")  Plaintiff states that Laurel was also a friend of Bosley, accepted Bosley's narrative, but never reached out to talk with Bisch or YFB's program manager for their version of events.  ECF No. 50 at 14:15-16 (citing Bosley Depo Tr. at 152:20-153:24; Bisch Decl. at ¶ 23; Hatfield Decl. at ¶ 19.)

Plaintiff also highlights emails obtained through California Public Records Act requests to show that a purported "narrative among governmental officials" about Plaintiff "being unethical began to and continued to circulate." *Id.* at 14:18-19 (citing Singh Decl. ¶¶ 5-7, 9-11, Exs. 5-10.) In particular, Plaintiff characterizes these emails as revealing "a plan to use the pressure of withheld funding to YFB to pressure action against Bisch." *Id.* at 14:23-24 (citing Singh Decl. ¶

27

5; Ex. 4.)  Plaintiff states in his declaration that on or about March 14, 2022, Laurel informed YFB Director Ramos that Plaintiff had engaged in improper threats.  *Id.* at 14:25-27 (citing Bisch Decl. ¶ 26(a).)  Plaintiff also states that on or about March 14, 2022, pursuant to statements made by YFB Board Member Kate Stille to Plaintiff, Defendant Hiatt called Stille and informed her that Plaintiff had engaged in improper threats and forwarded her an email thread from Bosley about those threats.  *Id.* at 14:27-28; 15:1-2 (citing Bisch Decl. ¶ 26(c), Singh Ex. 4 at CPRA WOODLAND000086.)[12]

Plaintiff contends that certain Defendants continued their "campaign against YFB executives using private back channels to" YFB Board Members.  *Id.* at 16:19-20.  In an April 27, 2022 meeting, YFB Board Chairman Muller purportedly acknowledged to the YFB Board and Plaintiff that the Yolo County Supervisors were seeking "retribution," which Plaintiff characterizes as being "consistent with the threats made in the March 18, 2022 letter."  *Id.* at 16:20-22 (citing Complaint at ¶ 35(u); Bisch Decl. ¶ 26(f)-(k); Hatfield Decl. ¶ 23; Singh Ex. 3, Zoom Video Tr. at 13:20-14:15).  In the same meeting, Muller purportedly concluded that the YFB Board likely has to terminate Plaintiff and YFB's Program Director.  *Id.* at 16:23-24 (citing Bisch Decl. at ¶¶ 26(g)-(k); Singh Ex. 3, Zoom Video Tr. at 4:3-5:14, 8:25-9:12, 12:7-15, 13:20-14:9, 18:16-19, 19:14-24.)

Finally, Plaintiff argues that after his termination from YFB, Defendants sent purportedly congratulatory emails to one another.  *Id.* at 18:10-11 (citing Singh Decl. ¶ 7; Singh Ex. 6.)

### 3.  Supplemental Evidence and Briefs

With leave of court, on November 17, 2025, Plaintiff filed supplemental evidence from his state court trial, as well as supplemental argument on the MTS.  The Court engages more fully with this supplemental evidence in the analysis section below, but summarizes it here.

---

[12]  Plaintiff persistently draws connections between the alleged private interests of YFB Board Members and certain Defendants, insinuating some sort of corrupt motive.  *See*, e.g., ECF No. 50 at 15-16.  None of this is particularly relevant to analysis of the character of the communications for purposes of Anti-SLAPP analysis, so long as Defendants' communications also concern a public issue.

### a. Privileged Status of the March 18 Letter

Some of that evidence concerns the question of whether the March 18 Letter from Defendants Villegas and Barajas to the YFB Board is a privileged communication. Plaintiff's counsel's declaration states that the state court transcript shows a "ruling on the March 18, 2022 letter that it is not an official proceeding when [the state court] denied Defendants' common interest privilege defense for defamation." ECF No. 73-1 at ¶ 14. The relevant transcript excerpt reads as follows:

> MS. COTTER: Your Honor, did you -- we did raise the official proceeding privilege to the entire April 22nd, 2022, given that the official proceeding privilege applies to any governmental proceeding, and this letter is an inquiry from the county. And under the case law, even an inquiry which could lead to further inquiries can be considered an official –
>
> THE COURT: Even informal -- see, that inquiry didn't come from the Board of Supervisors. It came from two supervisors.
>
> MS. COTTER: Okay.
>
> THE COURT: So I'm finding that it's not an official proceeding. That's the order.

ECF No. 73-1 at 115 (Singh Supplemental Ex. 9, Rulings on Mtn. for Nonsuit Tr. at 3:3-15). While the transcript does not reference the March 18 Letter, and instead references another date, April 22,[13] in context the state court's ruling apparently did concern the status of the March 18 Letter.

Defendants argue this line of argument is misplaced because they "did not raise an official privilege argument in the anti-SLAPP motion." ECF No. 74 at 1. Instead, they note that their speech arose under Code of Civil Procedure §§ 425.16(e)(2) and (e)(4), for statements "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." *Id*. at 2 (quoting ECF 40-1 at 15). They also contend that they did not invoke the absolute privilege for statements in "an official proceeding" under Civil Code § 47(b), but rather the "common interest privilege" under Civil

---

[13] From other evidence in the record, the Court understands that April 22 was the date the YFB Board responded to the March 18 Letter. YFB's trial counsel may have confused the two dates.

29

Code § 47(c).[14] *Id.* Thus, Defendants argue, "the state court's ruling denying YFB's argument for official proceeding privilege" is "irrelevant" to the MTS. *Id.*

Even if the official proceeding privilege were at issue, Defendants contend there is a "lack of privity" between YFB and Defendants in the instant action. *Id.* at 3. As a result, issue preclusion does not bind this Court to adopt the state court's position. *See id.*

### b. Trial Evidence and Jury Verdicts

Plaintiff also submitted verdict forms from his state court trial, transcripts of the testimony of certain witnesses from the trial, and certain trial exhibits. Plaintiff argues that the jury verdict has preclusive effect in this case. ECF No. 73 at 5. To summarize Plaintiff's argument, both the state trial and the pending MTS in the instant case "focus on whether Plaintiff Bisch improperly threatened Mercy Coalition in March of 2022." *Id.* As Plaintiff notes, "[t]he jury found this claim not substantially true, and Defendants' defense here rests on this identical claim." *Id.* (citing ECF No. 50 (Opposition to MTS) at 13, 22-23, 30; Singh Supp. Ex. 1 at Section IV-B, questions 1a, 2, 3, 4, 5.)

As to the verdict forms, Defendants argue they are not preclusive because there is a lack of privity between the defendants in the state court case and Defendants in the instant case. ECF No. 74 at 3. Defendants also argue that some of Plaintiff's supplemental exhibits support Defendants' arguments in the MTS. *Id.* at 4.

### D. Analysis of the Motion to Strike

#### 1. Preclusion Does Not Apply to Issues Litigated During the State Court Trial

Plaintiff's supplemental briefing argues that issue preclusion applies to certain issues decided in his Yolo County Superior Court trial against YFB and YFB Board Members. ECF No. 73 at 2-3. Federal courts apply state law to determine the preclusive effect of a state court judgment. *White v. City of Pasadena*, 671 F.3d 918, 926 (9th Cir. 2012). Under California law,

---

[14] Defendants' brief cites to "Civil Code § 47c(b)" and "Civil Code § 47c(c)." However, Civil Code § 47c is not an actual statute. Based on context, it is clear Defendants intended to cite to paragraphs within Civil Code § 47.

30

issue preclusion applies under the following circumstances: "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." *Samara v. Matar*, 5 Cal. 5th 322, 327 (2018). On the present record, Plaintiff has not shown privity between the defendants in the state court trial (YFB and YFB Board Members) and Defendants in the instant action.

Privity exists when a non-party "controlled an action in cooperation with others" and had a "proprietary or financial interest" in the challenged conduct. *Kerner v. Superior Court*, 206 Cal. App. 4th 84, 126 (2012). Plaintiff draws a number of connections between the actions of the defendants in the state court matter and Defendants in the instant action. ECF No. 73 at 4. However, Plaintiff fails to show either that Defendants in the instant action "controlled" the actions of YFB or had a "proprietary or financial interest" in Plaintiff being terminated or defamed. The fact that some of the state court defendants had personal relationships with certain Defendants in the instant action, or that the state court defendants and Defendants here may have shared concerns about certain matters of food policy (e.g., YFB's stance as to Mercy Coalition's direct access to food sources or YFB's discontinuation of holiday baskets) does not—without more—establish privity. Absent privity, issue preclusion does not apply. However, the Court nonetheless evaluates the impact of the state court judgment and the state court evidence on the substantive Anti-SLAPP analysis below.

### 2. Defendants' Protected Speech

Defendants claim their speech falls into two Anti-SLAPP statutory categories: speech made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, Code Civ. Proc. § 425.16(e)(2); and any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest, Code Civ. Proc. § 425.16(e)(4). ECF No. 40-1 at 15. Defendants have adequately shown that they engaged in protected speech under either provision.

Defendants note that they engaged in legislative consideration of compliance with SB

1383 and of "entering into funding agreements with local nonprofits" in 2021. ECF No. 40-1 at 16. The implementation of this legislative agenda, by Plaintiff's own account, was an important public issue. *Id.* at 16-17. Beyond speech made in connection with SB 1383 as a legislative matter, Defendants argue that the concerns articulated by the Individual Defendants regarding Mercy Coalition's ability to collect food waste and RISE, Inc.'s ability to distribute holiday food baskets were public issues.[15] *Id*. at 17. Defendants also assert that the general operation of the Edible Food Recovery Program was a public issue. *See Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995) ("Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'").

Plaintiff disagrees, contending that "the purported free speech Defendants present as a basis for their anti-SLAPP motion were in fact malicious statements made in bad faith as part of an organized, improper, non-public government intervention in a private dispute between two non-profits over their contractual obligations in which one of the executive directors had private and/or personal relationships with elected government officials." ECF No. 50 at 9. But these points are better directed to Defendants' intent—the province of the second prong of Anti-SLAPP analysis—and do not refute the proposition that Defendants were engaged in protected speech in the first place. After all, in a free speech dispute, the challenger often believes that the speaker is acting in bad faith, but that belief does not preemptively disqualify the contested speech from protection.

More specifically, Plaintiff argues that Defendants' pressure campaign was not based on speech about SB 1383, but rather on "(i) the private dispute between two nonprofits, Mercy Coalition and YFB, (ii) the threat to withhold ARPA funding from YFB if YFB's executive staff was not held accountable for said dispute, or (iii) the proposed reduction in donated turkeys at certain Thanksgiving sites for which Plaintiff Bisch was targeted and chastised." ECF No. 50 at 12. In other words, as Plaintiff argues, Defendants' "improper pressure … was not focused on

[15] Defendants argue that when Plaintiff "placed in jeopardy the Edible Food Recovery Program" in Yolo County, "the Yolo Entities spoke up – calling for the YFB Board to investigate and take necessary action." ECF No. 40-1 at 8. As Defendants see it, they "used speech" to call on YFB "to look critically at its actions," and such speech is protected by the First Amendment. *Id*.

32

publicly debated SB 1383 issues, but instead was focused on a private contractual relationship between YFB and Mercy Coalition as two independent nonprofits, and YFB's private internal decision to reduce a turkey donation program and ultimately on Bisch's employment." ECF No. 50 at 12:14-16 (citing Hatfield Decl. ¶¶ 15-19, 20-23; Bisch Decl. ¶¶ 19-23, 24-26.).

Plaintiff's attempt to characterize all of this as purely private is unavailing, as both the Mercy Coalition controversy and the holiday food basket controversy involved the affected non-profits complaining directly to public officials. Defendants were understandably concerned about these developments, which affected not only the complaining non-profits but also their constituents. YFB's interactions with Mery Coalition and decision to cancel holiday food baskets were matters of public interest.[16] They did not cease to be matters of public interest even though the relevant communications were private. *See Averill v. Superior Court*, 42 Cal.App.4th 1170, 1174-76 (1996) (holding that the Legislature had not "intended to exclude private conversations from protection under the [Anti-SLAPP] statute, in part because "the stated purpose of the statute, which includes protection of not only the constitutional right to 'petition for the redress of grievances,' but the broader constitutional right of freedom of speech"); *Wilcox v. Superior Court*, 27 Cal.App.4th 809, 814-15, 820 (1994) (holding the Anti-SLAPP statute applies to private communications, in that case a memorandum circulated among court reporters that invited participation in a lawsuit attacking exclusive contracts with insurance companies).

Having reviewed "the 'content' and 'context' of the" applicable facts," *Gopher Media LLC v. Melone*, 154 F.4th at 712, it is clear Plaintiff's claim arose from Defendants' acts "in furtherance of [their] right of petition or free speech," Cal. Civ. Proc. Code § 425.16(b)(1). Defendants have made their threshold showing that the challenged conduct arose from protected communication.

---

[16] Plaintiff is also incorrect in arguing that that Bosley's correspondence in March 2022 was "about a private partnership dispute between YFB and Mercy Coalition" and did not implicate "public discourse on SB 1383." ECF 50 at 13. Bosley stated that YFB's push for "solidarity" specifically related to SB 1383 implementation. SB 1383 implementation was thus apparently intertwined with YFB's stance towards Mercy Coalition.

**3. Plaintiff's Showing as to Each State Law Claim**

    **a. Tortious Interference with Contractual Relations (Third Cause of Action)**

The elements of tortious interference with contractual relations are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *See Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal.5th 1130, 1141 (2020). "It is generally not necessary that the defendant's conduct be wrongful apart from the interference with the contract itself." *Id*. However, "to state a claim for interference with an *at-will contract* by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act." *Id*. at 1148 (emphasis added). The crux of the analysis below is whether Plaintiff has sufficiently shown (1) an independently wrongful act and (2) that Defendants' intentional acts were designed to induce a breach or disruption of his contractual relationship.

    **i.    Applicability of Common Interest Privilege**

Defendants make what in effect is a threshold argument that, if successful, would preclude Plaintiff's claim for tortious interference: That Plaintiff's tortious interference claim is based on communications protected by the "common interest privilege" under Civil Code § 47(c). Section 47(c) recognizes as privileged, "communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." Cal. Civ. Code § 47(c). *See, e.g., Deaile v. General Telephone Co. of Cal.*, 40 Cal.App.3d 841, 849 (1974) (communications among management regarding whether an employee breached his responsibilities or employment are afforded privileges under § 47); *Vackar v. Package Machinery Co.*, 841 F.Supp. 310, 315 (N.D. Cal. 1993) (content and discussion by management of interviews pertaining to complaints of sexual harassment were found privileged under § 47). Defendants argue that their communications about YFB's "interference with the Edible Food Recovery

34

Program by and between employees and elected officials of the Yolo Entities qualify as common interest communications." ECF No. 40-1 at 20.  If the "common interest" privilege of § 47(c)(2) applies, Plaintiff must show malice, which Defendants note involves "a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy, or injure another person." *Id*. (citing *Brown v. Kelly Broadcasting Co*., 48 Cal.3d 711, 723 (1989)).

On the current record, Defendants have not shown that the common interest privilege applies to their communications about YFB's dispute with Mercy Coalition and decision to discontinue holiday food aid.  Paradigmatic common interest cases involve communications within an organization. *See, e.g., Deaile*, 40 Cal.App.3d at 849; *Vackar,* 841 F.Supp. at 315.  Other common interest cases involve an express agreement by individuals or organizations who share a common interest, as when lawyers from different firms sign a common interest agreement to maintain privilege over communications related to pre-litigation investigation of potential claims.  Here, the communications at issue involved elected officials, municipal administrators, and YFB's staff and Board Members.  Plaintiff's evidence shows that the interests of multiple of these individuals were often in tension.  Moreover, there is nothing in the record to indicate that all of them agreed in advance that they shared a common interest in communicating about YFB's alleged actions.  The common interest privilege does not apply, and the Court accordingly need not determine whether Plaintiff has shown malice in the context of privilege analysis.

### ii.    Independently Wrongful Act

Defendants persuasively argue that the record shows that Plaintiff was an at-will employee of YFB in 2022. ECF No. 54 at 6.  Accordingly, Plaintiff must, in addition to the other elements of tortious interference, demonstrate Defendants engaged in an independently wrongful act. *See Ixchel Pharma, LLC*, 9 Cal.5th at 1148.  "An act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id*. at 1142.  Plaintiff argues that the violations of Plaintiff's First and Fourteenth Amendment rights are sufficient to show the independent wrongfulness of Defendants' actions. ECF No. 50 at 28-29.  Defendants do not meaningfully respond to Plaintiff identifying independent wrongfulness in the alleged constitutional violations.  Having found that

35

Plaintiff states a claim for First Amendment retaliation, as to Defendants Barajas, Villegas, Saylor, Rinde and County of Yolo, *supra* Section II.A, Plaintiff has shown an independently wrongful act as to those Defendants.  However, Plaintiff has not shown an independently wrongful act as to the other Defendants.  The Anti-SLAPP motion to strike Plaintiff's claim for tortious interference should be granted as to those other Defendants on this basis alone.

### iii.    Intentional Acts Designed to Induce a Breach or Disruption of Contractual Relationship

At the second stage of Anti-SLAPP analysis, Plaintiff must demonstrate that the complaint is "supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Navellier*, 29 Cal.4th at 89 (cleaned up).  Plaintiff has not made a prima facie showing that Defendants engaged in intentional acts designed to induce a breach or disruption of the contractual relationship.  As explained in detail below, the parties' evidence shows that certain Defendants were upset about Plaintiff's advocacy concerning SB 1383, and were particularly upset about YFB's reported ultimatum to Mercy Coalition and later decision to discontinue holiday food baskets.  The parties' evidence also shows that certain Defendants contacted certain YFB Board Members about their concerns and sought answers and a change of course from YFB.  However, there is no admissible evidence that any of the Defendants called for Plaintiff's termination, either directly or indirectly.  Accordingly, even as to the Defendants for whom Plaintiff has shown an independently wrongful act (First Amendment retaliation), the evidence fails to support a prima facie case for tortious interference.

The Court begins with the evidence concerning the period around March 2022, when Bosley shared reports about YFB's interactions with Mercy Coalition and when Barajas and Villegas ultimately sent the March 18 Letter.  During this period, a variety of public officials, including Individual Defendants, communicated with each other and with YFB Board Members in response to reports that YFB was limiting Mercy Coalition's access to food.[17]  For example,

---

[17]  As the emails in the record indicate, a variety of employees who worked for the Government Entity Defendants were upset by Bosley's reports of Mercy Coalition losing access to food sources as a result of YFB's stance.  For example, on March 7, 2022, City of Davis Conservation Coordinator Jennifer Gilbert wrote in an email to City of Woodland Environmental Resource Analyst Rosie Ledesma, "Wow, I'm just … stunned by the news that West Sac shared.  And

Plaintiff highlights emails dated March 4 and March 18, 2022 sent by non-party officials from the City of West Sacramento to other non-parties alleging YFB and Plaintiff were engaging in "unethical" practices as to Mercy Coalition. ECF No. 40-5 (Ex. C to Juhler Decl.); ECF No. 50-2 (Ex. 5 to Singh Decl.) But the March 4 email from West Sacramento's Traci Goularte to Yolo County's Juhler characterized YFB as "unethical" with reference to an embedded email from Mercy Coalition's Bosley in which *he explained* that YFB had "made clear that they [YFB] might close our access to Nugget and Raley's in their [YFB's] food recovery program if we failed to stand in solidarity with them, in their words." ECF No. 40-5 (Ex. C to Juhler Decl.) Defendant Hiatt, on March 14, 2022, forwarded Goularte's March 4 email to YFB Board Member Kate Stille, but only with reference to Bosley's embedded email, "where Nugget is referenced."[18] ECF No. 50-2 at 134 (Ex. 4 to Singh Decl.) In any event, Goularte's email represents a single non-party's concerned reaction to a report that YFB threatened to limit Mercy Coalition's access to food – it makes no mention of an attempt to get Plaintiff fired.

The March 18 email that Plaintiff highlights similarly does not support a theory of tortious interference. That email was sent by Susan Strand, a non-party official from West Sacramento, in response to the March 18 Letter, to other non-party officials from West Sacramento and to non-party Juhler. It states, in part, "I have been so upset by this situation. It is great to finally see the unethical actions of Michael Bisch finally being fully addressed in public." ECF No. 50-2 (Ex. 5 to Singh Decl.) But there is no evidence that this email characterizing Plaintiff as unethical was sent to the YFB Board. It is irrelevant to the question of whether Defendants allegedly sought to interfere with Plaintiff's employment.[19]

---

sickened." ECF No. 50-2 (Singh Decl., Ex. 4.) It is unclear why Plaintiff believes that such emails represent a tortious campaign against him, as opposed to predictable expressions of concern about Bosley's reports.

[18] Stille is one of the founders and owners of Nugget Markets.

[19] As discussed in greater length below, Plaintiff's counsel mischaracterizes some of the email evidence concerning the period around the March 18 Letter. Plaintiff's counsel declares that employees of Defendants Yolo County, City of Davis, and City of West Sacramento "forwarded" "specific narratives of" Plaintiff being "unethical." ECF No. 50-2 (Singh Decl. ¶ 5.b). However, of the six emails cited by Plaintiff's counsel for this proposition, only a single email, the one sent by Strand and discussed in the paragraph above, refers to Plaintiff or YFB as "unethical." The assertion that employees of all three of the Government Entity Defendants forwarded that "specific

Plaintiff also highlights his email communication with West Sacramento's City Manager, Defendant Laurel.  When Plaintiff inquired about the status of ARPA funding on March 11, 2022, Laurel wrote in response, "Yes, I would like an explanation for why YFB has attempted to extort one of our local service providers." ECF No. 50-1 (Bisch Decl. at ¶ 24(d)); *id.* (Ex. 14 to Bisch Decl.) (Laurel stating, "it's not about SB 1383.  It's about … Mercy Coalition").  Plaintiff argues that Laurel accepted Bosley's narrative, but never reached out to talk with Plaintiff or YFB's program manager for their version of events.  ECF No. 50 at 14:14-16 (citing Bosley Depo Tr. at 152:20-153:24; Bisch Decl. at ¶ 23; Hatfield Decl. at ¶ 19).  However, this argument is belied by the content of Laurel's email, which specifically asks Plaintiff for YFB's explanation.  The fact that such a request was pointed and used a charged term ("extort") does not show that Laurel was involved in a campaign to pressure the YFB Board to fire Plaintiff.  Indeed, there is no evidence that Laurel forwarded this email chain to anyone else.

Plaintiff also states that on or about March 14, 2022, Laurel "attempted to leverage his known personal friendship with YFB Director Ramos," by informing Ramos that Plaintiff had engaged in improper threats.  *Id.* at 14:25-27 (citing Bisch Decl. at ¶ 26(a)).  Plaintiff also states that on or about March 14, 2022, pursuant to statements made by YFB Board Member Stille to Plaintiff, Hiatt called Stille and informed her that Plaintiff had engaged in improper threats.  *Id.* at 15:1-2 (citing Bisch Decl. at ¶ 26(c), Singh Ex. 4 at CPRA WOODLAND000086).  But these statements by Plaintiff simply show Laurel and Hiatt directing concerns about YFB's actions to YFB Board Members.  They do not show an attempt to get Plaintiff fired.[20]

Similarly, the March 18 Letter does not call for YFB to take any personnel action and does not even express a definitive narrative about what happened between YFB and Mercy Coalition.  The first paragraph of the letter included the following caveat: "We continue to gather

_____

narrative" is flatly wrong.

[20] Defendants challenge many of the statements in Plaintiff's declaration as to what Defendants said as inadmissible hearsay and double hearsay.  However, on an Anti-SLAAP motion, evidence may be considered if it is "reasonably possible" the evidence will be admissible at trial.  *See Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co.*, 6 Cal.5th 931, 947 (2019).  It appears reasonably possible that Plaintiff would be able to present direct evidence of what Defendants purportedly said at trial.

information about the role of Yolo Food Bank leadership in these actions, which may include deterring small food pantries, churches, and other organizations from accepting local government funding and retaliating against those that accept funding by curtailing their access to donated food." ECF No. 50-3 (Barajas Dec., Ex. A.) It also noted, "we hope your leadership's role has been mischaracterized[.]" *Id.* The letter later stated, "it is our understanding that the Yolo Food Bank may now be threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery programs." *Id.* It then immediately stated that "[s]uch actions, if accurate, are contrary to the shared goals of redirecting edible food from the landfill to those in need[.]" *Id.* In a subsequent sentence it used the conditional language "if true" in characterizing the alleged YFB actions. *Id.* In short, the March 18 Letter did not call for Plaintiff's termination and used relatively cautious language.

To be sure, the March 18 Letter threatened to withhold ARPA funding from YFB and appeared designed to force YFB to change course on its contracting practices with respect to Mercy Coalition and other nonprofits. It therefore involved some governmental coercion, as the Court recognized with respect to Plaintiff's First Amendment retaliation claim. However, the fact that Barajas and Villegas sought to force YFB to change its practices does not show that they sought to have YFB terminate Plaintiff's employment.

Plaintiff's theory, as to the March 18 Letter, seems to be that the Individual Defendants—after learning about Bosley's reports—should not have expressed concerns to the YFB Board, or that they should have waited on the results of a thorough investigation before expressing such concerns. That theory goes too far. There was nothing incredible about Bosley's reports. Moreover, Bosley's reports—that YFB's contracts required food pantries to abstain from contracting with Yolo County and its partner municipalities—implicated the Defendants' own policies and interest concerning food waste and food security.

Nor is there evidence showing that any of the Individual Defendants called for Plaintiff's firing. The only evidence of a municipal official seemingly contemplating that Plaintiff should be fired is in an email from Tom Stallard, a non-party councilmember from Woodland, to Defendant

39

Hiatt. Stallard stated, upon reading the March 18 Letter, "A spicy meatball, indeed. That board has to get Bisch under control or bounce him." ECF No. 50-2 at 120 (Singh Decl., Ex. 4.) But Stallard's passing response was sent only to Defendant Hiatt, not to YFB Board Members. Defendant Hiatt also testified that he does not believe he forwarded Stallard's "get Bisch under control or bounce him" email to anyone else. ECF No. 73-1 at 38 (Oct. 22, 2025 Trial Tr. at 22:3-15.)[21] Plaintiff has not made a prima facie showing of Defendants' intentional acts designed to induce a breach during the period around the March 18 Letter.

Even assuming there was such evidence, Defendants' actions around the time of the March 18 Letter did not actually cause Plaintiff to be terminated. To the contrary, the YFB Board stood behind Plaintiff in the aftermath of the March 18 Letter. Plaintiff's declaration states that, after the March 18 Letter, "YFB Board members . . . in private communications with [Plaintiff], agreed that the accusations in the letter were either false . . ." ECF No. 50-1 (Bisch Decl. ¶ 24k); *see also* Bisch Decl., Ex. 18 (Board member email to Bisch on March 21, 2022, "We know that these allegations are not true . . . I'm sure the Board has your back!"). Certain YFB Board members went so far as to propose a fake administrative leave for Plaintiff, apparently in order to respond to the concerns about Plaintiff's alleged conduct, but to avoid imposing actual sanctions.

---

[21] Plaintiff highlights Bosley's representation that Defendant Villegas made negative statements about Plaintiff ("completely driven by 'greed' and 'a power grab'") prior to the March 18 Letter that Villegas and Barajas sent the to the YFB Board. *See* ECF No. 14-2 (Singh Ex. 2 at BOSLEY000221). Bosley also testified that on March 4, 2022, Villegas shared with him that "The County Board of Supervisors are all livid with Michael Bisch." ECF No. 50-2 (Bosley Depo Tr. at 191:9-13). Bosley concluded, based on his conversations with Villegas, that the County viewed Bisch negatively because of their prior "battles around SB 1383[.]" *Id*. (Bosley Depo Tr. at 178:4-5). Plaintiff also submits an email in which non-party Jess Loren, an official with the City of Winters, states in reaction to receiving the March 18 Letter, "It seems like a gossip based letter targeting Michael Bisch. He and the BOS have been having trouble over SB 1383 for quite some time. … I watched a July 2021 meeting where Oscar [Villegas] went after YFB and it was very discouraging. There's always politics behind the scenes." ECF No. 50-2 at 156 (Singh Decl., Ex. 10.) This evidence fairly shows that Villegas and the Yolo County Board saw Plaintiff in a distinctly negative light based on Plaintiff's speech concerning SB 1383 implementation. But that reality was already apparent on the face of the March 18 Letter. This evidence does not show that the Individual Defendants actually called for Plaintiff's firing. To be sure, Plaintiff alleged in the Complaint that on March 30, 2022, Yolo County's Interim HHSA Director Nolan Sullivan told Plaintiff, "County Supervisors are upset and want their pound of flesh." ECF No. 1 ¶ 35.q. However, Plaintiff did not submit evidence at the MTS stage to substantiate that allegation and the Court does not credit it as evidence.

On April 22, 2022, YFB responded in writing to the March 18 Letter, indicating it had conducted an investigation and was unaware of incidents of YFB staff deterring non-profit partners from accepting SB 1383 funding. ECF No. 50-1 (Bisch Decl., Ex. 19). The YFB letter further provided that YFB would assign a new communication liaison but made no mention of discipline or termination of Plaintiff. *Id.* Plaintiff was not fired until May 31, 2022, over two months after the March 18 Letter, and only after the flare up concerning YFB's decision to cancel holiday food aid around the April 27 Meeting. Accordingly, there is not a prima facie evidentiary record of Defendants' conduct leading up to and including the March 18 Letter being the cause of Plaintiff's firing.

In the period around the April 27 Meeting, Plaintiff characterizes certain Defendants' action as a continued "campaign against YFB executives using private back channels to" YFB Board Members. ECF No. 50 at 16:19-20 (citing Complaint at ¶ 35.q, 35.t, 35.u). However, the evidence does not show such a campaign. Rather, it shows that only Defendants Villegas and Barajas contacted certain YFB Board Members upon learning that YFB informed several non-profit partners that it would be discontinuing a holiday food aid program, after YFB's non-profit partners affected by that discontinuation complained to Villegas and Barajas. As explained below, it strains credulity to characterize that as a campaign against Plaintiff.

In late April 2022, YFB's program director, Zane Hatfield, notified YFB's non-profit partners that holiday food aid would be discontinued due to fiscal constraints and YFB prioritizing other food aid. Certain Yolo County Supervisors soon learned about this. Defendant Villegas, through an aide, initially sought confirmation from Jeneba Lahai, executive director of one of the non-profits, Yolo County Children's Alliance, that YFB would be unable "to support the future community giveaway," and to note the impact on West Sacramento, Clarksburg and other areas. ECF No. 73-1 at 74 (Oct. 31, 2025 Trial Tr. at 20:23-25.) At Plaintiff's state court trial, Lahai testified that this request from Villegas' office did not concern her "because Mr. Villegas's office serves West Sacramento and Clarksburg, and whatever happened in West Sacramento and Clarksburg is a huge concern to the office, especially in regards to something as big as terminating a holiday food distribution." ECF No. 73-1 at 78 (Oct. 31, 2025 Trial Tr. at

41

24:16-21.) Lahai took her concerns to Villegas in the first place because "it felt like it was above me … It wasn't just YCCA that was affected. It was the entire country. It wasn't my place to coordinate and convene everyone." *Id*. at 79-80 (Oct. 31, 2025 Trial Tr. 25:27-28; 26:1-5.)

Similarly, Tico Zendejas, the executive director of another of the affected non-profits, RISE, Inc., took his concerns about YFB's discontinuation of holiday food aid to Defendant Barajas. Zendejas forwarded to Barajas an email chain between him and Hatfield that summarizes YFB's position on the discontinuation of the holiday food aid. ECF No. 40-3 (Ex. B to Barajas Decl.) Zendejas later testified at Plaintiff's state court trial that as "an executive director nonprofit [sic], it's normal for us to communicate and contact our advocates." ECF No. 73-1 at 95 (Oct. 31, 2025 Trial Tr. at 15:16-18.) Once Zenedejas had "clear information from food bank" about the discontinuation, "it makes perfect sense I would forward that information to Supervisor Barajas. …That's us being proactive and advocating for our organization."[22] *Id*. at 15:20-22. In short, the evidence shows that non-profit leaders took their frustrations to Villegas and Barajas in the hope that they would address those frustrations to YFB, not that Villegas and Barajas concocted some pretext to try to further pressure YFB.

The concerns about YFB's discontinuation of the holiday food aid came to a head at an April 27, 2022 meeting between members of the YFB Board, Plaintiff, and Hatfield.[23] At the meeting, ▮▮▮▮▮▮ noted that they had been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, respectively, concerning ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Apr. 27, 2022 Zoom Video Tr. ("Zoom Tr.") at 5:2-3. Another YFB Board Member, ▮▮▮, stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 6:3-9. ▮▮▮ also expressed, ▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 7:25-

---

[22] Zendejas also forwarded to Defendant Saylor an email chain between him and Hatfield that summarizes YFB's position on the discontinuation of the holiday food aid. ECF 73-1 at 101-103 (Singh. Supp. Ex. 6B.) Zendejas' testified that Barajas did not suggest that Zendejas forward the email to Saylor. Id. at 97 (Oct. 31, 2025 Trial Tr. at 17.) Zendejas stated there was nothing unusual about sending this to Saylor because he represents Winters, a city that RISE operates in.
[23] Pursuant to the Court's order sealing the transcript of this meeting, *infra*, Section V, the public version of this Order and Findings and Recommendations contains appropriate redactions.

42



8:1. █████ noted that █████████████████████████ *Id.* at 9:6-7; 14:18-19. █████████████, went on, noting that the YFB Board— ████████████████████ *Id.* at 9:4-6. █████ expressed that this was, ███████████████████████████████████ *Id.* at 9:11-12; 12:12. █████ then stated, █████████████████ *Id.* at 13:11-12. ███ then mentions again ███████████████ *Id.* at 13:20. And then states, █████████████ *Id.* at 14:2-3. Later, YFB Board Member █████████ states, ████████████████████████████████████████████████████████████ *Id.* at 16:22-17:1. █████████ then refers to ████ feeling ███████████████████████████████████████████████████████████ went on, █████████████████ Singh Ex. 3, Zoom Tr. at 18:17-19.

It is necessary to pause on the concept of "retribution" as expressed at the April 27 Meeting. Plaintiff repeatedly characterizes ████████ statements as showing that the Defendant Supervisors sought retribution. Complaint at ¶ 35(u); ECF No. 50 at 16, 17, 24, 29; ECF No. 50-1 at 29. And it may be that ██████ was attempting to articulate his understanding of that very point when he said, ████████████████████████████ Though precisely what ████ meant, and who ████ and ████ refers to, is hardly clear. Much clearer is that YFB Board Member ████ believed that *YFB's actions* looked like retribution *by* YFB *against* the affected non-profits. YFB Board Member ████ expressed a similar concern about YFB appearing to be selectively targeting particular agencies. Regardless, there is no direct evidence

43

that the Defendant Supervisors sought retribution.  At most, there is an opinion by ▮▮▮ on that point.

Plaintiff overstates—and at times plainly mischaracterizes—other evidence concerning the period around and after the April 27 Meeting.  For example, Plaintiff argues that several emails involving Individual Defendants reveal "a plan to use the pressure of withheld funding to YFB to pressure action against Bisch."  ECF No. 50 at 14:23-24 (citing Singh Decl. at ¶ 5; Singh Ex. 4.)  One email from Defendant Hiatt on May 24, 2022 states that funding to YFB required "first consulting with the City Manger's [sic] and County Administrator" and that "CMs and CAO should be informed of any funding request made by YFB."  ECF No. 50-2 at 92-93 (Singh Decl., Ex. 4.)  Another email from non-party Juhler to Defendant Rinde, which copies other non-parties, mentions a "recent letter from Yolo Food Bank wanting to reopen the discussion about them receiving Edible Food Recovery funding" and states "we are awaiting decision from the Board Members who received that letter to them how to proceed."  *Id.* at 93 (Singh Decl., Ex. 4.)  However, those emails do not so much as allude to Plaintiff, let alone a "plan" to "pressure action against" him.

Plaintiff also asserts that after his termination from YFB, "Defendants openly cheered and sent congratulatory emails to one another the moment they learned that Michael Bisch was terminated on May 31, 2022."  ECF No. 50 at 18:9-11 (citing Singh Decl. at ¶ 7; Singh Ex. 6).  Plaintiff badly mischaracterizes this evidence.  There is not a single Individual Defendant on the May 31, 2022 email that Plaintiff cites.  Instead, the individuals on that email are non-party Juhler and several other non-parties who appear to work for Defendant Cities of Davis, Woodland, and West Sacramento.  ECF No. 50-2 at 145 (Singh Decl., Singh Ex. 6.)  Moreover, the entirety of the supposedly congratulatory email is the text of an article in the Davis Enterprise about Plaintiff's firing and the following: "Thank you Marissa! FYI, I just saw this in the Davis Enterprise."  *Id.* The "[t]hank you" note refers to Juhler's earlier email message about her "brain dump" to "dispute the false claims in letter [sic] from the YFB."[24]  *Id.* at 146.

---

[24]  In the same portion of his brief, Plaintiff characterizes one email as, "Don Bosley observing the County's leadership has a vendetta against Plaintiff."  ECF No. 50 at 18:12 (citing ECF No.

As Defendants point out, there is simply no admissible evidence of Defendants pressuring YFB to fire Plaintiff.  Muller testified concerning his communications with Barajas that, "[t]hey didn't do anything improper.  He [Barajas] just called and said they cut this turkey thing off.  How did they – how did this happen. I said I didn't know. … He never pressured me."  ECF No. 50-2 at 210 (Singh Exhibit 13, Muller Depo Tr. at 317:10-14.)  Yolo County Counsel similarly testified at Plaintiff's state court trial that Yolo County never conditioned the provision of ARPA funding to YFB on the "termination" of Plaintiff or on any other "personnel action" against him.  ECF No. 73-1 at 62-64 (Oct. 22, 2025 Trial Tr. at 77-79.)  Indeed, there appears to be no evidence that any Defendant directly pressured YFB or its Board to fire Plaintiff.  *See* ECF 54 at 7-9.  Simply put, the evidence that Barajas and Villegas contacted YFB Board Members with concerns about YFB's discontinuation of holiday food aid, which concerns were indisputably based on accurate information, and that YFB later terminated Plaintiff, do not make out a prima facie case of tortious interference.

### b.  Defamation and Defamation Per Se (Fourth Cause of Action)

The elements of defamation are: (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.  *See Taus v. Loftus*, 40 Cal.4th 683, 720 (2007).  The Complaint identifies the following specific incidents allegedly involving defamatory statements: (1) Defendant Laurel's false statement, during a meeting on March 11, 2022, among several defendants and others, that "accus[ed] Plaintiff Bisch of extorting" Mercy Coalition by "allegedly 'terminating or threatening to terminate subcontracts with partner nonprofits who consider or accept funding from the County related to the expansion of the edible food recovery program;'" Complaint at ¶ 35(b); (2) separate calls made to YFB Board Member Ramos on or around March 14, 2022 by Laurel and Defendant Webb, which "propagated the false and defamatory narrative about Plaintiff Bisch extorting third-party nonprofits," *id*. ¶¶

50-2 at 67 (Singh Decl., Ex. 2.)  However, the relevant portion of that email—in which Bosley shares the news of Plaintiff's firing with undisclosed recipients—states, "all the government leaders, both of city jurisdictions and the county, are aware of [Plaintiff's] unacceptable actions … I have no doubt that their pressure on the YFB Board ultimately had a lot to do with this decision to terminate."  ECF No. 50-2 at 67.  It is simplification to the point of distortion to characterize this as an observation of a vendetta.

35(f), 73(e)(ii); (3) Defendant Hiatt's similar statements to YFB Board Member Stille during a call on or around March 14, 2022, *id*. ¶¶ 35(f); (4) Defendant Rinde's statement in a March 17, 2022 email to Plaintiff, which Plaintiff believes Rinde circulated to other Yolo County officials and/or to third party entities or individuals, alleging that YFB "is possibly terminating or threatening to terminate access to food for those food recovery agencies that may opt-in to accept funding from the County and cities as part of the edible food recovery program that the County's Board of Supervisors and the cities of Davis, Woodland, West Sacramento and Winter's collectively approved in October/November 2021," *id*. ¶ 35(k); and (5) the statement in the March 18 Letter signed by Defendants Barajas and Villegas and addressed to the YFB Board,[25] but also communicated to various county and city employees and third-party community stakeholders, that Plaintiff was "threatening to terminate subcontracts with partner nonprofits simply because they may also choose to accept funding from the County related to expansion of edible food recovery program,"[26] ECF No. 1 ¶ 73(a)-(b)  Plaintiff does not meaningfully allege other specific incidents of defamatory statements.[27]  Beyond specific alleged defamatory statements, Plaintiff alleges that all Defendants "propagated the false and defamatory narrative about Plaintiff Bisch extorting third-party nonprofits." *See, e.g., id*. ¶ 73(c) (making such allegation against Defendant Saylor).[28]

Each allegedly defamatory statement concerned the alleged ultimatum that YFB made to Mercy Coalition.  But as Defendants point out, Hatfield's declaration—submitted by Plaintiff—demonstrates the substantial truth of these alleged defamatory statements.  ECF 54 at 10.  Hatfield states that he informed Bosley that if he agreed to sign a contract with the County of Yolo, "it would be a potential breach of YFB agreement with Feeding America and because of that he

[25] Plaintiff alleges Defendant Rinde drafted and circulated the March 18 Letter.  ECF No. 1 ¶ 73.d.ii.

[26] As noted below, Plaintiff's rendition of that statement omits other softening language contained in the letter.

[27] While Plaintiff seeks to characterize the alleged calls for retribution by Defendants Barajas, Saylor, Webb, and Laurel as defamatory, as Defendants point out, any calls for retribution are not defamatory because they do not involve a statement about Plaintiff that can be proven true or false. *See* ECF No. 40-1 at 22.

[28] Plaintiff also specifically alleges that Defendant Saylor called the YFB Board Chair to threaten to withhold funds from YFB "until YFB addresses the problem with Plaintiff Bisch," but Plaintiff does not allege a specific defamatory statement contained in that threat.

46

would lose access to Feeding America retailers like Raley's and Nugget Market." ECF No. 14-3 (Hatfield Decl. ¶ 16.)[29] YFB's negotiating position as to Mercy Coalition was consistent with the language of an amended agreement presented by YFB to partner organizations around March 2022, which contains a provision reading, "The [YFB partner] Organization shall not enter into any other agreements pertaining to the receipt and distribution of donated food products in Yolo County apart from the Nonprofit Partner Organization Agreement and any arrangements made by YFB." ECF No. 40-5 at 4-5, 16 (Juhler Dec. ¶ 9 & Ex. E.) The undersigned thus agrees with Defendants that it was substantially true that "YFB gave Mercy Coalition an ultimatum: if you sign on with the Country you lose access to food pick-ups at Raley's and Nugget Market." ECF No. 54 at 10.

Plaintiff understandably highlights the state court jury verdict finding that YFB Board Member Dan Ramos defamed him. The specific statement at issue in the Ramos defamation claim was that Plaintiff "improperly threatened another nonprofit[.]" ECF No. 73-1 (Singh Supp. Ex. 1 at 11-12, Section IV-B Questions 3, 4, 5).[30] By virtue of Plaintif's state court verdict against Ramos, Plaintiff argues that the jury necessarily found the narrative that Plaintiff and YFB made "improper threats" to be false. ECF No. 73 at 6. However, the undersigned does not know what evidence was before the jury as to the truth of that statement or narrative. As noted above, the record in this case shows the substantial truth of the contested statement. As a result, the jury verdict against Ramos does not change the analysis here.

The only potentially actionable defamatory statement is that Plaintiff sought to "extort" Mercy Coalition. As noted above, in response to Plaintiff's inquiry about the status of ARPA

---

[29] Plaintiff similarly stated in is declaration that he instructed his staff to "adjust the delivery/pick-up schedule for Mercy Coalition so that in the event Mercy Coalition was not agreeable to stay exclusive with us, they could still access YFB's resources but not directly pickup said resources from Raley's and Nugget Market." ECF No. 50-1 (Bisch Dec. ¶ 21.)
[30] The verdict form concerning his state court defamation claim against YFB Board Member Ramos asked whether Ramos "state[d] to other [YFB] Board members" that Plaintiff "improperly threatened another nonprofit?" *Id*. As Plaintiff notes, the jury found that statement was *not* "substantially true," found that Ramos "fail[ed] to use reasonable care to determine the truth or falsity of the statement(s)," and lacked "reasonable grounds for believing the truth of the statement(s)[.]" *Id*. Plaintiff thus reasons that the state court jury "specifically found" the "narrative" of Plaintiff improperly threatening other nonprofits to be untrue, and that such narrative "was not investigated, and was spread with malice." ECF No. 73 at 6.

funding to YFB, on March 11, 2022, Defendant Laurel responded, "Yes, I would like an explanation for why YFB has attempted to extort one of our local service providers." ECF No. 50-1 (Bisch Decl. at ¶ 24(d)); *id.* (Ex. 14 to Bisch Decl.) (Laurel stating, in a subsequent email as part of the same chain, "It's about your recent treatment of the Mercy Coalition"). Defendant Laurel copied Defendant Hiatt on that email, satisfying the "publication" element of defamation. *See Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (1999) ("Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made. Publication need not be to the 'public' at large; communication to a single individual is sufficient.")[31]  While Laurel's email pinned the alleged extortion on YFB, and not Plaintiff specifically, in the context of other information about Plaintiff's role in the Mercy Coalition situation circulating, Hiatt could have understood the Laurel was accusing Plaintiff himself of extortion.

Plaintiff makes much of a supposed narrative of extortion throughout the Complaint and in his briefing. *See, e.g.,* ECF No. 1 ¶¶ 35.f, 73.e.ii (alleging Defendants Laurel and Webb called YFB Board Member Ramos on or around March 14, 2022 and "propagated the false and defamatory narrative about Plaintiff Bisch extorting third-party nonprofits"); *id*. ¶ 35.f (alleging Defendant Hiatt made similar statements to YFB Board Member Stille during a call on or around March 14, 2022). However, there is no evidence that Laurel used the term extortion on another occasion or that other Defendants used the term extortion.[32]  However, as indicated above, the

---

[31] Plaintiff himself increased the circulation of this allegedly defamatory email by voluntarily sharing it on March 13, 2022 with Winters City Councilmember Jesser Loren and West Sacramento Mayor Martha Guerrero. ECF No. 50-1 (Bisch Decl. at ¶ 24(f).)

[32] Plaintiff also argues that this allegedly defamatory narrative was accompanied by a "shocking" narrative where Plaintiff was "literally vilified as unethical repeatedly." ECF No. 50 at 31:24-25. However, as with certain characterizations of the evidence elsewhere, *see supra* Section III.D.3a.iii, Plaintiff's characterization of the evidence here is exaggerated. Plaintiff cites *dozens* of email threads purporting to support his contention about Plaintiff's "repeated[]" "vilifi[cation] as unethical." *See* ECF 50 at 31-32 (citing "Singh Exhibit 4 at CPRA WOODLAND 000008-9, 000013-14, 000022-23, 000028, 000038-41, 000054-60, 000061-65, 000066-69, 000070-77, 000078-81, 000082-83, 000086-88; 0000111, 000218-220; Singh Exhibit 5; Singh Exhibit 6"). But only two of those threads—the emails discussed above from non-party employees of West Sacramento—characterize Plaintiff or YFB's leadership as unethical, and neither come from a Defendant. In any event, a statement that someone is unethical is broadly understood to be a

48

single publication from Laurel to Hiatt is sufficient to satisfy the publication element of defamation as to Laurel.

Defendants argue that use of the term "extortion" was hyperbole that is not actionable as defamation. ECF 40-1 at 24. While courts have frequently found an allegation of extortion to be hyperbole, *id*. (citing cases), those findings depended on the specific context in each case. Here there is a fair argument that Laurel was not formally accusing Plaintiff of criminal extortion, but rather of unreasonable negotiating practices. *See Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler,* 398 U.S. 6, 14 (1970) (noting that while "extortion" can refer to a crime, it is more routinely used as a "vigorous epithet" by those who consider an individual's "negotiating position extremely unreasonable"). However, that is a disputed question best left for a trier of fact. As a result, the evidence sufficiently establishes the "defamatory" element of defamation at this phase of the case.

Defendants argue that the actual malice standard applies because Plaintiff had become a limited public figure during public controversy over the implementation of SB 1383 and edible food recovery mandates. ECF No. 40-1 at 25; 54 at 11. Assuming that the actual malice standard applies, there is sufficient evidence to believe that Laurel at the very least acted with reckless disregard for the truth of his "extortion" statement.[33] While Bosley had communicated directly to Laurel about YFB's negotiating position, he had not shared information that would have reasonably allowed Laurel to believe that YFB was literally extorting Mercy Coalition. ECF No. 40-4 (Bosley Decl.) ("I informed [Villegas] what Mr. Bisch told me about removing our access to Nugget Market and Raley's food and the need to stand in solidarity with YFB … I recounted the same information to West Sacramento City Manager Aaron Laurel."). For the foregoing reasons,

statement of opinion. *See Kane v. Chester Cty.*, 811 F.App'x 65, 70 (3d Cir. 2020) (statements in a letter that plaintiff's actions were "'unethical, unprofessional, and harassing'" held to be "nonactionable opinions"); *Lewis v. Time, Inc*., 710 F.2d 549, 554 (9th Cir. 1983) (holding that the statement in an article that plaintiff was "an unethical and dishonest lawyer who should be disbarred" was a statement of opinion).

[33] The verdict forms in Plaintiff's state court trial required a finding of actual malice—through either a finding of knowledge of falsity or reckless disregard for truth of falsity—indicating that the state court believed Plaintiff was a public figure as to similar allegedly defamatory statements in that case.

Plaintiff has made out a prima facie case of defamation against Laurel and, on a respondeat superior theory, West Sacramento.  But Plaintiff has otherwise failed to make out a defamation claim against other of the Defendants, due to the substantial truth of the narrative that YFB, under Plaintiff's leadership, was threatening to withhold Mercy Coalition's access to Nugget and Raley's if it were to contract with Yolo County.

### IV.    Leave to Amend

The Court has considered whether Plaintiff should be granted leave to amend his claims. Federal Rule of Civil Procedure 15 provides that a court "should freely give leave when justice so requires."  However, a court may deny leave to amend where amendment would be futile.  *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020).  A court may also deny leave to amend due to undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the opposing party. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).  Plaintiff has not previously amended the complaint, and thus for purposes of the claims dismissed pursuant to Rule 12(b)(6), the Court will consider only whether leave to amend would be futile.

Plaintiff only briefly argues for leave to amend in his opposition papers and has not argued that he can plead any additional facts if given leave to amend.  In opposing the MTS, Plaintiff notes that federal courts may allow leave to amend when an anti-SLAPP motion is granted.  ECF No. 50 at 21.  In opposing the motion to dismiss, Plaintiff does not offer argument concerning leave to amend but requests it in the concluding sentence of the brief.  ECF No. 51 at 26.

The Ninth Circuit has recognized that "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment."  *Verizon Delaware, Inc. v. Covad Comm. Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004).  However, the Ninth Circuit has also held that factual Anti-SLAPP challenges, like the MTS presented here, may be filed pursuant to Rule 56(b) "at any time until 30 days after the close of all discovery."  *Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016).  As an Anti-SLAPP motion may functionally operate as a motion

50

for summary judgment, it cannot be that leave to amend after a decision on such motion is mandatory. The Ninth Circuit has stated that when a motion to strike challenges the factual sufficiency of a claim, the Rule 56 standard will apply. *See Planned Parenthood*, 890 F.3d at 834. In such circumstances, discovery must be allowed, with an opportunity to supplement the record. *Id*. As noted above, in this case, the Court allowed Plaintiff to supplement the record with evidence from discovery and trial in his state court case. ECF No. 72. On a factual Anti-SLAPP challenge like the one presented here, the Court may decline leave to amend for stricken claims. *See Todd v. Lovecruft*, 2020 WL 60199, *21-22 (N.D. Cal. Jan. 6, 2020) (finding under *Planned Parenthood* that when a motion to strike raises a factual challenge and is evaluated under Rule 56, then free leave to amend is not required); *cf. Nguyen v. United States*, 792 F.2d 1500, 1503 (9th Cir. 1986) (explaining that a court will ordinarily be reluctant to allow leave to amend to a party against whom summary judgment has been entered).

### A. Claims Dismissed Pursuant to Rule 12(b)(6)

As noted above, the Court recommends granting Defendants' motion to dismiss the First Amendment retaliation claim as to several Defendants, and dismissing the Due Process claim entirely. The Court recommends dismissal of the retaliation claim as to several Defendants because there are insufficient factual allegations demonstrating that those Defendants did anything more than engage in speech. There were no allegations that they threatened to withhold funding or directly attempted to get Plaintiff fired. The evidence submitted in connection with the MTS suggests that Plaintiff likely cannot allege such facts and amendment would likely be futile. However, "[l]eave to amend should be granted unless the district court 'determines that the pleading could not possibly be cured by the allegation of other facts.'" *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc)). The Court cannot say that the pleading defects as to the First Amendment retaliation claim could not possibly be cured. Accordingly, Plaintiff should be given leave to amend his First Amendment retaliation claim.

As to due process, the Court finds that amendment should be permitted as to Plaintiff's procedural due process claim but denied as to Plaintiff's substantive due process claim. While

51

amendment would likely be futile as to the procedural due process claim, there is some possibility the defects could be cured by amendment. The evidentiary record demonstrates that Plaintiff did not have an employment contract that guaranteed a duration of employment at the time of his termination. He likely cannot allege that he could only be terminated for cause. *See* ECF No. 40-1 at 18; ECF No. 54 at 6. However, in certain circumstances, state law creates a "limited exception[] to at-will employment … that can support a property interest." *Armstrong v. Reynolds*, 22 F.4th 1058, 1066-68 (9th Cir. 2022) (reversing dismissal of procedural due process claim brought by a plaintiff who had been fired from her at-will employment and holding that Nevada's whistleblower protection laws created a protected property interest in the plaintiff's employment under the circumstances of that case). To be clear, the Court believes it is unlikely that Plaintiff will be able to allege facts and the existence of a state law that created a protected property interest in his employment with YFB. However, given that amendment would not necessarily be futile, he should be given the opportunity to amend his procedural due process claim.

The Court recommends Plaintiff's substantive due process claim be denied without leave to amend because as discussed *supra* it is duplicative of his retaliation claim. Accordingly, leave to amend this claim would be futile.

### B. Claims Dismissed Pursuant to Anti-SLAPP Motion to Strike

As noted above, the Court recommends that the tortious interference claim be stricken, and the defamation claim be stricken except as to Defendant Laurel. As the parties have been allowed the opportunity to conduct discovery and have supplemented the record, the Court is not required, in this factual-challenge posture, to allow leave to amend as to claims that are stricken. *See Todd*, 2020 WL 60199, at *21-22. The Court, having thoroughly considered the record, recommends that leave to amend be denied as to the tortious interference and defamation claims.

### V.   Motion to Seal (ECF No. 49)

Plaintiff filed a motion to "provisionally seal" three exhibits pertaining to the MTS. ECF No. 49. The exhibits are: 1) Singh Exhibit 3, the transcript of an April 27, 2022 Yolo Food Bank (YFB) Board meeting via Zoom (the "Transcript"); 2) Singh Exhibit 15, emails from Plaintiff to

52

YFB Human Resources that were produced in the related state court matter (the "Emails"); and 3) Bisch Exhibit 25, YFB Board meeting minutes from October 27, 2021 (the "Minutes").  Plaintiff takes the position that none of these documents meet the compelling reasons standard for sealing, but anticipates that a third-party, YFB, would assert confidentiality over the three exhibits.

YFB filed a response (ECF No. 52) stating that it has no objection to the filing of the E-mails or Minutes, but it does argue that the Transcript should be maintained under seal.  YFB contends that a "controversy exists" regarding whether the individuals who attended the Zoom meeting were aware that it was being recorded.  ECF No. 52 at 2-3.  YFB contends that the Transcript should not be admissible in evidence under California Penal Code 632(d), and that the Transcript is not needed because Plaintiff attended the meeting and could testify as to his memory of the meeting.  *Id.* at 3-4.

Requests to seal documents in this district are governed by Local Rule 141.  Rule 141 provides that documents may only be sealed by a written order of the court after a specific request to seal has been made.  LR 141(a).  However, a mere request to seal is not enough.  Rule 141(b) requires that "[t]he 'Request to Seal Documents' shall set forth the statutory or other authority for sealing[.]"  Local Rule 141(b).

The Court starts "with a strong presumption in favor of access to court records."  *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).  There is a strong presumption in favor of access "based on the need for federal courts, although independent — indeed, particularly because they are independent — to have a measure of accountability and for the public to have confidence in the administration of justice."  *Id*. (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir.1995)).  A request to seal material must normally meet the high threshold of showing that "compelling reasons" support secrecy.  *Id*. (citing *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).

The proponent of sealing bears the burden of overcoming the presumption in favor of access to court record.  *Kamakana*, 447 F.3d at 1178.  Compelling reasons for sealing may exist where "court files might have become a vehicle for improper purposes, such as the use of records

53

to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1179 (citation and quotation omitted).  A lesser standard applies when the court is considering sealing documents in the context of a non-dispositive motion: "The public policies that support the right of access to dispositive motions, and related materials, do not apply with equal force to non-dispositive materials." *Id*.  "A 'good cause' showing under Rule 26(c) will suffice to keep sealed records attached to non-dispositive motions." *Id*. at 1180.

The Transcript is 28 pages long and captures the statements at a meeting of YFB Board Members and YFB leadership, including Plaintiff and Hatfield.  YFB has submitted the declarations of three persons who were present at the meeting and state they did not consent to the recording.  ECF No. 52-1.  The Court need not determine at this time whether the meeting was recorded in violation of California Penal Code 632(d), or whether the transcript is admissible in evidence.  As discussed above, evidence may be considered in the context of an Anti-SLAAP motion if it is "reasonably possible" the evidence will be admissible at trial.  *See Sweetwater Union High Sch. Dist*., 6 Cal.5th at 947.  The Court does find that YFB has offered compelling reasons that the Transcript should remain under seal, grants motion to seal (ECF No. 49) as to Singh Exhibit 3, the transcript of an April 27, 2022 Yolo Food Bank Board meeting via Zoom, and otherwise denies the motion to seal.

**VI.    Conclusion**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiff's Motion to Seal be GRANTED only as to Singh Exhibit 3:

1.  The Clerk of the Court shall file Singh Exhibit 3 under seal;

2.  An unredacted version of this Order and Findings and Recommendations be filed under seal; and

3.  Plaintiff shall file Singh Exhibit 15 and Bisch Exhibit 25 on the public docket.

Further, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant's Motion to Dismiss (ECF No. 9) be GRANTED in part and DENIED in part as follows:

    a.  Defendants Laurel, Hiatt, Webb, West Sacramento, Davis, and Woodland

54

should be dismissed as to the First Amendment retaliation claim with leave to amend, and

    b. Plaintiff's due process claim should be dismissed, with leave to amend only the procedural due process component of that claim;

2. Defendants' Motion to Strike be GRANTED in part and DENIED in part as follows:

    a. Plaintiff's tortious interference claim should be stricken as to all Defendants without leave to amend, and

    b. Plaintiff's defamation claim should be stricken as to all Defendants, except as to Defendant Laurel, without leave to amend; and

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). **Within fourteen days** after being served with these findings and recommendations, either party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 20, 2026

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE